# United States Court of Appeals
# for the Federal Circuit

_____

WALKER DIGITAL, LLC,

Plaintiff-Appellant,

v.

EXPEDIA, INC. et al.,

Defendants-Appellees.

_____

No. 2013-1520, 2014-1080

_____

Appeal from the United States District Court for the District of Delaware in
Case No. 11-cv-313-SLR, Judge Sue L. Robinson

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WALKER DIGITAL, LLC,

Plaintiff-Appellant,

v.

AMAZON.COM, INC.,

Defendant-Appellee.

_____

No. 2013-1521, 2014-1077

_____

Appeal from the United States District Court for the District of Delaware in
Case No. 12-cv-140-SLR, Judge Sue L. Robinson

WALKER DIGITAL, LLC,

Plaintiff-Appellant,

v.

BARNES & NOBLE, INC.,

Defendant-Appellee.

_____

No. 2013-1522, 2014-1090

_____

Appeal from the United States District Court for the District of Delaware in
Case No. 12-cv-141-SLR, Judge Sue L. Robinson

--------------------------------------------------------------------------------------------------------------------

WALKER DIGITAL, LLC,

Plaintiff-Appellant,

v.

EXPEDIA, INC.,

Defendant-Appellee.

_____

No. 2013-1523, 2014-1081

_____

Appeal from the United States District Court for the District of Delaware in
Case No. 12-cv-142-SLR, Judge Sue L. Robinson

_____

**NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT
WALKER DIGITAL, LLC**

Anthony G. Simon
Benjamin R. Askew
Michael P. Kella
Stephanie H. To
Timothy D. Krieger
THE SIMON LAW FIRM, P.C.
800 Market Street, Suite 1700
St. Louis, Missouri 63101
Telephone: (314) 241-2929
Facsimile: (314) 241-2029
asimon@simonlawpc.com
baskew@simonlawpc.com
mkella@simonlawpc.com
sto@simonlawpc.com
tkrieger@simonlawpc.com

Timothy E. Grochocinski
INNOVALAW, P.C.
1900 Ravinia Place
Orland Park, Illinois 60462
teg@innovalawpc.com

Marc A. Fenster
Benjamin T. Wang
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-6991
mfenster@raklaw.com
bwang@raklaw.com

*Counsel for Plaintiff-Appellant Walker Digital, LLC*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Walker Digital, LLC certifies the following:

1.      The full name of every party or amicus represented by me is:

Walker Digital, LLC

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented is: N/A

3.      All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented: N/A

4.      The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear for the party in this Court are:

**The Simon Law Firm, P.C.**            **Bayard, P.A.**
Anthony G. Simon                        Richard D. Kirk
Benjamin R. Askew                       Stephen B. Brauerman
Michael P. Kella                        Vanessa R. Tiradentes
Stephanie H. To
Timothy D. Krieger

**InnovaLaw, P.C.**                     **Russ, August & Kabat**
Timothy E. Grochocinski                 Marc A. Fenster
                                        Benjamin T. Wang

Dated:  February 27, 2014            /s/ Anthony G. Simon
                                     Anthony G. Simon
                                     *Attorney for Plaintiff-Appellant*

i

# **TABLE OF CONTENTS**

Pursuant to Federal Circuit Rule 28(d)(1)(B), confidential material has been redacted from this brief. Confidential information relating to a confidential agreement that is subject to protective orders in district court has been omitted from pages 3-19, 22-42, 47, 49-51, and 53.

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES............................................................3

STATEMENT OF THE CASE................................................................3

I.   THE -313 CASE ...........................................................................5

II.  THE -140, -141, AND -142 CASES.............................................7

III. THE ██████████████████████ ..........................................8

  A.  The ████████████ .................................................8

  B.  The ██████████████ .........................................9

  C.  The ████████████████ ...............................10

  D.  The Conflicting Statement Regarding ██████████ ..11

IV.  DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING ......12

V.   THE DISTRICT COURT'S DISMISSAL FOR LACK OF STANDING.......15

VI.  THE DISTRICT COURT'S SUBSEQUENT DISMISSAL WITH PREJUDICE…...............................................................17

SUMMARY OF ARGUMENT .............................................................18

ARGUMENT ......................................................................................20

I.   STATEMENT OF THE STANDARD OF REVIEW ...................20

  A.  Standing...................................................................20

  B.  Exercise of subject matter jurisdiction.......................21

C. Dismissal with prejudice ...........................................................................21

II. THE DISTRICT COURT ERRED IN FINDING THAT █████████ ████████████████████ CLEARLY AND UNAMBIGUOUSLY TRANSFERRED █████████ .................................22

   A. The Four Corners of the ████████████████ t Evidence That The ███████ ...23

     1. The only granting language applies only to the ██████████ ████████ . ...........................................24

     2. The district court's interpretation of the ██████████ conflicts with the entire scheme of ████████ ...........................................27

     3. The district court's interpretation of the ██████████ is undermined by the fact that ███████████████ ██████ . ...........................................28

     4. The district court's interpretation of the ██████████ conflicts with the ████████████████ and the circumstances surrounding execution of the ████████████ . ...................29

III. THE DISTRICT COURT ERRED BY FAILING TO RESOLVE ANY AMBIGUITY IN THE ██████████████ AGREEMENT WITH THE UNEQUIVOCAL EXTRINSIC EVIDENCE CONFIRMING THAT ███████ ████████████████████████████ ...........................................33

   A. ████████████████████████ .......................34

   B. ████████████████████████ ..................36

   C. Walker Digital's and eBay's ████████████ Confirm ████████████████ ....................38

Confidential Material Redacted Pursuant to Protective Order

   D. Walker Digital's and eBay's Actions ██████████████ Confirm the ████████████████ ...........................................39

IV.  THE DISTRICT COURT ERRED IN EXERCISING SUBJECT MATTER
      JURISDICTION TO DISMISS THE CASE WITH PREJUDICE AFTER
      WALKER DIGITAL FILED ITS NOTICES APPEALING THE DISTRICT
      COURT'S DISMISSAL FOR LACK OF STANDING ...............................43

V.  TO THE EXTENT THE DISTRICT COURT HAD JURISDICTION TO
      DISMISS WITH PREJUDICE, THE DISTRICT COURT ERRED IN
      DISMISSING WITH PREJUDICE AND WALKER DIGITAL SHOULD BE
      ENTITLED TO CURE ANY STANDING DEFECT.....................................46

    A.  The District Court's Dismissal Should Be Reversed Because It Did Not
          Extinguish Any Claims and Its Implications Are Unclear.........................47

    B.  As Long as the Defect Is Curable, a Party Should Not Be Required to
          "Offer Evidence" of a Specific "Plan to Cure"...........................................48

    C.  The District Court's Conclusion that "Plaintiff Was Offered Multiple
          Opportunities to Cure the Standing Defect" Inaccurately Portrays the
          History of the Case .......................................................................................50

    D.  The District Court's Dismissal Was Procedurally Improper .....................52

CONCLUSION ......................................................................................................53

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Alfred E. Mann Found. For Scientific Research v. Cochlear Corp.*,
   604 F.3d 1354 (Fed. Cir. 2010) ...........................................................20

*Alvin v. Suzuki*,
   227 F.3d 107 (3d Cir. 2000) ................................................................46

*Anderson v. Ayling*,
   396 F.3d 265 (3d Cir. 2005) ................................................................21

*City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*,
   624 A.2d 1191 (Del. 1993)...................................................................33

*Cordis Corp. v. Boston Scientific Corp.*,
   868 F. Supp. 2d 342 (D. Del. 2012) ....................................................35

*DCV Holdings, Inc. v. ConAgra, Inc.*,
   889 A.2d 954 (Del. 2005)....................................................................23

*Dow Chem. Co. v. Nova Chems. Corp.*,
   458 Fed. Appx. 910 (Fed. Cir. 2012) ..................................................23

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*,
   702 A.2d 1228 (Del.1997)...................................................................35

*Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*,
   551 A.2d 433 (Del. 1988).....................................................................35

*Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*,
   561 F.3d 1340 (Fed. Cir. 2009) ...........................................................22

*Gilda Indus., Inc. v. United States*,
   511 F.3d 1348 (Fed. Cir. 2008) ..................................................... 43, 44

*GMG Capital Invs., L.L.C. v. Athenian Venture Partners I, L.P.*,
   36 A.3d 776 (Del. 2012).................................... 22, 23, 27, 31, 33, 35

*Griggs v. Provident Consumer Discount Co.,*
    459 U.S. 56 (1982) ........................................................................ 43, 44

*H.R. Techs., Inc. v. Astechnologies, Inc.,*
    275 F.3d 1378 (Fed. Cir. 2002) ........................................... 21, 46, 49

*Intel Corp. v. American Guarantee & Liability Ins. Co.,*
    51 A.3d 442 (Del. 2012) ............................................................... 28

*Kasap v. Folger Nolan Fleming & Douglas, Inc.,*
    166 F.3d 1243 (D.C. Cir. 1999) ..................................................... 48

*Kuhn Const., Inc. v. Diamond State Port Corp.,*
    990 A.2d 393 (Del. 2010) .............................................................. 26

*Lorillard Tobacco Co. v. Am. Legacy Found.,*
    903 A.2d 728 (Del. 2006) .............................................................. 22

*Lucent Technologies, Inc. v. Gateway, Inc.,*
    543 F.3d 710 (Fed. Cir. 2008) ...................................................... 21

*McClatchy Newspapers v. Cent. Valley Typographical Union No. 46,*
    686 F.2d 731 (9th Cir. 1982) ......................................................... 44

*Motorola, Inc. v. Amkor Tech., Inc.,*
    849 A.2d 931 (Del. 2004) .............................................................. 35

*Newton v. Consol. Gas Co.,*
    258 U.S. 165 (1922) ...................................................................... 44

*Osborn ex rel. Osborn v. Kemp,*
    991 A.2d 1153 (Del. 2010) .............................. 23, 27, 28, 29, 30, 31

*Radio Corp. of Am. v. Phil. Storage Battery Co.,*
    6 A.2d 329 (Del. 1939) ................................................................. 22

*Rite-Hite Corp. v. Kelley Co., Inc.,*
    56 F.3d 1538 (Fed. Cir. 1995) ...................................................... 20

*Sicom Sys., Ltd v. Agilent Techs., Inc.,*
 427 F.3d 971 (Fed. Cir. 2005) ............................................................52

*Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.,*
 524 F.3d 1229 (11th Cir. 2008) .........................................................48

*Tyco Healthcare Group L.P. v. Ethicon Endo-Surgery, Inc.,*
 587 F.3d 1375 (Fed. Cir. 2009) .................................................. 21, 50

*United States  v. Leppo,*
 634 F.2d 101 (3d Cir. 1980) ....................................................... 43, 44

*Univ. of Pittsburgh v. Varian Med. Sys., Inc.,*
 569 F.3d 1328 (Fed. Cir. 2009) ................................. 21, 46, 47, 49

*Vanguard Research, Inc. v. PEAT, Inc.,*
 304 F.3d 1249 (Fed. Cir. 2002) .........................................................21

*Venen v. Sweet,*
 758 F.2d 117 (3d Cir. 1985) ..............................................................43

*West v. Keve,*
 721 F.2d 91 (3d Cir. 1983) ................................................................44

*Zenith Elecs. Corp. v. United States,*
 884 F.2d 556 (Fed. Cir. 1989) ..........................................................45

## Statutes

28 U.S.C. § 1295(a)(1) .............................................................................3

28 U.S.C. § 1331 .....................................................................................2

28 U.S.C. § 1338(a) ................................................................................2

## Other Authorities

11 Williston on Contracts § 32:7 (4th ed.)....................................... 31, 32

Allan Ides, *The Authority of a Federal District Court to Proceed After a Notice of Appeal Has Been Filed,* 143 F.R.D. 307 (1992) ..................................44

## **Rules**

Del. Local Rule 7.1.2(b) ................................................................... 18, 53

Fed. R. App. P. 4(a)(1)(A) .....................................................................2

Fed. R. Civ. P. 41(b) ...................................................................... 43, 45

Fed. R. Civ. P. 60(a)............................................................................45

# STATEMENT OF RELATED CASES

No other appeals in or from the same civil action or proceeding were previously before this or any other appellate court.

On this consolidated appeal, the following appeals are before this Court pursuant to this Court's November 27, 2013 Order, (Doc. 46), and February 6, 2014 Order, (Doc. 50):

- *Walker Digital, LLC v. Expedia, Inc. and Amazon.com, Inc. and American Airlines, Inc., and Zappos.com, Inc*. (Appeal Nos. 2013-1520, 2014-1080), appeal from the United States District Court for the District of Delaware (11-cv-313-SLR);

- *Walker Digital, LLC v. Amazon.com, Inc.* (Appeal Nos. 2013-1521, 2014-1077), appeal from United States District Court for the District of Delaware (12-cv-140-SLR);

- *Walker Digital, LLC v. Barnes & Noble, Inc*. (Appeal Nos. 2013-1522, 2014-1090), appeal from United States District Court for the District of Delaware (12-cv-141-SLR); and

- *Walker Digital, LLC v. Expedia, Inc.* (Appeal Nos. 2013-1523, 2014-1081), appeal from United States District Court for the District of Delaware (12-cv-142-SLR).

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Delaware had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  On June 19, 2013, the district court granted Defendants-Appellees Amazon.com, Inc.'s, Zappos.com, Inc.'s, Expedia, Inc.'s, and Barnes & Noble, Inc.'s motions to dismiss under Fed. R. Civ. P 12(b)(1) for lack of standing.  A0015, A0017.  On July 19, 2013, Walker Digital timely filed notices of appeal regarding this ruling.  28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A); A3068; A3070; A3072; A3074.

In July 2013, Defendants-Appellees Amazon.com, Inc., Zappos.com, Inc., Expedia, Inc., and Barnes & Noble, Inc. filed a motion for attorneys' fees and dismissal with prejudice.  A2933-34.  On October 16, 2013, the district court denied Defendants' motion for attorneys' fees and dismissal with prejudice.  A0022.  The district court's denial was without prejudice to renew.  A0022.  On October 25, 2013, in response to Defendants-Appellees Amazon.com, Inc.'s Zappos.com, Inc.'s, and Expedia, Inc.'s motion for clarification, the district court granted Defendants' request for clarification and Defendants' request for dismissal with prejudice.  A0026.  On November 11, 2013, Walker Digital timely filed notices of appeal of the district court's order, including the district court's grant of Defendants' motion for clarification and dismissal with prejudice.  A3601; A3603; A3605; A3607; 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

Confidential Material Redacted Pursuant to Protective Order

The orders appealed from are final.  This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Did the district court err in granting Defendants' motion to dismiss for lack of standing, finding that the ███████████████ clearly and unambiguously transferred the patents-in-suit to eBay?

2.    Did the district court err in failing to resolve any ambiguity in the ██████████████ with the unequivocal extrinsic evidence, which confirmed that the parties did not intend to ██████████████████?

3.    Did the district court err in exercising subject matter jurisdiction to subsequently dismiss Walker Digital's claims with prejudice after Walker Digital filed its notices of appeal of the district court's dismissal for lack of standing?

4.    If the district court had jurisdiction to dismiss Walker Digital's claims with prejudice, did the district court err in dismissing with prejudice?

## STATEMENT OF THE CASE

This appeal relates to several actions for patent infringement brought by Walker Digital against Defendants-Appellees Amazon.com, Inc. ("Amazon"), Zappos.com, Inc. ("Zappos"), Expedia, Inc. ("Expedia"), and American Airlines, Inc. ("American Airlines") in Civil Action No. 1:11-cv-00313 ("the -313 case") and Amazon.com, Barnes & Noble, Inc. ("Barnes & Noble"), and Expedia, Inc.

("Expedia") in Civil Actions Nos. 1:12-cv-00140, -141, and -142, respectively

("the -140, -141 and-142 cases") in the United States District Court for District of

Delaware.   A0221; A0614; A0651; A0687.

Walker Digital filed a notice of appeal on July 19, 2013, A3068, appealing

the district court's dismissal of the -313 case for lack of standing, A0015, A0017,

which gave rise to appeal no. 2013-1520.  Walker Digital filed three notices of

appeal on July 19, 2013, A3070, A3072, A3074, appealing the district court's

dismissal of the -140, -141, and -142 cases for lack of standing, A0015, A0017,

which gave rise to appeals nos. 2013-1521, 2013-1522, and 2013-1523.  The

district court's dismissal of all four of these cases was based on its interpretation of

the December 9, 2011 ███████████████████████████████████████

███████████████████████████████████.  A0013, A0015.

After dismissing the -313 case and the -140, -141, and -142 cases for lack of

standing, the district court dismissed each of these four cases with prejudice.

A0026.  Walker Digital filed a notice of appeal in the -313 case, appealing the

district court's dismissal of the case with prejudice, which gave rise to appeal no.

2014-1080.  A3601.   Walker Digital also filed notices of appeal in the -140, -141,

and -142 cases, appealing the district court's dismissal of these cases with

prejudice, A3603; A3605; A3607, which gave rise to appeals nos. 2014-1077,

2014-1081, and 2014-1090.

## I.  THE -313 CASE

In April 2011, Walker Digital filed a complaint against eBay, Amazon, Zappos, Expedia, American Airlines, and several other defendants for infringement of U.S. Patent Nos. 7,827,056 ("the '056 patent") and 7,831,470 ("the '470 patent") in the -313 case.  A0221.  Only the '056 patent was asserted against eBay in this action.  A0245-47.  The '056 patent was also asserted against Amazon, Zappos, America Airlines, Expedia, and several other defendants.  A0232-52.  The '470 patent was only asserted against Amazon and two other defendants.  A0225-32.



In December 2011, ███████████████████

███████████████████████████████████████

███████████████████████████.  A0867-925, 867, 869-70, 882-883, A1787-1845, 1789-90, 1802-03.  ███████████████████

███████████████  which was asserted against eBay (and other defendants) in the -313 case ███████████████████████  A0867; A1787.  The '942 patent was asserted against eBay (and other defendants including Amazon, Expedia, and Barnes & Noble) in Civil Action No. 11-cv-0315 ("the -315 case").  A0330; A0334-35.

███████████████████████████████████

███████████████████████████████████████

5

████████████. A0920- A0923; A1840-A1845.  Specifically, ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ A0920; A1840 (emphasis

removed).  ████████████████████████████████████

████████████████████████████████████████████████

████████████████ A0923; A1843.

████████████████████████████, Walker Digital

stipulated to dismissal of all claims against eBay in the -313 and -315 cases

pursuant to the ████████████████.  A0607-A0608; A0609-A0610.

Walker Digital subsequently dismissed the -315 case against the remaining

Defendants by joint stipulation pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) for

reasons unrelated to standing.  Walker Digital continued to pursue its patent

infringement claims against Amazon, Zappos, American Airlines, and Expedia

(and others)—and eBay knew this.  A2067-68 at ¶¶ 4-6; A2116 at ¶ 7; A2436-37 at

¶¶ 4-6; A2627; A2655, p. 111:11-18; A2562; A2590, p. 111:11-18.

In November 2012, Defendants Amazon, Zappos, and Expedia filed a

motion to dismiss for lack of standing in the -313 case.  A0840.  Defendants'

motion argued that Walker Digital lacked constitutional standing because it

transferred the '056 and '470 patents ████████████████████████████

and therefore lost standing to sue upon the execution of the ███████████

██████. A0840; A0847-48.

## II.   THE -140, -141, AND -142 CASES

Walker Digital asserted U.S. Patent No. 8,112,359 ("the '359 patent") in the

-140, -141, and -142 cases.  A0192; A0614; A0651; A0687.  When ██████████

█████████████████████████████████████, the application that issued as

the '359 was still pending.  A0882-83; A1802-03; A0192.  Neither the '359 patent

nor its underlying application ██████████████████████████████████

██████████████.  A0923; A1843.

Walker Digital filed its complaints for infringement of the '359 patent

against Amazon (the -140 case), Barnes & Noble (the -141 case), and Expedia (the

-142 case) in February 2012.  A0192; A0614; A0651; A0687.  In February 2013,

Defendants in the -140, -141, and -142 cases filed motions to dismiss for lack of

standing.  A1754-56.  Defendants' motions argued that Walker Digital lacked

constitutional standing because it transferred the '359 patent to ██████████████

█████████████████████████████████████████████████████████████████

██████  A1754; A1763-64.

**III.  THE** ███████████████████████████████

   **A.   The** ██████ **Language**

As explained, the █████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████



A0920; A1840 (emphasis in original).  ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

A0923; A1843.    Schedule A does not include the '056, '470, '942, or '359

patents (or underlying applications).  A0923; A1843.  However, ██████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████  A0923; A1843.  The

'470 patent, asserted in the -313 case, is a continuation-in-part of the '300

patent.  A0119.  The '056 patent, also asserted in the -313 case, is a

continuation of application no. 09/219,267 (which issued as the '470 patent),

8

which is a continuation-in-part of the '300 patent. A0119; A0184 at c.1, l.44-50. The '359 patent, asserted in the -140, -141, and -142 cases, is a continuation of the '942 patent, which is continuation-in-part of the '300 patent. A0192.

## B. The No Pending Litigation Warranty

When the ███████████████████████████, the -313 and -315 cases (the cases from which ███████████████████ ███████████████t, A0873; A0884; A1793; A1804) were currently pending against other defendants. These other defendants challenged, among other things, the validity and enforceability of '056, '470, and '942 patents. *E.g.,* A0489-91; A0734-59; A0771-84; A0386-88; A0400-03; A0464-67. eBay had also challenged the validity of the '056 and '942 patents before ███████████████. A0450; A0417.



. . . .



A0920; A1840 (emphasis in underline added).

**C.    The** 

A0921; A1841 (emphasis in underline and italics added).

Walker Digital executed and delivered to eBay

twenty-six short form assignments corresponding to the twenty-six patents and

applications listed in Schedule A.  A2107 at ¶ 3; A1061 at ¶ 8; A1189-1216.

Walker Digital also mailed to eBay the twenty-six patent grants and prosecution

files for the twenty-six patents and applications listed on Schedule A.[1]  A2107 at ¶

2.  Walker Digital did not deliver to eBay executed short-form assignments for the

'056, '470, or '942 patents, or the then-pending application that issued as the '359

---

[1] With the exception of one file for application no. 09/282,757, which appears to
have been included as a result of a clerical error.  A2107 at ¶ 4.

patent. *See, e.g.* A2107 at ¶ 4. Walker Digital did not deliver patent grants or prosecution files for these patents and application. *See, e.g.* A2107 at ¶ 4. At no time has eBay requested additional short form assignments or files. *See, e.g.* A2107 at ¶ 4.

### D. The Conflicting Statement Regarding ███████████ ████████

Despite the fact that ████████████████████████████



a declarative statement that conflicts with the rest of the ████████████. While ████████████████ ████████████, it states that:

A0920; A1840. However, ████████████████████████ ████████████████████, which were in litigation in the -313 and -315 cases ████████████████████, or the then-pending application no. 12/974,742 (later issued as the '359 patent), which was later asserted in the -140, -141, and -142 cases. A0923; A1843.

11

During negotiations, prior to the ███████████████████
████████████████████████████████. On December 9, 2011,
█████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████. A1060 at ¶¶ 3-4; A1063; A2116 at ¶ 4; A2244-45. ██
█████████████████████████████████████████████
██████████████████████. A1060-61 at ¶ 5; A1121; A2116 at ¶
4; A2368. ████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████ A1060-61 at ¶ 5;
A1186; A2116 at ¶ 4; A2242. ████████████████████████████████
██████████████████████████████████████
A0923; A1843.

## IV. DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

Almost a year after ████████████████████, Defendants Amazon,

Zappos, and Expedia filed a motion to dismiss the -313 case for lack of standing

pursuant to Fed. R. Civ. P. 12(b)(1). A0840; A0843-48.  Thereafter, Defendants

Amazon, Expedia, and Barnes & Noble filed a motion to dismiss the -140, -141,

and -142 cases for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1).  A1754-

56; A1758-64.  Defendants' motions to dismiss under Rule 12(b)(1) alleged that

the 

. A0843-48; A0855-56; A1758-

64.  Defendants argued that, even though the '470, '056, and '359 patents (or then-

pending '359 application)

A0843-48; A0855-56; A1758-

64.

     After Walker Digital informed eBay about Defendants' first motion to

dismiss in the -313 case, eBay provided a letter stating:

.

A1061 at ¶ 9; A1218; A2116 at ¶ 6; A2434.

     At the February 2013 hearing on Defendants' motion to dismiss the -313

case, the district court stated: "It strikes me that [] defendants' interpretations are

leading us to a ludicrous result . . . ."  A3425 at 5:5-6.  "[T]heir interpretation leads

to what I would consider an absurd result."  A3425 at 5:24-25.  "[I]t is difficult for

someone like me to resolve [this issue] in defendants' favor based solely on the

language because it is such an incredible result."  A3435 at 15:3-6.  The district

court then requested that Walker Digital submit by March 4, a declaration or

affidavit from eBay that eliminated any question that eBay did not own the patents

asserted in the -313 case.[2]  A3445 at 25:2-11; A3475 at 55:19-22.  In response to

the court's request, on March 4, Walker Digital submitted a declaration from Anup

Tikku, Senior Patent Counsel at eBay.  A2067 at ¶ 1; A2116 at ¶ 7; A2436 at ¶ 1.



. A2067-68 at ¶¶ 4-6; A2116 at ¶ 7; A2436-37 at ¶¶ 4-6.  Mr. Tikku declared:

---

[2] Defendants' motion to dismiss in the -140, -141, and -142 cases was not filed
until February 7, 2013, the day of the hearing.  A1754-56.

Confidential Material Redacted Pursuant to Protective Order

A2067-68 at ¶¶ 4-6; A2116 at ¶ 7; A2436-37 at ¶¶ 4-6.

Thereafter, the district court ordered that the Defendants be permitted to take the deposition of Anup Tikku, in response to Defendants' request for further discovery on the issue of the █████████████████████. A2440.

Mr. Tikku's deposition further confirmed that █████████████████

 and that it was █████████████████

. Mr. Tikku explicitly stated █████████████



A2625; A2655 at p. 111:11-18; A2561; A2590 at p. 111:11-18. And, █████████

███████████████████████████████████████

█████████████. A2625 -79; A2562-14.

## V. THE DISTRICT COURT'S DISMISSAL FOR LACK OF STANDING

On June 19, 2013, the district court granted Defendants' motions to dismiss for lack of standing in the -313 and -140, -141, and -142 cases. A0001-15, A0015; A0016-17; *Walker Digital, LLC v. Expedia, Inc.*, 950 F. Supp. 2d 729 (D. Del. 2013).

With respect to the '056 and '470 patents at issue in the -313 case, the

district court held in its memorandum opinion that "the broad granting language is

inconsistent with plaintiff's warranty that ███████████████████████████

███████████████, as plaintiff was actively litigating the '942 patent, as well as

the '470 and '056 patents, at the time of the ██████████████." A0013.

(internal citations omitted). In discussing this inconsistency, the district court

acknowledged ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████. A0014. The district court

did not reference the deposition testimony of Anup Tikku, which was submitted.

However, the district court stated that "Plaintiff's parol evidence does not help

resolve this conflict." A0014. The district court then stated that it "decline[d] to

elevate a standard warranty clause" above what it found to be "unambiguous

granting language – the clear purpose of the document." A0014. "Given the

complexity of plaintiff's patent portfolio and the sophistication of the parties to the

Settlement Agreement, the court relies on the unambiguous granting language

rather than the equivocal parol evidence to divine what the parties meant to

accomplish through the Settlement Agreement." A0015.

With respect to the -140, -141, and -142 cases, the district court similarly

concluded that "under the broad granting language of Exhibit A [██████████

16

███████████ the Settlement Agreement clearly transferred ownership rights of the '359 patent to eBay.  Therefore, the motions to dismiss Civ. No. 12-140, 12-141, and 12-142 are granted."  A0013.

Despite the district court's decision to ultimately rely on "the unambiguous granting language" in dismissing the -313 cases and -140, -141, and -142 cases, the district court stated in its memorandum order denying Defendants' motion for attorneys fees that "plaintiff did proffer evidence to demonstrate that it was not the parties' intent to transfer ownership of the patents-in-suit to eBay," but "the court ultimately found the parol evidence to be unpersuasive."  A0025 n.1.

## VI. THE DISTRICT COURT'S SUBSEQUENT DISMISSAL WITH PREJUDICE

After the district court issued its memorandum order granting Defendants' motions to dismiss the cases for lack of standing, Defendants moved to have the cases dismissed with prejudice.  A2933-40.  On October 16, 2013, the district court denied Defendants' motion.  A0022, at ¶ 8.  The denial was without prejudice to renew.  *Id*.  Defendants Amazon, Zappos, and Expedia filed motions for clarification of the district court's order denying dismissal with prejudice.  A3593-96; A3597-600.  Although Defendants did not request dismissal with prejudice in their motions for clarification, the district court dismissed the cases with prejudice in response to these motions.  A0023-26; A0026 at ¶ 8.  The district court concluded:

17

[p]laintiff was offered multiple opportunities to cure the standing defect. In its opposition to defendants' motion, plaintiff has offered no evidence that it has a plan to cure the standing defect, stating only that it "has been and currently is engaged in continued discussions with eBay regarding ownership of the patents-in-suit."

A0026 at ¶ 8. The Deleware Local Rules allowed Walker Digital 14 days to respond to these motions. Del. Local Rule 7.1.2(b). However, the district court dismissed with prejudice 3 days after the motions were filed.

## SUMMARY OF ARGUMENT



The district court erred in finding that the ███████████████ ███████████████████████████████████ (███████████████, thereby depriving Walker Digital of standing to assert these patents. The district court failed to give priority to Walker Digital's and eBay's intentions, which were both reflected within the four corners of the ███████████████ and confirmed by the extrinsic evidence.

Had the district court properly construed the ████████████████ as a whole, the district court would have arrived at the correct conclusion. The ███ ████████████████ transferred only what was listed in ████████████ ████████████, which did not list the patents-in-suit. Instead, the district court erroneously gave effect only to an inaccurate declarative statement in the ████ ████████████s. The district court ignored the only true grant language, defining that the ████████████ were limited to ████████████████████.

18



█████ The district court erroneously ignored the remainder of the agreement, the import of ███████ and the circumstances surrounding its execution, which are consistent with the true grant language.

To the extent there is an ambiguity in the ████████████ as to whether the parties intended to ████████████ the district court erred to the extent that it did not look to the extrinsic evidence of the parties' intentions, as it was required to do. To the extent the district court did look to extrinsic evidence and found the extrinsic evidence unpersuasive, such findings were wholly unsupported by the record and illogical. The extrinsic evidence, including a declaration and deposition testimony from ████████████

████████████

████████████

█████t. *See* A1061 at ¶ 9; A1217-18; A2116 at ¶ 6; A2433-34; A2590 at p. 111:11-18; ("████████████

████████████

████████████

█████"); *see also* A2067-68 at ¶¶ 4-6.

The district court also erred in exercising subject matter jurisdiction to dismiss Walker Digital's cases with prejudice. When the district court dismissed with prejudice, Walker Digital had already appealed the district court's prior order

19

dismissing these cases for lack of standing, which was not designated as with prejudice. Once Walker Digital filed its notices of appeal, the district court was not permitted to exercise subject matter jurisdiction to dismiss the cases with prejudice. The limited exceptions to a district court's ability to exercise subject matter jurisdiction after an appeal is filed do not apply here. And, to the extent the district court dismissed these cases as a result of an oversight in its prior dismissal for lack of standing, the district court was required to obtain leave of the appellate court.

To the extent that the district court did have subject matter jurisdiction to dismiss these cases with prejudice, the district court erred in doing so. The district court's dismissal with prejudice did not extinguish any claims, its implications are unclear, and Walker Digital should be entitled to cure any standing defect. The district court's dismissal with prejudice was also procedurally improper.

## ARGUMENT

### I. STATEMENT OF THE STANDARD OF REVIEW

#### A. Standing

The question of standing to sue is jurisdictional, which this Court reviews *de novo*. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995); *see also Alfred E. Mann Found. For Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1358 (Fed. Cir. 2010) ("We review de novo the district court's decisions

regarding standing to sue."). This Court has stated that, in patent infringement actions, standing is often determined through interpretation of a contract. *Tyco Healthcare Group L.P. v. Ethicon Endo-Surgery, Inc.*, 587 F.3d 1375, 1378 (Fed. Cir. 2009). Contract interpretation is a question of law, which this Court reviews *de novo*. *Lucent Technologies, Inc. v. Gateway, Inc.*, 543 F.3d 710, 717 (Fed. Cir. 2008).

## B. Exercise of subject matter jurisdiction

Whether the district court had jurisdiction is a question of law that this Court reviews *de novo*. *Vanguard Research, Inc. v. PEAT, Inc.*, 304 F.3d 1249, 1254 (Fed. Cir. 2002).

## C. Dismissal with prejudice

In determining whether a dismissal should have been with or without prejudice, this Court applies the law of the pertinent regional circuit. *H.R. Techs., Inc. v. Astechnologies, Inc.*, 275 F.3d 1378, 1384 (Fed. Cir. 2002). The Third Circuit reviews a district court's decision to designate a dismissal as 'with prejudice' for an abuse of discretion. *Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 569 F.3d 1328, 1331 (Fed. Cir. 2009) (citing *Anderson v. Ayling*, 396 F.3d 265, 273 (3d Cir. 2005).

## II.    THE DISTRICT COURT ERRED IN FINDING THAT ███████ ██████████████████████ CLEARLY AND UNAMBIGUOUSLY TRANSFERRED THE PATENTS-IN-SUIT TO eBAY

Construction of patent assignment agreements is a matter of state contract law.  *Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*, 561 F.3d 1340, 1343 (Fed. Cir. 2009). ████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████.”  A0879; A1799.

Accordingly, Delaware law governs interpretation of the eBay Settlement Agreement.

Under Delaware law, the fundamental goal of contract interpretation is to effectuate the parties' intent.  *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).   Of paramount importance is determining what a reasonable person in the position of the parties would have thought.  *Id.* at 739; *see also Radio Corp. of Am. v. Phil. Storage Battery Co.*, 6 A.2d 329, 334 (Del. 1939) ("Rules for the interpretation of contracts are not inflexible, their purpose being to arrive at the probable intent of the parties.").

Delaware courts interpret clear and unambiguous contract terms in accordance with their plain meaning.  *GMG Capital Invs., L.L.C. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).  When interpreting a contract, Delaware courts give priority to the parties' intentions as reflected in the

four corners of the agreement. *Id.* at 779. In upholding the intentions of the parties, a court must construe the agreement *as a whole*, giving effect to *all provisions* therein. *Id.* at 779; *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

The meaning inferred from *a particular provision* cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan. *GMG Capital*, 36 A.3d at 779. *Dow Chem. Co. v. Nova Chems. Corp.*, 458 Fed. Appx. 910 (Fed. Cir. 2012) ("'[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.'" (quoting *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005)). Courts will not read a contract to render a provision or term meaningless or illusory. *Osborn,* 991 A.2d at 1159.

**A.     The Four Corners of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Evidence That The Only Transferred Patents And Applications Were Listed in Schedule A**

Delaware courts interpret clear and unambiguous contract terms in accordance with their plain meaning. *GMG Capital*, 36 A.3d at 780.

23

1.  The only ███████████████████████████████
████████████████████████████████

The only term in the ██████████████████████████████████

████████████████████████████████████████



A0920; A1840 (emphasis in underline added).  The plain meaning of the ████

████████████████████████████████████████████████████

████████████████████████████████████

████████████████ Indeed, ████████████████████████████

A0923; A1843.  Thus, the only ████████████████████████████

clearly and unambiguously transferred only ████████████████████

████████████████████████████████████████

████████████. A0923; A1843.

Despite the plain meaning of the granting language, the district court

improperly interpreted the ████████████████████ to expand the scope of

the patents and applications that were ████████████. However, the second

████████████████████████████████████████████████

████████████████. It is merely an inaccurate declarative statement:

24



A0920; A1840.  The district court incorrectly interpreted this statement to mean

that "the term ' ███████████ for purposes of ███████ was comprised of

those patents and applications listed on Schedule A, further described  . . . as  . . .

"all counterparts, continuation's, continuations-in-part . . . claiming priority from,

derived from, or related to any of the foregoing." A0012.  Contrary to the district

court's interpretation, this statement does not purport to grant any rights to eBay.

At best, it inaccurately describes what ████████████████████████████

████.

The patents-in-suit therefore are not " ████████████."  The only

" ████████," according to the unambiguous granting language, were the



████████████.

The district court also erroneously relied on the fact that eBay added the

language "whether filed before, on, or after the effect date" to the second sentence

of Section 1.1 in interpreting the ███████████████.  A0014 at n. 9.

This language, or any ████████████████████████████

████████████████████████████████.



. A1061 at ¶ 9; A1218; A2116 at ¶ 6; A2434; A2655 at p.111:11-18; A2590 at p.111:11-18; A2066-68 at p.1, ¶¶ 4-6; A1218; A1061-62 at ¶ 5; A1182; A2116 at ¶ 4; A2430. ███████████

████████████████████████████ n. A2627; A2634 at p. 28:15-22; A2562; A2569 at p. 28:15-22. And, ████████████

████████. *See, e.g.* A0014 at n. 9. If eBay did not appropriately modify ████████████ to comport with ████████ the parties' intent, thereby creating ambiguity as to what the agreement ████████ should be construed adversely to eBay, the drafter, not Walker Digital. *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010).

Accordingly, it was error for the district court to conclude that "under the broad granting language of Exhibit A, the Settlement Agreement clearly transferred ownership of the '359 patent" A0013, and to rely on its incorrect interpretation of the "unambiguous granting language" to arrive at the conclusion that the ████████████████████████, A0015 ("the court relies on the unambiguous granting language."). The ██████████████████

████████████████████████████

26

2. The district court's interpretation of the █████████ conflicts with the entire scheme of ████████

The district court's interpretation of the second sentence of Section 1.1 altered the scope of Walke███████████████████████████████████ ████████████. *GMG Capital*, 36 A.3d at 779 ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."). ███████



to include all patents and applications continuations, continuations-in-part, and related to those on ████████ (as the district court did) renders meaningless the scope and format of ████████ *See Osborn,* 991 A.2d at 1159. If Walker Digital and eBay intended for the ██████████████████████████████████████████ parties simply would have listed ████████████████████████████████ ████████████. The other 23 patents/applications would be

27

mere surplusage. *See id.* The district court's interpretation of the Patent █████

██████ is contrary to the requirement that a court should not interpret a contract to

render clauses superfluous. *Intel Corp. v. American Guarantee & Liability Ins.*

*Co.*, 51 A.3d 442, 449 (Del. 2012) ("[N]o part of an agreement should be rendered

superfluous.").

      3. <u>The district court's interpretation of the ████████████ is</u>
         <u>undermined by the fact that ████████████████████████</u>
         <u>████████████.</u>

The district court's definition of the ████████████ to include

patents/applications not listed in ██████████ is further undermined by the fact that

████████████████████████████████████████████████████████

██████████████, but omits several other descendants of the same three parent

applications. For example, it is undisputed that there are a total of at least 44

applications that claim the benefit of the '149 application, the parent and first listed

item for ████████ A2086-87; A2441-57. It is undisputed that only 17 of these 44

"children" are listed on ██████████ A2086-87; A2441-57. While 17 of these 44

"children" are listed in ████████ and were thus clearly intended to be a part of

the ██████████, 27 children, including the patents-in-suit, were excluded

from ████████ A, and thus not intended to be part of the ████████████.

In order to accept the district court's interpretation of the ████████████

██████ (i.e., that all related patents and applications were transferred), this Court

would have to assume that █████████ has no meaning and merely reflects a random subset of the patents and applications that were transferred. This Court would also have to assume that ████████████████████████████████████ ████████████████████████████████████ A. No reasonable party to the ████ ████████████████ would have interpreted the ████████████ Terms as ████████████ this many ████████████████████. These are absurd results that the district court should have rejected. *Osborn,* 991 A.2d at 1160, n.21 ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

The logical and correct conclusion, which the district court ignored, is that ████████████████████████████████████████████████ ████████████████████████████, and, consistent with the unambiguous granting language, ████████████ was intended to be a complete list.

4. The district court's interpretation of the ████████████████ conflicts with the █████████████████ circumstances surrounding execution of the ███████████ ███████

The district court's interpretation of the ████████████████ further conflicts with the ████████████████ provision and the circumstances surrounding execution of the ████████████████. Section 3.1 of the ████████████████ contains a ████████████████, which states:



A0921-22; A1841-42.  The district court's interpretation of the ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮y because the -313 and -315 cases were currently pending against

other defendants when the ▮▮▮▮▮▮▮▮▮▮▮▮ was executed.  *E.g.,*

A0489-91(-313, Expedia's Counterclaims); A0734-59; A0771-84; A0386-88;

A0400-403; A0464-67.   These defendants challenged, among other things, the

validity and enforceability of '056, '470, and '942 patents which were asserted

against them.  *E.g.,* A0489-91; A0734-59; A0771-84; A0386-88; A0400-403;

A0464-67.

Because the '056, '470, and '942 patents were in litigation and challenged

prior to (and at the time) of the ▮▮▮▮▮▮▮▮▮▮▮▮, and were

continuations-in-part of the patents/applications listed on ▮▮▮▮▮▮ interpreting

the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ns runs afoul of the

principle that a construction rendering performance impossible or meaningless is to

be avoided.  *See Osborn,* 991 A.2d at 1159.  If the ▮▮▮▮▮▮▮ms

transferred the '056, '470, and '942 patents, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

30



would have been meaningless. *See id.* The ██████████████ would also squarely contradict the scheme and plan of ██████████ these ████████ ██████. *See GMG Capital*, 36 A.3d at 779.

There is no question that eBay was aware that at least the '056 and '470 patents would still be in litigation against other defendants in the -313 case after execution of the ████████████████. A2066-68 at ¶¶ 4-6; A2116; A2436-37 at ¶¶ 4-6; A2627; A2655 at p. 111: 11-18; A2562; A2590 at p. 111: 11-18. A court's consideration of the circumstances surrounding execution of a contract in order to determine the parties' intent does not violate the parol evidence rule. 11 Williston on Contracts § 32:7 (4th ed.). If the ██████████████ for which e██ negotiated included a ██████████████████ ████████████, it defies logic that eBay would not demand that any pending litigation involving the transferred patents be dismissed or to be substituted as a plaintiff. Yet, ████████████████████████████████████ ██████████████████████ (*e.g.*, Amazon, Zappos, Expedia, American Airlines, and Barnes & Noble) ██████████████████ that the parties negotiated. Moreover, eBay never sought to be substituted as a plaintiff in these cases. Instead, ██████████████████████████████ ██████████. A0884; A1804.

Instead of imposing a ███████████████ requiring Walker Digital to

dismiss the -313 and -315 cases, ████████████████████████████████

████████████████████████████████████. *See* 11 Williston on

Contracts § 32:7 (4th ed.).  On December 9, 2011 ███████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████.  A1060 at ¶¶ 3-

4; A1063; A2116 at ¶ 4; A2244-45. ███████████████████████████████

██████████████████████████████  A1060-61 at ¶ 5; A1121; A2116 at ¶

4; A2303.  It defies logic ███████████████████████████████████████

████████████████████████████.

The absence a provision requiring Walker Digital to dismiss the -313 and

-315 case and ████████████████████████████████████████████████████

█████████ with Mr. Tikku's testimony that ████████████████████████

█████████████████████████████████████████████████████████████████

█████████.  A2627; A2634 at p. 28:16-22; A2562; A2569 at p. 28:16-22.

As such, district court erred in finding that the ██████████████████████

████████████████████████████████████.  The true ████████

█████████ applied only the patents/applications ████████████ and interpreting the

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

## III. THE DISTRICT COURT ERRED BY FAILING TO RESOLVE ANY AMBIGUITY IN THE ████████████████████████ WITH THE UNEQUIVOCAL EXTRINSIC EVIDENCE CONFIRMING THAT ███████████████████████████████████████ ██████████████████████████████

Although Delaware courts interpret clear and unambiguous contract terms in accordance with their plain meaning, *GMG Capital*, 36 A.3d at 780, where a contract is ambiguous, the interpreting court **must** look beyond the language of the contract to ascertain the parties' intentions. *Id.* (emphasis added).

An ambiguity exists when the provisions in controversy are fairly susceptible to different interpretations or may have two or more different meanings. *Id.*; *see also City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) ("In that situation the language used by the parties is subject to different meanings and is, thus, ambiguous, or more precisely, not reflective of the parties shared intent.").

To the extent that the language of ████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████, there is ambiguity in the agreement.

Confidential Material Redacted Pursuant to Protective Order

**A.** ██████████████████████ ████ **and** ████████

████████████████████████████████████████████████

█████████████████████████████



A0920; A1840 (emphasis added in underline).  The second declarative sentence of

████████████████:

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████ ████████████████████████████████████

████████████████████████████████████████

██████████████████).  A0923; A1843.  But, as explained, the patents-in-suit

are continuations-in-part of the ████████████████████████ Thus,

██████████████████ would be wholly inconsistent and in conflict with one

another, rendering these provisions of the ████████████ ambiguous.

*Cordis Corp. v. Boston Scientific Corp.*, 868 F. Supp. 2d 342, 352 (D. Del. 2012)

*aff'd in part, vacated in part*, 504 F. App'x 922 (Fed. Cir. 2013) ("inconsistent

contractual provisions may create ambiguity in a contract"); *Empire of Am.*

*Relocation Servs., Inc. v. Commercial Credit Co.,* 551 A.2d 433, 436 (Del. 1988)

("the terms of the amended agreement were ambiguous because they were, in fact,

in conflict"); *Motorola, Inc. v. Amkor Tech., Inc.,* 849 A.2d 931, 937 (Del. 2004).

At the very least, these provisions would be fairly susceptible to different

interpretations, further highlighting the resultant ambiguity. *GMG Capital*, 36

A.3d at 780 ("an ambiguity exists when the provisions in controversy are fairly

susceptible to different interpretations or may have two or more different

meanings")

The resulting ambiguity raises the question of whether only the patents and

applications listed in ████████ or *all* patents and applications that are

continuations, continuations-in-part, and related to those in ████████ including

the patents-in-suit, ████████████ Where a contract is ambiguous, "the

interpreting court **must** look beyond the language of the contract to ascertain the

parties' intentions." *GMG Capital*, 36 A.3d at 780 (emphasis added); *Eagle*

*Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A**.**2d 1228, 1232 (Del.1997)

("[W]hen there is uncertainty in the meaning and application of contract language,

35

the reviewing court must consider [extrinsic] evidence offered in order to arrive at

a proper interpretation of the contractual terms.").

**B.** ████████████████████████ **and** ███████████
████████████████

Ambiguity also exists because the ███████████████, detailed

above, conflicts with a ███████████████████████████

████████████████████████████████████████

████████████████████████ This definition encompasses the

'056, '470, and '942 patents in litigation. The ████████████████

████████████████████████████████████████

███████. This ambiguity similarly raises the question of whether only the patents

and applications listed in ████████ *all* patents and applications that are

continuations, continuations-in-part, and related to those in ████████ including

the asserted patents, ████████████████

Here, the district court acknowledged that there is an ambiguity with respect

to the conflict it found between ████████████████████████████.

The district court stated that "the broad granting language is inconsistent with

plaintiff's warranty that none of the Transferred Patents were subject of litigation,

as plaintiff was actively litigating the '942 patent, as well as the '470 and '056

patents, at the time of the Settlement Agreement." A0013. But, according to the

district court, "Plaintiff's parol evidence [did] not help the court resolve this

conflict." A0014. "[T]he court ultimately found the parol evidence to be

unpersuasive," despite the fact that "plaintiff did proffer evidence to demonstrate

that it was not the parties' intent to transfer ownership of the patents-in-suit to

eBay." A0025 n.1. Ultimately, the district court chose to rely "on the

unambiguous granting language rather than the equivocal parol evidence to divine

what the parties meant to accomplish through the Settlement Agreement." A0015;

A0025 n.1. However, the district court pointed to no extrinsic evidence that was

contrary to the undisputed extrinsic evidence that was submitted.

To the extent the district court declined to consider the extrinsic evidence to

resolve all of the ambiguity, the district court erred because the district court *must*

look beyond the language of the contract to ascertain Walker Digital's and eBay's

intentions. To the extent the district court did attempt to ascertain the parties'

intentions, the district court erred in finding that the extrinsic evidence was

"equivocal" and "unpersuasive." A0015. This finding is wholly unsupported by

the record. As detailed below, the unequivocal extrinsic evidence resolves the

ambiguity, confirming that ████████████████████████████████

████████████████████████████████████████████████

████████████████

In light of this ambiguity, the district court was required to look to extrinsic

evidence to ascertain Walker Digital's and eBay's intentions. The district court

erred because it failed to do so.  To the extent the district court did consider the

unequivocal extrinsic evidence of the parties' intentions, which is detailed below,

the district court erred by failing to resolve the ambiguity in accord with this

undisputed evidence.



    **C.**    **Walker Digital's and eBay's** ▮▮▮▮▮▮▮▮

During negotiations, prior to the execution of the ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  On December 9, 2011,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ A1060 at ¶¶ 3-4; A1063; A2242-45. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.

A1060-61 at ¶ 5; A1121; A2116 at ¶ 4; A2303.  A▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮ A1060-61 at ¶ 5; A1186; A2116 at ¶ 5; A2430.

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ A0923; A1843.

These email communications and modifications to ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████. The
patents and applications ██████████████████████ are continuations and
continuations-in-part to patents/applications on ████████████████ If
████████████████████ effectuate the parties' intent, it follows that ████
████████████████████████████████████████████████
████████████████████████████████████ Otherwise,
removing a continuation or continuation-in-part ██████████ would have had
no effect if ████████████████████████████████████████
██████████

**D.  Walker Digital's and eBay's** ████ █████████████

████████████████████████████████

The parties' conduct following execution of the ████████████████
████████████████████████████████████████████
██████, and nothing more.

After Walker Digital informed eBay about the Defendants' first motion to
dismiss in the -313 case, eBay provided a letter stating:

████████████████████████████████████
████████████████████████████

A1061 at ¶ 9; A1218; A2116 at ¶ 6; A2434.  eBay's ████████████████
████████████████████████████████ A.  eBay later provided a



████████████████████████████████████████. A2067-68 at ¶¶ 1, 4-

6; A2116 at ¶ 7; A2436-37 at ¶¶ 1, 4-6. ███████████████████████

A2067-2068 ¶¶ 4-6; A2116; A2436-2437 ¶¶ 4-6.

A2627; A2655 at 111:11-18; A2562; A2590 at 111:11-18.

████████████████████████████████████████████████████

A2627; A2634 at 28:15-22; A2562; A2569 at 28:15-22.

In sum, eBay's own statements ████████████████████████████████

████████████████████████████████. Had the parties intended to

transfer all related patents and applications to those ████████████, eBay

would not have stated in a letter or declaration, or offered testimony at a

deposition, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

Walker Digital's fulfillment of the ████████████████████

████████████nt further evidences that the parties did not intend to transfer

any ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████

A0920; A1840 (underline and italics added).

Pursuant to ▮▮▮▮▮▮ Walker Digital executed and delivered to eBay twenty six short-form assignments corresponding to the twenty six patents and applications listed in Schedule A. A2107 at ¶ 3; A1061 at ¶ 8; A1190-216. Walker Digital also mailed to eBay the twenty six patent grants and prosecution files for the twenty six patents and applications listed on Schedule A.[3] A2107 at ¶ 2. Walker Digital did not deliver to eBay executed short-form assignments for the '056, '470, or '942 patents, or the underlying application for the '359 patent, or for any other patents or applications. *See, e.g.* A2107 at ¶ 4. Walker Digital did not deliver patent grants or prosecution files for these patents and application, or for any other patents or applications. *See, e.g.* A2107 at ¶ 4. At no time has eBay requested additional short form assignments or files. *See, e.g.* A2107 at ¶ 4. This removes any arguable doubt that ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

There is only one logical interpretation that is consistent with both the contractual language and the contracting parties' clear and unequivocal intent, which is confirmed by the extrinsic evidence: ▮▮▮▮▮▮▮▮▮▮

---

[3] With the exception of one file for application no. 09/282,757, which appears to have been included as a result of a clerical error. A2107 at ¶ 4.

██████████████████████████████████

███████████████████████████████████

████

## IV. THE DISTRICT COURT ERRED IN EXERCISING SUBJECT MATTER JURISDICTION TO DISMISS THE CASE WITH PREJUDICE AFTER WALKER DIGITAL FILED ITS NOTICES APPEALING THE DISTRICT COURT'S DISMISSAL FOR LACK OF STANDING

The district court did not have jurisdiction to enter a dismissal with prejudice after Walker Digital filed notices appealing the district court's dismissal for lack of standing. The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal. *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982); *Gilda Indus., Inc. v. United States,* 511 F.3d 1348, 1351 (Fed. Cir. 2008); *United States v. Leppo,* 634 F.2d 101, 104 (3d Cir. 1980). The critical date for determining whether jurisdiction passes to the court of appeals is the date of filing of the notice of appeal. That is, when a notice of appeal is timely filed, a trial court is divested of jurisdiction at the time the notice is filed. *Gilda Indus.,* 511 F.3d at 1351 (internal citations omitted). The purpose of this rule is to prevent confusion and inefficiency which would result if two courts were considering the same issues simultaneously. *Venen v. Sweet,* 758 F.2d 117, 120 (3d Cir. 1985).

Here, the district court granted Defendants' motion to dismiss for lack of standing on June 19, 2013. A0016-17. The dismissal was without prejudice. A0016-17; Fed. R. Civ. P. 41(b). Thereafter, Walker Digital filed its notices of appeal, appealing the dismissal for lack of standing. A3068-69; A3070-71; A3072-73; A3074-75. At this point, the district court had no jurisdiction to enter any orders dismissing the cases with prejudice. *Griggs,* 459 U.S. at 58; *Gilda Indus.,*511 F.3d at 1351; *Leppo,* 634 F.2d at 104. Therefore, the district court erred in granting Defendants' motion for clarification, wherein it dismissed these cases, which were already on appeal, with prejudice. A0023-26.

There are only limited exceptions to this rule that relate to situations in which a party seeks to preserve the status quo during the pendency of the appeal or seek an application of bonds or attorney's fees; critically, none of these situations in which the trial court can act during the pendency of an appeal deal with the substantive questions being appealed. *See Newton v. Consol. Gas Co.*, 258 U.S. 165, 177 (1922); *West v. Keve*, 721 F.2d 91, 95 n. 5 (3d Cir. 1983). Thus, the jurisdiction of the district court during an appeal is limited, and the district court is not permitted to adjudicate anew the merits of the case or materially alter the status of the case on appeal. *McClatchy Newspapers v. Cent. Valley Typographical Union No. 46*, 686 F.2d 731, 734 (9th Cir. 1982); Allan Ides, *The Authority of a*

*Federal District Court to Proceed After a Notice of Appeal Has Been Filed,* 143 F.R.D. 307, 322 (1992).

These exceptions do not apply to these cases. Here, the district court purported to dismiss the cases with prejudice, after the district court had already dismissed these cases for lack of standing without prejudice. A0023-26; A0016-17; Fed. R. Civ. P. 41(b). This materially altered the status of the cases that were already on appeal, from without prejudice to with prejudice, which the district court was not permitted to do.

A district court may only correct clerical mistakes or oversights pursuant to Fed. R. Civ. P. 60(a). The rule provides that "during the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected **with leave of the appellate court**." Fed. R. Civ. P. 60(a) (emphasis added). Once an appeal has been docketed a district court must obtain permission from the appellate court even before correcting clerical errors or oversights. *Zenith Elecs. Corp. v. United States*, 884 F.2d 556, 561 (Fed. Cir. 1989).

Here, the district court's original dismissal for lack of standing was without prejudice. A0016-17; Fed. R. Civ. P. 41(b). However, in response to Defendants' motion for clarification, the district court decided that after an "opportunity to review its prior decision," and "having given the matters more thought," the cases

should be dismissed with prejudice. A0024-25 at ¶¶ 2, 6. Because the cases were already on appeal, the district court was required to seek leave of the appellate court to the extent that it was correcting an oversight or error in its prior dismissal for lack of standing without prejudice. A0016-17; Fed. R. Civ. P. 41(b).

There district court should therefore be reversed for dismissing these cases with prejudice because it had no jurisdiction to do so.

## V. TO THE EXTENT THE DISTRICT COURT HAD JURISDICTION TO DISMISS WITH PREJUDICE, THE DISTRICT COURT ERRED IN DISMISSING WITH PREJUDICE AND WALKER DIGITAL SHOULD BE ENTITLED TO CURE ANY STANDING DEFECT

A dismissal for lack of standing is jurisdictional and is not an adjudication on the merits. *Univ. of Pittsburgh v. Varian Med. Sys., Inc.,* 569 F.3d 1328, 1332 (Fed. Cir. 2009). "[I]n determining whether a dismissal should have been with or without prejudice," this Court applies the law of the pertinent regional circuit. *H.R. Techs.* 275 F3d. at 1384.

In the Third Circuit, a dismissal with prejudice is a "severe and disfavored remedy*." Alvin v. Suzuki*, 227 F.3d 107, 122 (3d Cir. 2000). Indeed, "the Third Circuit and this court, as well as other regional circuit courts, have repeatedly emphasized that a dismissal for lack of standing should generally be without prejudice, particularly when the defect is curable." *Univ. of Pittsburgh,* 569 F.3d at 1332; *see also H.R. Techs.* 275 F.3d at 1384 ("Because lack of standing is not an issue that goes to the merits of the underlying patent issues, a dismissal of a

complaint for lack of standing would not normally be expected to be made with

prejudice."). As this Court has recognized, "the law universally disfavors

dismissing an action with prejudice based on lack of standing, and there is a strong

presumption that such a dismissal is improper." *Id.*

If this Court reverses the district court's dismissal for lack of standing or

finds that the district court lacked jurisdiction to dismiss with prejudice, the district

court must be reversed on its decision to grant Defendants' motion to dismiss with

prejudice, as there would be no basis for a dismissal. To the extent that this Court

affirms the district court's dismissal for lack of standing, the district court erred in

dismissing with prejudice and should be reversed. The dismissal did not

extinguish any claims, its implications are unclear, and Walker Digital should be

entitled to cure any standing defect. The district court's dismissal with prejudice

was also procedurally improper.

## A. The District Court's Dismissal Should Be Reversed Because It Did Not Extinguish Any Claims and Its Implications Are Unclear

Even if the district court's dismissal for lack of standing were affirmed,

Walker Digital could still obtain an ███████████████████████████████████

██████████████████████████████████████. The district court's ruling did

not extinguish any claims and was not an adjudication on the merits. *See Univ. of*

*Pittsburgh*, 569 F.3d at 1332 ((citing *Kasap v. Folger Nolan Fleming & Douglas,*

*Inc.*, 166 F.3d 1243, 1248 (D.C. Cir. 1999) (modifying a dismissal to be without

47

prejudice because "dismissals for lack of jurisdiction are not decisions on the merits and therefore have no res judicata effect on subsequent attempts to bring suit in a court of competent jurisdiction")); *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1234–35 (11th Cir. 2008) (explaining that a dismissal for lack of standing is necessarily without prejudice because the court lacked subject matter jurisdiction and thus could not reach the merits of the claim). If the dismissal with prejudice is affirmed, the patent owner still has a claim for infringement of the '056, '470, and '359 patents, and affirming the same should not implicate a non-party's claims.

The implications of the district court's dismissal with prejudice are also unclear. For example, it is unclear whether: 1) Walker Digital cannot assert the '056, '470, or '359 patents against Defendants, 2) eBay cannot assert these patents against Defendants, and/or 3) any party holding rights in the future to these patents cannot assert them against Defendants. Walker Digital should be able to assert these patents against Defendants even if the district court is affirmed and Walker Digital obtains an assignment back of the patents-in-suit.

### B. As Long as the Defect Is Curable, a Party Should Not Be Required to "Offer Evidence" of a Specific "Plan to Cure"

One basis for the district court's decision to modify its dismissal to be with prejudice is the district court's finding that "plaintiff has offered no evidence that it has a plan to cure the standing defect." A0026. Walker Digital should not be

required to "offer evidence" that it *has a plan* to cure the standing defect. The

district court required this after it ruled on Defendants' motion, without ever

informing Walker Digital of the same). The pertinent inquiry under the law is

whether "the defect *is curable*." *Univ. of Pittsburg,* 569 F.3d at 1332; *see also*

*H.R. Techs.,* 275 F.3d at 1384. Here, any defect *is curable*. The district court itself

recognized that the alleged defect is curable. A0014. If this Court affirms the

district court's dismissal for lack of standing, Walker Digital may be able to amend

the ████████████████████████████████████████████████████████

████████████████████████. A0014. This is not a case where the other party (eBay)

to the agreement was a hostile party who refused to acknowledge that Walker

Digital retains any rights to the asserted patents. eBay is not even a defendant who

is challenging Walker Digital's standing. To the contrary, ████████████████

████████████████████████████████████████████████████████████████

████████████████████████. A2067-68 at ¶¶ 4-6; A2116 at ¶ 7; A2436-37 at

¶¶ 4-6; A2627; A2655 at p. 111:11-18; A2562; A2590 at p. 111:11-18; A1061 at ¶

9; A1218; A2116 at ¶ 6; A2434.

In *Tyco Healthcare Group L.P. v. Ethicon Endo-Surgery, Inc.*, this Court

affirmed a dismissal without prejudice where the district court found that the

plaintiff failed to meet its burden to show ownership of the patents-in-suit. 587

F.3d at 1380. This was because "as best we can tell, [the plaintiff] may be able to

Confidential Material Redacted Pursuant to Protective Order

show it owned the asserted patents. Alternatively, [the plaintiff] may be able to

obtain ownership of the patents." *Id.* Here, similar to *Tyco,* the alleged effect

could be cured through amendment or otherwise. The district court has recognized

the same. A0014.

### C.    The District Court's Conclusion that "Plaintiff Was Offered Multiple Opportunities to Cure the Standing Defect" Inaccurately Portrays the History of the Case

The second basis for the district court's decision to dismiss with prejudice

was that, according to the district court: "plaintiff was offered multiple

opportunities to cure the standing defect." A0026. This unfairly portrays the

history of the case. The district court never found that Walker Digital lacked

standing until it dismissed these cases for the first time, giving rise to this appeal.

A0001-A0015.

This is not a case where Walker Digital has been dismissed multiple times

because of the same standing defect. While the district court requested that Walker

Digital take certain steps to clarify eBay's and Walker Digital's intent with respect

to the eBay ████████████████ (*e.g.*, by submitting a declaration from eBay),

Walker Digital willingly complied with the district court's requests, each time with

the belief that the steps it took were more than sufficient to confirm that the

█████████████████████████████y. However, Walker Digital did not

ultimately learn that this evidence was insufficient until the district court dismissed

Confidential Material Redacted Pursuant to Protective Order

Walker Digital's case for lack of standing. Although the district court ultimately

disagreed with Walker Digital, at the first hearing on Defendants' motion to

dismiss, the district court itself stated: "It strikes me that [] defendants'

interpretations are leading us to a ludicrous result . . . ." A3425 at 5:5-6. "[T]heir

interpretation leads to what I would consider an absurd result." A3425 at 5:24-25.

"[I]t is difficult for someone like me to resolve [this issue] in defendants' favor

based solely on the language because it is such an incredible result." A3435 at

15:3-6.

The district court's dismissal with prejudice amounts to a punishment for

choosing to have the district court resolve the standing issue with what Walker

Digital believed to be more than sufficient evidence, rather than prematurely obtain

an ████████████████████████████████████████████████████████

████. It was entirely reasonable for Walker Digital have the district court resolve

the issue. As the district court acknowledged:

> The motions to dismiss involved complex questions of law, with there
> being grounds for reasonable disagreement. With arguably valuable
> property rights at stake, it is not surprising that plaintiff choose [sic] to
> have the court resolve the dispute rather than amicably resolve such
> with defendants.

A0025.

Consistent with the district court's acknowledgements, Walker Digital

should not be punished with the severe and disfavored remedy of a dismissal with

prejudice simply because it chose to have the district court resolve the standing issue. eBay is a third party whom Walker Digital does not control, and Walker Digital did not believe that eBay owned the asserted patents.

The only Federal Circuit authority that the district court cited in support of its decision granting Defendants' motion for dismissal with prejudice is *Sicom Sys., Ltd v. Agilent Techs., Inc.*, 427 F.3d 971 (Fed. Cir. 2005). *Sicom* involved an entirely different set of facts than this case. First, the plaintiff in *Sicom* had twice attempted to establish standing because it had *twice been dismissed* after failing to establish standing. *Id.* at 973-74, 980. The plaintiff in *Sicom* also did not dispute that the dismissal should be with prejudice. *Id.* at 980. Here, Walker Digital has not re-filed the same cases, asserting the same patents, in multiple failed attempts to establish standing. And, unlike in *Sicom,* Walker Digital opposed and disputed the merits of Defendants' motion for dismissal with prejudice. A3098-100.

### D. The District Court's Dismissal Was Procedurally Improper

The district court's dismissal with prejudice was procedurally improper. As an initial matter, Defendants' motions to dismiss for lack of standing did not request a dismissal with prejudice. A0840-A0842; A0843-A0863; A1448-A1462; A1754-A1757; A1758-A1779; A2441-A2457; A2615-A2623. Defendants did not move for dismissal with prejudice until after the district court dismissed the cases

for lack of standing without prejudice.  A0001-3, 15; A0016-17; Fed. R. Civ. P. 41(b); A0016-17; A2933-940.

Further, the district court improperly dismissed the cases in response to motions that did not even request a dismissal with prejudice.  A0023-A0026; A3593-A3596; A3597-A3600.  The district court did not dismiss the cases with prejudice until it issued its memorandum order on Defendants' request for clarification.  A0023-A0026.  However, Defendants' motion for clarification did not request a dismissal with prejudice.  A3593-A3596; A3597-A3600; A0001-3, 15; A0016-17.  Barnes & Noble did not even file a motion for clarification. A0088-A0103.  If the district court was going to consider dismissing the cases with prejudice in response to these motions that did not request dismissal with prejudice, the district court should have informed the parties and given Walker Digital the appropriate amount of time to respond in opposition.  Del. Local Rule 7.1.2(b) (allowing 14 days to respond to motions).  Instead, the district court prematurely dismissed the cases with prejudice three days after Defendants filed their motions.  A0023-A0026; A3593; A3597.

For these reasons, the district court erred in dismissing the -313, -140, -141, and -142 cases with prejudice.

## CONCLUSION

53

For the reasons herein, this Court should reverse the district court's dismissal for lack of standing. The district court erred in finding ████████ ████████████████████████████████████████, depriving Walker Digital of standing. This Court should also reverse the district court's dismissal with prejudice. The district court erred in exercising subject matter jurisdiction to dismiss with prejudice. As explained herein, even if it had jurisdiction, the district court erred in dismissing with prejudice.

Dated:  February 27, 2014          Respectfully submitted,

/s/ *Anthony G. Simon*
Anthony G. Simon
Benjamin R. Askew
Michael P. Kella
Stephanie H. To
Timothy D. Krieger
THE SIMON LAW FIRM, P.C.
800 Market Street, Suite 1700
St. Louis, Missouri  63101
Telephone:  (314) 241-2929
Facsimile:  (314) 241-2029
asimon@simonlawpc.com
baskew@simonlawpc.com
mkella@simonlawpc.com
sto@simonlawpc.com
tkrieger@simonlawpc.com

Timothy E. Grochocinski
INNOVALAW, P.C.
1900 Ravinia Place
Orland Park, Illinois 60462
teg@innovalawpc.com

*Counsel for Plaintiff-Appellant Walker Digital, LLC*

Marc A. Fenster
Benjamin T. Wang
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474

Facsimile: (310) 826-6991
mfenster@raklaw.com
bwang@raklaw.com

*Counsel for Plaintiff-Appellant Walker Digital, LLC*

CASE PARTICIPANTS ONLY

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 11-313-SLR |
| | ) | |
| EXPEDIA, INC., AMAZON.COM, INC., | ) | |
| AMERICAN AIRLINES, INC., and | ) | |
| ZAPPOS.COM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-140-SLR |
| | ) | |
| AMAZON.COM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-141-SLR |
| | ) | |
| BARNES & NOBLE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

WALKER DIGITAL, LLC,                  )
                                      )
                Plaintiff,            )
                                      )
       v.                             )      Civ. No. 12-142-SLR
                                      )
EXPEDIA, INC.,                        )
                                      )
                Defendant.            )

---

Richard D. Kirk, Esquire and Stephen B. Brauerman, Esquire, and Vanessa R. Tiradentes, Esquire of Bayard, P.A., Wilmington, Delaware.  Counsel for Plaintiff.  Of Counsel:  Anthony G. Simon, Esquire of The Simon Law Firm, P.C., Marc A. Fenster, Esquire and Benjamin T. Wang, Esquire of Russ, August & Kabat, and Timothy E. Grochocinski, Esquire of InnovaLaw, LLC.

Richard L. Horwitz, Esquire, David E. Moore, Esquire, and Bindu A. Palapura, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware.  Counsel for Defendants Amazon.com, Inc, Zappos.com, Inc., and Target Corp.  Of Counsel: Eliza V. Bechtold, Esquire, Klaus H. Hamm, Esquire, Salumeh R. Loesch, Esquire, Jeffrey S. Love, Esquire, Todd M. Siegel, Esquire, Philip Warrick, Esquire, Garth A. Winn, Esquire, Kristen L. Reichenbach, Esquire, and Carla Todenhagen, Esquire of Klarquist Sparkman, LLP.

William J. Marsden, Jr., Esquire and Gregory Booker, Esquire of Fish and Richardson, P.C., Wilmington, Delaware.  Counsel for Defendant Expedia, Inc.  Of Counsel:  Ahmed J. Davis, Esquire, Gabriel Olander, Esquire, and Linhong Zhang, Esquire of Fish & Richardson P.C.

Chad S. C. Stover, Esquire of Novak Druce Connolly Bove + Quigg LLP, Wilmington, Delaware.  Counsel for Defendant American Airlines, Inc.  Of Counsel:  John B. Campbell, Jr., Esquire and Phillip Aurentz of McKool Smith.

Philip A. Rovner, Esquire and Alan R. Silverstein, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware.  Counsel for Defendant Barnes & Noble, Inc.

---

**MEMORANDUM OPINION**

Dated: June 19, 2013
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On April 11, 2011, plaintiff Walker Digital, LLC ("plaintiff") filed Civ. No. 11-313 against ten defendants, including eBay, Inc. ("eBay"), for allegedly infringing U.S. Patent Nos. 7,831,470 ("the '470 patent") and 7,827,056 ("the '056 patent"). (Civ. No. 11-313, D.I. 1) Currently before the court in Civ. No. 11-313 is defendants Amazon.com, Inc. ("Amazon"), Zappos.com, Inc. ("Zappos"), and Expedia, Inc.'s motion to dismiss under Rule 12(b)(1) for lack of standing (Id., D.I. 242), and Amazon and Zappos' motion for leave to file amended answers (Id., D.I. 258).

On February 7, 2012, plaintiff filed separate actions against defendants Amazon, Barnes & Noble, Inc., and Expedia, Inc., alleging infringement of U.S. Patent No. 8,112,359 ("the '359 patent"). (Civ. No. 12-140, D.I. 1; Civ. No. 12-141, D.I. 1; Civ. No. 12-142, D.I. 1) Currently before the court are these defendants' motions to dismiss under Rule 12(b)(1) for lack of standing. (Civ. No. 12-140, D.I. 75; Civ. No. 12-141, D.I. 52; and Civ. No. 12-142, D.I. 44)

The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). For the reasons that follow, the defendants' motions to dismiss are granted.[1]

## II. BACKGROUND

On April 11, 2011, plaintiff filed Civ. No. 11-315 against numerous defendants, including eBay, alleging infringement of U.S. Patent No. 7,236,942 ("the '942 patent"). (Civ. No. 11-315, D.I. 1) In order to settle Civ. No. 11-315, plaintiff and eBay, Inc. ("eBay") entered into a Confidential Settlement and License Agreement ("Settlement

---

[1]The motion for leave to file amended answers (Civ. No. 11-313, D.I. 258) is denied as moot.

Agreement"). Pursuant to the Settlement Agreement, plaintiff

> grant[ed] to EBAY, effective immediately,[²] an irrevocable, nonexclusive, fully paid-up, worldwide license, under the PATENT RIGHTS to use, make, have made, sell, offer to sell, modify, import, export, and otherwise offer, dispose of, distribute, display, host, advertise, and/pr promote any COVERED PRODUCT directly or indirectly through any channel, including through multiple tiers of distribution. The license grant herein also extends to EBAY THIRD PARTIES but only with respect to COVERED PRODUCTS.

(Civ. No. 11-313, D.I. 244, ex. I at 9)  The phrase "PATENT RIGHTS" was defined in

the Settlement Agreement as follows:

> "PATENT RIGHTS" shall mean any patents or patent applications worldwide, existing presently or in the future, owned or controlled by WALKER DIGITAL presently or at any time in the future, including but not limited to:  (a) U.S. Patent Nos. 7,236,942 and 7,827,056 and (b) the entire families of U.S. Patent Nos. 7,236,942 and 7,827,056 anywhere in the world, including but not limited to all of their parents, continuations, continuations-in-part, divisionals, reissues, and re-examinations; (c) all patent applications or patents claiming priority to any of the foregoing patents or claiming priority to any application that led to any of foregoing patents; and (d) all foreign  counterparts to any of the foregoing.  WALKER DIGITAL represents that a current list of worldwide patents and patent applications that compris[e] PATENT RIGHTS is attached as Appendix B.

(*Id.* at 3-4)  The Settlement Agreement also contained a standard merger clause,

acknowledging that "this Agreement sets forth the entire agreement and understanding

of the PARTIES hereto as to the subject matter hereof, and shall not be subject to any

change or modification except by the execution of a written instrument executed to by

authorized persons for the PARTIES hereto."  (*Id.* at 13)

---

[²]The parties do not dispute that the transfer of rights occurred at the execution of the Settlement Agreement on December 9, 2011.

2

In addition to Appendix B, but neither mentioned in the body of the Settlement

Agreement nor separately executed, is a document labeled "EXHIBIT A, PATENT

PURCHASE TERMS." (*Id.* at 53)  The first paragraph of this document provides as

follows:

> **1. SALE OF PATENTS**
> **1.1 Purchase and Sale.** Walker Digital LLC ("**Seller**" for purposes
> of this Exhibit A) hereby conveys, assigns, and transfers to eBay Inc.
> ("**Purchaser**" for purposes of this Exhibit A), and Purchaser hereby
> accepts, all right title, and interest in and to the patents and patent
> applications described on **Schedule A** (collectively, the "**Transferred
> Patents**").  The Transferred Patents include all counterparts,
> continuations, continuations-in-part, divisionals, reissues, reexaminations,
> and extensions thereof, and all current, future, or abandoned patents
> and patent applications (whether filed by Seller or Purchaser and whether
> filed before, on, or after the Effective Date) claiming priority from, derived
> from, or related to any of the foregoing in any jurisdiction.  The sale of the
> Transferred Patents to Purchaser includes the transfer of (i) the right to
> sue and recover damages for past, present, and/or future infringement;
> (ii) the right to injunctive relief and; (iii) any and all causes of action relating
> to any of the inventions or discoveries described in the Transferred Patents.
> Seller reserves no rights whatsoever in the Transferred Patents.

(*Id.*)  In section 3.1(e), the Seller represented that,

> with respect to each Transferred Patent: (i) no action, suit, litigation,
> arbitration, investigation, prosecution, or other proceeding (a "**Proceeding**")
> is pending or, to the knowledge of Seller, threatened, nor has any claim
> or demand been made, which challenges or challenged the legality,
> validity, enforceability, or use by Seller or such Transferred Patent; and
> (ii) all maintenance, annuity, and other fees have been fully paid and all
> filings have been properly and timely made. . . .

(*Id.* at 54)  Attached to Exhibit A is Schedule A; not surprisingly, many (but not all) of the

patents and patent applications listed on Schedule A are listed on Appendix B, the

"master list" of plaintiff's "PATENT RIGHTS."[3]  (*Id.* at 56)  Also listed on Appendix B are

---

[3]Specifically, all of the issued patents are listed, as well as all of the pending (as
opposed to abandoned) patent applications.  (*Id.* at 56)

the patents-at-issue (in the case of the '359 patent, the application relating thereto). (*Id.*

at 40, 49)  The "Short Form Patent Assignment," attached as Schedule B and executed

subsequent to the Settlement Agreement, uses yet different language in describing the

property conveyed through the transaction at issue:

> (1) any and all improvement disclosed in **United States**
> **Patent Application Serial No.** _____ and
> entitled _____;
>
> (2) all original and reissued letters patents that have been or
> shall be issued in the United States and in all foreign
> countries on any of said improvements; and in and to all
> divisional, continuing, reissue, extension, substitution and
> renewal applications, and all other patent applications that
> have been filed or shall be filed in the United States and in
> any foreign countries, on any of said improvements; and in
> and to all rights attaching to said improvements (including
> any and all rights under the Hague Convention, the Paris
> Convention for the Protection of Industrial Property, and
> under the Patent Cooperation Treaty); and
>
> (3) all past, present and future proceeds of said letters
> patent (including, but not limited to, all license royalties and
> proceeds of infringement suits); and in and to any and all
> causes of action for past, present, and future infringement of
> any of said letters patent, or relating to any inventions or
> discoveries described therein, including the right to collect
> royalties for all such infringements and the right to sue on all
> such causes of action for its own use and benefit and the
> use and benefit of its successors, assigns and legal
> representatives.

(*Id.* at 57)

Schedule A of the Settlement Agreement lists U.S. Patent Nos. 6,694,300 ("the

'300 patent), 6,196,458 ("the '458 patent"), 6,898,570 ("the '570 patent"), and the

applications for each such patent. (*Id.* at 56)  The genealogy of the patents-at-issue all

relate back to one or more of such patents.  More specifically, the **'470** patent is a

4

continuation-in-part of an application, which is a continuation-in-part of the '300 patent; the **'470** patent is also related to the '458 and '570 patents. (*See* '470 patent, 1:35-55) The **'056** patent is a continuation of an application, which is a continuation-in-part of the '300 patent; the **'056** patent is also related to the '458 patent. (*See* '056 patent, 1:9-13, 34-50) The **'359** patent is a continuation of U.S. Patent No. 7,856,379, which is a continuation of the '942 patent, which is a continuation-in-part of the '300 patent. The **'359** patent is also a continuation-in-part of the U.S. Patent No. 6,405,174, which in turn is a continuation-in-part of the '300 patent. (*See* '359 patent, 1:7-26)

## III. STANDARD OF REVIEW

Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000). Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact). *See 2 James W. Moore, Moore's Federal Practice* § 12.30[4] (3d ed. 1997). Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408-09 (3d Cir. 1991) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

Under a factual attack, however, the court is not "confine[d] to allegations in the .

5

. . complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997); *see also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891-92 (3d Cir. 1977). In such a situation, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Carpet Group*, 227 F.3d at 69 (quoting *Mortensen*, 549 F.2d at 891). Although the court should determine subject matter jurisdiction at the outset of a case, "the truth of jurisdictional allegations need not always be determined with finality at the threshold of litigation." 2 Moore § 12.30[1]. Rather, a party may first establish jurisdiction "by means of a nonfrivolous assertion of jurisdictional elements and any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure before a judge alone (as distinct from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection)." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537-38 (1995) (citations omitted).

Article III standing requires: "(1) an injury-in-fact . . . ; (2) a causal connection between the injury and the conduct complained of; and (3) that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007). To have standing, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Sierra Club v. Morton*, 405

6

U.S. 734, 734-735 (1972)).

Plaintiff bears the burden of establishing that it has standing to bring an action for patent infringement. *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). The Patent Act provides that "[a] patentee" is entitled to bring a civil action for patent infringement. 35 U.S.C. § 281. The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors to the patentee." Id. at § 100(d). These sections "have been interpreted to require that a suit for infringement of patent rights ordinarily be brought by a party holding legal title to the patent." *Propat Intern. Corp. v. RPost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007) (citing *Sicom Sys. Ltd.*, 427 F.3d at 976); *see also  Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001). A party that holds the exclusionary rights to a patent suffers constitutional injury-in-fact. *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1341 (Fed. Cir. 2007).

**IV. ANALYSIS**

The parties dispute whether the Settlement Agreement transferred all rights to the three patents-at-issue - the '470, '056, and '359 patents - to eBay on December 9, 2011, thus terminating plaintiff's constitutional standing to pursue the above captioned litigation. In Delaware, the interpretation of contracts is a matter of law for the court to determine. *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). A court's interpretation of a contract "will give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Capital*

7

*Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours and Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (citations omitted). "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "[I]f part of the contract is irreconcilable with the main purpose of the contract, that part will be given no effect in order that the main purpose of the contract can be achieved." 11 Williston on Contracts § 32:9 (4th ed.).

If a contract's terms are clear and unambiguous, the court will interpret such terms according to their ordinary and usual meaning. *See Paul*, 974 A.2d at 145. Contract terms are held to be clear and unambiguous "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (citing *Rhone-Poulenc*, 616 A.2d at 1196). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1195. If a court determines that a contractual provision is ambiguous, the "court may consider evidence of prior agreements and communications of the parties as well as

8

trade usage or course of dealing." *Eagle Indus.*, 702 A.2d at 1233.

The Settlement Agreement ostensibly includes two separate conveyances of rights from plaintiff to eBay:  a nonexclusive license to some 544 patents and patent applications listed on Appendix B, and ownership rights to a subsection of those patents and patent applications as listed on Schedule A.  The language used to describe the intellectual property conveyed is different in both instances; nonetheless, each conveyance is effected using very broad language.  In divining whether plaintiff conveyed ownership rights to the patents-at-issue through operation of Exhibit A/Schedule A, the court starts with the basic principle that it "must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."  *See Dow Chemical Co. v. Nova Chemicals Corp.*, 458 Fed. Appx. 910, 914 (Fed. Cir. 2012) (citing *Elliott Assocs. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998)).

The first sentence of Section 1.1 of Exhibit A assigns the term "Transferred Patents" to those patents "described on Schedule A."  The second sentence further defines the term "Transferred Patents" to include "**all**" related patents "whether filed by Seller or Purchaser" and regardless of filing date.[4]  *See Regents of the Univ. of New Mexico v. Knight*, 321 F.3d 1111, 1120 (Fed. Cir. 2003) (holding that a patent policy covering "all divisions, continuations, substitutions, renewal, and reissue applications" was "more than sufficient" to require inventors to assign continuation-in-part

---

[4]The record indicates that eBay added the language "whether filed before, on, or after the effective date" to the second sentence of Section 1.1, another indication that eBay intended to receive more than just those patents and applications described on Schedule A.  (D.I. 12-140, D.I. 77, ex. XIII at 53)

applications).  To ignore the second sentence of Section 1.1 would conflict with the "general principle[] of contract law, [that] a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless." *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) (citing *Seabreak Homeowners Ass'n v. Gresser*, Del. Ch., 517 A.2d 263, 269 (1986), *aff'd*, 538 A.2d 1113 (Del. 1988).

Comparing the language used by the parties throughout the entire transaction, plaintiff described its "PATENT RIGHTS" for purposes of the licensing agreement as comprising those patents and patent applications listed on Appendix B.  Despite this broad grant, plaintiff more specifically described the property licensed as "including but not limited to . . . the entire families of" the '942 and '056 patents, further described as "including but not limited to all of their parents, **continuations, continuations-in-part, divisionals, reissues, and re-examinations**."[5]  (Civ. No. 11-313, D.I. 244, ex. I at 3) (emphasis added)  In contrast, the term "Transferred Patents," for purposes of Exhibit A, was comprised of those patents and patent applications listed on Schedule A, further described using virtually the same language as above:  "all counterparts, **continuations, continuations-in-part, divisionals, reissues, reexamintions**, and extensions thereof, and all current, future, or abandoned patents and patent applications . . . claiming priority from, derived from, or related to any of the foregoing in any jurisdiction."  (*Id.* at 53) (emphasis added)  The court cannot discern the difference

---

[5]Plaintiff's argument that the identification of the '056 patent in this section clearly shows that it did not transfer the '056 patent rings hollow as all of the issued patents listed on Schedule A (held out by plaintiff to be a complete list of Transferred Patents) are also listed on Appendix B (seemingly the list of licensed patents).

10

between the breadth of these two descriptions and finds this "granting" language to be

unambiguous.[6]

The court concludes that, under the broad granting language of Exhibit A, the

Settlement Agreement clearly transferred ownership rights of the '359 patent to eBay.

Therefore, the motions to dismiss Civ. Nos. 12-140, 12-141, and 12-142 are granted.[7]

With respect to the '470 and '056 patents, the broad granting language is

inconsistent with plaintiff's warranty that none of the Transferred Patents were the

subject of litigation (Civ. No. 11-313, D.I. 244, ex. I at 54, Section 3.1(e)), as plaintiff

was actively litigating the '942 patent (Civ. No. 11-315), as well as the '470 and '056

patents (Civ. No. 11-313), at the time of the Settlement Agreement.[8]  While a court

should seek to give meaning to all provisions of a contract if possible, when

"irreconcilable differences between contract clauses [arise, the court] is to enforce the

clause relatively more important or principal to the contract."  11 Williston on Contracts

§§ 32:5, 32:9; *c.f. Ludwig Honold Mfg. Co. v. Fletcher*, 405 F. 2d 1123, 1131 (3rd Cir.

---

[6]Compare, e.g., the language at issue in *Dow*, a case relied upon by plaintiff for
this argument in its briefing in Civ. No. 12-140.  (Civ. No. 12-140, D.I. 87 at 8-10)  In
*Dow*, the **only** affirmative description of the transferred patents was the following: "The
parties shall provide a schedule of Patent Rights as Schedule A to this Agreement,
within ninety (90) days of the Effective Date, and shall provide subsequent supplements
thereto from time to time during the Term."  *Dow*, 458 Fed. Appx. at 913.  The Federal
Circuit held that this sentence "makes it abundantly clear that Dow and DGTI intended
Schedule A to include a list of all of the transferred patents (among other things)."  *Id.* at
914.  For *Dow* to be applicable to the facts at bar, Section 1.1 would have to be limited
to the first sentence which, clearly, is not the case.

[7]Thus, plaintiff's motions to dismiss without prejudice are rendered moot.  (Civ.
No. 12-140, D.I. 105; Civ. No. 12-141, D.I. 81; and Civ. No. 12-142, D.I. 73)

[8]The '359 patent was not in litigation at the time of the Settlement Agreement
and was not mentioned in any of eBay's submissions.

11

1969) (citing 22 Williston § 619) ("Where ambiguity exists, the minor provisions must be construed as not to conflict with the main purpose of the contract.").

Plaintiff's parol evidence does not help the court resolve this conflict. In this regard, the record contains a letter from eBay which states in toto: "This confirms that eBay Inc. is not the owner of [the '470 and '056 patents]. eBay Inc. reserves all rights and no other rights, express or implied, are granted."[9] (Civ. No. 11-313, D.I. 254, ex. 6) The record also contains the declaration of Anup Tikku, Senior Patent Counsel at eBay, wherein he avers that plaintiff and eBay did not intend to transfer the rights to patents in litigation at the time of the transfer. (Civ. No. 11-313, D.I. 291, ex. 1)

The court declines to elevate a standard warranty clause above unambiguous granting language - the clear purpose of the document. This seeming conflict does not render performance of the contract impossible or meaningless, as it was (and continued to be) easily cured through amendment or otherwise. Indeed, plaintiff dismissed Civ.

---

[9]This ambiguous language is a far cry from the clear language used by the parties in *IpVenture* to confirm the status of a patent-in-suit. *IpVenture, Inc. v. Prostar Computer*, Inc., 503 F.3d 1324, 1326-27 (Fed. Cir. 2007). In *IpVenture*, the Federal Circuit considered whether Hewlett-Packard, the employer of a co-inventor of the patent-in-suit, had an ownership interest in the patent. Hewlett-Packard expressly disclaimed its patent rights in an agreement written during the pendency of the litigation:

> IpVenture is the sole assignee of [the '235 patent and other patents] ... [Hewlett-Packard] has never asserted any ownership rights to the IpVenture Patents and agrees to forbear from asserting such rights at anytime in the future ... [Hewlett-Packard] has no rights ... and never has had any legal or equitable rights, including any shop rights, to any of the IpVenture Patents.

*IpVenture*, 503 F.3d at 1326-27. The Federal Circuit held that this confirmation of the patent status removed the need to construe an employment agreement controlling Hewlett-Packard's interest in the patent. *Id.* at 1327.

12

No. 11-315 as to eBay after entering into the Settlement Agreement, and then subsequently dismissed the case as to the other defendants. (*See, e.g.*, Civ. No. 11-315, D.I. 159, 338-40)  Neither is eBay's letter, which purports to "reserve[] all rights," explicit enough to circumvent the clear language of the contract.

Given the complexity of plaintiff's patent portfolio[10] and the sophistication of the parties to the Settlement Agreement, the court relies on the unambiguous granting language rather than the equivocal parol evidence to divine what the parties meant to accomplish through the Settlement Agreement. *Demetree v. Commonwealth Trust Co.*, No. 14354, 1996 WL 494910, at *4 (Del. Ch. Aug. 27, 1996) ("An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.").  Therefore, the court grants defendants' motion to dismiss Civ. No. 11-313.

## V. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss under Rule 12(b)(1) for lack of standing (Civ. No. 11-313, D.I. 242; Civ. No. 12-140, D.I. 75; Civ. No. 12-141, D.I. 52; and Civ. No. 12-142, D.I. 44) are granted.  Amazon and Zappos' motion for leave to file amended answers to assert lack of standing as an affirmative defense (Civ. No. 11-313, D.I. 258) is denied as moot.

---

[10]According to Appendix B, plaintiff owned 389 patents and 155 patent applications at the time of the transfer, many (if not most) of them related.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 11-313-SLR |
| | ) | |
| EXPEDIA, INC., AMAZON.COM, INC., | ) | |
| AMERICAN AIRLINES, INC., and | ) | |
| ZAPPOS.COM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-140-SLR |
| | ) | |
| AMAZON.COM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-141-SLR |
| | ) | |
| BARNES & NOBLE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

WALKER DIGITAL, LLC,                    )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )        Civ. No. 12-142-SLR
                                        )
EXPEDIA, INC.,                          )
                                        )
            Defendant.                  )

## O R D E R

At Wilmington this 19th day of June, 2013, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendants Amazon, Zappos, and Expedia, Inc.'s motion to dismiss under Rule 12(b)(1) for lack of standing (Civ. No. 11-313, D.I. 242) is granted.

2. Amazon and Zappos' motion for leave to file amended answers (Civ. No. 11-313, D.I. 258) is denied as moot.

3. Amazon's motion to dismiss under Rule 12(b)(1) for lack of standing (Civ. No. 12-140, D.I. 75) is granted.

4. Barnes & Noble, Inc.'s motion to dismiss under Rule 12(b)(1) for lack of standing (Civ. No. 12-141, D.I. 52) is granted.

5. Expedia, Inc.'s motion to dismiss under Rule 12(b)(1) for lack of standing (Civ. No. 12-142, D.I. 44) is granted.

United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 11-313-SLR |
| | ) | |
| EXPEDIA, INC., AMAZON.COM, INC., | ) | |
| AMERICAN AIRLINES, INC., and | ) | |
| ZAPPOS.COM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-140-SLR |
| | ) | |
| AMAZON.COM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-141-SLR |
| | ) | |
| BARNES & NOBLE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

WALKER DIGITAL, LLC,                )
                                    )
            Plaintiff,              )
                                    )
     v.                             )          Civ. No. 12-142-SLR
                                    )
EXPEDIA, INC.,                      )
                                    )
            Defendant.              )

### MEMORANDUM ORDER

At Wilmington this \\6th day of October, 2013, having reviewed the motions for attorney fees and dismissal with prejudice filed by defendants Amazon.com Inc., Barnes & Noble Inc., Zappos.com Inc., and Expedia, Inc., and the papers filed in connection therewith;

IT IS ORDERED that said motions (Civ. No. 11-313, D.I. 318; Civ. No. 12-140, D.I. 110; Civ. No. 12-141, D.I. 86; and Civ. No. 12-142, D.I. 78) are denied without prejudice, as follows:

1. **Background**.  On April 11, 2011, plaintiff Walker Digital, LLC ("plaintiff") filed Civ. No. 11-313 against ten defendants, including Amazon.com Inc. ("Amazon"), Barnes & Noble Inc. ("Barnes & Noble"), Zappos.com Inc. ("Zappos"), and Expedia, Inc. ("Expedia") (collectively "defendants") and eBay, Inc. ("eBay"), for allegedly infringing U.S. Patent Nos. 7,831,470 and 7,827,056.  (Civ. No. 11-313, D.I. 1)  On February 7, 2012, plaintiff filed separate actions against defendants Amazon, Barnes & Noble, and Expedia, alleging infringement of U.S. Patent No. 8,112,359 (collectively with U.S. Patent Nos. 7,831,470 and 7,827,056, "the patents-in-suit").  (Civ. No. 12-140, D.I. 1; Civ. No. 12-141, D.I. 1; Civ. No. 12-142, D.I. 1)

2. On April 11, 2011, plaintiff also filed Civ. No. 11-315 against defendants

Amazon, Barnes & Noble, and Expedia, as well as eBay and others, alleging infringement of U.S. Patent No. 7,236,942 ("the '942 patent"). (Civ. No. 11-315, D.I. 1) In order to settle Civ. Nos. 11-315 and 11-313, plaintiff and eBay, Inc. ("eBay") entered into a Confidential Settlement and License Agreement ("Settlement Agreement") which transferred certain "patent rights" to eBay. Defendants then moved to dismiss each of the above captioned cases under Rule 12(b)(1) for lack of standing, alleging that the Settlement Agreement transferred all rights to the three patents-in-suit and the '942 patent to eBay on December 9, 2011, thus terminating plaintiff's constitutional standing. (Civ. No. 11-315, D.I. 320; Civ. No. 11-313, D.I. 242; Civ. No. 12-140, D.I. 75; Civ. No. 12-141, D.I. 52; and Civ. No. 12-142, D.I. 44)

3. Plaintiff dismissed Civ. No. 315 against defendants, by joint stipulation, in March 2013.[1] (Civ. No. 11-315, D.I. 337, 338, 339) On June 19, 2013, the court issued a memorandum opinion and order granting defendants' motions to dismiss under Rule 12(b)(1). (Civ. No. 11-313, D.I. 314, 315; Civ. No. 12-140, D.I. 106, 107; Civ. No. 12-141, D.I. 82, 83; and Civ. No. 12-142, D.I. 74, 75) Subsequently, Walker Digital appealed to the Federal Circuit. (Civ. No. 11-313, D.I. 322; Civ. No. 12-140, D.I. 114; Civ. No. 12-141, D.I. 90; and Civ. No. 12-142, D.I. 82) Defendants filed the pending motions for attorney fees on July 12, 2013.

4. **Standard**. Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." In order to determine whether a case is exceptional and, therefore, eligible for an award of attorney fees, the court

---

[1]But denies that it did so for reasons involving standing. (Civ. No. 11-313, D.I. 328 at 4 & n.2)

2

undergoes a two-step process. *See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1323-24 (Fed. Cir. 2011). The district court must first "determine whether the prevailing party has proved by clear and convincing evidence that the case is exceptional." *Id.* (citing *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1327 (Fed. Cir. 2003)). "Second, if the district court finds the case to be exceptional, the court must then determine whether an award of attorney fees is appropriate and, if fees are appropriate, the amount of the award." *Id.* (citing *CyborCorp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998)).

5. Under Federal Rule of Civil Procedure 54(d)(2)(8),[2] if an appeal on the merits of a case is pending, a court "may rule on the claim for fees, may defer its ruling on the motion, or may deny the motion without prejudice, directing under subdivision (d)(2)(8) a new period for filing after the appeal has been resolved." Fed. R. Civ. P. 54, Advisory Committee Note, 1993 Amendment, Paragraph (2), Subparagraph (B).

6. **Discussion.** Defendants assert that they are prevailing parties, as the court resolved the disputed ownership issue in their favor, finding that plaintiff did not own the patents-in-suit. (Civ. No. 313, D.I. 319 at 14) Defendants attempt to establish that this case is exceptional by arguing that plaintiff: (1) litigated the asserted patents after transferring them to eBay on December 9, 2011; (2) unilaterally altered the language in the Short Form Patent Assignments publicly filed with the PTO to "bury [the] transfer [of patents] to eBay;" (3) continued to litigate the asserted patents after defendants brought the lack of standing issue to plaintiff's attention in November 2012; and (4) brought

---

[2]"A claim for attorney's fees ... must be made by a motion." Fed. R. Civ. P. 54(d)(2)(A).

3

motions to voluntarily dismiss the cases without prejudice because of the issues surrounding ownership of the asserted patents in June 2013.  Alternatively, defendants argue that attorney fees should be awarded as a sanction for plaintiff's bad faith conduct for the same reasons.  Defendants also request dismissal of the above captioned cases with prejudice.  (Civ. No. 313, D.I. 319)  Plaintiff responds that the lack of standing is not relief on the merits, therefore, defendants are not prevailing parties. Plaintiff urges the court to deny the motions in their entirety or defer or deny the motions pending the present appeal to the Federal Circuit.  (Civ. No. 313, D.I. 328 at 2)

7.  As this case was resolved on a motion to dismiss, based on disputed ownership of the patents-in-suit, the court utilizes its discretion under Fed. R. Civ. P. 54(b) and denies defendants' motions pending appeal.  If the Federal Circuit affirms, defendants may request a briefing schedule for their attorney fee motions.

8.  **Conclusion.**  For the reasons stated above, defendants' motions for attorney fees and dismissal (Civ. No. 11-313, D.I. 318; Civ. No. 12-140, D.I. 110; Civ. No. 12-141, D.I. 86; and Civ. No. 12-142, D.I. 78) are denied without prejudice to renew. Plaintiff's motions for leave to submit a sur-reply in opposition to defendants' motions are denied as moot.  (Civ. No. 11-313, D.I. No. 340; Civ. No. 12-140, D.I. 132; Civ. No. 12-141, D.I. 108; Civ. No. 12-142, D.I. 98)

United States District Judge

4

A0022

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 11-313-SLR |
| | ) | |
| EXPEDIA, INC., AMAZON.COM, INC., | ) | |
| AMERICAN AIRLINES, INC., and | ) | |
| ZAPPOS.COM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-140-SLR |
| | ) | |
| AMAZON.COM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| WALKER DIGITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-141-SLR |
| | ) | |
| BARNES & NOBLE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

WALKER DIGITAL, LLC,     )
                           )
       Plaintiff,      )
                           )
   v.              )     Civ. No. 12-142-SLR
                           )
EXPEDIA, INC.,         )
                           )
       Defendant.   )

### MEMORANDUM ORDER

At Wilmington this 25th day of October, 2013, having reviewed defendants' motion for clarification;

IT IS ORDERED that said motion (D.I. 345) is granted, to the following extent:

1.  By memorandum opinion and order issued on June 19, 2013, the court granted defendants' motions to dismiss for lack of standing, which decision has been appealed by plaintiff.  Given the procedural posture of the case, no judgment was entered, nor should judgment be entered.  Indeed, having determined that plaintiff no longer owns the patents-in-suit subsequent to the eBay settlement agreement, defendants' counterclaims against plaintiff have been mooted by the court's decision.

2.  The only reason Fed. R. Civ. P. 54 was mentioned in the October 16, 2013 memorandum order was as a guideline for determining when best to resolve the pending motions for attorney fees.  Rule 54 was not implicated substantively.

3.  Given defendants' concerns about the appellate record, the court takes advantage of the opportunity to review its prior decision and, having given the matters more thought, has determined that it is more appropriate to decide defendants' motions for attorney fees now.  Consistent with the two-step analysis required under *Eon-Net LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1323-24 (Fed. Cir. 2011), the court concludes that

said motions should be denied.

4. In the first instance, defendants did not prevail on the merits. The above cases were dismissed based on business arrangements negotiated with another defendant and the resulting consequences of such.

5. Even if the court were to characterize its decision to dismiss as equivalent to an entry of judgment in favor of defendants, the court finds that defendants have failed to prove that these cases are exceptional. In this regard, defendants base their motions on plaintiff's conduct, not the substantive merits of the cases. More specifically, defendants essentially ask the court to find that plaintiff continued to litigate these cases **knowing** that it no longer owned the patents-in-suit; i.e., that there was no reasonable basis for plaintiff's conduct.

6. Whether the standard of proof is clear and convincing evidence (to prove exceptionality) or preponderance of the evidence (to justify a sanction), the court finds that the record does not weigh in defendants' favor. The eBay settlement agreement was complex and negotiated in the midst of litigation. The attorneys involved in the litigation were not involved in these negotiations. The motions to dismiss involved complex questions of law, with there being grounds for reasonable disagreement.[1] With arguably valuable property rights at stake, it is not surprising that plaintiff choose to have the court resolve the dispute rather than amicably resolve such with defendants.

―――――――――――――――

[1]Although the court ultimately found the parol evidence to be unpersuasive, plaintiff did proffer evidence to demonstrate that it was not the parties' intent to transfer ownership of the patents-in-suit to eBay.

2

A0025

7.  As to defendants' request for dismissal with prejudice, plaintiff contends that it

has not had sufficient opportunity to cure the standing defect, while defendants argue

that the temporary stay and opportunity to present evidence of plaintiff's continued

ownership of the patents-in-suit sufficed.  *Fairchild Semiconductor Corp. v. Power

Integrations, Inc.*, 630 F. Supp. 2d 365, 373 (D. Del. 2007) (concluding that dismissal

with prejudice was not appropriate, when plaintiff "had only one bite at the apple," and

even defendant recognized that the possibility of curing the standing defects existed);

*Sicom Sys., Ltd v. Agilent Techs., Inc.*, 427 F.3d 971, 980 (Fed. Cir. 2005) (affirming

dismissal with prejudice, when plaintiff "twice attempted and twice failed to establish

standing").  Here, plaintiff was offered multiple opportunities to cure the standing defect.

In its opposition to defendants' motion, plaintiff has offered no evidence that it has a

plan to cure the standing defect, stating only that it "has been and currently is engaged

in continued discussions with eBay regarding ownership of the patents-in-suit."  (D.I.

328 at 17)  For all of these reasons, and to clarify the record for purposes of appeal;

IT IS FURTHER ORDERED that defendants' motions for attorney fees are

denied. (Civ. No. 11-313, D.I. 318; Civ. No. 12-140, D.I. 110; Civ. No. 12-141, D.I. 86;

and Civ. No. 12-142, D.I. 78)

IT IS FURTHER ORDERED that defendants' requests for dismissal with

prejudice are granted.  (Civ. No. 11-313, D.I. 318; Civ. No. 12-140, D.I. 110; Civ. No.

12-141, D.I. 86; and Civ. No. 12-142, D.I. 78).

United States District Judge

3

A0026



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

March 31, 2011

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *7,831,470*
ISSUE DATE: *November 09, 2010*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

T. LAWRENCE
Certifying Officer

WD000039



US007831470B1

(12) **United States Patent**
Walker et al.

(10) Patent No.: **US 7,831,470 B1**
(45) Date of Patent: *****Nov. 9, 2010**

(54) **METHOD AND APPARATUS FOR FACILITATING ELECTRONIC COMMERCE THROUGH PROVIDING CROSS-BENEFITS DURING A TRANSACTION**

(75) Inventors: **Jay S. Walker**, Ridgefield, CT (US); **Daniel E. Tedesco**, New Canaan, CT (US); **John M. Packes, Jr.**, Stamford, CT (US); **James A. Jorasch**, Stamford, CT (US)

(73) Assignee: **Walker Digital, LLC**, Stamford, CT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/219,267**

(22) Filed: **Dec. 23, 1998**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/943,483, filed on Oct. 3, 1997, now abandoned, which is a continuation-in-part of application No. 08/923,683, filed on Sep. 4, 1997, now Pat. No. 6,553,346, which is a continuation-in-part of application No. 08/889,319, filed on Jul. 8, 1997, now Pat. No. 6,085,169, which is a continuation-in-part of application No. 08/707,660, filed on Sep. 4, 1996, now Pat. No. 5,794,207, and a continuation-in-part of application No. 09/100,684, filed on Jun. 19, 1998, now Pat. No. 6,898,570, which is a continuation-in-part of application No. 08/982, 149, filed on Dec. 1, 1997, now Pat. No. 6,196,458, and a continuation-in-part of application No. 08/994,426, filed on Dec. 19, 1997, now Pat. No. 6,694,300, which is a continuation-in-part of application No. 08/920, 116, filed on Aug. 26, 1997, now Pat. No. 6,119,099, which is a continuation-in-part of application No. 08/822,709, filed on Mar. 21, 1997, now Pat. No. 6,267,670.

(51) Int. Cl.
*G06Q 30/00* (2006.01)

(52) U.S. Cl. ............... **705/14.23**; 705/14.1; 705/14.11; 705/14.34; 705/14.36; 705/14.38; 705/14.39; 705/26; 705/300

(58) Field of Classification Search ................... 705/14, 705/40, 14.1, 14.11, 14.23, 14.34, 14.36, 705/14.38, 14.39, 26, 300
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,573,747 A 4/1971 Adams et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP 0 109 189 A1 5/1984
(Continued)

OTHER PUBLICATIONS

Radio Shack, "www.Radioshack.com/Partners/Verizon/ VerinzonLanding.asp", copyright 2003, printed Apr. 11, 2003, 3 pp.* buy.com, "www.buy.com/retail/w...Category=CELLUAR", copyright 1997-2003, printed Apr. 11, 2003, 2 pp.*
(Continued)

*Primary Examiner*—Eric W Stamber
*Assistant Examiner*—Tri V Nguyen
(74) *Attorney, Agent, or Firm*—Fincham Downs, LLC; Michael Downs

(57) **ABSTRACT**

A merchant server of a first merchant receives an indication of items that a customer is to purchase via a web site. The indication may be, for example, a signal indicating that the customer is ready to "check out" his shopping cart of items on the web site. In response, the merchant server provides an offer for a subsidy from a second merchant. The offer is provided before the items are purchased, and thus the offer is not provided unless and until the customer has manifested an intent to make a purchase from the first merchant. A response is received from the customer. If the response indicates acceptance of the offer, then the subsidy is applied to the items purchased. For example, the total price paid for the items may be reduced, or the items may even be provided to the customer without charge. In exchange, the customer agrees to participate in a transaction with the second merchant. For example, the customer may be required to switch service providers (e.g. long distance telephone service) or initiate a new service agreement (e.g. sign up for a credit card account).

**22 Claims, 18 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000040

## US 7,831,470 B1
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,108,361 A | 8/1978 | Krause | |
| 4,247,759 A | 1/1981 | Yuris et al. | |
| 4,323,770 A | 4/1982 | Dieulot et al. | |
| 4,449,186 A | 5/1984 | Kelly et al. | |
| 4,484,733 A | 11/1984 | Loos et al. | 270/54 |
| 4,491,725 A | 1/1985 | Pritchard | |
| 4,494,197 A | 1/1985 | Troy et al. | |
| 4,500,880 A | 2/1985 | Gomersall et al. | 340/825.35 |
| 4,553,222 A | 11/1985 | Kurland et al. | |
| 4,667,292 A | 5/1987 | Mohlenbrock et al. | |
| 4,669,730 A | 6/1987 | Small | |
| 4,677,553 A | 6/1987 | Roberts et al. | |
| 4,689,742 A | 8/1987 | Troy et al. | |
| 4,723,212 A | 2/1988 | Mindrum et al. | 364/401 |
| 4,750,119 A | 6/1988 | Cohen et al. | |
| 4,751,728 A | 6/1988 | Treat | |
| 4,760,247 A | 7/1988 | Keane et al. | |
| 4,789,928 A | 12/1988 | Fujisaki | |
| 4,799,156 A | 1/1989 | Shavit et al. | |
| 4,815,741 A | 3/1989 | Small | |
| 4,839,507 A | 6/1989 | May | |
| 4,854,590 A | 8/1989 | Jolliff et al. | |
| 4,859,838 A | 8/1989 | Okiharu | |
| 4,882,473 A | 11/1989 | Bergeron et al. | |
| 4,902,880 A | 2/1990 | Garczynski et al. | 235/375 |
| 4,903,201 A | 2/1990 | Wagner | |
| 4,908,761 A | 3/1990 | Tai | 364/401 |
| 4,910,672 A | 3/1990 | Off et al. | 364/405 |
| 4,922,522 A | 5/1990 | Scanlon | |
| 4,937,853 A | 6/1990 | Brule et al. | |
| 4,973,952 A | 11/1990 | Malec et al. | 340/825.35 |
| 4,982,337 A | 1/1991 | Burr et al. | |
| 4,982,346 A | 1/1991 | Girouard et al. | |
| 4,993,714 A | 2/1991 | Golightly | |
| 5,021,953 A | 6/1991 | Webber | |
| 5,025,372 A | 6/1991 | Burton et al. | |
| 5,056,019 A | 10/1991 | Schultz et al. | |
| 5,060,165 A | 10/1991 | Schumacher et al. | 364/478 |
| 5,119,295 A | 6/1992 | Kapur | |
| 5,128,862 A | 7/1992 | Mueller | 364/405 |
| 5,132,914 A | 7/1992 | Cahlander et al. | 364/478 |
| 5,136,501 A | 8/1992 | Silverman et al. | |
| 5,168,446 A | 12/1992 | Wiseman | |
| 5,172,328 A | 12/1992 | Cahlander et al. | 364/478 |
| 5,177,342 A | 1/1993 | Adams | 235/379 |
| 5,189,607 A | 2/1993 | Shirasaki et al. | |
| 5,191,613 A | 3/1993 | Graziano et al. | |
| 5,192,854 A | 3/1993 | Counts | 235/375 |
| 5,200,889 A | 4/1993 | Mori | 364/401 |
| 5,201,010 A | 4/1993 | Deaton et al. | 382/7 |
| 5,202,826 A | 4/1993 | McCarthy | |
| 5,216,595 A | 6/1993 | Protheroe | 364/412 |
| 5,223,698 A | 6/1993 | Kapur | |
| 5,224,034 A | 6/1993 | Katz et al. | |
| 5,231,569 A | 7/1993 | Myatt et al. | 364/408 |
| 5,239,165 A | 8/1993 | Novak | |
| RE34,380 E | 9/1993 | Sleevi | |
| 5,243,515 A | 9/1993 | Lee | |
| 5,245,533 A | 9/1993 | Marshall | 364/401 |
| 5,256,863 A | 10/1993 | Ferguson et al. | 235/383 |
| 5,262,941 A | 11/1993 | Saladin et al. | |
| 5,274,547 A | 12/1993 | Zoffel et al. | 364/408 |
| 5,283,731 A | 2/1994 | Lalonde et al. | |
| 5,287,268 A | 2/1994 | McCarthy | |
| 5,297,026 A | 3/1994 | Hoffman | |
| 5,297,031 A | 3/1994 | Gutterman et al. | |
| 5,302,811 A | 4/1994 | Fukatsu | 235/381 |
| 5,309,355 A | 5/1994 | Lockwood | 364/401 |
| 5,319,542 A | 6/1994 | King et al. | |
| 5,329,589 A | 7/1994 | Fraser et al. | |
| 5,333,186 A | 7/1994 | Gupta | |
| 5,353,219 A | 10/1994 | Mueller et al. | 364/405 |
| 5,361,199 A | 11/1994 | Shoquist et al. | |
| 5,367,450 A | 11/1994 | Pintsov | 364/401 |
| RE34,915 E | 4/1995 | Nichtberger et al. | 364/401 |
| 5,404,291 A | 4/1995 | Kerr et al. | |
| RE34,954 E | 5/1995 | Haber et al. | |
| 5,420,914 A | 5/1995 | Blumhardt | |
| 5,426,281 A | 6/1995 | Abecassis | |
| 5,459,306 A | 10/1995 | Stein et al. | 235/383 |
| 5,467,269 A | 11/1995 | Flaten | |
| 5,481,094 A | 1/1996 | Suda | 235/383 |
| 5,504,475 A | 4/1996 | Houdou et al. | 340/825.35 |
| 5,510,979 A | 4/1996 | Moderi et al. | 364/405 |
| 5,515,270 A * | 5/1996 | Weinblatt | 705/14 |
| 5,517,555 A | 5/1996 | Amadon et al. | |
| 5,519,769 A | 5/1996 | Weinberger et al. | |
| 5,523,794 A | 6/1996 | Mankovitz et al. | |
| 5,553,131 A | 9/1996 | Minervino, Jr. et al. | |
| 5,564,546 A | 10/1996 | Molbak et al. | 194/216 |
| 5,572,653 A | 11/1996 | DeTemple et al. | 395/501 |
| 5,581,064 A | 12/1996 | Riley et al. | 235/383 |
| 5,592,376 A | 1/1997 | Hodroff | 395/214 |
| 5,602,377 A | 2/1997 | Beller et al. | 235/462 |
| 5,606,602 A | 2/1997 | Johnson et al. | |
| 5,612,868 A | 3/1997 | Off et al. | |
| 5,619,558 A | 4/1997 | Jheeta | |
| 5,620,079 A | 4/1997 | Molbak | 194/217 |
| 5,621,201 A | 4/1997 | Langhans et al. | 235/380 |
| 5,621,640 A | 4/1997 | Burke | 395/214 |
| 5,621,812 A | 4/1997 | Deaton et al. | |
| 5,632,010 A | 5/1997 | Briechle et al. | 345/1 |
| 5,636,346 A * | 6/1997 | Saxe | 705/1 |
| 5,638,457 A | 6/1997 | Deaton et al. | |
| 5,642,279 A | 6/1997 | Bloomberg et al. | |
| 5,642,484 A | 6/1997 | Harrison, III et al. | |
| 5,642,485 A | 6/1997 | Deaton et al. | |
| 5,644,723 A | 7/1997 | Deaton et al. | |
| 5,649,114 A | 7/1997 | Deaton et al. | |
| 5,652,421 A | 7/1997 | Veenman et al. | |
| 5,652,784 A | 7/1997 | Blen et al. | |
| 5,655,007 A | 8/1997 | McAllister et al. | |
| 5,655,089 A | 8/1997 | Bucci | 395/240 |
| 5,664,115 A | 9/1997 | Fraser | 705/37 |
| 5,665,953 A | 9/1997 | Mazzamuto et al. | 235/383 |
| 5,666,649 A * | 9/1997 | Dent | 455/445 |
| 5,673,317 A * | 9/1997 | Cooper | 380/23 |
| 5,684,965 A | 11/1997 | Pickering | 395/234 |
| 5,689,100 A | 11/1997 | Carrithers et al. | |
| 5,689,652 A | 11/1997 | Lupien et al. | |
| 5,694,551 A | 12/1997 | Doyle et al. | |
| 5,710,887 A * | 1/1998 | Chelliah et al. | 705/26 |
| 5,715,402 A | 2/1998 | Popolo | |
| 5,717,866 A | 2/1998 | Naftzer | |
| 5,721,827 A * | 2/1998 | Logan et al. | 709/217 |
| 5,724,521 A | 3/1998 | Dedrick | |
| 5,724,525 A | 3/1998 | Beyers, II et al. | 395/240 |
| 5,724,886 A | 3/1998 | Ewald et al. | 99/374 |
| 5,727,153 A | 3/1998 | Powell | |
| 5,729,693 A | 3/1998 | Holda-Fleck | 395/214 |
| 5,732,400 A | 3/1998 | Mandler et al. | |
| 5,734,838 A | 3/1998 | Robinson et al. | |
| 5,734,890 A | 3/1998 | Case et al. | |
| 5,745,882 A | 4/1998 | Bixler et al. | |
| 5,752,238 A | 5/1998 | Dedrick | |
| 5,758,328 A | 5/1998 | Giovannoli | |
| 5,759,101 A | 6/1998 | Von Kohorn | |
| 5,761,647 A | 6/1998 | Boushy | 705/10 |
| 5,761,648 A | 6/1998 | Golden et al. | |
| 5,774,868 A | 6/1998 | Cragun et al. | |
| 5,774,869 A | 6/1998 | Toader | |
| 5,794,207 A | 8/1998 | Walker et al. | |
| 5,794,210 A | 8/1998 | Goldhaber et al. | |
| 5,794,219 A | 8/1998 | Brown | |

WD000041

US 7,831,470 B1

Page 3

| | | | |
|---|---|---|---|
| 5,794,220 A | 8/1998 | Hunt | |
| 5,794,221 A | 8/1998 | Egendorf | |
| 5,806,044 A | 9/1998 | Powell | |
| 5,806,045 A | 9/1998 | Biorge et al. | |
| 5,809,144 A | 9/1998 | Sirbu et al. | |
| 5,812,769 A | 9/1998 | Graber et al. | |
| 5,819,092 A | 10/1998 | Ferguson et al. | |
| 5,819,241 A | 10/1998 | Reiter | |
| 5,822,736 A | 10/1998 | Hartman et al. | |
| 5,825,881 A | 10/1998 | Colvin, Sr. | |
| 5,826,244 A | 10/1998 | Huberman | |
| 5,832,457 A | 11/1998 | O'Brien et al. | 705/14 |
| 5,835,896 A | 11/1998 | Fisher et al. | |
| 5,839,119 A | 11/1998 | Krsul et al. | |
| 5,845,259 A | 12/1998 | West et al. | 705/14 |
| 5,845,265 A | 12/1998 | Woolston | |
| 5,848,396 A | 12/1998 | Gerace | |
| 5,855,008 A | 12/1998 | Goldhaber et al. | |
| 5,857,175 A | 1/1999 | Day et al. | |
| 5,864,757 A | 1/1999 | Parker | |
| 5,864,822 A | 1/1999 | Baker, III | |
| 5,870,030 A | 2/1999 | DeLuca et al. | |
| 5,873,068 A | 2/1999 | Beaumont et al. | |
| 5,873,069 A | 2/1999 | Reuhl et al. | |
| 5,884,292 A | 3/1999 | Baker et al. | |
| 5,890,135 A | 3/1999 | Powell | |
| 5,890,718 A | 4/1999 | Byon | 273/459 |
| 5,918,211 A * | 6/1999 | Sloane | 705/16 |
| 5,923,016 A | 7/1999 | Fredregill et al. | |
| 5,937,037 A | 8/1999 | Kamel et al. | |
| 5,946,665 A | 8/1999 | Suzuki et al. | 705/26 |
| 5,970,469 A | 10/1999 | Scroggie et al. | |
| 6,014,634 A | 1/2000 | Scroggie et al. | |
| 6,026,370 A | 2/2000 | Jermyn | 705/14 |
| 6,035,281 A | 3/2000 | Crosskey et al. | 705/14 |
| 6,049,778 A | 4/2000 | Walker et al. | |
| 6,052,730 A | 4/2000 | Felciano | |
| 6,055,513 A | 4/2000 | Katz et al. | |
| 6,059,142 A | 5/2000 | Wittern, Jr. et al. | |
| 6,064,987 A | 5/2000 | Walker et al. | 705/38 |
| 6,076,068 A | 6/2000 | DeLapa et al. | |
| 6,076,069 A | 6/2000 | Laor | |
| 6,124,799 A | 9/2000 | Parker | |
| 6,138,105 A | 10/2000 | Walker et al. | 705/10 |
| 6,144,948 A | 11/2000 | Walker et al. | |
| 6,173,274 B1 | 1/2001 | Ryan, Jr. | |
| 6,178,411 B1 | 1/2001 | Reiter | |
| 6,185,545 B1 | 2/2001 | Resnick et al. | |
| 6,223,163 B1 | 4/2001 | Van Luchene | 705/14 |
| 6,259,908 B1 | 7/2001 | Austin | |
| 6,298,329 B1 | 10/2001 | Walker et al. | 705/14 |
| 6,298,331 B1 | 10/2001 | Walker et al. | 705/15 |
| 6,327,580 B1 | 12/2001 | Pierce et al. | |
| 6,332,128 B1 | 12/2001 | Nicholson | 705/14 |
| 6,336,095 B1 | 1/2002 | Rosen | |
| 6,336,099 B1 | 1/2002 | Barnett et al. | 705/14 |
| 6,349,288 B1 | 2/2002 | Barber | |
| 6,393,407 B1 | 5/2002 | Middleton et al. | |
| 6,405,174 B1 | 6/2002 | Walker et al. | |
| 6,456,981 B1 | 9/2002 | Dejaeger et al. | |
| 6,965,870 B1 | 11/2005 | Petras et al. | |
| 7,225,142 B1 | 5/2007 | Apte et al. | |
| 2001/0014868 A1 | 8/2001 | Herz et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 512413 A | 11/1992 |
| EP | 0 607 686 A2 | 7/1994 |
| EP | 809202 | 11/1997 |
| EP | 0 902 381 A2 | 3/1999 |
| JP | 05257950 A | 10/1993 |
| JP | 10187318 A | 7/1998 |
| WO | WO 95/03570 | 2/1995 |
| WO | WO 96/31848 | 10/1996 |
| WO | WO 96/36926 | 11/1996 |
| WO | WO 97/20279 | 6/1997 |
| WO | WO 97/35441 | 9/1997 |
| WO | WO 98/06050 | 2/1998 |
| WO | WO 98/26363 | 6/1998 |
| WO | WO 98/28699 A1 | 7/1998 |
| WO | WO 98/34187 | 8/1998 |
| WO | WO 00/21400 A1 | 4/2000 |

OTHER PUBLICATIONS

Myhre, James W., "Examiner's Affidavit," Apr. 11, 2003, 1 pp.*
Myhre, James W., "Examiner's Affidavit", certified Apr. 11, 2003 affidavit, Dec. 22, 2003, 1 pp.*
Press Release of Oct. 16, 1996, "Radioshack Introduces Handheld Flip-style Cellular Telephone with Vibration Alert", Tandy Corporation, Copyright 1995, 2 pp.*
Press Release of Aug. 21, 1996, "Fort Worth Outlet Square Offers American Airlines AAdvantage Miles", Tandy Corporation, Copyright 1995, 2 pp.*
Press Release of Sep. 11, 1996, "One-Stop Telephone Shopping Returns to America! Sprint, Sprint Spectrum and Radioshack Join Forces", Tandy Corporation, Copyright 1995, 2 pp.*
The Myhre Affidavit.*
Tedesco, Richard. "Pactel pushes 'Net access." Broadcasting & Cable. Jun. 3 1996, p. 64-65.*
Colman, Price. "Cross-marketing cuts cable bills." Broadcasting & Cable. Jul 15 1996, p. 44.*
Fleming et al. "European Banks, Insurance Firms Cross Into Each Other's Territory." Wall Street Journal. (Europe) Feb 20, 1991, p. 9.*
Anonymous ("Manufacturers shine with cross-promotional prowes." Discount Store News. New York: Aug. 5, 1996, vol. 35, Iss 15, p. 19).*
Brian Donlon ("Cable industry channels its efforts in April; sampler of specials." USA Today. McLean, VA: Mar 29, 1990. p. 3D).*
Brian Reilly. "Upselling strategies hit the net" Net Marketing, Dec. 1996.*
Oslund ("The battle is joined // State's local long-distance business lures US West's competitor." Star Tribune, Feb 12, 1996, pp. 1-3).*
Eisman, Regina."Incentive marketing: the Energy of synergy." Incentive. Nov. 1992, p. 61.*
Pogoda, Dianne M., "G.E.C.C. Offers Credit Card With Discounts, Rebates; General Electric Capital Corp." WWD (Women's Wear Daily) Sep. 3, 1992.
"Chemical Bank and AT&T Smart Cards form strategic alliance",(http://www.att.com/press/1193/931117.blb.html), Nov. 17, 1993.
Kristof, Kathy "Card Sharks are in Season; Be Wary of Discounts and Rebates As You Shop Around for Good Credit Deals", Chicago Tribune Nov. 23, 1993.
Rosenberg, Joyce M. "GE Capital Comes to Macy'S Aid Again", AP Worldstream Feb. 17, 1994.
Block, Valerie "GM Turns up the heat with plan to cross-sell some financial products", The American Banker Nov. 18, 1994.
Ellis, Stephen "Credit Card firms drive down costs", Sunday Times Feb. 27, 1994.
"Pagers That Can Spell It All Out" , Business Week Jan. 16, 1995.
Meece, Mickey "Big Finance Companies May Want Piece of Limited'S Private-Label Card Program" ,The American Banker Apr. 12, 1995.
Schrage, Michael "Free Stuff! Predatory Pricing or Creative Cross-Promotion? You Be the Judge;The Beta Version; Industry Trend or Event" Marketing Computers , Oct. 1995.
Marshall, Kyle "More Phone Choices Ring in", The News and Observer Aug. 13, 1996.
Wessel, Harry "Rewarding Experience?; Credit Cards Offering Bonuses Not for Everyone", Chicago Tribune Nov. 4, 1996.
Selasky, Susan "Easy-To-Swallow Savings; Diner Credit Cards Serve Wide Menu of Discounts", Pittsburgh Post-Gazette Dec. 5, 1996.
"Merger Creates Alliance Data", Credit Risk Management Report Dec. 16, 1996.

WD000042

A0122

## US 7,831,470 B1

Page 4

Higgins, Stephen "Digital Phone Service on the Way" Business Dateline; New Haven Register , Jan. 7, 1997.

Kerstetter, Jim "E-Commerce Updates Get Intelligent Agents; Electronic Commerce", PC Week Feb. 3, 1997.

Barlow, Rick "Relationship Marketing : Coalition Marketing Is Coming Back", Brandweek Apr. 28, 1997.

Simon, Ruth "Make Sure Your Rebate Card Still Delivers The Goods", Money Aug. 1997.

Gilligan, Gregory J. "Credit Cards From Retail Stores A Mixed Blessing for Shoppers", The Richmond Times Dispatch, Jul. 20, 1997.

Fitzgerald, Beth "New Jersey-Based SCA Helps Private Label Credit Cards Take Off", The Star Ledger Aug. 4, 1997.

Sanders, Edmund "Tricky Business; The Magic of Rebate Cards Can Quickly Disappear", Chicago Tribune Aug. 18, 1997.

Wijnen, Renee "Cendant Eyes Cross-Marketing Opportunities; CUC International-HFS Inc. Merger Expected to Yield an Additional 2 Million Club Members" DM-News Feb. 2, 1998.

"Cardholders Think Big" Bank Marketing International Mar. 1998.

Wald, Matthew L. "Spending It; Utying Cellular Phones From Those Annual Contracts" The New York Times Mar. 15, 1998.

"American Eagle Outfitters, Inc. Introduces The First Clear Credit Card" PR Newswire Mar. 26, 1998.

Ling, Teh Hooi "Prices of Handphones Dive, Thanks to Cross-Subsidies" Business Times Apr. 8, 1998.

"Card Briefs: Beneficial, Casual Male Team Up on Card" The American Banker May 4, 1998.

"Points Earn Little Credit As Cardholders Fail to Cash in" Birmingham Post May 9, 1998.

"Jay Jacobs Inc. Introduces Private Label Credit Card", Business Wire May 18, 1998.

"Wellspark Group Launches V.I.P. Rewards; The Most Comprehensive Relationship Marketing Program Ever Created by a Mall Developer", Business Wire May 19, 1998.

"SNET Cellular Value Plans" Brochure , Jun. 12, 1998.

"Shoppers Charge Accounts Co. To Administer Private Label Credit Card for Lew Magram, Ltd.; Program Marks SCA's Entry Into Retail Catalog/Mail Order Industry" PR Newswire Jun. 29, 1998.

"Cell Phones At 7-117 Almost Everyone Is Selling Wireless Service These Days. Here's How to Get the Right Deal" Time Magazine Jul. 6, 1998.

"The Savings Game; Read Fine Print in Rebate Offers by Credit Cards" The Cincinnati Enquirer Aug. 31, 1998.

"Wal-Mart on Retail Road Less Traveled: Cobranding" The American Banker Sep. 11, 1998.

Elkin, Tobi "Promotions: Mastercard Wins Coveted On-Pack Real Estate in Tie-In With Microsoft" Brandweek Sep. 14, 1998.

"Clubmacy's" brochure Sep. 1998.

"Filene's" Credit Card Application , Sep. 1998.

"Dual-Function Cards Latest Pitch to Call in Holders", Card Marketing Nov. 1998.

"Issuers Charge Ahead to Focus on Price vs. Brand", Card Marketing Nov. 1998.

"Competition: First USA, With Its Microsoft Pact, Is King of the Internet", Credit Card News Nov. 1, 1998.

"Retail Cards: Attention Kmart Card Holders: 6% Back Is Dead A New Package of Perks Is Coming" Credit Card News Nov. 1, 1998.

"Microsoft and First USA Announces $90 Million Online Advertising Alliance" EDP Weekly's IT Monitor Nov. 2, 1998.

Feldman, Amy "Paying With Plastic Not Such a Smart Idea", New York Daily News Nov. 4, 1998.

Cowell, Alan "America's Turn to Colonize; Creditcard Issuers Invade Britain, With U.S. Firepower", The New York Times Nov. 12, 1998.

"To Business and Technology Editors" PR Newswire Nov. 27, 1998.

Shermach, Kelly "Partnerships Help Issuers Weave Web Concepts" , Card Marketing, Dec. 1998.

"Largest Internet Ad Deal Signed", Bank Marketing International , Dec. 1998.

"Amazon.Com and Netflix.Com Establish Promotional Relationship for the Sale and Rental of DVD Titles" Business Wire Dec. 4, 1998.

"At Sports Superstore Online, Shoppers Get More for Their Money; 10,000 Reasons to Shop At Sports Superstore Online", Business Wire Dec. 4, 1998.

"Credit Card Enticements" NPR Morning Edition , Dec. 23, 1998.

"Milestone Events Making Spring History 1899-1989", undated.

Sims, Calvin, "Centel Acquiring Cellular Phone Unit", The New York Times, May 28, 1988, Section 1, p. 33, col. 3, Financial Desk.

Butcher, Lola, "United May Pocket Windfall With Sale of Cellular Business", Kansas City Business Journal, Jun. 6, 1988, Section: vol. 6, No. 38, Section 1, p. 8.

Winter, Christine, "GTE to Sell Par of US Sprint Stake Deal to Shift Another 30% to Partner Untied Telecom", Chicago Tribune, Jul. 19, 1988, Section: Business, p. 2, Zone C.

"United Telecommunications Announces Completion of Sale", PR Newswire, Oct. 5, 1988.

Henze, Doug, "A Tightening in Cellular Market", Oakland Business Monthly, Aug. 1989, Section 1, vol. 7, No. 8, p. 45.

"United Telecom halts Sprint deal as net falls", Chicago Tribune, Jul. 18, 1990, Section: Business, p. 1, Zone C.

Connely, Joanne, "FCC gets spectrum comments; US Federal Communications Commission investigates development of personal communications networks and radio-based technologies", Chilton's Electronic News, Jan. 28, 1991, Section: No. 1845, vol. 37, p. 10, ISSN: 1054-6847.

Manuta, Lou, "Should cellular be deregulated? Cellular radio telephones; Industry Overview", Cellular Marketing, Jan. 1992, Section: vol. 7, No. 1, p. 20, ISSN: 0890-2402.

Rossa, James L., "Cellphones ride roller coaster; American Information Technologies Corp. to cut commission rebates to retailers", HFD-The Weekly Home Furnishings Newspaper, Feb. 3, 1992, Section: vol. 66, No. 5, p. 89, ISSN: 0746-7885.

La Rossa, James Jr., "Ameritech policy stirs debate; executives weigh retailer rebates on eve of Cellular Telecommunications Industry Association Show; American Information Technologies Corp; Special CTIA Show Issue", HFD-The Weekly Home Furnishings Newspaper, Feb. 10, 1992, Section: vol. 66, No. 6, p. 81, ISSN: 0746-7885.

Ziegler, Bart, "Sprint to Merge with Centel", Associated Press, May 28, 1992, Section: Business News.

Marek, Sue, "The carrier/retailer love affair—still going strong? Cellular radio industry; Cover Story," Cellular Marketing, Jul. 1992, Section: vol. 7, No. 7, p. 18, ISSN: 0890-2402.

"Resale Effect Debate; GAO Faults FCC on Cellular Duopoly Scheme", Communications Daily, Jul. 2, 1992, Section: vol. 12, No. 128, p. 3.

Strandjord, Jeannine M., "Should you bundle 401k services? Employee Benefits", Financial Executive, Sep. 1992, Section: vol. 8, No. 5, p. 45, ISSN: 0895-4186.

Brown, Bob and Wallace, Bob, "AT&T bid fro McCaw to reshape landscape; Gives dominant carrier access to rapidly evolving market and opportunity to influence, drive, change.", Network World, Nov. 9, 1992, Section: Top News, p. 1.

Avril, Tom, "Centel Confident of Victory After Vote on Sprint Merger", Dec. 2, 1992, Section: Business News.

Avril, Tom, "Communications; Centel Investors Vote on Sprint Merger", The Commercial Appeal, Dec. 3, 1992, Section: Business, p. B4.

Oloroso Jr., Arsenio, "Centel holds its breath; Shareholders wait to see outcome of Sprint deal", Crain's Chicago Business, Dec. 7, 1992, Section: p. 38.

Yates, Ronald E., "Sprint-Centel merger complete despite fears", Chicago Tribune, Mar. 10, 1993, Section: Business, p. 1, Zone N.

Wenske, Paul, "Sprint's big deal", Ingram's, May 1993, Section: vol. 19, No. 5, Section, p. 34.

"Petition Criticized; Fight on CPE Unbundling for IXC Resellers Launched by Major Retailers", Communications Daily, Aug. 10, 1993, Section: vol. 13, No. 153, p. 1.

DeFebo, Carl Jr., "Sprint opens first superstore in Mechanicsburg", Central Penn Business Journal, Nov. 3, 1993, Section: vol. 9, No. 22, Section 1, p. 12.

"Testimony Feb. 8, 1994, John V. Roach Consumer Electronics Retailers Coalition House Energy/Telecommunications and Finance Antitrust Reform Act of 1993", Federal Document Clearing House Congressional Testimony, Feb. 8, 1994.

"Sprint—Company Data", Securities and Exchange Commission Form 10-Q, for the quarterly period ended Mar. 31, 1994.

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000043

US 7,831,470 B1

Page 5

"Form 10-K Sprint Corp—FON", Filed Mar. 15, 1994 (period Dec. 31, 1993).

Kraemer, Joseph S., "Local competition; Changing Ground Rules for Network Access", Business Communications Review, Sep. 1994, Section: vol. 24, No. 9, p. S4, ISSN: 0162-3885.

Steward, Shawn, "Activating the masses", Cellular Business, Oct. 1994, Section: vol. 11, No. 10, pp. 72-80, ISSN: 0741-6520, Coden: COHE.

"Sprint—Defining the Communications Company of the Future 1994 Annual Report to Shareholders", Document Date: Dec. 31, 1994, Filing Date: Mar. 22, 1995.

"Inside Sprint Corporation: 1994 Competitive Market Developments", Inside Telecom, Jul. 17, 1995.

"Tandy Corp—Form-Type ARS", Document Date: Dec. 31, 1995, Filing Date: Apr. 10, 1996.

"Sprint Completes Spin-Off of It's Cellular Subsidiary", Chicago Sun-Times, Mar. 8, 1996, Section: Financial, p. 44.

"Securities and Exchange Commission Form 10-K/A, 360 Degrees Communications Co Cross-Reference: Sprint Cellular Co", for the fiscal year ended Dec. 31, 1995, Filing date: Apr. 16, 1996.

Press Release: "Sprint, Sprint Spectrum and Radio Shack Join Forces", New York, NY, Sep. 11, 1996.

Maxon, Terry, "Tandy pairs with Sprint for venture; Companies will offer expanded offering of telecommunications products, services", The Dallas Morning News, Sep. 12, 1996, Section: Business; p. 1B.

Hopper, Kathryn, "Tandy, Sprint to offer one-stop phones shopping", Fort Worth Star-Telegram, Sep. 12, 1996, Section: News, p. 1.

"Tandy Corporation—Quarterly Report", For the quarterly period ended Sep. 30, 1996, Filed Nov. 12, 1996.

Alleman, James and Cole, Larry, "The International Handbook of Telecommunications Economics, vol. III, Sprint—GTE's lost opportunity", Edward Elgar Publishers, 2002, Chapter 10.

King, Suzanne and Hayes, David, "Sprint PCS has played key role in cell phone boom", Posted: Jan. 6, 2002.

"Examiner's Affidavit", Affidavit of USPTO, Apr. 11, 2003.

Website: "Sprint 1995 Annual Report—Notes to Consolidated Financial Statements", (http //www sprint com/sprint/annual/95/finance/p_52a html), download date Oct. 21, 2003.

Website: "Sprint/History", (http www sprint com/sprint/ir/sd/timeline_02 html), download date: Oct. 22, 2003.

Website: "Surviving the Great Depression", (http //www geocities com/Athens/Column/4735/clbrown2 html), download date: Nov. 13, 2003.

Website: "The Mobile: 20 Years Young", (http: //motoinfo Motorola com/motoinfo/20th_anniversary/docs/timeline pdf), download date: Jan. 9, 2004.

Website: "Qualcomm About Qualcomm—History / Key Milestones", (http www qualcomm com/about/history/ html), download date: Jul. 27, 2004.

Decision on Appeal, U.S. Appl. No. 09/540,034, Decided Mar. 26, 2007, 16 pp.

Affidavit of Michael D. Downs dated Apr. 6, 2007, 91 pp.

Affidavit of Michael D. Downs dated Apr. 6, 2007, 19 pp.

International Search Report for PCT Application No. PCT/US99/21720 mailed Mar. 23, 2000, 6 pp.

International Search Report for PCT Application No. PCT/US99/13819 mailed Oct. 21, 1999, 8 pp.

International Search Report for PCT Application No. PCT/US99/13409 mailed Oct. 21, 1999 6 pp.

International Search Report for PCT Application No. PCT/US99/19955 mailed Feb. 23, 2000, 2 pp.

Written Opinion for PCT Application No. PCT/US99/13819 mailed May 16, 2000, 6 pp.

Written Opinion for PCT Application No. PCT/US99/13409 mailed May 16, 2000, 9 pp.

Spoor, Dana L., "Selling a free phone", Cellular Business, Feb. 1994, vol. 11, No. 2, pp. 58-62, ISSN: 0741-6520, 3 pp.

Crump, Stuart F. Jr., "Faith goes cellular (case study of a real estate agent's selection of a cellular phone and carrier)", Home Office Computing, Jun. 1994, vol. 12, No. 6, p. 110(2), 4 pp.

Krauss, Jeffrey, "Subsidized cable modems—Their time has come", Communications Engineering & Design—Feb. 2001, (http //www cedmagazine com/ced/2001/0201/02cc).

Sabatini, Patricia, "Card sharks; Lurking in the sea of offers you get from credit card companies are some nasty surprises. Unless you read the fine print, you'll be in the companies' jaws before you know it.", Pittsburgh Post-Gazette, Feb. 4, 1996, Section: Business, p. Cl, 8 pp.

Website: "Welcome to the American Airlines Internet Silent Auction", American Airlines, Inc., (http //www Americanair com), download date: Aug. 1996, 8 pp.

Website: "Crest—Cruise/Ferry Revenue Management System", (http www rtscorp com/h2o htm), download date: Aug. 5, 1996, 4 pp.

Wagner, Jim, "Cameras Tell Mall What Door You Use, How Often You Go", Albuquerque Tribune, Aug. 9, 1996, Section: Evening, p. A3, 2 pp.

Nishimoto, Lisa, "Market Analysis; Travel services are first online commerce offerings to fly; Many corporations arrange flight, car rental, and hotel bookings on the Internet", Infoworld, Jul. 29, 1996, Section: Internet p. 44, 2 pp.

Fickenscher, Lisa, "Amex to Start Free Rewards Program with Discounts on Merchandise", The American Banker, Oct. 18, 1996, Section: Credit/Debit/ATMS, p. 10, 2 pp.

Fitzgerald, Kate, "Amex program moves loyalty to next level: Custom Extras finds a medium customers can't ignore: Billing Statements", Advertising Age, Nov. 4, 1996, Section: News, 2 pp.

"World's First Real-Time Travel Auction Service to be Available Via World Wide Web; ETA to Open Bidding to Consumers, Travel Industry; Web Auction Leader eBay to Provide Technology Support", Business Wire, Nov. 4, 1996, 2 pp.

Website: "Web Ventures presents Bookit!", (http //www webventures com/bookit), download date: Dec. 2, 1996, 3 pp.

Nimmer, Raymond T., "Commercial Transactions on the Global Information Infrastructure: Electronic Contracting: Legal Issues", The John Marshall Journal of Computer Information Law, 14 J. Marshall J. Computer & Info. L. 211, Winter 1996, 26 pp.

Bryant, Adam, "Shaking Up Air Fares' Status Quo; Entrepreneur Seeks Break for Last-Minute Business Fliers", The New York Times, Apr. 1, 1997, Section: Section D, p. 1, col. 2, Business/Financial Desk, 4 pp.

"Dispensing the future", Electronic Payments International, May 1997, Section: Feature; 5 pp.

"Frequently Asked Questions about: AIRHITCH", (http //www isicom fr/airhitch/ahfaq), download date: May 6, 1997, 5 pp.

"Industry Briefs", Card News, Jun. 9, 1997, Section: vol. 12, No. 11, 2 pp.

"Internet mortgage service eliminates loan agents and passes commissions on to the consumer", Business Wire, Jun. 30, 1997, 2 pp.

"The United Computer Exchange: How it all Works", The Untied Computer Exchange Corporation, (www uce com/howitworks html), download date Jul. 23, 1997, 6 pp.

"Classifieds2000 The Internet Classifieds", (http www classifieds2000 com/cgi-cls/Display exe?C2K+aboutus), download date: Aug. 6, 1997, 3 pp.

Brochure: "Tired of Shopping for the Best Home Loan?", Mortgage Loan Specialists, Aug. 7, 1997, 2 pp.

Website: "HomeShark Refinance Check", (http //www homeshark com/homewatch/refi/refistep1 htm), download date: Aug. 13, 1997, 6 pp.

"General trading information and terms provided by tradingfloor.com", Tradingfloor.com, (http //www tradingfloor com/info htm), download date: Aug. 14, 1997, 11 pp.

"Nasdaq", (http //home axford com/corfin/corf11 htm), download date: Aug. 15, 1997, 3 pp.

Website: "The Nasdaq Stock Market, Inc. ('Nasdaq') Consolidated Subscriber Agreement", (http //www pcquote com/geninfo/exchange/ex_nasdaq php), download date: Aug. 15, 1997, 5 pp.

"Case-in-Point: Case Study: Bloomingdale's, Inc", (http www acxiom com/cip-cs-b htm), download date: Sep. 23, 1997, 2 pp.

Website: "NCR 7452 Workstation—Beyond Traditional POS", (http //www ncr com/product/retail/products/catalog/7452 shtml), download date: Sep. 23, 1997, 3 pp.

Brochure: OpenSite Technologies Inc., copyright 1998, 8 pp.

New Partners more exciting rewards: The Membership Rewards Program for 1998, (http // ww americanexpress com rewards news docs 1998ne w mr shtml), 38 pp.

Hemsley, Steve "Research and Destroy . . . " Marketing Week, Apr. 16, 1998, Section: Point of Purchase, 3 pp.

Website: Collector's Super Mall Information, (http // www csmonline com help aboutcsm html) Apr. 23, 1998, 4 pp.

Amato-McCoy, Deena, "Co-Branded Acme Credit Card Rewards Loyal Users" Supermarket News, Jun. 15, 1998, Section: p. 17, ISSN: 0039-5803, 2 pp.

"Acme Markets, U.S. Bankcorp Debut Visa Rewards Card", Card News, Jun. 22, 1998, Section: vol. 13, No. 12, 1 pg.

Rubenstein, Ed, "Prepaid program lets Galleria guests dine a la Card", Nations Restaurant News, Jun. 29, 1998, Section: Technology, 1 pg.

"DataCard Partners With CSI to Offer Card-Based Loyalty Solution to Merchants", Business Wire, Jul. 9, 1998, 1 pg.

Albright, Mark, "Grocery savings via Web coupons", St. Petersburg Times, Jul. 22, 1998, Section: Business, 2 pp.

Website: "DealDeal com- The Best Auction Deals on the . . . ; Bid to Win", (http www dealdeal com/pxfm/bidandwin cfm?classID=elc &cid=&cal=), download date: Oct. 29, 1998, 2 pp.

Mr. Pigeon "Cell Phone Hype Pigeon Family Sweats The Details", Star Tribune, Jan. 29, 1995, 5 pp.

Parker, Penny "Cart vendors offer line-free shopping", Denver Post, Dec. 20, 1995, 2 pp.

Website: "Amazia Endeavour Travel—TS60 Eight Day New Zealand Fly Drive Package", (http //www anzac com/endvr/ts60 html), download date: Jan. 17, 1999, 2 pp.

Website: "The Sabre Group—Sabre Decision Technologies", (http www sdt com), undated, 6 pp.

Website: MasterCard—The Smart Card: News & Views, Using Smart Cards to Deliver New Value, (http// www mastercard com/ ourcards/smartcard/articles/ar ticle4 html), Copyright 1994-2000, 5 pp.

Lacher, Lisa, "Coupon Gimmick Registers Profits", Business Record, Dec. 7, 1987, Section: vol. 83, No. 47, Sec. 1, 2 pp.

Stevens, Lawrence, "Hypermarket challenge", Computerworld, Dec. 10, 1988, Section: Software & Services, 2 pp.

Kuttner, Robert, "Computers May Turn the World Into One Big Commodities Pit", Business Week, Sep. 11, 1989, Section: Economic Viewpoint, No. 3123, 2 pp.

Golden, Fran, "AAL's Riga doubts Marketel's appeal to retailers; Chris Riga of American Airlines", Travel Weekly, Nov. 13, 1989, Section: vol. 48, No. 91, 2 pp.

"Safeway Introduces Store-Generated Coupons", PR Newswire, May 1, 1990, 1 pg.

Ritter, Jeffrey, "Scope of the Uniform Commercial Code: Computer Contracting Cases and Electronic Commercial Practices", The Business Lawyer, Aug. 1990, Section: Survey, 20 pp.

Pelline, Jeff, "Travelers Bidding on Airline Tickets SF firm offers chance for cut-rate fares", The San Francisco Chronicle, Aug. 19, 1991, Section: News, 5 pp.

Blattberg, Robert C., "Interactive marketing: exploiting the age of addressability", Sloan Management Review, Sep. 22, 1991, Section: vol. 33, No. 1, 15 pp.

Del Rosso, Laura, "Ticket-bidding firm closes its doors; Marketel International", Travel Weekly, Mar. 12, 1992, Section: vol. 51, No. 21, 3 pp.

McDowell, Bill, "Frequency marketing builds repeat business; Management", Building Supply Home Centers, Aug. 1993, Section: No. 2, vol. 165, p. 96, ISSN: 0890-9008, 5 pp.

Fitzgerald, Kate, "Dual-function Cards Latest Pitch to Call in Holders", Card Marketing, Nov. 1998, vol. 2, No. 10, (http //cardmarketing faulknergray com), 2 pp.

Speidel, Richard, "Impact of Electronic Contracting on Contract Formation Under Revised UCC Article 2, Sales", The American Law Institute—ABA Course of Study, Dec. 9, 1993, 4 pp.

"Cardbriefs: Stored-Value Card Designed for Casinos", The American Banker, Oct. 31, 1995, Section: Credit/Debit/ATMS, 1 pg.

"Tecmark Reward Terminal", (http //www tecmarkinc com/terminal htm), copyright, 1996 Tecmark Services, Inc., 1 pg.

"Draft—Uniform Commercial Code Revised Article 2. Sales—Parts 2,3, and 7", The American Law Institute, Jan. 4, 1996, 24 pp.

"MyPoints: Members Guide", (http www mypoints com/mp/dStatial show?isref=main nonmemberguide default), download date: Apr. 28, 2000, 5 pp.

Website: "Verizon Wireless at Radio Shack", (http //www radioshack com/PartnersVerizon/VerizonLanding asp?In=ve), Copyright 2003, 3 pp.

Website: "The Loan Process", Mortgage Loan Specialists, (http //web archive org/web/1970715200608/http //www sdtech com/mls/ process html), download date: Sep. 30, 2003, 3 pp.

Website: "The Nasdaq Stock Market, Inc. ('Nasdaq') Consolidated Subscriber Agreement", (http //www pcquote com/geninfo/exchange/ex_nasdaq php), download date: Sep. 30, 2003, 4 pp.

Website: "NETIS—Internet's Largest Auction Site for Auction Information", (http web archive org/web/19980703174530/http //www2 auctionweb com/), 9 pp.

Website: "Phonemiser: Frequently Asked Questions", (http //web archive org/web/19970601100142/http //www phonemiser com/faq htm), download date: Sep. 30, 2003, 8 pp.

Website: "Welcome to Sotheby's", (http //web archive org/web/ 19970101034054/http www sotheby's com/), download date: Sep. 30, 2003, 2 pp.

Website: "Welcome to Trade-direct", (http //web archive org/web/ 19970212130834/http //www trade-direct com), download date: Sep. 30, 2003, 2 pp.

Website: "Airhitch Your Way to Low Cost Travel!", (http //web archive org/web/19970416104620/http//www vaportrails com/Budget/BudFeatures/Airhitch/A...), download date: Nov. 7, 2003, 2 pp.

Carroll, Richard, "TravelASSIST Magazine—Travel Deals—Hitch a Flight to Europe", (http //web archive org/web/19970118210259/ http //www travelassist com/mag/a69 html), download date: Nov. 7, 2003, 1 pg.

Rozen, Miriam, "What's New in Joint Promotions", The New York Times, Mar. 10, 1985, Section 3, Financial Desk, 1 pg.

Katcher, P. Royall, "Getting products to consumers; The Basics of Retailing, part 2", Automotive Marketing, May 1990, Section: vol. 19, No. 5, ISSN: 0193-3264, 1 pg.

McKinney, Jeff, "Merchant program could pay off for provident", The Cincinnati Enquirer, Mar. 24, 1996, Section: Financial, 2 pp.

Website: "Rate Hunter", (http //207.49.64.77/rhprodrh htm), download date: Jul. 14, 1996, 2 pp.

Website: "Cathay Pacific—Cyber Traveler Auction #3—Official Rules", (http //www cathaypacific.com), download date: Jul. 30, 1996, 4 pp.

"UK's World Telecom Unveils New WorldSaver Tariffs", Newsbytes, Feb. 13, 1997, 1 pg.

Fickenscher, Lisa, "Merchant: American Express Seeks to Mine Its Data on Cardholder Spending Patters", The American Banker, Mar. 24, 1997, Credit/Debit/ATMS, 2 pp.

Kelsey, John et al., "Conditional Purchase Orders", Fourth ACM Conference on Computers, Apr. 1997, 8 pp.

"About IAO", (http //www iaoauction com/about htm), download date: Sep. 8, 1997, 10 pp.

"Welcome to Onsale", Onsale, Inc., (http www onsale com), download date: Sep. 8, 1997, 15 pp.

Hoeschen, Brad, "Brookfield Square hopes mall card strikes a chord", Business Journal-Milwaukee, Sep. 12, 1997, Section: vol. 14, No. 50, 2 pp.

Holton, Lisa Cable Efforts Help Insurers Tune Into New Markets:, Card Marketing, Jan. 1999, 2 pp.

Shook, David "Rebate Limits Can Be a pain for Consumers", The Buffalo News, Jan. 5, 1999, 2 pp.

Samuelson, Paul "Economics Ninth Edition", McGraw Hill Book Company, 1973, 10 pp.

Blattberg, Robert C and Levin, Alan, "Modeling The Effectiveness and Profitability of Trade Promotions", Marketing Science, 1987, 23 pp.

Jensen, Elizabeth, "Yaking It Up" The Wall Street Journal Europe, Apr. 28, 1998, 5 pp.

Point.com, webpage, copyright 1998-2000, 6 pp.

Booker, Ellis, "Checkout lines to offer more than just candy and waiting", Computer World, May 21, 1990, 1 pg.

Shaw, Robert, "How the Smart Card is Changing Retailing", vol. 24, 1991, 4 pp.

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000045

A0125

**US 7,831,470 B1**

Page 7

Travel Agent No Show Crackdown, vol. 287, No. 6, 1 pg.
Website: "Apollo Host Computer", (http //www Apollo com), undated, 4 pp.
Brochure: "Reaching Out in New Directions", Fist Data Corporation, Merchant Services, 19 pp.
Sprint Opens First Store in Mechanicsburg, Central Penn Business Journal, Nov. 3, 1993, 3 pp.
Foster, Ed, "Can mixing 'cookies' with online marketing be a recipe for heartburn?", InfoWold, Jul. 22, 1996, 2 pp.
Patch, Kimberly PC Week, Sled, InterNIC debut Internet Services, May 16, 1994, 1 pg.
Office Action for U.S. Appl. No. 09/282,747, 23 pp.
Office Action for U.S. Appl. No. 09/282,747 mailed Feb. 27, 2007, 24 pp.
Office Action for U.S. Appl. No. 09/282,747 mailed Mar. 21, 2006, 21 pp.
Office Action for U.S. Appl. No. 09/282,747 mailed Dec. 7, 2004, 12 pp.
Office Action for U.S. Appl. No. 09/282,747 mailed Apr. 13, 2004, 14 pp.
Office Action for U.S. Appl. No. 09/282,747 mailed Nov. 19, 2002, 18 pp.
Office Action for U.S. Appl. No. 09/282,747 mailed Mar. 1, 2002, 20 pp.
Office Action for U.S. Appl. No. 09/282,747 mailed May 21, 2001, 35 pp.
Office Action for U.S. Appl. No. 09/282,747 mailed Oct. 13, 2000, 34 pp.
Office Action for U.S. Appl. No. 09/322,351 mailed Aug. 20, 2007, 25 pp.
Office Action for U.S. Appl. No. 09/322,351 mailed Nov. 30, 2006, 26 pp.
Office Action for U.S. Appl. No. 09/332,351 mailed Mar. 13, 2006, 20 pp.
Office Action for U.S. Appl. No. 09/332,351 mailed Nov. 19, 2004, 22 pp.
Office Action for U.S. Appl. No. 09/332,351 mailed Jan. 27, 2003, 28 pp.
Office Action for U.S. Appl. No. 09/332,351 mailed Sep. 25, 2001, 22 pp.
Office Action for U.S. Appl. No. 09/332,351 mailed Oct. 12, 2000, 34 pp.
Board of Appeals Decision for U.S. Appl. No. 09/540,034 decided May 16, 2007, 16 pp.
Examiner's Answer for U.S. Appl. No. 09/540,034 mailed Jan. 23, 2006, 44 pp.
Office Action for U.S. Application No. 09/540,034 mailed Oct. 10, 2003, 21 pp.
Office Action for U.S. Application No. 09/540,034 mailed Jan. 14, 2003, 21 pp.
Office Action for U.S. Appl. No. 11/423,481 mailed Oct. 9, 2007, 24 pp.
Office Action for U.S. Appl. No. 11/423,481 mailed Jan. 25, 2007, 6 pp.
Office Action for U.S. Appl. No. 11/423,493 mailed Oct. 18, 2007, 21 pp.
Office Action for U.S. Appl. No. 11/423,493 mailed Jan. 26, 2007, 6 pp.
Office Action for U.S. Appl. No. 11/423,498 mailed Oct. 18, 2007, 9 pp.
Office Action for U.S. Appl. No. 11/423,498 mailed Jan. 26, 2007, 6 pp.
Office Action for U.S. Appl. No. 09/274,281 mailed Jun. 29, 2007, 5 pp.
Examiner's Answer for U.S. Appl. No. 09/274,281 mailed Oct. 31, 2006, 13 pp.
Office Action for U.S. Appl. No. 09/274,281 mailed Jul. 27, 2005, 9 pp.
Office Action for U.S. Appl.n No. 09/274,281 mailed Apr. 10, 2003, 7 pp.
Office Action for U.S. Appl. No. 09/274,281 mailed Apr. 12, 2002, 9 pp.

Office Action for U.S. Appl. No. 09/579,215 mailed Jul. 12, 2007, 18 pp.
Office Action for U.S. Appl. No. 09/579,215 mailed Mar. 6, 2006, 19 pp.
Office Action for U.S. Appl. No. 09/579,215 mailed Dec. 17, 2004, 20 pp.
Office Action for U.S. Appl. No. 09/579,215 mailed Apr. 7, 2004, 32 pp.
Office Action for U.S. Appl. No. 09/579,215 mailed Jul. 29, 2003, 20 pp.
Marn, Michael, Rosiello, Robert L., Managing Price, gaining profit, Autumn 1992, 10 pp.
Howard, Lisa S., RM sees outsourcing challenge, National Underwriter Property & Casualty-Risk & Benefits Management, Nov. 24, 1997, 2 pp.
Shamrock Technology Co. Establishes No. American IIQ as monitor manufacturer continues market expansion, Business Wire, Mar. 25, 1997, 2 pp.
Office Action for Appl. No. 09/282,747 mailed Dec. 10, 1999, 17 pp.
Office Action for Appl. No. 09/282,747 mailed Mar. 4, 2009, 16 pp.
Office Action for Appl. No. 09/282,747 mailed Jun. 12, 2008, 14 pp.
Office Action for Appl. No. 09/322,351 mailed Aug. 4, 2009, 20 pp.
Office Action for Appl. No. 09/322,351 mailed Apr. 17, 2008, 19 pp.
Office Action for Appl. No. 11/423,481 Mar. 5, 2009, 18 pp.
Office Action for Appl. No. 11/423,481 mailed Jun. 2, 2008, 18 pp.
Notice of Allowance for Appl. No. 09/274,281 mailed Sep. 9, 2010, 5 pp.
Office Action for Appl. No. 09/274,281 mailed Feb. 20, 2009, 4 pp.
Office Action for Appl. No. 09/274,281 mailed May 5, 2008, 7 pp.
"Introducing the Digital MenuBoard", Siren Technologies, Inc., (www sirentech com), undated.
"Cape Town", Reuters, Nov. 8, 1979.
"Save the Mark", Financial Times London, Feb. 1, 1983, Section: Section I, Men & Matters, p. 12.
Cook, Louise, "ConsumerWatch: Clip, Snip, Save", Associated Press, Mar. 12, 1984, Section: Business News.
Greene, Jan, "Farm bills please assn; National Grocers Association", Supermarket News, Dec. 23, 1985, Section: vol. 35, p. 6, ISSN: 0039-5803.
"Pos spectrum: a lottery looks to POS for growth", POS News, Jan. 1989, Section: vol. 5, No. 7, p. 8, ISSN: 0896-6230, Coden: Bhorad.
"Let's Play the Cash Register Receipts Lottery", The New York Times, Dec. 25, 1990, Section: Section I, p. 30, col. 4, Editorial Desk.
Del Rosso, Laura, "Marketel says it plans to launch air fare 'auction' in June; Marketel International", Travel Weekly, Apr. 29, 1991, Section: vol. 50, No. 34, p. 1, ISSN: 0041-2082.
"Philips offers customers financing through Citicorp; Philips Medical Systems North America, Citicorp North America Inc." Health Industry Today, Jun. 1991, Section: vol. 54, No. 6, p. 4, ISSN: 0745-4678.
"Coupons get serious; supermarkets use barcodes to prevent misredemptions", Chain Store Age Executive with Shopping Center Age, Oct. 1992, Section: vol. 68, No. 10, p. 68, ISSN: 0193-1199.
"Winn-Dixie/The Salvation Army Report Contributions for War Against Hunger", PR Newswire, Jun. 10, 1993, Section: Financial News.
Jones, Jeanne, "Data Readers Streamline Management . . . ", The Houston Post, Jun. 26, 1994, Section: Business, p. D1.
Fiorini, Philip, "No Place For Penny?", USA Today, Jul. 29, 1994, Section: News, p. 1A.
Smith, Alison, "Survey of UK Consumer Credit and Asset Finance", Financial Times, Nov. 3, 1994, p. VI.
News Release: Linnen, Herb et al. "AT&T comments on new FCC rules to curb 'slamming'"Jun. 14, 1995.
Andreoli, Tom et al., "Cash Machines Offer A Whole Lotto Money . . .", Crain's Chicago Business, Jun. 19, 1995, Section: News, p. 8.
Knippenberg, Jim, "Will local radio empires strike back?", The Cincinnati Enquirer, Jul. 23, 1995, Section: Tempo, p. F01.
"Cyberbid", Net Fun Ltd., Copyright 1996.
Hadley, Kimberly, "Pastors praying anti-arson effort will burn bias", The Nashville Banner, Jul. 26, 1996, Section: News, p. A13.
Gapper, John, "NatWest reports rise in bad debt", Financial Times, Jul. 31, 1996, Section: News, UK, p. 09.

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

## US 7,831,470 B1
Page 8

"Lynx Technology: Lynx to provide business leasing programme through Schroder Leasing", M2 Presswire, Aug. 9, 1996.

Taylor, Paul, "Towards a dream market", Financial Times, Sep. 4, 1996, Section: Survey -FT IT, p. 03.

Bonnici, Joseph et al., "Consumer issues in coupon usage: An exploratory analysis", Journal of Applied Business Research, winter 1996/1997, vol. 13, No. 1, pp. 31-40, ISSN: 0892-7626, Coden: JPBEBK.

"Happy Anniversary here's your Cashback Bonus ® Award", Private Issue by Discover, Copyright 1997, Greenwood Trust Company.

Rehayem, Gilbert, "Opinion: X-Press Betting", La Fleur's Lottery World, Feb. 7, 1997.

Singletary, Michelle, "Electronic World, Unchecked Problem?", The Washington Post, Mar. 4, 1997, Section: Financial, p. C01.

"Products and Services, Checkout Direct", Catalina Marketing Corporation, (http //catalinamktg com/prodcdir htm), download date: May 29, 1997.

Riordan, Teresa, "Patents; A novel approach to making a better spermicide harks back to some old-fashioned methods.", The New York Times, Jun. 9, 1997, Section D, p. 2, col. 1, Business/Financial Desk.

Nairn, Geoff, "The key to your identity: Falling costs will allow fingerprint verification to be widely used", Financial Times (London), Jul. 15, 1997, Section: Technology, p. 12.

"Switch your Chase MasterCard to a Shell MasterCard from Chase and you'll earn: Free Formula Shell Gasoline", Chase Manhattan Bank USA, N. A., Sep. 1997.

Ross, Chuck et al., "Coke Card promotion set for '98", (http //adage com/news_and_features/features/19971117/article3 html), Copyright Nov. 1997.

"NCR 7453 PC-Based Point-of-Sale Solution", NCR Corporation, Copyright 1998.

"For the Crew & the Customer", Olivetti, Winter, 1998.

Krauss, Jeffrey, "Subsidized TV sets?", CED (Communications Engineering & Design), Feb. 1998.

Goldblatt, Henry, "AT&T Finally Has an Operator . . . ", Fortune, Feb. 16, 1998, Section: Features/Telcos, p. 79.

Elstrom, Peter, "Reach Out and Pay Someone", Business Week, Mar. 23, 1998, p. 4.

"Cross-Sell Billing Statement Acquisition System", Apr. 7-9, 1998.

Website: "MCI Freeflix Free Video Rental Program", (http //www mci com/aboutus/products/prepaid/promotional shtm), download date: Apr. 21, 1998.

Website: "MCI PrePaid Card Retail Promotional Opportunities", (http //www mci com/aboutus/products/glossary/home/freeflix shtml), download date: Apr. 21, 1998.

Website: "Wall Street Access . . . : Active Trader Rebate Program", (http //www wsaccess com/active_rebate_program htm), download date: Apr. 22, 1998.

"IAFC Launches NextCard(sm)—The First True Internet VISA", (http //www nextcard com/release1 html), download date: Sep. 14, 1999.

Goldberg, Jeff, "Cellular phone information from Point.com", (http www point com/articles/489 asp), download date: Nov. 16, 2000.

Office Action mailed Jul. 29, 2003 for U.S. Appl. No. 09/579,215, entitled "Systems and Methods for Evaluating Information Associated With a Transaction to Determine a Subsidy Offer", filed May 26, 2000 in the name of Jay S. Walker et al.

US 5,709,782, 01/1998, Larson et al. (withdrawn)

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 03/30/2011



100

FIG. 1

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000048



FIG. 2

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000049

300

| | CUSTOMER IDENTIFIER 320 | NAME 322 | BILLING ADDRESS 324 | CREDIT CARD INFORMATION 326 | E-MAIL 328 |
|---|---|---|---|---|---|
| 302 → 304 → | C0001 | DAN MANN | 123 MAIN ST. | VISA 1111-1111-1111-1111 | DMANN@ISP.COM |
| 306 → | C0002 | STEVE DAVIS | 3 RIVERPLACE ROAD | AMEX 4444-555 6666-3333 | SDAVIS@SCHOOL.EDU |
| 308 → | C0003 | JEFF SMITH | 2 THRUSH LANE | DIS 2222-3333 4444-7777 | SMITH@WEBTV.COM |
| → | C0004 | GEORGE ALAN | 15 LAUREL AVENUE | VISA 1111-4444-8888-3333 | ALAN@WORK.COM |

FIG. 3

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000050

400

| ITEM IDENTIFIER 420 | ITEM DESCRIPTION 422 | ITEM PRICE 424 | AVAILABILITY 426 |
|---|---|---|---|
| P001 | WAR AND PEACE | $13.95 | IN STOCK |
| P002 | SUN TZU: THE ART OF WAR | $15.95 | AVAILABLE IN 2-3 DAYS |

402

404

# FIG. 4

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000051

A0131

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

500

| TRANSACTION IDENTIFIER 520 | TIME OF TRANSACTION 522 | ITEMS ORDERED 524 | CREDIT CARD INFORMATION 526 | AMOUNT CHARGED 528 | DELIVERY ADDRESS 530 | CUSTOMER IDENTIFIER 532 |
|---|---|---|---|---|---|---|
| T 000 001 | 1/4/2001 8:07 AM | P038, P049, P812 | VISA 1111-1111-1111-1111 EXP. 3/2002 | $49.87 | 123 MAIN ST. TOWN, USA | NONE |
| T 000 002 | 1/9/2001 9:00 PM | P123 | MASTERCARD 2222-2222-2222-2222 EXP. 9/2002 | $0.00 | 9876 PARK AVE. CITY, USA | C1234 |
| T 000 003 | 1/10/2001 3:02 AM | P456, P789, P789 | AMEX 9999-9999-9999-9999 EXP. 4/2005 | $0.00 | 24 SHADY LA. TOWN, USA | C5678 |

502

504

506

FIG. 5

WD000052

— 600

| SUBSIDIZING PARTY IDENTIFIER 620 | SUBSIDIZING PARTY NAME 622 | ACCOUNT 624 | AMOUNT OWED TO MERCHANT 626 |
|---|---|---|---|
| S001 | CREDIT CARD COMPANY X | BANK ACCOUNT #2345678 | $855.00 |
| S002 | LONG DISTANCE TELEPHONE Y | MC 1111-2222-3333-4444 | $4,390.00 |
| S003 | SATELLITE TELEVISION Z | PREPAID BALANCE $10,500 | $0 |

602

604

606

## FIG. 6

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000053

A0133

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

— 700

| OFFER RULE IDENTIFIER 720 | SUBSIDIZING PARTY IDENTIFIER 722 | SUBSIDY AMOUNT 724 | WHEN EFFECTIVE 726 | ADDITIONAL TRANSACTION REQUIRED 728 |
|---|---|---|---|---|
| R00001 | S11 | UP TO $50 | ALWAYS | SIGN UP FOR CREDIT CARD ACCOUNT |
| R0002 | S12 | UP TO $50 | TOTAL PRICE > $300 | SIGN UP FOR CREDIT CARD ACCOUNT |
| R0003 | S12 | $40 | CREDIT CARD = VISA AND TOTAL PRICE > $100 | SIGN UP FOR VISA PLUS ACCOUNT |
| R0004 | 213 | $80 | CUSTOMER IS FROM A NEW ENGLAND STATE | SIGN UP FOR CELLULAR TELEPHONE SERVICE |
| R0005 | S14 | $75 | CUSTOMER DOES NOT HAVE CABLE TELEVISION FROM SERVICE PROVIDER | SIGN UP FOR CABLE TELEVISION |

702
704
706
708
710

FIG. 7

WD000054

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

*← 800*

| OFFER IDENTIFIER **820** | TRANSACTION IDENTIFIER **822** | SUBSIDIZING PARTY **824** | OFFER RULE APPLIED **826** | SUBSIDY AMOUNT **828** | TOTAL PRICE **830** | TOTAL PRICE WITH SUBSIDY **832** | ACCEPTED YES/NO **834** |
|---|---|---|---|---|---|---|---|
| F001 | T123 | S111 | R1230 | $50 | $97.12 | $37.12 | YES |
| F002 | T456 | S222 | R4561 | $100 | $19.95 | $19.95 | YES |
| F003 | T789 | S345 | R7892 | $10 | $10.00 | $0 | YES |
| F004 | T109 | S678 | R0123 | $15 | $15.00 | $0 | YES |
| F005 | T555 | S901 | R3454 | $75 | $48.00 | $0 | YES |

802
804
806
808
810

FIG. 8

WD000055


900

| SUBSIDIZING PARTY IDENTIFIER: S888 | | | |
| :--- | :--- | :--- | :--- |
| _902_ | | | |
| TOTAL NUMBER OF OFFERS: 1,794 | | | |
| _904_ | | | |
| TOTAL NUMBER OF OFFERS ACCEPTED: 1,003 | | | |
| _906_ | | | |
| TOTAL AMOUNT OF SUBSIDIES: $52,800.00 | | | |
| _908_ | | | |
| OFFER RULE IDENTIFIER _920_ | NUMBER OF OFFERS _922_ | NUMBER OF OFFERS ACCEPTED _924_ | AMOUNT OF SUBSIDIES DUE _926_ |
| R1111 | 1004 | 500 | $2,500.00 |
| R2222 | 790 | 503 | $50,300.00 |

910

912

FIG. 9

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000056



1000

RECEIVE AN INDICATION THAT THE CUSTOMER IS TO PURCHASE ITEMS FROM MERCHANT'S WEB SITE 1002

PROVIDE OFFER FOR SUBSIDY BEFORE THE ITEMS ARE PURCHASED 1004

RECEIVE CUSTOMER RESPONSE 1006

OFFER ACCEPTED? 1008

NO

PROCESS TRANSACTION CONVENTIONALLY 1010

YES

APPLY SUBSIDY TO THE ITEMS 1012

SELL ITEMS 1014

FIG. 10

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000057



FIG. 11

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000058

1200

APPLY FOR A VISA PLUS CREDIT CARD ACCOUNT
AND YOUR PURCHASE IS **ABSOLUTELY FREE!**

| APPLICATION FOR CREDIT |
|---|

NAME:

ADDRESS 1:

ADDRESS 2:

SOC. SEC. NUMBER:

ANNUAL INCOME:

1204

CLICK HERE TO
COMPLETE THE
APPLICATION

1202

1206

BACK TO MY
SHOPPING CART

# FIG. 12

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000059

A0139



FIG. 13A

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000060



FROM FIG. 13A

A

DETERMINE SUBSIDY AMOUNT

1318

SUBTRACT SUBSIDY AMOUNT FROM
TOTAL PRICE OF THE ITEMS

1320

SELL THE ITEMS FOR THE
REDUCED TOTAL PRICE

1322

# FIG. 13B

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000061

A0141



FIG. 14A

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000062



FROM FIG. 14B

A

INITIATE A NEW SERVICE AGREEMENT
WITH THE SECOND MERCHANT
1420

REDUCE TOTAL PRICE OF THE
SHOPPING CART OF ITEMS BY
AMOUNT OF SUBSIDY
1422

SELL ITEMS FOR REDUCED
TOTAL PRICE
1424

FIG. 14B

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000063

A0143



FIG. 15

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000064



1600

RECEIVE AN INDICATION THAT
THE CUSTOMER IS READY TO
PURCHASE ITEMS HAVING A
TOTAL PRICE     <u>1602</u>

PROVIDE OFFER FOR A SUBSIDY,
THE SUBSIDY DEFINING A
DISCOUNT AMOUNT APPLIED TO
THE CUSTOMER'S PURCHASE AND A
SPREAD AMOUNT RETAINED BY
THE FIRST MERCHANT     <u>1604</u>

RECEIVE CUSTOMER
ACCEPTANCE     <u>1606</u>

CHARGE CUSTOMER'S ACCOUNT:
TOTAL AMOUNT -
DISCOUNT AMOUNT     <u>1608</u>

CHARGE SECOND MERCHANT'S
ACCOUNT: DISCOUNT
AMOUNT + SPREAD AMOUNT     <u>1610</u>

## FIG. 16

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000065

US 7,831,470 B1

**1**

**METHOD AND APPARATUS FOR FACILITATING ELECTRONIC COMMERCE THROUGH PROVIDING CROSS-BENEFITS DURING A TRANSACTION**

The present application is a continuation-in-part of U.S. patent application Ser. No. 08/943,483 entitled "SYSTEM AND METHOD FOR FACILITATING ACCEPTANCE OF CONDITIONAL PURCHASE OFFERS (CPOs)" to Andrew S. Van Luchene, Daniel E. Tedesco, James A. Jorasch, Jay S. Walker and Thomas M. Sparico filed Oct. 3, 1997 and now abandoned, which is a continuation-in-part of U.S. patent application Ser. No. 08/923,683 entitled "CONDITIONAL PURCHASE OFFER (CPO) MANAGEMENT SYSTEM FOR PACKAGES" to Andrew S. Van Luchene, Daniel E. Tedesco, James A. Jorasch, Jay S. Walker and T. Scott Case filed Sep. 4, 1997 and issued as U.S. Pat. No. 6,533,346 on Apr. 22, 2003; which is a continuation-in-part of U.S. patent application Ser. No. 08/889,319 entitled "CONDITIONAL PURCHASE OFFER MANAGEMENT SYSTEM" to Bruce Schneier, James A. Jorasch, Jay S. Walker and T. Scott Case filed Jul. 8, 1997 and issued as U.S. Pat. No. 6,085,169 on Jul. 4, 2000, which is a continuation-in-part of U.S. patent application Ser. No. 08/707,660 entitled "METHOD AND APPARATUS FOR A CRYPTOGRAPHICALLY ASSISTED COMMERCIAL NETWORK SYSTEM DESIGNED TO FACILITATE BUYER-DRIVEN CONDITIONAL PURCHASE OFFERS", to Bruce Schneier, James A. Jorasch and Jay S. Walker filed Sep. 4, 1996 and issued as U.S. Pat. No. 5,794,207 on Aug. 11, 1998; and a continuation-in-part of U.S. patent application Ser. No. 09/100,684 entitled "BILLING STATEMENT CUSTOMER ACQUISITION SYSTEM" to Daniel E. Tedesco, James A. Jorasch and Jay S. Walker filed Jun. 19, 1998 and issued as U.S. Pat. No. 6,898,570 on May 24, 2005; which is a continuation-in-part of U.S. patent application Ser. No. 08/982,149 entitled "METHOD AND APPARATUS FOR PRINTING A BILLING STATEMENT TO PROVIDE SUPPLEMENTARY PRODUCT SALES" to Jay S. Walker, Daniel E. Tedesco, Andrew S. Van Luchene and Dean P. Alderucci filed Dec. 1, 1997 and issued as U.S. Pat. No. 6,196,458 on Mar. 6, 2001; and a continuation-in-part of U.S. patent application Ser. No. 08/994,426 entitled "METHOD AND APPARATUS FOR PROVIDING SUPPLEMENTARY PRODUCT SALES TO A CUSTOMER AT A CUSTOMER TERMINAL" to Jay S. Walker, Andrew S. Van Luchene and Daniel E. Tedesco filed Dec. 19, 1997 and issued as U.S. Pat. No. 6,694,300 on Feb. 17, 2004; which is a continuation-in-part of U.S. patent application Ser. No. 08/920,116 entitled "METHOD AND SYSTEM FOR PROCESSING SUPPLEMENTARY PRODUCT SALES AT A POINT-OF-SALE TERMINAL" to Jay S. Walker, James A. Jorasch and Andrew S. Van Luchene filed Aug. 26, 1997 and issued as U.S. Pat. No. 6,119,099 on Sep. 12, 2000, which is a continuation-in-part of U.S. patent application Ser. No. 08/822,709 entitled "SYSTEM AND METHOD FOR PERFORMING LOTTERY TICKET TRANSACTIONS UTILIZING POINT-OF-SALE TERMINALS" to Jay S. Walker, James A. Jorasch and Sanjay K. Jindal filed Mar. 21, 1997 and

**2**

issued as U.S. Pat. No. 6,267,670 on Jul. 31, 2001. Each of the foregoing applications is incorporated herein by reference.

FIELD OF THE INVENTION

The present invention relates to methods and apparatus for facilitating electronic commerce.

BACKGROUND OF THE INVENTION

Electronic commerce is becoming more accepted as growing numbers of customers find shopping via the World Wide Web more appealing. However, electronic commerce suffers many problems that have plagued conventional commerce. For example, there is a great deal of competition among merchants to attract and retain customers that actually make purchases. Price competition is even stronger on the Internet, where customers can more readily "shop around" and determine the prices offered by various merchants.

Even when a customer has browsed a merchant's inventory, he may not make a purchase if an item's price is greater than the customer is willing to pay. One way to increase customer willingness to purchase, via the World Wide Web or otherwise, is to provide discounts on items purchased. Unfortunately, merchants must use discounts sparingly, since reducing purchase prices likewise reduces profits and the reduced profits may not be offset by increased sales.

It is known for a merchant to offer promotions to provide an incentive for customers to make purchases. For example, a merchant may offer a "buy one get one free" promotion whereby a purchase of an item yields the benefit of an additional item at no cost. Similarly, a merchant may provide a discount on a purchase in exchange for signing up for a credit card account provided by the merchant.

It is known to provide a promotion among more than one merchant. For example, a first merchant may advertise that if a product is purchased, a second product may be purchased from or given away by a second merchant.

It is also known for a promotion to be provided at the point of sale. For example, a web site of a merchant may provide a "banner advertisement" that allows a customer to go to another site to make a second purchase.

It would be advantageous to facilitate further electronic commerce in a manner that maintained an acceptable level of profits for merchants yet increased a customer's willingness to make purchases.

SUMMARY OF THE INVENTION

It is an object of the present invention to facilitate electronic commerce.

In accordance with the present invention, a merchant server of a first merchant receives an indication of items that a customer is to purchase via a web site. The indication may be, for example, a signal indicating that the customer is ready to "Check out" his shopping cart of items on the web site. In response, the merchant server provides an offer for a benefit from a second merchant, which may be referred to as a cross-benefit. The offer is provided before the items are purchased, and thus the offer is not provided unless and until the customer has manifested an intent to make a purchase from the first merchant. A response to the offer is received from the customer. If the response indicates acceptance of the offer, then the benefit is applied to the items purchased. For example, the total price paid for the items may be reduced, or the items may even be provided to the customer without charge.

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000066

US 7,831,470 B1

3

In exchange, the customer agrees to participate in a transaction with the second merchant. For example, the customer may be required to switch service providers (e.g. long distance telephone service) or initiate a new service agreement (e.g. sign up for a credit card account). In one embodiment, the customer's agreement may be secured; such that a penalty is assessed against the customer if he does not participate in the transaction as he agreed to.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic illustration of an apparatus for facilitating electronic commerce.

FIG. 2 is a schematic illustration of a merchant server of the apparatus of FIG. 1.

FIG. 3 is a representation of a customer database of the merchant server of FIG. 2.

FIG. 4 is a representation of an item database of the merchant server of FIG. 2.

FIG. 5 is a representation of a transaction database of the merchant server of FIG. 2.

FIG. 6 is a representation of a subsidizer database of the merchant server of FIG. 2.

FIG. 7 is a representation of an offer rules database of the merchant server of FIG. 2.

FIG. 8 is a representation of an offers database of the merchant server of FIG. 2.

FIG. 9 is a representation of a record of an offer summary database of the merchant server of FIG. 2.

FIG. 10 is a flow chart illustrating an embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

FIG. 11 is an exemplary web page.

FIG. 12 is another exemplary web page.

FIGS. 13A and 13B are a flow chart illustrating another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

FIGS. 14A and 14B are a flow chart illustrating another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

FIG. 15 is a flow chart illustrating another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

FIG. 16 is a flow chart illustrating another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Applicants have recognized that the acquisition budgets of various service providers may be advantageously used to facilitate electronic commerce. A customer that is purchasing items from a first merchant may be paid by a second merchant, so that the customer pays a reduced price, or nothing at all, for his desired items. In exchange, the customer signs up or agrees to sign up for a service that is provided by the second merchant. Since many service providers are willing to pay significant amounts of money (e.g. often $50 to $200) to acquire a new customer, the ability to acquire a customer by essentially "intervening" in a sale between others can benefit all parties involved. The customer is benefited by the reduced price of his items, the first merchant is benefited by the increased sales that such an arrangement would bring, and the second merchant is benefited by the acquisition of a new customer.

4

Furthermore, by presenting offers for such "cross-subsidies" only after a customer is ready to buy items, the merchant may reduce the chance that customers will merely "bargain shop", rather than make purchases.

In addition, a number of benefits may be offered besides reduced prices. For example, the first merchant may alternatively provide the customer with an upsell (e.g. a product upgrade for no additional cost).

Referring to FIG. 1, an apparatus 100 includes a merchant server 110 that is in communication with a customer terminal 120 and with subsidizing merchant servers 130, 140 and 150. The merchant server 110 may communicate with the customer terminal 120 and subsidizing merchant servers 130, 140 and 150 via an appropriate network such as the Internet. Each of the customer terminal 120 and with subsidizing merchant servers 130, 140 and 150 may comprise computers, such as those based on the Intel® Pentium® microprocessor, that are adapted to communicate via the Internet (e.g. via a modem). Any number of subsidizing merchant servers and customer terminals may be in communication with the merchant server 110.

The merchant server 110 may be a "web server" of a merchant. The merchant server 110 can generate a web page that may be accessed via the World Wide Web and allow purchases from the merchant to be made in a manner known in the art. A customer terminal may appropriately access the web page to communicate with the merchant server 110 in a manner that is also known to those skilled in the art.

Referring to FIG. 2, the merchant server 110 comprises a processor 200, such as the Intel® Pentium® microprocessor. The processor 200 is in communication with a data storage device 210, such as an appropriate combination of magnetic, optical and/or semiconductor memory. The data storage device 210 may comprise one or more of a ROM, RAM and hard disk. The processor 200 and the data storage device 210 may each be (i) located entirely within a single computer or other computing device; (ii) connected to each other by a remote communication medium, such as a serial port cable, telephone line or radio frequency transceiver; or (iii) a combination thereof. In one embodiment, the merchant server 110 may comprise one or more computers that are connected to a remote server computer for maintaining databases.

The data storage device 210 stores a program 220 for controlling the processor 200. The processor 200 performs instructions of the program 220, and thereby operates in accordance with the present invention, and particularly in accordance with the methods described in detail herein. The program 220 furthermore includes program elements that may be necessary, such as an operating system and "device drivers" for allowing the processor 200 to interface with computer peripheral devices. Appropriate device drivers and other necessary program elements are known to those skilled in the art, and need not be described in detail herein.

The storage device 210 also stores (i) a customer database 230, (ii) a item database 240, (iii) a transaction database 250, (iv) a subsidizer database 260, (v) an offer rules database 270, (vi) an offers database 280 and (vii) an offer summary database 290. The databases 230, 240, 250, 260, 270, 280 and 290 are described in detail below and depicted with exemplary entries in the accompanying figures. As will be understood by those skilled in the art, the schematic illustrations and accompanying descriptions of the databases presented herein are exemplary arrangements for stored representations of information. A number of other arrangements may be employed besides those suggested by the tables shown. Similarly, the illustrated entries of the databases represent exemplary infor-

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000067

US 7,831,470 B1

5

mation, and those skilled in the art will understand that the number and content of the entries can be different from those illustrated herein.

Referring to FIG. 3, a table 300 represents an embodiment of the customer database 230 (FIG. 2). The table 300 includes entries 302, 304, 306 and 308, each defining a customer that may purchase items via the merchant server 110 (FIG. 1). Those skilled in the art will understand that the table 300 may include any number of entries. The table 300 also defines fields for each of the entries 302, 304, 306 and 308. The fields specify (i) a customer identifier 320 that uniquely identifies the customer, (ii) a name 322 of the customer, (iii) a billing address 324 of the customer, (iv) credit card information 326 which may be used to render payment in purchasing the items, and (v) an electronic mail ("email") address 328 for communication with the customer.

Referring to FIG. 4, a table 400 represents an embodiment of the item database 240 (FIG. 2). The table 400 includes entries 402 and 404, each defining an item sold via the merchant server 110 (FIG. 1). Those skilled in the art will understand that the table 400 may include any number of entries. The table 400 also defines fields for each of the entries 402 and 404. The fields specify (i) a item identifier 420 that uniquely identifies the item, (ii) an item description 422, (iii) an item price 424 for which the item is typically sold, and (iv) an availability 426 of the item which may be based on an inventory level of the item.

Referring to FIG. 5, a table 500 represents an embodiment of the transaction database 250 (FIG. 2). The table 500 includes entries 502, 504 and 506, each defining a transaction with the merchant server 110 (FIG. 1). Typically, the transaction includes a purchase of items by a customer. Those skilled in the art will understand that the table 500 may include any number of entries. The table 500 also defines fields for each of the entries 502, 504 and 506. The fields specify (i) a transaction identifier 520 that uniquely identifies the transaction, (ii) a time 522 of the transaction, (iii) the items ordered 524, (iv) credit card information 526 that may define a credit card account that was charged to pay for the items purchased, (v) an amount charged 528 for the items, (vi) a delivery address 530 for the items, and (vii) a customer identifier 532 (if any) that identifies the customer that made the purchase.

Referring to FIG. 6, a table 600 represents an embodiment of the subsidizer database 260 (FIG. 2). The table 600 includes entries 602, 604 and 606, each defining a party (e.g. another merchant) that may subsidize purchases made via the merchant server 110 (FIG. 1). Those skilled in the art will understand that the table 600 may include any number of entries. The table 600 also defines fields for each of the entries 602, 604 and 606. The fields specify (i) a subsidizing party identifier 620 that uniquely identifies the subsidizing party, (ii) a name 622 of the subsidizing party, (iii) an account 624 used to pay for the subsidies, and (iv) an amount owed 626 by the subsidizing party to the merchant.

Referring to FIG. 7, a table 700 represents an embodiment of the offer rules database 270 (FIG. 2). The table 700 includes entries 702, 704, 706, 708 and 710, each defining an offer rule. When an offer rule is satisfied during a transaction, the merchant provides an offer for a specified benefit, such as a subsidy. Those skilled in the art will understand that the table 700 may include any number of entries. The table 700 also defines fields for each of the entries 702, 704, 706, 708 and 710. The fields specify (i) an offer rule identifier 720 that uniquely identifies the offer rule, (ii) a subsidizing party identifier 722 that uniquely identifies the subsidizing party, (iii) a subsidy amount 724, (iv) when the offer rule is effective (i.e.

6

when the offer rule is satisfied), and (v) an additional transaction 728 that is required of the customer in exchange for the subsidy. As described below, several types of transactions, such as additional purchases or initiating service agreements, may be required of the customer.

Referring to FIG. 8, a table 800 represents an embodiment of the offers database 280 (FIG. 2). The table 800 includes entries 802, 804, 806, 808 and 810, each defining an offer for a subsidy. The offer was provided to a customer during a transaction of the customer with the merchant. Those skilled in the art will understand that the table 800 may include any number of entries. The table 800 also defines fields for each of the entries 802, 804, 806, 808 and 810. The fields specify (i) an offer identifier 820 that uniquely identifies the offer, (ii) a transaction identifier 822 that uniquely identifies the transaction during which the offer was provided, (iii) a subsidizing party identifier 824 that uniquely identifies the subsidizing party, (iv) an identifier of an offer rule 826 that was satisfied during the transaction, (v) a subsidy amount 828, (vi) a total price 830 that the customer would have to pay without the subsidy, (vii) a total price 832 that the customer would have to pay with the subsidy, and (viii) whether the offer was accepted 834. As described above with reference to FIG. 7, offer rules define specific subsidies. Thus, the identifier of an offer rule stored in field 826 may be used to determine a corresponding subsidy amount.

Referring to FIG. 9, a table 900 represents a record of an embodiment of the offer summary database 290 (FIG. 2). The offer summary database 290 typically includes a plurality of records, each defining a summary of offers for subsidies that have been provided on behalf of a subsidizing party. The table 900 includes a subsidizing party identifier 902 that uniquely identifies the subsidizing party, a total number of offers provided 904 on behalf of the subsidizing party, a total number of those offers that were accepted 906, and a total amount 908 of the subsidies due in connection with accepted offers.

The table 900 also includes entries 910 and 912, each defining offers provided due to satisfaction of an offer rule of the subsidizing party. Those skilled in the art will understand that the table 900 may include any number of entries. The table 900 also defines fields for each of the entries 910 and 912. The fields specify (i) an offer rule identifier 920 that uniquely identifies the offer rule, (ii) a number 922 of offers provided due to the offer rule, (iii) a number 924 of these offers that were accepted, (iv) an amount 926 of the subsidies due in connection with these accepted offers.

Referring to FIG. 10, a flow chart 1000 illustrates an embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant. In one embodiment, the illustrated method is performed by the merchant server 110 after the customer has accessed a web page generated and/or controlled by the merchant server 110.

The merchant server 110 receives an indication that the customer is to purchase items from the web site of the merchant (step 1002). For example, after a customer accesses the web site, the customer may select one or more items to purchase, and "click" a button that indicates that the customer desires to purchase the selected items. The act of clicking could generate a signal that the merchant server 110 interprets as an indication that the customer is to purchase the selected items. In another embodiment, the act of accessing the web site could generate a signal that the merchant server 110 interprets as an indication that the customer is to purchase the selected items. Those skilled in the art will understand still other types of appropriate indications.

Before the customer purchases the items, the merchant server 110 provides the customer with an offer for a subsidy

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000068

US 7,831,470 B1

7

(step 1004). For example, the web page may display text describing the subsidy. In one embodiment, the web page may be dynamically modified to include a button that, when clicked, indicates acceptance of an offer for a subsidy. Alternatively, the offer may be transmitted to the customer via email or other means.

A response to the offer is received from the customer (step 1006). For example, the customer may click a button on the web page or click on a hyperlink on the web page. If it is determined that the offer is not accepted (step 1008), then the transaction is processed conventionally (step 1010). For example, the items are purchased for the conventional total price, and a credit card account of the customer is charged appropriately.

If it is determined that the offer is accepted (step 1008), then the subsidy is applied to the items (step 1012) and the items are sold to the customer with the benefit of the subsidy (step 1014).

Referring to FIG. 11, an exemplary web page 1100 illustrates a possible means for providing an offer for a benefit and receiving an acceptance of the offer. The web page 1100 illustrates an embodiment in which the merchant sells books via the World Wide Web. A book that the customer is ready to purchase is indicated by text 1102, and a quantity of that book (one book in FIG. 11) is indicated by text 1104. A price of the books is indicated by text 1106, and similarly a total price (e.g. the sum of item prices and any other prices) due from the customer is indicated by text 1108.

A button 1110 is clicked by the customer if the customer desires to purchase the specified items and thereby consummate the purchase. Upon clicking the button 1110, the items may be immediately deemed as having been purchased by the customer. A button 1112 is clicked by the customer if the customer desires to accept an offer for a subsidy. Alternatively, actuating the button 1112 may indicate that the customer is interested in further information regarding an offer for a subsidy, and the customer may subsequently indicate whether he accepts the offer.

Referring to FIG. 12, a second exemplary web page 1200 allows the customer to provide customer information via a form having fields 1202 that receive entered text. The customer information is used in applying for a credit card account with a credit card issuer. In one embodiment, the web page 1200 may be displayed after the customer clicks the button 1110 of FIG. 11. Information that is entered via the web page 1200 may be transmitted to the merchant server 110 upon actuation of a button 1204. Actuation of the button 1204 may furthermore indicate acceptance of the offer for the subsidy. For example, actuation of the button 1204 may indicate a willingness to apply for a credit card account, or that the customer has applied for the credit card account. Conversely, actuation of the button 1206 may indicate rejection of the offer for the subsidy.

Referring to FIGS. 13A and 13B, a flow chart 1300 illustrates another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant. The merchant server 110 receives an indication that the customer is ready to purchase items from the web site of a first merchant (step 1302). A customer may indicate his readiness to purchase by, for example, selecting items to purchase and actuating a specific button that consummates the purchase of the items. Before the customer purchases the items, the merchant server 110 provides the customer with an offer for a subsidy from a second merchant (step 1304). Subsequently, a response from the customer is received (step 1306).

8

If it is determined that the offer is not accepted (step 1308), then the transaction is processed conventionally (step 1310). If however it is determined that the offer is accepted (step 1308), then customer information is received (step 1312). Such customer information may be used in providing or facilitating an additional transaction that is required of the customer in exchange for the subsidy. In one embodiment described in further detail below, in exchange for the subsidy the customer agrees to initiate a new service agreement, so that a service is provided by the second merchant. Accordingly, the customer information may comprise an indication of a service that is provided to the customer (e.g. whether the customer has cable television service), or a service provider that provides a service to the customer (e.g. which company provides cable television service to the customer). The additional transaction may occur after a significant amount of time has elapsed. Accordingly, in one embodiment there is a means for determining if the future action has occurred.

Furthermore, a penalty may be assessed against the customer if the customer does not perform the required additional transaction. For example, the subsidy to the customer may be canceled and the transaction may then be processed conventionally. Alternatively, a penalty fee may be charged to the customer.

Similarly, a penalty could be assessed if another imposed condition is violated. For example, a penalty could be assessed if the items are purchased and then returned. Accordingly, in such an embodiment a returnable purchase is made a non-returnable purchase in exchange for the subsidy or other benefit.

The customer information may be received from the customer. In one embodiment, the merchant server 110 can request that the customer provide customer information. For example, the merchant server 110 may transmit a form (e.g. via the web site) including questions to be answered. In response, the merchant server would receive answers to the questions, and these answers would constitute the customer information from the customer.

In another embodiment, the customer information may be received from a party other than the customer. For example, information regarding the customer may be received from a third-party database (e.g. a list of addresses to provide a location of the customer). Alternatively, customer information may be received from an ISP (Internet Service Provider), which can provide information such as an Internet address of the customer.

In still another embodiment, the customer information may be received via a "cookie" stored on the customer terminal 120 (FIG. 1). Those skilled in the art will understand that a great variety of data may be stored in such cookies, and information may be stored in the cookie in response to various events such as the web sites that are visited by the customer.

The merchant server 110 may verify whether the customer information is accurate (step 1314). For example, if the information is provided by the customer, it can be advantageous to assure that the customer information is not false. To provide a further incentive for the customer to provide accurate customer information, a penalty may be assessed against the customer if the customer information is not accurate. For example, if it is determined that the customer information is not accurate (step 1316), the subsidy to the customer may be canceled and the transaction is processed conventionally (step 1310). Alternatively, a penalty fee may be charged to the customer if it is determined that the customer information is not accurate. In such an embodiment, it may be further advantageous to verify the customer information before the pur-

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000069

US 7,831,470 B1

9

chase is consummated. Thus, the threat that the subsidy will not be forthcoming can give the customer an incentive to provide accurate information.

If it is determined that the customer information is accurate (step 1316), then the merchant server 110 determines the amount of the subsidy (step 1318). The subsidy amount is typically stored in the offer rules database 270 (FIG. 2). The subsidy amount may be, for example, a predetermined amount or a predetermined percentage (e.g. a predetermined percentage of the total price). The subsidy amount may also be limited, such that the price charged cannot be lower than zero. For example, a subsidy amount may be "up to $100 off, but no more than the total price".

The subsidy amount is subtracted from the total price of the items (step 1320) and the items are sold for the reduced total price (step 1322). Alternatively, instead of the total price being reduced, a price of one or more items (e.g. items of a certain type or promotional items) may be reduced to provide an incentive to purchase these items. In summary, accepting the subsidy allows the items to be sold to the customer for a lesser price, and the items may even be provided to the customer without charge.

Referring to FIGS. 14A and 14B, a flow chart 1400 illustrates another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a first merchant. The merchant server 110 receives a signal indicating that the customer is ready to "check out" his "shopping cart" of items on the web site of the first merchant (step 1402). As is understood by those skilled in the art, a shopping cart of items on a web site defines a set of items the customer desires to purchase. Checking out the shopping cart indicates a desire to proceed with purchasing the selected items.

Before the customer purchases the items, the merchant server 110 provides the customer with an offer for a reduction in the total price in exchange for signing up for a service with a second merchant (step 1404). For example, the service may be telephone service, Internet service, banking services, credit card account services, insurance service, securities trading service, satellite television service, or cable television service. Accordingly, the second merchant would be a provider of such services, and the customer would be requested to participate in a transaction (e.g. initiate a service agreement with) with the second merchant.

Subsequently, a response from the customer is received (step 1406). If it is determined that the offer is not accepted (step 1408), then the transaction is processed conventionally (step 1410). If however it is determined that the offer is accepted (step 1408), then a current service provider of the customer (i.e. a party that provides a specified service to the customer) is determined (step 1412). The customer may be asked to provide information of the current provider, or this information may be determined from other sources. For example, one or more databases may be accessed to determine the long distance telephone service provider of the customer. Alternatively, the second merchant may allow access to a database of its existing customers.

If it is determined that the customer has a service provider (step 1414), and it is determined that the second merchant already provides the customer with the specified service (step 1416), then the transaction is processed conventionally (step 1410). If it is determined that the customer has a service provider (step 1414), but it is determined that the second merchant does not provide the customer with the specified service (step 1416), then the customer must have a service agreement with another service provider. Accordingly, the existing service agreement is canceled (step 1418).

10

If it is determined that the customer does not have a service provider of the specified service at all (step 1414), (or if the merchant server 110 will cancel or has canceled the existing service agreement) then a new service agreement is initiated with the second merchant (step 1420). Thus, the second merchant has acquired a new customer, either by signing up the customer for a new service or by switching providers of the specified service that is provided to the customer. In exchange, the total price of the shopping cart of items is reduced by the amount of the subsidy (step 1422), and the items are sold for this reduced total price (step 1424).

Referring to FIG. 15, a flow chart 1500 illustrates another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a first merchant. The merchant server 110 receives an indication that the customer is ready to purchase items from the web site of a first merchant (step 1502). The merchant server 110 may also receive customer information (step 1504), as described above. The customer information may comprise, for example, a location of the customer or a current service provider of the customer.

A set of subsidies for which the customer may be eligible is determined (step 1506). In one embodiment, the set of subsidies is determined based on customer information. For example, upon reference to the customer information, one or more offer rules may be satisfied. The corresponding subsidies would then be included in the set of subsidies. In another embodiment, the offer rules may be satisfied without reference to customer information. For example, an offer rule may be satisfied if the total price of the items (or the price of any of the item) is greater than a predetermined threshold. In yet another embodiment, one or more subsidizing merchants may be contacted, customer information may be transmitted to the subsidizing merchants, and in response the subsidizing merchants may transmit to the merchant server 110 a description of a subsidy to offer.

Offers for each of the subsidies may be provided to the customer (step 1508) for the customer to select one (or more). For example, each offer may be listed on a web page, and the customer must click a hyperlink corresponding to his desired offer. The customer selection is received (step 1510) and the corresponding subsidy is applied to the customer's purchase (step 1512). Alternatively, the customer may be similarly prompted to select a merchant from a plurality of merchants, and the customer would subsequently be provided with an offer for a subsidy from the selected merchant.

Referring to FIG. 16, a flow chart 1600 illustrates another embodiment of a method for providing an offer for a benefit. In particular, the illustrated flow chart 1600 shows the exchange of payment among the parties. The merchant server 110 receives an indication that the customer is ready to purchase items having a total price (step 1602). In response, the merchant server 110 provides an offer for a subsidy (step 1604). The subsidy defines a discount amount that is applied to the customer's purchase. The subsidy also defines a spread amount that is retained by the first merchant.

Once the customer acceptance is received (step 1606), the customer's account (e.g. a credit card account) is charged by the total amount less the discount amount (step 1608). Similarly, an account of the second merchant is charged by the sum of the discount amount and the spread amount. The second merchant may be charged substantially immediately (e.g. immediately after the customer accepts). In another embodiment, the customer may be charged at predefined intervals (e.g. once per month).

Although the present invention has been described with respect to a preferred embodiment thereof, those skilled in the

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000070

US 7,831,470 B1

| 11 | 12 |

art will note that various substitutions may be made to those embodiments described herein without departing from the spirit and scope of the present invention.

What is claimed is:

1. A method, comprising:

receiving an indication that a customer initiated a checkout process to consummate purchase of at least one item from a merchant via a web site, the at least one item having an associated total price for only the at least one item,

in response to the received indication,

transmitting a web page including

an indication of the at least one item to be purchased,

an indication of the associated total price for the at least one item,

a first selectable button associated with a first option for the customer to pay the associated total price for the at least one item, and

a second selectable button associated with a second option for the customer to receive an offer for a reduction of the associated total price;

after transmitting the web page,

receiving a signal indicating selection by the customer of the second selectable button of the web page;

in response to the received signal,

automatically selecting by a computer device, from a database that includes a plurality of offers, an offer for a reduction in the total price in exchange for applying for a credit card account with a credit card issuer, in which the credit card issuer is not the merchant;

after receiving the signal,

providing the selected offer to the customer via the web site before the at least one item is purchased,

whereby the selected offer is not provided to the customer unless and until the signal indicating selection by the customer of the second selectable button of the web page is received;

after receiving the signal and before the at least one item is purchased, receiving, from the customer, an indication of willingness to apply for a credit card account; and

after receiving the signal, selling, by the merchant, the at least one item to the customer for less than the total price in accordance with the selected offer.

2. The method of claim 1, in which the step of receiving, from the customer, an indication of willingness to apply for a credit card account comprises:

receiving, from the customer, information for use in applying for a credit card account.

3. The method of claim 2, further comprising:

transmitting to the customer a form for receiving information for use in applying for a credit card account.

4. The method of claim 1, further comprising:

determining whether the customer already has a credit card account with the credit card issuer.

5. The method of claim 4, in which the step of providing the offer is only performed if it is determined that the customer does not already have a credit card account with the credit card issuer.

6. The method of claim 1, further comprising:

charging the credit card issuer for an amount of payment.

7. The method of claim 6, in which the step of selling comprises:

selling the at least one item to the customer for an amount that is based on a difference between the total price and the amount of payment charged to the credit card issuer.

8. A method, comprising:

receiving, by a merchant server in communication with at least one customer terminal, an indication that a customer is initiating a checkout process to make a purchase of at least one item from a first merchant,

receiving information about the customer,

in which the information about the customer does not include information about the purchase;

selecting, by the merchant server, a second merchant from a plurality of merchants;

in response to receiving the indication that the customer is initiating the checkout process to make the purchase from the first merchant,

transmitting customer information to the second merchant;

after receiving the indication and after transmitting the customer information to the second merchant,

receiving, from the second merchant, a description of a subsidy to be applied to the purchase;

in response to receiving the description of the subsidy,

providing, by the merchant server to the customer, an offer for the subsidy from the second merchant, the step of providing the offer being performed before the purchase is consummated but only after receiving the indication that the customer is initiating the checkout process to make a purchase from the first merchant and only after transmitting the customer information to the second merchant,

whereby the offer is not provided unless and until the indication is received;

receiving an acceptance of the offer by the customer;

applying, by the merchant server, the subsidy to the purchase during the checkout process in response to the acceptance of the offer; and

selling the at least one item of the purchase to the customer.

9. The method of claim 8, further comprising:

initiating a new service agreement between the second merchant and the customer for a service to be provided by the second merchant to the customer.

10. The method of claim 9, in which the service comprises Internet service.

11. The method of claim 9, in which the service comprises a banking service.

12. The method of claim 9, in which the service comprises an insurance service.

13. The method of claim 9, in which the service comprises a satellite television service.

14. The method of claim 9, in which the service comprises a cable television service.

15. The method of claim 8, in which providing to the customer an offer for the subsidy from the second merchant comprises:

transmitting a web page to the customer, the web page including:

the offer for the subsidy from the second merchant to have the purchase provided to the customer free of charge in exchange for the customer agreeing to sign up for a first service with the second merchant, and

an offer for a subsidy from a third merchant to have the purchase provided to the customer free of charge in exchange for the customer agreeing to sign up for a second service with the third merchant.

16. A method, comprising:

generating an interface for allowing a customer to access a web site that permits purchases from a first merchant, the interface including a button;

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000071

US 7,831,470 B1

**13**

receiving a first indication that a customer is willing to make a purchase of at least one item from a first merchant,

activating the button in response to receiving the indication;

after activating the button, receiving a signal that the customer has clicked the button;

selecting a second merchant from a plurality of merchants;

providing, in response to the received signal, an offer for a subsidy from the second merchant, the step of providing the offer being performed before the purchase is consummated but only after receiving the signal that the customer has clicked the button,

whereby the offer is not provided unless and until the signal is received;

receiving from the customer a response to the offer;

applying the subsidy to the purchase if that response indicates acceptance of the offer; and

selling the at least one item of the purchase to the customer.

**17.** A computer readable medium storing instructions configured to direct a computing device to perform a method, the method comprising:

receiving an indication that a customer initiated a checkout process to consummate purchase of at least one item from a merchant via a web site, the at least one item having an associated total price for only the at least one item,

in response to the received indication,

transmitting a web page including

an indication of the at least one item to be purchased,

an indication of the associated total price for the at least one book,

a first selectable button associated with a first option for the customer to pay the associated total price for the at least one item, and

a second selectable button associated with a second option for the customer to receive an offer for a reduction of the associated total price;

after transmitting the web page,

receiving a signal indicating selection by the customer of the second selectable button of the web page;

in response to the received signal,

automatically selecting by a computer device, from a database that includes a plurality of offers, an offer for a reduction in the total price in exchange for applying for a credit card account with a credit card issuer,

in which the credit card issuer is not the merchant;

after receiving the signal,

providing the selected offer to the customer via the web site before the at least one item is purchased,

whereby the selected offer is not provided to the customer unless and until the signal indicating selection by the customer of the second selectable button of the web page is received;

after receiving the signal and before the at least one item is purchased,

receiving, from the customer, an indication of willingness to apply for a credit card account; and

after receiving the signal,

selling, by the merchant, the at least one item to the customer for less than the total price in accordance with the selected offer.

**18.** An apparatus comprising:

a processor; and

a computer readable medium in communication with the processor, the computer readable medium storing

**14**

instructions configured to direct the processor to perform a method, the method comprising:

receiving an indication that a customer initiated a checkout process to consummate purchase of at least one item from a merchant via a web site, the at least one item having an associated total price for only the at least one item,

in response to the received indication,

transmitting a web page including

an indication of the at least one item to be purchased,

an indication of the associated total price for the at least one item,

a first selectable button associated with a first option for the customer to pay the associated total price for the at least one item, and

a second selectable button associated with a second option for the customer to receive an offer for a reduction of the associated total price;

after transmitting the web page,

receiving a signal indicating selection by the customer of the second selectable button of the web page;

in response to the received signal,

automatically selecting by a computer device, from a database that includes a plurality of offers, an offer for a reduction in the total price in exchange for applying for a credit card account with a credit card issuer,

in which the credit card issuer is not the merchant;

after receiving the signal,

providing the selected offer to the customer via the web site before the at least one item is purchased,

whereby the selected offer is not provided to the customer unless and until the signal indicating selection by the customer of the second selectable button of the web page is received;

after receiving the signal and before the at least one item is purchased,

receiving, from the customer, an indication of willingness to apply for a credit card account; and

after receiving the signal,

selling, by the merchant, the at least one item to the customer for less than the total price in accordance with the selected offer.

**19.** A computer readable medium storing instructions configured to direct a computing device to perform a method, the method comprising:

receiving, by a merchant server in communication with at least one customer terminal, an indication that a customer is initiating a checkout process to make a purchase of at least one item from a first merchant,

receiving information about the customer,

in which the information about the customer does not include information about the purchase;

selecting, by the merchant server, a second merchant from a plurality of merchants;

in response to receiving the indication that the customer is initiating the checkout process to make the purchase from the first merchant,

transmitting customer information to the second merchant;

after receiving the indication and after transmitting the customer information to the second merchant,

receiving, from the second merchant, a description of a subsidy to be applied to the purchase;

in response to receiving the description of the subsidy,

providing, by the merchant server to the customer, an offer for the subsidy from the second merchant, the step of providing the offer being performed before the

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000072

US 7,831,470 B1

15

purchase is consummated but only after receiving the indication that the customer is initiating the checkout process to make a purchase from the first merchant and only after transmitting the customer information to the second merchant,

whereby the offer is not provided unless and until the indication is received;

receiving an acceptance of the offer by the customer;

applying, by the merchant server, the subsidy to the purchase during the checkout process in response to the acceptance of the offer; and

selling the at least one item of the purchase to the customer.

20. An apparatus comprising:

a processor; and

a computer readable medium in communication with the processor, the computer readable medium storing instructions configured to direct the processor to perform a method, the method comprising:

receiving an indication that a customer is initiating a checkout process to make a purchase of at least one item from a first merchant,

receiving information about the customer,

in which the information about the customer does not include information about the purchase;

selecting a second merchant from a plurality of merchants;

in response to receiving the indication that the customer is initiating the checkout process to make the purchase from the first merchant,

transmitting customer information to the second merchant;

after receiving the indication and after transmitting the customer information to the second merchant,

receiving, from the second merchant, a description of a subsidy to be applied to the purchase;

in response to receiving the description of the subsidy,

providing to the customer an offer for the subsidy from the second merchant, the step of providing the offer being performed before the purchase is consummated but only after receiving the indication that the customer is initiating the checkout process to make a purchase from the first merchant and only after transmitting the customer information to the second merchant,

whereby the offer is not provided unless and until the indication is received;

receiving an acceptance of the offer by the customer;

applying the subsidy to the purchase during the checkout process in response to the acceptance of the offer; and

selling the at least one item of the purchase to the customer.

21. A computer readable medium storing instructions configured to direct a computing device to perform a method, the method comprising:

16

generating an interface for allowing a customer to access a web site that permits purchases from a first merchant, the interface including a button;

receiving a first indication that a customer is willing to make a purchase of at least one item from a first merchant,

activating the button in response to receiving the indication;

after activating the button, receiving a signal that the customer has clicked the button;

selecting a second merchant from a plurality of merchants;

providing, in response to the received signal, an offer for a subsidy from the second merchant, the step of providing the offer being performed before the purchase is consummated but only after receiving the signal that the customer has clicked the button,

whereby the offer is not provided unless and until the signal is received;

receiving from the customer a response to the offer;

applying the subsidy to the purchase if the response indicates acceptance of the offer; and

selling the at least one item of the purchase to the customer.

22. An apparatus comprising:

a processor; and

a computer readable medium in communication with the processor, the computer readable medium storing instructions configured to direct the processor to perform a method, the method comprising:

generating an interface for allowing a customer to access a web site that permits purchases from a first merchant, the interface including a button;

receiving a first indication that a customer is willing to make a purchase of at least one item from a first merchant,

activating the button in response to receiving the indication;

after activating the button, receiving a signal that the customer has clicked the button;

selecting a second merchant from a plurality of merchants;

providing, in response to the received signal, an offer for a subsidy from the second merchant, the step of providing the offer being performed before the purchase is consummated but only after receiving the signal that the customer has clicked the button,

whereby the offer is not provided unless and until the signal is received;

receiving from the customer a response to the offer;

applying the subsidy to the purchase if the response indicates acceptance of the offer; and

selling the at least one item of the purchase to the customer.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000073



WD000001



US007827056B2

(12) **United States Patent** (10) Patent No.: **US 7,827,056 B2**
Walker et al. (45) Date of Patent: **\*Nov. 2, 2010**

(54) **METHOD AND APPARATUS FOR FACILITATING ELECTRONIC COMMERCE THROUGH PROVIDING CROSS-BENEFITS DURING A TRANSACTION**

Inventors: **Jay S. Walker**, Ridgefield, CT (US);
**Daniel E. Tedesco**, New Canaan, CT
(US); **John M. Packes, Jr.**, Stamford,
CT (US); **James A. Jorasch**, Stamford,
CT (US)

(73) Assignee: **Walker Digital, LLC**, Stamford, CT
(US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

This patent is subject to a terminal dis-
claimer.

(21) Appl. No.: **11/423,481**

(22) Filed: **Jun. 12, 2006**

(65) **Prior Publication Data**

US 2006/0218049 A1 Sep. 28, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 09/219,267, filed on
Dec. 23, 1998, which is a continuation-in-part of appli-
cation No. 08/943,483, filed on Oct. 3, 1997, now
abandoned, which is a continuation-in-part of applica-
tion No. 08/923,683, filed on Sep. 4, 1997, now Pat.
No. 6,553,346, which is a continuation-in-part of
application No. 08/889,319, filed on Jul. 8, 1997, now
Pat. No. 6,085,169, which is a continuation-in-part of
application No. 08/707,660, filed on Sep. 5, 1996, now
Pat. No. 5,794,207, application No. 09/219,267, which
is a continuation-in-part of application No. 09/100,
684, filed on Jun. 19, 1998, now Pat. No. 6,196,458,
which is a continuation-in-part of application No.
08/982,149, filed on Dec. 1, 1997, now Pat. No. 6,196,
458, application No. 09/219,267, which is a continua-

tion-in-part of application No. 08/994,426, filed on
Dec. 19, 1997, now Pat. No. 6,694,300, which is a
continuation-in-part of application No. 08/920,116,
filed on Aug. 26, 1997, now Pat. No. 6,119,099, which
is a continuation-in-part of application No. 08/822,
709, filed on Mar. 21, 1997, now Pat. No. 6,267,670.

(51) Int. Cl.
*G06Q 30/00* (2006.01)

(52) U.S. Cl. ............... 705/14.23; 705/14.1; 705/14.11;
705/14.34; 705/14.36; 705/14.38; 705/14.39;
705/26; 705/300

(58) Field of Classification Search ................... 705/14,
705/14.1, 14.11, 14.23, 14.34, 14.36, 14.38,
705/14.39, 26, 300
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,573,747 A | 4/1971 | Adams et al. |
| 4,108,361 A | 8/1978 | Krause |
| 4,247,759 A | 1/1981 | Yuris et al. |
| 4,323,770 A | 4/1982 | Dieulot et al. |
| 4,449,186 A | 5/1984 | Kelly et al. |
| 4,484,733 A | 11/1984 | Loos et al. |
| 4,491,725 A | 1/1985 | Pritchard |
| 4,494,197 A | 1/1985 | Troy et al. |
| 4,500,880 A | 2/1985 | Gomersall et al. |
| 4,553,222 A | 11/1985 | Kurland et al. |
| 4,667,292 A | 5/1987 | Mohlenbrock et al. |
| 4,669,730 A | 6/1987 | Small |
| 4,677,553 A | 6/1987 | Roberts et al. |
| 4,689,742 A | 8/1987 | Troy et al. |
| 4,723,212 A | 2/1988 | Mindrum et al. |
| 4,750,119 A | 6/1988 | Cohen et al. |
| 4,751,728 A | 6/1988 | Treat |
| 4,760,247 A | 7/1988 | Keane et al. |
| 4,789,928 A | 12/1988 | Fujisaki |
| 4,799,156 A | 1/1989 | Shavit et al. |
| 4,815,741 A | 3/1989 | Small |
| 4,833,308 A | 5/1989 | Humble |
| 4,839,507 A | 6/1989 | May |
| 4,854,590 A | 8/1989 | Jolliff et al. |
| 4,859,838 A | 8/1989 | Okiharu |
| 4,876,592 A | 10/1989 | Von Kohorn |



WD000002

US 7,827,056 B2

Page 2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4,882,473 A | 11/1989 | Bergeron et al. | | 5,517,555 A | 5/1996 | Amadon et al. | |
| 4,902,880 A | 2/1990 | Garczynski et al. | | 5,519,769 A | 5/1996 | Weinberger et al. | |
| 4,903,201 A | 2/1990 | Wagner | | 5,523,794 A | 6/1996 | Mankovitz et al. | |
| 4,908,761 A | 3/1990 | Tai | | 5,537,314 A | 7/1996 | Kanter | |
| 4,910,672 A | 3/1990 | Off et al. | | 5,539,189 A | 7/1996 | Wilson | |
| 4,922,522 A | 5/1990 | Scanlon | | 5,553,131 A | 9/1996 | Minervino, Jr. et al. | |
| 4,937,853 A | 6/1990 | Brule et al. | | 5,557,518 A | 9/1996 | Rosen | |
| 4,973,952 A | 11/1990 | Malec et al. | | 5,564,546 A | 10/1996 | Molbak et al. | |
| 4,982,337 A | 1/1991 | Burr et al. | | 5,570,417 A | 10/1996 | Byers | |
| 4,982,346 A | 1/1991 | Girouard et al. | | 5,572,653 A | 11/1996 | DeTemple et al. | |
| 4,993,714 A | 2/1991 | Golightly | | 5,581,064 A | 12/1996 | Riley et al. | |
| 5,003,384 A | 3/1991 | Durden et al. | | 5,592,375 A | 1/1997 | Salmon et al. | |
| 5,021,953 A | 6/1991 | Webber | | 5,592,376 A | 1/1997 | Hodroff | |
| 5,025,372 A | 6/1991 | Burton et al. | | 5,602,377 A | 2/1997 | Beller et al. | |
| 5,056,019 A | 10/1991 | Schultz et al. | | 5,606,602 A | 2/1997 | Johnson et al. | |
| 5,060,165 A | 10/1991 | Schumacher et al. | | 5,611,052 A | 3/1997 | Dykstra et al. | |
| 5,119,295 A | 6/1992 | Kapur | | 5,612,868 A | 3/1997 | Off et al. | |
| 5,128,862 A | 7/1992 | Mueller | | 5,615,269 A | 3/1997 | Micali | |
| 5,132,914 A | 7/1992 | Cahlander et al. | | 5,619,558 A | 4/1997 | Jheeta | |
| 5,136,501 A | 8/1992 | Silverman et al. | | 5,620,079 A | 4/1997 | Molbak | |
| 5,168,446 A | 12/1992 | Wiseman | | 5,621,201 A | 4/1997 | Langhans et al. | |
| 5,172,328 A | 12/1992 | Cahlander et al. | | 5,621,640 A | 4/1997 | Burke | |
| 5,173,851 A | 12/1992 | Off et al. | | 5,621,812 A | 4/1997 | Deaton et al. | |
| 5,177,342 A | 1/1993 | Adams | | 5,632,010 A | 5/1997 | Briechle et al. | |
| 5,189,607 A | 2/1993 | Shirasaki et al. | | 5,636,346 A | 6/1997 | Saxe | |
| 5,191,613 A | 3/1993 | Graziano et al. | | 5,638,457 A | 6/1997 | Deaton et al. | |
| 5,192,854 A | 3/1993 | Counts | | 5,642,279 A | 6/1997 | Bloomberg et al. | |
| 5,200,889 A | 4/1993 | Mori | | 5,642,484 A | 6/1997 | Harrison, III et al. | |
| 5,201,010 A | 4/1993 | Deaton et al. | | 5,642,485 A | 6/1997 | Deaton et al. | |
| 5,202,826 A | 4/1993 | McCarthy | | 5,644,723 A | 7/1997 | Deaton et al. | |
| 5,216,595 A | 6/1993 | Protheroe | | 5,649,114 A | 7/1997 | Deaton et al. | |
| 5,223,698 A | 6/1993 | Kapur | | 5,652,421 A | 7/1997 | Veeneman et al. | |
| 5,224,034 A | 6/1993 | Katz et al. | | 5,652,784 A | 7/1997 | Blen et al. | |
| 5,231,569 A | 7/1993 | Myatt et al. | | 5,655,007 A | 8/1997 | McAllister | |
| 5,239,165 A | 8/1993 | Novak | | 5,655,089 A | 8/1997 | Bucci | |
| RE34,380 E | 9/1993 | Sleevi | | 5,664,115 A | 9/1997 | Fraser | |
| 5,243,515 A | 9/1993 | Lee | | 5,665,953 A | 9/1997 | Mazzamuto et al. | |
| 5,245,533 A | 9/1993 | Marshall | | 5,666,649 A | 9/1997 | Dent | |
| 5,256,863 A | 10/1993 | Ferguson et al. | | 5,673,317 A | 9/1997 | Cooper | |
| 5,262,941 A | 11/1993 | Saldin et al. | | 5,684,965 A | 11/1997 | Pickering | |
| 5,274,547 A | 12/1993 | Zoffel et al. | | 5,687,322 A | 11/1997 | Deaton et al. | |
| 5,283,731 A | 2/1994 | Lalonde et al. | | 5,689,100 A | 11/1997 | Carrithers et al. | |
| 5,287,268 A | 2/1994 | McCarthy | | 5,689,652 A | 11/1997 | Lupien et al. | |
| 5,297,026 A | 3/1994 | Hoffman | | 5,694,551 A | 12/1997 | Doyle et al. | |
| 5,297,031 A | 3/1994 | Gutterman et al. | | 5,708,782 A | 1/1998 | Larson et al. | |
| 5,302,811 A | 4/1994 | Fukatsu | | 5,710,884 A | 1/1998 | Dedrick | |
| 5,305,195 A | 4/1994 | Murphy | | 5,710,887 A * | 1/1998 | Chelliah et al. ............... 705/26 | |
| 5,309,355 A | 5/1994 | Lockwood | | 5,715,402 A | 2/1998 | Popolo | |
| 5,315,093 A | 5/1994 | Stewart | | 5,717,860 A | 2/1998 | Graber et al. | |
| 5,319,542 A | 6/1994 | King et al. | | 5,717,866 A | 2/1998 | Naftzger | |
| 5,329,589 A | 7/1994 | Fraser et al. | | 5,721,827 A | 2/1998 | Logan et al. | |
| 5,333,186 A | 7/1994 | Gupta | | 5,724,521 A | 3/1998 | Dedrick | |
| 5,353,218 A | 10/1994 | De Lapa et al. | | 5,724,525 A | 3/1998 | Beyers, II et al. | |
| 5,353,219 A | 10/1994 | Mueller et al. | | 5,724,886 A | 3/1998 | Ewald et al. | |
| 5,361,199 A | 11/1994 | Shoquist et al. | | 5,727,153 A | 3/1998 | Powell | |
| 5,367,450 A | 11/1994 | Pintsov | | 5,729,693 A | 3/1998 | Holda-Fleck | |
| 5,371,796 A | 12/1994 | Avarne | | 5,732,400 A | 3/1998 | Mandler et al. | |
| 5,380,991 A | 1/1995 | Valencia et al. | | 5,734,838 A | 3/1998 | Robinson et al. | |
| RE34,915 E | 4/1995 | Nichtberger et al. | | 5,734,890 A | 3/1998 | Case et al. | |
| 5,404,291 A | 4/1995 | Kerr et al. | | 5,745,882 A | 4/1998 | Bixler et al. | |
| RE34,954 E | 5/1995 | Haber et al. | | 5,752,238 A | 5/1998 | Dedrick | |
| 5,420,606 A | 5/1995 | Begum et al. | | 5,758,328 A | 5/1998 | Giovannoli | |
| 5,420,914 A | 5/1995 | Blumhardt | | 5,759,101 A | 6/1998 | Von Kohorn | |
| 5,426,281 A | 6/1995 | Abecassis | | 5,761,647 A | 6/1998 | Boushy | |
| 5,434,394 A | 7/1995 | Roach et al. | | 5,761,648 A | 6/1998 | Golden et al. | |
| 5,444,630 A | 8/1995 | Dlugos | | 5,774,868 A | 6/1998 | Cragun et al. | |
| 5,450,938 A | 9/1995 | Rademacher | | 5,774,869 A | 6/1998 | Toader | |
| 5,459,306 A | 10/1995 | Stein et al. | | 5,794,207 A | 8/1998 | Walker et al. | |
| 5,467,269 A | 11/1995 | Flaten | | 5,794,210 A | 8/1998 | Goldhaber et al. | |
| 5,481,094 A | 1/1996 | Suda | | 5,794,219 A | 8/1998 | Brown | |
| 5,504,475 A | 4/1996 | Houdou et al. | | 5,794,220 A | 8/1998 | Hunt | |
| 5,510,979 A | 4/1996 | Moderi et al. | | 5,794,221 A | 8/1998 | Egendorf | |
| 5,515,270 A | 5/1996 | Weinblatt | | 5,806,044 A | 9/1998 | Powell | |

WD000003

A0156

| | | | |
|---|---|---|---|
| 5,806,045 A | 9/1998 | Biorge et al. | |
| 5,809,144 A | 9/1998 | Sirbu et al. | |
| 5,812,769 A | 9/1998 | Graber et al. | |
| 5,819,092 A | 10/1998 | Ferguson et al. | |
| 5,819,241 A | 10/1998 | Reiter | |
| 5,822,736 A | 10/1998 | Hartman et al. | |
| 5,825,881 A | 10/1998 | Colvin, Sr. | |
| 5,826,244 A | 10/1998 | Huberman | |
| 5,832,457 A | 11/1998 | O'Brien et al. | |
| 5,835,896 A | 11/1998 | Fisher et al. | |
| 5,839,119 A | 11/1998 | Krsul et al. | |
| 5,845,259 A | 12/1998 | West et al. | |
| 5,845,265 A | 12/1998 | Woolston | |
| 5,848,396 A | 12/1998 | Gerace | |
| 5,855,008 A | 12/1998 | Goldhaber et al. | |
| 5,857,175 A | 1/1999 | Day et al. | |
| 5,864,757 A | 1/1999 | Parker | |
| 5,864,822 A | 1/1999 | Baker, III | |
| 5,870,030 A | 2/1999 | DeLuca et al. | |
| 5,873,068 A | 2/1999 | Beaumont et al. | |
| 5,873,069 A | 2/1999 | Reuhl et al. | |
| 5,884,292 A | 3/1999 | Baker et al. | |
| 5,890,135 A | 3/1999 | Powell | |
| 5,890,718 A | 4/1999 | Byon | |
| 5,893,075 A | 4/1999 | Plainfield et al. | |
| 5,918,211 A * | 6/1999 | Sloane ........................ | 705/16 |
| 5,923,016 A | 7/1999 | Fredregill et al. | |
| 5,937,037 A | 8/1999 | Kamel et al. | |
| 5,946,665 A | 8/1999 | Suzuki et al. | |
| 5,970,469 A | 10/1999 | Scroggie et al. | |
| 6,014,634 A | 1/2000 | Scroggie et al. | |
| 6,026,370 A | 2/2000 | Jermyn | |
| 6,035,281 A | 3/2000 | Crosskey et al. | |
| 6,049,778 A | 4/2000 | Walker et al. | |
| 6,052,730 A | 4/2000 | Felciano | |
| 6,055,513 A | 4/2000 | Katz et al. | |
| 6,059,142 A | 5/2000 | Wittern, Jr. et al. | |
| 6,064,987 A | 5/2000 | Walker et al. | |
| 6,076,068 A | 6/2000 | DeLapa et al. | |
| 6,076,069 A | 6/2000 | Laor | |
| 6,124,799 A | 9/2000 | Parker | |
| 6,138,105 A | 10/2000 | Walker et al. | |
| 6,144,948 A | 11/2000 | Walker et al. | |
| 6,173,274 B1 | 1/2001 | Ryan, Jr. | |
| 6,178,411 B1 | 1/2001 | Reiter | |
| 6,185,545 B1 | 2/2001 | Resnick et al. | |
| 6,223,163 B1 | 4/2001 | Van Luchene | |
| 6,259,908 B1 | 7/2001 | Austin | |
| 6,298,329 B1 | 10/2001 | Walker et al. | |
| 6,298,331 B1 | 10/2001 | Walker et al. | |
| 6,327,580 B1 | 12/2001 | Pierce et al. | |
| 6,332,128 B1 | 12/2001 | Nicholson | |
| 6,336,095 B1 | 1/2002 | Rosen | |
| 6,336,099 B1 | 1/2002 | Barnett et al. | |
| 6,349,288 B1 | 2/2002 | Barber | |
| 6,393,407 B1 | 5/2002 | Middleton et al. | |
| 6,405,174 B1 | 6/2002 | Walker et al. | |
| 6,456,981 B1 | 9/2002 | Dejaeger et al. | |
| 6,965,870 B1 | 11/2005 | Petras et al. | |
| 7,225,142 B1 | 5/2007 | Apte et al. | |
| 2001/0014868 A1 | 8/2001 | Herz et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 109 189 A1 | 5/1984 |
| EP | 512413 A | 11/1992 |
| EP | 0 607 686 A2 | 7/1994 |
| EP | 0 902 381 A2 | 3/1999 |
| JP | 05257950 A | 10/1993 |
| JP | 10187318 A | 7/1998 |
| WO | WO 95/03570 | 2/1995 |
| WO | WO 96/31848 | 10/1996 |
| WO | WO 96/31848 A2 | 10/1996 |
| WO | WO 96/36926 | 11/1996 |
| WO | WO 97/20279 | 6/1997 |
| WO | WO 97/35441 | 9/1997 |
| WO | WO 98/06050 | 2/1998 |
| WO | WO 98/26363 | 6/1998 |
| WO | WO 98/28699 A1 | 7/1998 |
| WO | WO 98/34187 | 8/1998 |
| WO | WO 00/21400 A1 | 4/2000 |

OTHER PUBLICATIONS

Yoshihara ("New magazines try to reach Asian businesses. The fledging English-language publications seek readers on both sides of the Pacific." Los Angeles Times. Oct. 2, 1989, p. 3.)*

Brian Reilly "Upselling strategies hit the net" Net Marketing, pp. M1 and M18, Dec. 1996.*

Affidavit of Michael D. Downs with Exhibits A-E dated Apr. 6, 2007, 19 pp.

Affidavit of Michael D. Downs with Exhibits A-C dated Apr. 6, 2007, 91 pp.

Rozen, Miriam, "What's New in Joint Promotions," The New York Times, Mar. 10, 1985, Financial Desk, Section 3, at p. 23, col. 1, 1 page.

Katcher, P. Royal, "Getting Products to Consumers; The Basics of Retailing, Part 2," Automotive Marketing, May 1990 vol. 19, No. 5 at p. 35, ISSN: 0193-3264, 5 pp.

PCT International Search Report for International Application No. PCT/US99/13409 mailed Oct. 21, 1999, 2 pp.

Cards Briefs: Stored-Value Card Designed for Casinos, Oct. 31, 1995, Copyright 1995 American Banker, Inc. (http://web.lexis-nexis.com/ln.universe/s...tz &_md5=b62 5be0ceccfc837881920 1ad83c41), Download Date Jan. 24, 1999, 1 page.

Website: "Apollo host Computer," downloaded from http//www. Apollo.com, undated, 9 pp.

Website: "The Saber Group: Welcome to Sabre Decision Technologies," downloaded from http//www.sdt.com, undated, 6 pp.

Ritter, Jeffery B., "Scope of the Uniform Commercial Code: Computer Contracting Cases and Electrical Commercial Practices," 45 Bus. Law 2533, Aug. 1990, 20 pp.

Speidel, Richard E. et al., "Impact of Electronic Contracting on Contract Formation Under Revised UCC Article 2, Labs" C878 ALI-ABA 335, Dec. 9, 1993, 4 pp.

"Cyberbid", Net Fun Ltd., Homepage: www.cyberbid.com., Copyright 1995-1996, 9 pp.

Lacher, Lisa. "Coupon Gimmick Registers Profits," Business Dateline, vol. 83, No. 47, Sec. 1, Dec. 7, 1987, 2 pp.

Stevens, Lawrence. "Hypermarket Challenge," Computerworld, Software and Services section, p. 25, Dec. 19, 1988, 2 pp.

Kuttner, Robert. "Computers May Turn the World into One Big Commodities Pit," Business Week, Economic Viewpoint section, No. 3123, p. 17, Sep. 11, 1989, 2 pp.

Golden, Fran. "AAL's Riga Doubts Marketel's Appeal to Retailers; Chris Riga of American Airlines," Travel Weekly, vol. 48, No. 91, p. 4, Nov. 13, 1989, 2 pp.

Schrage, Michael. "An Experiment in Economic Theory; Labs Testing Real Markets," The Record, Business section, p. B01, Nov. 26, 1989, 3 pp.

"Safeway Introduces Store-Generated Coupons," PR Newswire, May 1, 1990, 1 page.

Del Rosso, Laura. "Marketel Says It Plans to Launch air Fare 'Auction' in June; Marketel International Inc.," Travel Weekly, vol. 50, No. 34, p. 1, Apr. 29, 1991, 3 pp.

Palline, Jeff. "Traveler's Bidding on Airline Tickets SF Firm Offers Chance for Cut-Rate Fares," The San Francisco Chronicle, News section, p. A4, Aug. 19, 1991, 3 pp.

Blattberg, Robert C. et al. "Interactive Marketing; Exploiting the Age of Addressability," Sloan Management Review, vol. 33, No. 1, p. 5, Sep. 22, 1991, 15 pp.

Del Rosso, Laura. "Ticket-Bidding Firm Closes Its Doors; Marketel International," Travel Weekly, vol. 51, No. 21, p. 1, Mar. 12, 1992, 2 pp.

WD000004

**US 7,827,056 B2**

Page 4

McDowell, Bill. "Frequency Marketing Builds Repeat Business," Building Home supply Centers, No. 2, vol. 165, p. 96, Aug. 1993, 5 pp.

McKinney, Jeff. "Merchant Program Could Pay Off Provident," The Cincinnati Enquirer, Financial section, p. E02, Mar. 24, 1996, 2 pp.

Wagner, Jim. "Cameras Tell Mall What Door You Use, How Often You Go," Albuquerque Tribune, Evening section, p. A3, Aug. 9, 1996, 2 pp.

Fickenscher, Lisa. "AMEX to Start Free Rewards Program with Discounts on Merchandise," The American Banker, Credit/Debit/ATMs section, p. 10, Oct. 18, 1996, 2 pp.

Fitzgerald, Kate. "AMEX Program Moves Loyalty to Next Level: Custom Extras Finds a Medium Customers Can't Ignore: Billing Statements," Advertising age, News section, p. 2 Nov. 4, 1996, 2 pp.

Website: "Tecmark Reward Terminal," Tecmark Services, Inc., Homepage: www.tecmarkinc.com/terminal.htm, download date: Mar. 20, 1997, 1 page.

Fickenscher, Lisa. "Merchant: American Express Seeks to Mine Its Data on Cardholder Spending Patterns," The American Banker, Credit/Debit/ATMs section, p. 20, Mar. 24, 1997, 2 pp.

Kelsey, John. "Conditional Purchase Orders," 4th ACM Conference on Computers, Apr. 1997, 8 pp.

"Dispensing the Future", Electronic Payments International, Feature section, p. 12, May 1997, 5 pp.

"Industry Briefs," Card News, vol. 12, No. 11, Jun. 9, 1997, 2 pp.

Website: "The United Computer Exchange: How It All works," The United Computer Exchange Corp., www.uce.com/howitworks.html, Copyright date: 1997, download date: Apr. 10, 1998, 6 pp.

Website: "Classifieds2000: The Internet Classifieds," Classifieds 2000, Inc., Homepage: www.classifieds2000.com/cgi-cls/Display.exe?C2K+aboutus, download date: Aug. 6, 1997, 3 pp.

Brochure: "Tired of Shopping for the Best Home Loan?" Mortgage Loan Specialists, Aug. 7, 1997, 2 pp.

Website: "The Loan Process," Mortgage Loan Specialists, Homepage: www.sdtech.com/mls/process.html, download date: Aug. 7, 1997, 3 pp.

Website: "HomeShark Refinance Check," HomeShark, Inc., Homepage: www.homeshark.com/homewatch/refi/refistep 1.htm, download date: Aug. 31, 1997, 6 pp.

Website: "Tradingfloor.com" Homepage: www.tradingfloor.com/info/htm, download date; Aug. 14, 1997, 11 pp.

Website: The NASDAQ Market, Inc. ("NASDAQ") Consolidated subscriber Agreement, Homepage: www.pcquote.com/exchange/ex_nasd.html, download date: Aug. 15, 1997, 5 pp.

Website: "What is NASDAQ?" Homepage: http://home/axford.com/corfin/cof11.htm, download date: Aug. 15, 1997, 5 pp.

Website: "Onsale® Auction Supersite (TM)," OnSale, Inc., Homepage: www.onsale.com/category, download date: Sep. 8, 1997, 15 pp.

Website: "About IAO (Interactive Auction Online)," Interactive Auction Online, Homepage: www.iaoauction.com/auction.htm, download date: Sep. 18, 1997, 10 pp.

Hoeschen, Brad. "Brookfield Square Hopes Mall Card Strikes a Chord," Business Journal-Milwaukee, vol. 14, No. 50, p. 19, Sep. 12, 1997, 2 pp.

Website: "NCR 7452 Workstation," NCR Corporation, Homepage: www.ncr.com/products/Catalog/7452.shtml, download date: Sep. 23, 1997 5 pp.

Website: "Case-In-Point: Bloomindale's Inc.," Acxiom, Conway, AR., Homepage: www.acxiom.com/cip-cs-b.htm, download date: Sep. 23, 1997, 3 pp.

Website: "New Partners, More Exciting Rewards: The Membership Rewards Program for 1998," American Express Company, Homepage: www.americanexpress.com/rewards/news/docs/1998new_mr.shtml, download date: Mar. 12, 1998, 2 pp.

Brochure: "MyPoints (R)", MotivationNet, Inc. (TM), Homepage: www.mypoints.com, Copyright: Apr. 1998, 29 pp.

Hemsley, Steve. "Research and Destroy; Point-of Purchase Research Provides Brand Managers with Essential Information About Customers Trends and Enables Them to Achieve the Maximum Impact From Their Displays," Marketing week, Point of Purchase section, p. 33-36, Apr. 16, 1998, 3 pp.

Amato-Mccoy, Deena. "Co-Branded Acme Credit Card Rewards Loyal Users," Supermarket News, p. 17, Jun. 15, 1998, 2 pp.

"Acme Markets, U.S. Bancorp Debut Visa Rewards Card," Card News, vol. 13, No. 12, Jun. 22, 1998, 1 page.

Rubinstein, Ed. "Prepaid Program Lets Galleria Guests Dine 'A La Card'," Nation's Restaurant News, p. 43, Jun. 29, 1998, 1 page.

"Datacard Partners with CSI to Offer Card-Based Loyalty Solution to Merchants", Business Wire, Jul. 9, 1998, 1 page.

Albright, Mark. "Grocery Savings Via Web Coupons," St. Petersburg Times, Business section, p. 1E, Jul. 22, 1998, 2 pp.

Brochure: "Reaching Out in New Directions: Introducing USA Value Exchange (U$SVE)," First data Corp. Merchant Services, Undated, 32 pp.

Website: "Sotheby's General Information," downloaded from http://www.sothebys.com, (1996), 2 pp.

Nimmer, Raymond T., "Electronic Contracting: Legal issues," 14 J. Marshall Computer & Infor. L. 211, Winter 1996, 25 pp.

American Law Institute, Draft-Uniform Commercial Code Article 2 (Sales), parts 2,3, and 7, Jan. 4, 1996, 24 pp.

"Cathay Pacific Online Ticket Bidding," World Internet News Digest, May 8, 1996, 1 page.

Website: "About rate Hunter," downloaded from http//www.207.49.64.77/rhprodrh.htm, on Jul. 14, 1996, 2 pp.

Website: "Phonemiser," downloaded from http://www.phonemiser.com/faq/htm, on Jul. 14, 1996, 8 pp.

Nishimoto, Lisa, "Market Analysis: Travel Services are First Online Commerce Offerings to Fly: Many Corporations Arrange Flight, Car Rental and Hotel Bookings on the Internet," InfoWorld, p. 44, Jul. 29, 1996, 2 pp.

Wedsite: "Cathy Pacific: Cybertraveler auction #3—Official Rules," downloaded from http://www.cathypacific, downloaded Jul. 30, 1996, 4 pp.

Website: American Airlines Internet silent Auction, American Airlines, Inc, downloaded from http://www.Americanair.com Aug. 1996, 8 pp.

Website: "Crest: Cruise/Ferry Revenue Management System," Revenue Technology services Corporation, downloaded from http://www.rtscorp.com/h2o.htm, Aug. 5, 1996, 5 pp.

"World's First Real-Time Travel Auction Service to be Available Via World Wide Web," Business Wire, Nov. 4, 1996, 2 pp.

Website: "Web Ventures Presents Bookit!," downloaded from http://www.webventure.com/bookit/, Dec. 3, 1996, 2 pp.

"UK's World Telecom Unveils New Worldsaver Tariffs," Newsbytes, Feb. 13, 1997, 1 page.

Website: "Frequently Asked Questions About: Airhitch," downloaded from http://www.isicom.fr/airhitch/ahfaq, May 6, 1997, 5 pp.

Website: Airhitch Your way to Low Cost Travel, downloaded from http://www.vaportrails.com/Budget/Budfeatures/Airhitch/Airhitch.html, May 6, 1997, 2 pp.

Website: Hitch a Flight to Europe, downloaded from http://www.travelassist.com/mag/a69.html, May 6, 1997, 1 page.

Website: "Trade-Direct: We Help You Trade with Confidence," downloaded from http://www.trade-direct.com/, Aug. 6, 1997, 2 pp. Opensite Technologies, Inc., Brochure copyright date 1998, 8 pp.

Website: "CSM Online: Collector's Super CSM Mall," downloaded from http://www.csmonline.com/help/aboutcsm.html Apr. 23, 1998, 4 pp.

Website: "Netis: Auction Web," downloaded from http://www.auctionweb.com Oct. 13, 1998, 9 pp.

Website: "DealDeal>com:Bid to Win," downloaded from http://dealdeal.com/pxcfm/bidandwin.cfm?classID=elc&cid=&cal, Oct. 29, 1998.

Mandesse, Joe, "Interactive Puts Radio at Crossroads; Out-of Home Role, Tapping into Digital Tech Could Ensure Future," Advertising Age, News, Oct. 25, 1993 at p. 12, 4 pp.

Ellis, Stephen, "Credit Card firms Drive Down Costs," Sunday Times Business section, Feb. 27, 1994, 4 pp.

Patch, Kimberly, "Sled InterNIC Debut Internet Services; Sled Corp Offers Electronic Coupons for Encryption software; InteNIC Information Services Launches InfoGuide to Internet Computer Network" PC Week, May 16, 1994 vol. 11 No. 19 at p. 130, ISSN: 0740-1604, 1 page.

Ratcliffe, Mitch, "Lucie; Interactive Environment," Information, Advertising stands Upright, Prepares to Walk; Information Presen-

US 7,827,056 B2

Page 5

tation Technologies Inc.'s Local Use consumer Interactive Environment, Digital Media, Jun. 8, 1994, No. 1, vol. 4 at p. 14, ISSN: 1056-7038, 4 pp.

Armstrong, Larry. "Coupon Clippers, save Your Scissors," Vons Supermarkets are Revolutionizing the Delivery of Discounts. Business week, Jun. 20, 1994, No. 3377 at p. 164, 2 pp.

Bowles, Bob and Andreasen, Lois, "ADSI: Maximizing the Synergy Between the Network and Terminals; Analog display Services Interface," Telephony, Aug. 19, 1994, vol. 227, No. 9 at p. 20, ISSN: 0040-2656, 4 pp.

Radcliffe, Mitch. "All Roads Lead to Microsoft's Windows Everywhere Strategy," Digital Media, Mar. 6, 1995, No. 10, vol. 4 at p. 3, ISSN: 1056-7038, 11 pp.

Various Communications-Related Articles in Communications Daily, May 15, 1996, vol. 16, No. 95 at p. 4, 3 pp.

Nolle, Tom, "Overcoming Cellular Déjà vu; Personal Communications Services," America's Network, Sep. 15, 1996, No. 18, vol. 100 at p. 70, ISSN: 1075-5292.

Meece, Mickey. "Mastercard, Retailers Testing Point of Sales Discounts Program"; Credit/Debit/ATMS, Sep. 24, 1996 at p. 14.

Battle of the Bogoff: Roderick Oram on a Clash between Retailers and Manufacturers, Financial times (London), Management, Marketing and Advertising, Oct. 24, 1996 at p. 14, 2 pp.

"At&T Wireless Adds Convenience to Buying Cellular services," M2 Communications Jun. 1996; M2 Presswire, Pittsburgh, Nov. 20, 1996, 2 pp.

Beyer, Leslie. Target Marketing Made Easy; Supermarkets, Delta Communications Inc., Grocery Marketing, Feb. 1997 at p. 48, 3 pp.

"Emaginet Plans to Push Its Way into Consumer Mindset Pocketbook," Interactive PR and Marketing News, May 30, 1997, vol. 4 No. 22, 2 pp.

Warner, Bernhard. "Ads in the Ether on PC's Phones, Pagers (Will Consumers Accept Promo Beeps?)," Brandweek, Mar. 31, 1997 at p. 48, 3 pp.

Sinclair, Stewart. "To Mail or Not to Mail?" Strategy, Strategy Directresponse Special Report, Couponing, Oct. 12, 1998 at p. D21, 4 pp.

Dennis Sylvia. "Visa Gets ready for Interactive Set-Top Boxes," Newsbytes, Dec. 14, 1998, 2 pp.

Shermach, Kelly. "Retailers Rebuild Roots As Loyalty Pioneers," Card Marketing, Jan. 1999, vol. 3, No. 1, 2 pp.

"Northwest Airlines, Sprint Enter into Mileage Partnership; Consumers can Earn Up to 16,500 Frequent Flyer Miles Through Wide Range of Communications Services—Long Distance, Internet, Paging and Ultimately Sprint PCS," PR Newswire, Financial News, Jan. 5, 1999, 2 pp.

Free from NextCard—The Ages of Myst(TM), NextCard Promotion. (http://www.nextcard.com/ages/agesofmyst.html), download date: Jan. 6, 1999, 2 pp.

"E—Card web Page," E—Commerce Services from First USA, (http://apl.firstusa.com/pcard/index1.cfm?), download date: Jan. 11, 1999, 5 pp.

"About SaveSmart," SaveSmart.com, (http://www.savesmart.com/about/savesmart.html), down date: Jan. 12, 1999, 4 pp.

Internet/News.com staff, "The Trip.com, Visa Launch Rewards Program," (http://www.internetnews.com/ec-news/1999/01/1302-trip.html), download date: Jan. 13, 1999,2 pp.

"MySimon," my-Simon.com fact Sheet, (http://www.mysimon.com/corporate/company/factsheet.html), download date Jan. 13, 1999, 3 pp.

About ClickRewards the Best way to Earn Miles, (http://www.clickrewards.com/about.html), download date: Jan. 13, 1999, 4 pp.

"Join AOL Long Distance and This Is What You Will Receive . . . ," Jan. 13, 1999,2 pp.

"FYI; Calls Are Free After the Ads," Star Tribune, Jan. 14, 1999 at 1D.

"The New AE Card," American Eagle Outfitters Credit Application, Jan. 14, 1999, 6 pp.

"AltaVista's special Offer to You . . . $10 for Any CD!," Jan. 17, 1999, 1 page.

"Amazia Endeavour Travel," TS60 Eight Day Fly Drive Package, Jan. 17, 1999, 2 pp.

"Rent from NetFlix.com Buy from Amazon.com," Official Press Release, Jan. 17, 1999, 1 page.

"Sprint Sense Anytime;" Titanic on Videocassette is free when you sign up for Sprint Sense Day Long Distance, (http://csg.sprint.com/titanic), download date: Jan. 18, 1999, 1 page.

O'Brien, Timothy I.., "The Market: Market Place—Taking the Danger out of Danger out of Risk; Chase says Models Helped it avoid Financial Minefields," The New York Times Business/Financial Desk, Jan. 20, 1999 Section C. col. 2 at p. 1, 4 pp.

Cox, Beth, "Visa, Travelweb Enter Online Marketing Partnership," Internetnews.com, Jan. 21, 1999, 1 page.

Ellin, Abby, "I.istening to an Earful for Savings," (Hear the Pitches and talk for Free), The New York Times, Jan. 24, 1999, 1 page.

"Kiosk Issues Cards for Loyalty and Credit: Datacard, Minneapolis, Has Introduced a Line of Kiosks that Retailers Can Use to Issue Loyalty Program Cards and In-Store Charge Cards," Rtnews Feb. 1999, 1 page.

Files, Jennifer, "Grocers, At&T Team Up; "Smart" Coupon to Offer Bonus," The Dallas Morning News, Business, Feb. 6, 1999 at p. 12F, 2 pp.

Wijnen, Renee, "Listening to Ads Earns Free Long Distance; Advertisers Select Target Groups to Hear Messages," DM News, Supplement, Teleservices News, Mar. 1, 1999 at p. 1, 3 pp.

"Smart Cards; Buying Via Cable Lines," Future Banker, Future Money, Mar. 1, 1999 at p. 19, 1 page.

"CardTrak Online," ATM Ads, (www.cardweb.com/csrdtrak/news/1999/march/4a .html), 1 page.

"Wells Fargo Atms in California Becomes Little Billboards," Marketing news TM, Mar. 29, 1999 at p. 4, 2 pp.

"$20 in Free Groceries when You switch to AT&T Residential Long Distance Service. Call 1 800 288-262 AT&T," Photocopy of a Coupon Obtained from a coupon-dispensing Machine at a Safeway store May 19, 1999, 1 page.

"Planet U; Making Promotional Offers Available to U," (http://www.planetu/Pages/con-index.html), download date: May 23, 1999, 1 page.

"Five Great reasons to Enroll," (http://www.coolsavings.com/scripts/why enroll.asp?...), download date: May 23, 1999, 2 pp.

"E-Centives," (http://www.emaginet.com/de...memfaq.shtml), download date: May 23, 1999, 3 pp.

Visa—Smart Cards—About Smart cards; "What Is a smartcard?," (http://www.visa.com/nt/chip/info.html), Download date: May 23, 1999, 4 pp.

"Smart Cards for Windows;" The Smart Market Opportunity, (http://www.microsoft.com/windowsce/smartcard/start/background.asp), download date: May 23, 1999, 6 pp.

"Our Cards:Smart Cards: Using Smart Cards to deliver New Value." (http://www.mastercard/com/ourcard/smartcard/articles/artivle4.html0, download date: May 23, 1999, 5 pp.

"deja.com," (http://x24.deja.../getdoc.xp?...), May 24, 1999, 7 pp.

Royal Bank is First to Offer Instant Discount Program on No-Frills, Low rate Option and Classic Visa Cards: Canada News Wire; Financial News, Jul. 2, 1999, Friday, 2 pp.

Higginbotham, Stacey, "Next, Online Bids Over Jail Time?," Business Week, Up front Section, Jul. 19, 1999, 1 page.

Armstrong, Larry, "The Free-PC Game: Lure 'Em in and Lock 'Em Up," Business Week, Information Technology, Jul. 19, 1999, 1 page.

Poletti, Therese, "Latest twist on Free PC's—Free iMacs:" Yahoo! News, technology Headlines; Aug. 3, 1999, 2 pp.

Hamilton, Doug, "Florida Museum Displays Massive JFK Collection, Going Places; News, Notes & Tips," The Atlanta Journal and Constitution, Nov. 7, 1999, Sunday Home Edition Travel at p. 4K, 3 pp.

"Multi-Pint Computing Solutions," (http://multi-point.com/au/pmc/htm), download date: Nov. 22, 1999, 2 pp.

PCT International Search Report for International Application No. PCT/US99/19955 mailed Feb. 23, 2000, 6 pp.

PCT International Written Opinion for International Application No. PCT/US99/13409 mailed May 5, 2000, 2 pp.

"#1 Online Department Store Joins Clickrewards in Time for the Holidays; Azazz.com to Supply Name-Brand Merchandise for Netcentives' Clickrewards Catalog and Clickrewards; Members can Now Earn Generous Clickmiles Promotions within the Azazz.com

Internet Department Store," Nov. 27, 1998, Copyright 1998 PR Newswire Association, Inc.(http://web.lexis.nexis.com/1n.universe/s...a3&_md5=9feeb8c53a851ab13321cd728fc293), download date: Sep. 14, 1999, 3 pp.

Miriam Kreinin Souccar. "Epidemic of Rate Shopping Spurs a Search for remedies," Jan. 7, 1999, Copyright 1999 American Banker, Inc., (http://web.lexis.nexis.com/1n.universe/s...a3 &_md5=2d3eab8386c438f589062c3d5a7847aa), download date Sep. 14, 1999, 2 pp.

"Introducing the Digital MenuBoard", Siren Technologies, Inc., (www.sirentech com), undated, 4 pp.

"Cape Town", Reuters, Nov. 8, 1979, 1 page.

"Save the Mark", Financial Times London, Feb. 1, 1983, Section: Section I, Men & Matters, p. 12, 1 page.

Cook, Louise, "ConsumerWatch: Clip, Snip, Save", Associated Press, Mar. 12, 1984, Section: Business News, 2 pp.

Greene, Jan, "Farm bills please assn; National Grocers Association", Supermarket News, Jan. 27, 1986, Section: vol. 35, p. 6, ISSN: 0039-5803, 1 page.

Website: "buy.com", (wysiwyg//29http//www buy com/retail/w.. Category=CELLULAR&Keyword=cellular+), copyright 1997-2003, 2 pp.

Website: "Verizon Wireless at Radio Shack", (http://www radio shack com/Partners/Verizon/VerizonLanding asp?In=ve), Copyright 2003, 3 pp.

Office Action mailed Jul. 29, 2003 for U.S. Appl. No. 09/579,215, entitled "Systems And Methods For Evaluating Information Associated With A Transaction To Determine A Subsidy Offer", filed May 26, 2000 in the name of Jay S. Walker et al, 21 pp.

Press Release of Aug. 21, 1996, "Fort Worth Outlet Square Offers American Airlines AAdvantage Miles", Tandy Corporation, Copyright 1995, 2pp.

"Examiner's Affidavit", Affidavit Apr. 11, 2003, 1 page.

Press Release of Oct. 16, 19996, "Radioshack Introduces Handheld Flip-style Cellular Telephone with Vibration Alert" Tandy Corporation, Copyright 1995, 2 pp.

Pogoda, Dianne M., "G.E.C.C. Offers Credit Card with Discounts, Rebates; General Electric Capital Corp." WWD (Woman's Wear Daily) Sep. 3, 1992, 2 pp.

"Chemical Bank and AT&T Smart Cards form Strategic Alliance", www.att.com/press/1193/931117.b1b.html, 3 pp.

Kristof, Kathy "Card Sharks are in Season; be Wary of Discounts and Rebates as You Shop Around for Good Credit Deals", Chicago Tribune, Nov. 23, 1993, 2 PP.

Rosenberg, Joyce M. "GE Capital Comes to Macy's aid Again", AP Worldstream Feb. 17, 1994, 2 PP.

Booker, Ellis, "Checkout Lines to Offer More Than Just Candy and Waiting", Computerworld, PC's & Workstations, May 21, 1990 at p. 47, 1 page.

Shaw, Robert, "How the Smart Card is Changing Retailing", Long Range Planning, 1991, vol. 24, No. 1 at p. 111 to 114, 4 pp.

"Checkstands Boost Supermarket Profits", Chain Store Age Executive, Checkstand Design and Productivity, Dec. 1991 at p. 158, 2 pp.

"Set-top 'Converger'; Interactive Initiatives Abound at NCTA Convention", Communications Daily, Jun. 10, 1993 vol. !3 No. 111, at p. 9, 2 pp.

Tedesco, Richard. "Pactel Pushes Net Access." Broadcasting & Cable. Jun. 3, 1996, pp. 64-65.

Colman, Price. "Cross-marketing Cuts Cable Bills." Broadcasting & Cable. Jul. 15, 1996, p. 44, 2 pp.

Fleming et al. "European Banks, Insurance Firms Cross into Each Other's Territory." Wall Street Journal. (Europe) Feb. 29, 1991, p. 9, 4 pp.

"POS spectrum: a lottery looks to POS for growth", POS News, Jan. 1989, Section: vol. 5, No. 7, p. 8, ISSN: 0896-6230, Coden: BHORAD, 1 page.

"Let's Play the Cash Register Receipts Lottery", The New York Times, Dec. 25, 1990, Section: Section 1, p. 30, col. 4, Editorial Desk, 1 page.

Del Rosso, Laura, "Marketel says it plans to launch air fare 'auction' in June; Marketel International", Travel Weekly, Apr. 29, 1991, Section: vol. 50, No. 34, p. 1, ISSN: 0041-2082, 4 pp.

"Philips offers customers financing through Citicorp; Philips Medical Systems North America, Citicorp North America Inc." Health Industry Today, Jun. 1991, Section: vol. 54, No. 6, p. 4, ISSN: 0745-4678, 1 page.

"Coupons get serious; supermarkets use barcodes to prevent misredemptions", Chain Store Age Executive with Shopping Center Age, Oct. 1992, Section: vol. 68, No. 10, p. 68, ISSN: 0193-1199, 2 pp.

"Winn-Dixie/The Salvation Army Report Contributions For War Against Hunger", PR Newswire, Jun. 10, 1993, Section: Financial News, 1 page.

Jones, Jeanne, "Data Readers Streamline Management . . . ", The Houston Post, Jan. 26, 1994, Section: Business, p. D1, 1 page.

Fiorini, Phillip, "No Place For Penny?", USA Today, Jul. 29, 1994, Section: News, p. 1A, 3 pp.

Smith, Alison, "Survey of UK Consumer Credit and Asset Finance", Financial Times, Nov. 3, 1994, p. VI, 3 pp.

News Release: Linnen, Herb et al. "AT&T comments on new FCC rules to curb 'slamming'", Jun. 14, 1995, 4 pp.

Andreoli, Tom et al., "Cash Machines Offer A Whole Lotto Money . . .", Crain's Chicago Business, Jun. 19, 1995, Section: News, p. 8, 2 pp.

Knippenberg, Jim, "Will local radio empires strike back?", The Cincinnati Enquirer, Jul. 23, 1995, Section: Tempo, p. F01, 1 page.

"Cyberbid", Net Fun Ltd., Copyright 1996, 9 pp.

Hadley, Kimberly, "Pastors praying anti-arson effort will burn bias", The Nashville Banner, Jul. 26, 1996, Section: News, p. A13, 1 page.

Gapper, John, "NatWest reports rise in bad debt", Financial Times, Jul. 31, 1996, Section: News, UK, p. 09, 1 page.

"Lynx Technology: Lynx to provide business leasing program through Schroder Leasing", M2 Presswire, Aug. 9, 1996, 2 pp.

Taylor, Paul, "Towards a dream market", Financial Times, Sep. 4, 1996, Section: Survey—FT IT, p. 03, 2 pp.

Bonnici, Joseph et al., "Consumer issues in coupon usage: An exploratory analysis", Journal of Applied Business Research, winter 1996/1997, vol. 13, No. 1, pp. 31-40, ISSN: 0892-7626, Coden: JPBEBK, 11 pp.

"Happy Anniversary, here's your Cashback Bonus® Award", Private Issue by Discover, Copyright 1997, Greenwood Trust Company, 3 pp.

Rehayem, Gilbert, "Opinion: X-Press Betting", La Fleur's Lottery World, Feb. 7, 1997, 1 page.

Singletary, Michelle, "Electronic World, Unchecked Problem?", The Washington Post, Mar. 4, 1997, Section: Financial, p. C01, 4 pp.

"Products and Services, Checkout Direct", Catalina Marketing Corporation, (http //catalinamktg com/prodcdir htm), download date: May 29, 1997, 16 pp.

Riordan, Teresa, "Patents; A novel approach to making a better spermicide harks back to some old-fashioned methods.", The New York Times, Jun. 9, 1997, Section D, p. 2, col. 1, Business/Financial Desk, 3 pp.

Nairn, Geoff, "The key to your identity: Falling costs will allow fingerprint verification to be widely used", Financial Times (London), Jul. 15, 1997, Section: Technology, p. 12, 3 pp.

"Switch your Chase MasterCard to a Shell MasterCard from Chase and you'll earn: Free Formula Shell Gasoline", Chase Manhattan Bank USA, N.A., Sep. 1997, 2 pp.

Ross, Chuck et al., "Coke Card promotion set for '98", (http //adagecom/news_and_features/features/19971117/article3 html), Copyright Nov. 1997, 2 pp.

"NCR 7453 PC-Based Point-of-Sale Solution", NCR Corporation, Copyright 1998, 2 pp.

"For the Crew & the Customer", Olivetti, Winter, 1998, 2 pp.

Krauss, Jeffrey, "Subsidized TV sets?", CED (Communications Engineering & Design), Feb. 1998, 3 pp.

Goldblatt, Henry, "AT&T Finally Has An Operator . . . ", Fortune, Feb. 16, 1998, Section: Features/Telcos, p. 79, 4 pp.

Elstrom, Peter, "Reach Out and Pay Someone", Business Week, Mar. 23, 1998, p. 4, 1 page.

"Cross-Sell Billing Statement Acquisition System", Apr. 7-9, 1998, 2 pp.

WD000007

Website: "MCI Freeflix Free Video Rental Program", (http //www mci com/aboutus/products/prepaid/promotional shtm), download date: Apr. 21, 1998, 1 pp.

Website: "MCI PrePaid Card Retail Promotional Opportunities", (http //www mci com/aboutus/products/glossary/home/freeflix shtml), download date: Apr. 21, 1998, 2 pp.

Website: "Wall Street Access . . . : Active Trader Rebate Program", (http //www wsaccess com/active_rebate_program htm), download date: Apr. 22, 1998, 2 pp.

"IAFC Launches NextCard (sm)—The First True Internet VISA", (http //www nextcard com/release1 html), download date: Sep. 14, 1999, 2 pp.

Goldberg, Jeff, "Cellular phone information from Point.com", (http www point com/articles/489 asp), download date: Nov. 16, 2000, 7 pp.

"Milestone Events Making Spring History 1899-1989", undated, 1 page.

Sims, Calvin, "Centel Acquiring Cellular Phone Unit", The New York Times, May 28, 1988, Section 1, p. 33, col. 3, Financial Desk, 2 pp.

Butcher, Lola, "United May Pocket Windfall With Sale of Cellular Business", Kansas City Business Journal, Jun. 6, 1988, Section: vol. 6, No. 38, Section 1, p. 8, 3 pp.

Winter, Christine, "GTE to Sell Part of US Sprint Stake Deal to Shift Another 30% to Partner United Telecom", Chicago Tribune; Jul. 19, 1988, Section: Business, p. 2, Zone C, 2 pp.

"United Telecommunications Announces Completion of Sale", PR Newswire, Oct. 5, 1988, 2 pp.

Henze, Doug, "A Tightening in Cellular Market", Oakland Business Monthly, Aug. 1989, Section 1, vol. 7, No. 8, p. 45, 6 pp.

"United Telecom halts Sprint deal as net falls", Chicago Tribune, Jul. 18, 1990, Section: Business, p. 1, Zone C, 3 pp.

Connely, Joanne, "FCC gets spectrum comments; US Federal Communications Commission investigates development of personal communications networks and radio-based technologies", Chilton's Electronic News, Jan. 28, 1991, Sec.:No. 1845, vol. 37, p. 10, ISSN: 1054-6847,3 pp.

Manuta, Lou, "Should cellular be deregulated? Cellular radio telephones; Industry Overview", Cellular Marketing, Jan. 1992, Section: vol. 7, No. 1, p. 20, ISSN: 0890-2402 6 pp.

Rossa, James L., "Cellphones ride roller coaster; American Information Technologies Corp. to cut commission rebates to retailers", HFD-The Weekly Home Furnishings Newspaper, Feb. 3, 1992, Section: vol. 66, No. 5, p. 89, ISSN: 0746-7885, 3 pp.

La Rossa, James Jr., "Ameritech policy stirs debate; executives weigh retailer rebates on eve of Cellular Telecommunications Industry Association Show; American Information Technologies Corp; Special CTIA Show Issue", HFD-The Weekly Home Furnishings Newspaper, Feb. 10, 1992, Section: vol. 66, No. 6, p. 81, ISSN: 0746-7885, 3 pp.

Ziegler, Bart, "Sprint to Merge with Centel", Associated Press, May 28, 1992, Section: Business News, 3 pp.

Marek, Sue, "The carrier/retailer love affair—still going strong? Cellular radio industry; Cover Story", Cellular Marketing, Jul. 1992, Section: vol. 7, No. 7, p. 18, ISSN: 0890-2402, 5 pp.

"Resale Effect Debate; GAO Faults FCC on Cellular Duopoly Scheme", Communications Daily, Jul. 2, 1992, Section: vol. 12, No. 128, p. 3, 2 pp.

Strandjord, Jeannine M., "Should you bundle 401k services? Employee Benefits", Financial Executive, Sep. 1992, Section: vol. 8, No. 5, p. 45, ISSN: 0895-4186, 5 pp.

Brown, Bob and Wallace, Bob, "AT&T bid for McCaw to reshape landscape; Gives dominant carrier access to rapidly evolving market and opportunity to influence, drive, change.", Network World, Nov. 9, 1992, Section: Top News, p. 1, 3 pp.

Avril, Tom, "Centel Confident of Victory After Vote on Sprint Merger", Dec. 2, 1992, Section: Business News, 3 pp.

Avril, Tom, "Communications; Centel Investors Vote on Sprint Merger", The Commercial Appeal, Dec. 3, 1992, Section: Business, p. B4, 2 pp.

Oloroso Jr., Arsenio, "Centel holds its breath; Shareholders wait to see outcome of Sprint deal", Crain's Chicago Business, Dec. 7, 1992, Section: p. 38, 2 pp.

Yates, Ronald E., "Sprint-Centel merger complete despite fears", Chicago Tribune, Mar. 10, 1993, Section: Business, p. 1, Zone N, 3 pp.

Wenske, Paul, "Sprint's big deal", Ingram's, May 1993, Sec.: vol. 19, No. 5, Section, p. 34, 8 pp.

"Petition Criticized; Fight on CPE Unbundling for IXC Resellers Launched by Major Retailers", Communications Daily, Aug. 10, 1993, Section: vol. 13, No. 153, p. 1, 2 pp.

DeFebo, Carl Jr., "Sprint opens first superstore in Mechanicsburg", Central Penn Business Journal, Nov. 3, 1993, Section: vol. 9, No. 22, Section 1, p. 12, 3 pp.

"Testimony Feb. 8, 1994, John V. Roach Consumer Electronics Retailers Coalition House Energy/Telecommunications and Finance Antitrust Reform Act of 1993", Federal Document Clearing House Congressional Testimony, Feb. 8, 1994, 8 pp.

"Sprint—Company Data", Securities and Exchange Commission Form 10-Q, for the quarterly period ended Mar. 31, 1994, 4 pp.

"Form 10-K Sprint Corp—FON", Filed Mar. 15, 1994 (period Dec. 31, 1993), 8 pp.

Kraemer, Joseph S., "Local competition; Changing Ground Rules for Network Access", Business Communications Review, Sep. 1994, Sec.: vol. 24, No. 9, p. S4, ISSN: 0162-3885, 10 pp.

Steward, Shawn, "Activating the masses", Cellular Business, Oct. 1994, Section: vol. 11, No. 10, pp. 72-80, ISSN: 0741-6520, Coden: COHE, 7 pp.

"Sprint—Defining the Communications Company of the Future 1994 Annual Report to Shareholders", Document Date: Dec. 31, 1994, Filing Date: Mar. 22, 1995, 36 pp.

"Inside Sprint Corporation: 1994 Competitive Market Developments", Inside Telecom, Jul. 17, 1995, 7 pp.

"Tandy Corp—Form-Type ARS", Document Date: Dec. 31, 1995, Filing Date: Apr. 10, 1996, 14 pp.

"Sprint Completes Spin-Off of It's Cellular Subsidiary", Chicago Sun-Times, Mar. 8, 1996, Section: Financial, p. 44, 2 pp.

"Securities and Exchange Commission Form 10-K/A, 360 Degrees Communications Co Cross-Reference: Sprint Cellular Co", For the fiscal year ended Dec. 31, 1995, Filing date: Apr. 16, 1996, 23 pp.

Press Release: "Sprint, Sprint Spectrum and Radio Shack Join Forces", New York, NY, Sep. 11, 1996, 5 pp.

Maxon, Terry, "Tandy pairs with Sprint for venture; Companies will offer expanded offering of telecommunications products, services", The Dallas Morning News, Sep. 12, 1996, Section: Business; p. 1B, 2 pp.

"Tandy, Sprint to offer one-stop phone shopping", downloaded from http://web.archive.org/web/19971022163159/www.tandy.com/press/sprinton, copyright Tandy Corporation, 1995, 2 pp.

"Tandy Corporation—Quarterly Report", For the quarterly period ended Sep. 30, 1996, Filed Nov. 12, 1996, 36 pp.

Alleman, James and Cole, Larry, "The International Handbook of Telecommunications Economics, vol. III, Sprint—GTE's lost opportunity", Edward Elgar Publishers, 2002, Chapter 10, 13 pp.

King, Suzanne and Hayes, David, "Sprint PCS has played key role in cell phone boom", Posted: Jan. 6, 2002, 10 pp.

Website: "Sprint 1995 Annual Report—Notes to Consolidated Financial Statements", (http //www sprint com/sprint/annual/95/finance/p_52a html), download date Oct. 21, 2003, 1 page.

Website: "Sprint/History", (http www sprint com/sprint/ir/sd/timeline_02 html), download date: Oct. 22, 2003, 2 pp.

Website: "Surviving the Great Depression", (http //www geocities com/Athens/Column/4735/clbrown2 html), download date: Nov. 13, 2003, 2 pp.

Website: "The Mobile: 20 Years Young", (http: //motoinfo Motorola com/motoinfo/20th_anniversary/docs/timeline pdf), download date: Jan. 9, 2004, 2 pp.

Website: "Qualcomm About Qualcomm—History / Key Milestones", (http www qualcomm com/about/history/ html), download date: Jul. 27, 2004, 5 pp.

Schrage, Michael "Free Stuff! Predatory Pricing or Creative Cross-Promotion? You be the Judge; The Beta Version; Industry Trend or Event" Marketing Computers, Oct. 1995, 2 pp.

Marshall, Kyle "More Phone Choices Ring In", The News and Observer Aug. 13, 1996, 2 pp.

WD000008

US 7,827,056 B2

Page 8

Wessel, Harry "Rewarding Experience?; Credit Cards Offering Bonuses Not For Everyone", Chicago Poet-Gazette Dec. 5, 1996, 3 pp.

Selasky, Susan "Easy-To-Swallow Savings; Diner Credit Cards Serve Wide menu of Discounts", Pittsburgh Post-Gazette Dec. 5, 1996, 3 pp.

"Merger Creates alliance Data", Credit Risk Management Report Dec. 16, 1996, 1 page.

Higgins, Stephen "Digital Phone Service on the Way" Business Date-line; New Haven Register, Jan. 7, 1997, 3 pp.

Kerstetter, Jim "E-Commerce Updates Get Intelligent Agents; Electronic Commerce", PC Week Feb. 3, 1997, 2 pp.

Barlow, Rick "Relationship Marketing: Coalition Marketing is Coming Back", Brandweek Apr. 28, 1997, 2 pp.

Simon, Ruth "Make Sure Your Rebate Card Still Delivers the Goods", Money Aug. 1997, 2 pp.

Gilligan, Gregory J. "Credit Cards from Retail Store's a Mixed Blessing for Shoppers", The Richmond Times Dispatch, Jul. 20, 1997, 4 pp.

Fitzgerald, Beth "New Jresey-Based SCA Helps Private Label Credit Cards Take Off", The Star Ledger Aug. 4, 1997.

Sanders, Edmund "Tricky Business; The Magic of Rebate Cards can Quickly Disappear", Chicago Tribune Aug. 18, 1997, 3 pp.

Wijnen, Renee "Cendant Eyes Cross-Marketing Opportunities; CUC Internation-HFS Inc. Merger Expected to Yield an Additional 2 Million Club Members" DM News Feb. 2, 1998, 2 pp.

"Cardholders Think Big" Bank Marketing International Mar. 1998, 3 pp.

Wald, Matthew L. "Spending It; Untying Cellular Phones From Those Annual Contracts" The New York Times Mar. 15, 1998, 2 pp.

"American Eagle Outfitters, Inc. Introduces the First Clear Credit Card" PR Newswire Mar. 26, 1998, 2 pp.

Ling, The Hooi "Prices of Handphones Dive, Thanks to Cross-Subsidies" Business Times Apr. 8, 1998 1 pg.

"Card Briefs: Beneficial, Casual Male Team Up on Card" The American Banker May 4, 1998 1 pg.

"Points Earn Little Credit as Cardholders Fail to Cash In" Birmingham Post May 9, 1998, 2 pp.

Meece, Mickey "Big Finance Companies May Want Piece of Limited's Private-Label Card Program", The American Banker Apr. 12, 1995, 2 pp.

"Jay Jacobs Inc. Introduces Private Label Credit Card", Business Wire May 18, 1998, 1 page.

"Wellsparks Group Launches V.I.P. Rewards; The Most Comprehensive Relationship Marketing Program Ever Created by a Mall Developer", Business wire May 19, 1998, 2 pp.

"SNET Cellular Value Plans" Brochure, Jun. 12, 1998, 3 pp.

"Shoppers Charge Accounts Co. to Administer Private Label Credit Card for Lew Magnant Ltd; Program Marks SCA,s Entry into Retail Catalog/Mail Order Industry" PR Newswire Jun. 29, 1998, 6 pp.

"Cell Phones at 7-11? Almost Everyone is Selling Wireless Service these Days. Here's How to Get the Right Deal" Time Magazine Jul. 6, 1998, 2 pp.

"The Savings Game: Read Fine Print in Rebate Offers by Credit Cards" The Cincinnati Enquirer Aug. 31, 1998, 3 pp.

"Wal-Mart on Retail Road Less Traveled: Cobranding," The American Banker Sep. 11, 1998, 3 pp.

Elkin, Tobi "Promotions: Mastercard Wins Coveted On-Pack Real Estate in Tie-in with Microsoft" Brandweek Sep. 14, 1998, 1 page.

"Clubmacy's" Brochure Sep. 1998, 2 pp.

"Filene's" Credit Card Application, Sep. 1998, 2 pp.

"Dual-Function Cards Latest pitch to Call in Holders" Card Marketing Nov. 1998, 2 pp.

"Issuers Charge Ahead to Focus on Price Vs. Brand", Card Marketing Nov. 1998, 2 pp.

"Competition: First USA, with its Microsoft Pact, is King of the Internet", Credit Card News Nov. 1, 1998, 2 pp.

"Retail Cards: Attention Kmart Card Holders: 6% Back is Dead a New package of Perks is Coming" Credit Card News Nov. 1, 1998, 1 page.

"Microsoft and First USA Announces $90 Million Online Advertising Alliance" EDP Weekly's IT Monitor Nov. 2, 1998, 2 pp.

Feldman, Amy "Paying with Plastic Not Such a Smart Idea", New York Daily News Nov. 4, 1998, 2 pp.

Cowell, Alan "America's Turn to Colonize; Creditcard Issuers Invade Britain, with U.S. Firepower", The New York Times Nov. 12, 1998, 5 pp.

"No. 1 Online Department Store Joins Clickrewards" PR Newswire Nov. 27, 1998, 3 pp.

Shermach, Kelly "Partnerships Help Issuers Web Concepts", Card Marketing, Dec. 1998, 2 pp.

"Largest Internet Ad Deal Signed", Bank Marketing International, Dec. 1998, 3 pp.

"Amazon.com and Netflix.com Establish Promotional Relationship for the Sale and Rental of DVD Titles" Business Wire Dec. 4, 1998, 3 pp.

"At Sports Superstore Online, Shoppers Get More for Their Money; 10,000 Reasons to Shop at Sports Superstore Online", Business Wire Dec. 4, 1998, 2 pp.

"Credit Card Enticements" NPR Moning Edition, Dec. 23, 1998, 3 pp.

"Pagers That Can Spell It All Out", Business week Jan. 16, 1995, 2 pp.

Block, Valerie "GM Turns Up the Heat with Plan to Cross-sell some Financial Products," The American Banker Nov. 18, 1994, 2 pp.

International Search Report for PCT Application No. PCT/US99/21720 mailed Mar. 23, 2000, 6 pp.

International Search Report for PCT Application No. PCT/US99/13819 mailed Oct. 21, 1999, 8 pp.

International Search Report for PCT Application No. PCT/US99/13409 mailed Oct. 21, 1999, 8 pp.

International Search Report for PCT Application No. PCT/US99/19955 mailed Feb. 23, 2000, 2 pp.

Written Opinion for PCT Application No. PCT/US99/13819 mailed May 16, 2000, 6 pp.

Written Opinion for PCT Application No. PCT/US99/13409 mailed May 16, 2000, 9 pp.

Spoor, Dana L., "Selling a free phone", Cellular Business, Feb. 1994, vol. 11, No. 2, pp. 58-62, ISSN: 0741-6520, 3 pp.

Crump, Stuart F. Jr., "Faith goes cellular (case study of a real estate agent's selection of a cellular phone and carrier)", Home Office Computing, Jun. 1994, vol. 12, No. 6, p. 110(2), 4 pp.

Krauss, Jeffrey, "Subsidized cable modems—Their time has come", Communications Engineering & Design—Feb. 2001, (http //www cedmagazine com/ced/2001/0201/02cc).

Sabatini, Patricia, "Card sharks; Lurking in the sea of offers you get from credit card companies are some nasty surprises. Unless you read the fine print, you'll be in the companies' jaws before you know it.", Pittsburgh Post-Gazette, Feb. 4, 1996, Section: Business, p. Cl, 8 pp.

Website: "Welcome to the American Airlines Internet Silent Auction", American Airlines, Inc., (http://www.americanair com), download date: Aug. 1996, 8 pp.

Website: "Crest—Cruise/Ferry Revenue Management System", (http www rtscorp com/h2o htm), download date: Aug. 5, 1996, 4 pp.

Wagner, Jim, "Cameras Tell Mall What Door You Use, How Often You Go", Albuquerque Tribune, Aug. 9, 1996, Section: Evening, p. A3, 2 pp.

Nishimoto, Lisa, "Market Analysis; Travel services are first online commerce offerings to fly; Many corporations arrange flight, car rental, and hotel bookings on the Internet", Infoworld, Jul. 29, 1996, Section: Internet p. 44, 2 pp.

Fickenscher, Lisa, "Amex to Start Free Rewards Program with Discounts on Merchandise", The American Banker, Oct. 18, 1996, Section: Credit/Debit/ATMS, p. 10, 2 pp.

Fitzgerald, Kate, "Amex program moves loyalty to next level: Custom Extras finds a medium customers can't ignore: Billing Statements", Advertising Age, Nov. 4, 1996, Section: News, 2 pp.

"World's First Real-Time Travel Auction Service to be Available Via World Wide Web; ETA to Open Bidding to Consumers, Travel Industry; Web Auction Leader eBay to Provide Technology Support", Business Wire, Nov. 4, 1996, 2 pp.

Website: "Web Ventures presents Bookit!", (http://www webventures com/bookit), download date: Dec. 2, 1996, 1 pg.

Nimmer, Raymond T., "Commercial Transactions on the Global Information Infrastructure: Electronic Contracting: Legal Issues",

Copy provided by USPTO from the PIRS Image Dat…b    03/30/2014

## US 7,827,056 B2

Page 9

The John Marshall Journal of Computer Information Law, 14 J. Marshall J. Computer & Info. I. 211, Winter 1996, 26 pp.

Bryant, Adam, "Shaking Up Air Fares' Status Quo; Entrepreneur Seeks Break for Last-Minute Business Fliers", The New York Times, Apr. 1, 1997, Section: Section D, p. 1, col. 2, Business/Financial Desk, 4 pp.

"Dispensing the future", Electronic Payments International, May 1997, Section: Feature; 5 pp.

Website: "Frequently Asked Questions about: AIRHITCH", (http //www isicom fr/airhitch/ahfaq), download date: May 6, 1997, 5 pp.

"Industry Briefs", Card News, Jun. 9, 1997, Section: vol. 12, No. 11, 2 pp.

"Internet mortgage service eliminates loan agents and passes commissions on to the consumer", Business Wire, Jun. 30, 1997, 2 pp.

"The United Computer Exchange: How it All Works", The Untied Computer ExchangeCorporation, (www uce com/howitworks html), download date Jul. 23, 1997, 6 pp.

"Classifieds2000 The Internet Classifieds", (http www classifieds2000 com/cgi-cls/Display exe?C2K+aboutus), download date: Aug. 6, 1997, 3 pp.

Brochure: "Tired Of Shopping For The Best Home Loan?", Mortgage Loan Specialists, Aug. 7, 1997, 2 pp.

Website: "HomeShark Refinance Check", (http //www homeshark com/homewatch/refi/refistep1 htm), download date: Aug. 13, 1997, 6 pp.

"General trading information and terms provided by tradingfloor. com", Tradingfloor.com, (http //www tradingfloor com/info htm), download date: Aug. 14, 1997, 11 pp.

"Nasdaq", (http //home axford com/corfin/corf11 htm), download date: Aug. 15, 1997, 3 pp.

Website: "The Nasdaq Stock Market, Inc. ('Nasdaq') Consolidated Subscriber Agreement", (http //www pcquote com/geninfo/exchange/ex_nasdaq php), download date: Aug. 15, 1997, 5 pp.

"Case-in-POINT: Case Study: Bloomingdale's, Inc.", (http www acxiom comcip-cs-b htm), download date: Sep. 23, 1997, 2 pp.

Website: "NCR 7452 Workstation—Beyond Traditional POS", (http //www ncr com/product/retail/products/catalog/7452 shtml), download date: Sep. 23, 1997, 3 pp.

Brochure: OpenSite Technologies Inc., copyright 1998, 8 pp.

New Partners more exciting rewards: The Membership Rewards Program for 1998, (http // www americanexpress com rewards news docs 1998ne w mr shtml), 38 pp.

Hemsley, Steve "Research and Destroy . . . " Marketing Week, Apr. 16, 1998, Section: Point of Purchase, 3 pp.

Website: Collector's Super Mall Information, (http // www csmonline come help aboutcsm html) Apr. 23, 1998, 4 pp.

Amato-McCoy, Deena, "Co-Branded Acme Credit Card Rewards Loyal Users" Supermarket News, Jun. 15, 1998, Section: p. 17, ISSN: 0039-5803, 2 pp.

"Acme Markets, U.S. Bankcorp Debut Visa Rewards Card", Card News, Jun. 22, 1998, Section: vol. 13, No. 12, 1 p.

Rubenstein, Ed, "Prepaid program lets Galleria guests dine a la Card", Nations Restaurant News, Jun. 29, 1998, Section: Technology, 1 pg.

"DataCard Partners With CSI To Offer Card-Based Loyalty Solution to Merchants", Business Wire, Jul. 9, 1998, 1 pg.

Albright, Mark, "Grocery savings via Web coupons", St. Petersburg Times, Jul. 22, 1998, Section: Business, 2 pp.

Website: "DealDeal com—The Best Auction Deals on the . . . ; Bid To Win", (http www dealdeal com/psxfm/bidandwin cfm?classID elc &cid=&cal=), download date: Oct. 29, 1998, 2 pp.

Mr. Pigeon "Cell Phone Pigeon Family Sweats The Details", Star Tribune, Jan. 29, 1995, 5 pp.

Parker, Penny "Cart vendors offer line-free shopping", Denver Post, Dec. 20, 1995, 2 pp.

Website: "Amazia Endeavour Travel—TS60 Eight Day New Zealand Fly Drive Package", (http //www anzac com/endvr/ts60 html), download date: Jan. 17, 1999, 2 pp.

Website: "The Sabre Group—Sabre Decision Technologies", (http www sdt com), undated, 6 pp.

Website: MasterCard—The Smart Card: News & Views, Using Smart Cards to Deliver New Value, (http // www mastercard com/ ourcards/smartcard/articles/ar ticle4 html), Copyright 1994-2000, 5 pp.

Lacher, Lisa, "Coupon Gimmick Registers Profits", Business Record, Dec. 7, 1987, Section: vol. 83, No. 47, Sec. 1, 2 pp.

Stevens, Lawrence, "Hypermarket challenge", Computerworld, Dec. 10, 1988, Section: Software & Services, 2 pp.

Kuttner, Robert, "Computers May Turn the World Into One Big Commodities Pit", Business Week, Sep. 11, 1989, Section: Economic Viewpoint, No. 3123, 2 pp.

Golden, Fran, "AAL's Riga doubts Marketel's appeal to retailers; Chris Riga of American Airlines", Travel Weekly, Nov. 13, 1989, Section: vol. 48, No. 91, 2 pp.

"Safeway Introduces Store-Generated Coupons", PR Newswire, May 1, 1990, 1 pg.

Ritter, Jeffrey, "Scope of the Uniform Commercial Code: Computer Contracting Cases and Electronic Commercial Practices", The Business Lawyer, Aug. 1990, Section: Survey, 20 pp.

Pelline, Jeff, "Travelers Bidding on Airline Tickets SF firm offers chance for cut-rate fares", The San Francisco Chronicle, Aug. 19, 1991, Section: News, 5 pp.

Blattberg, Robert C., "Interactive marketing; exploiting the age of addressability", Sloan Management Review, Sep. 22, 1991, Section: vol. 33, No. 1, 15 pp.

Del Rosso, Laura, "Ticket-bidding firm closes its doors; Marketel International", Travel Weekly, Mar. 12, 1992, Section: vol. 51, No. 21, 3 pp.

McDowell, Bill, "Frequency marketing builds repeat business; Management", Building Supply Home Centers, Aug. 1993, Section: No. 2, vol. 165, p. 96, ISSN: 0890-9008, 5 pp.

Fitzgerald, Kate, "Dual-function Cards Latest Pitch To Call in Holders", Card Marketing, Nov. 1998, vol. 2, No. 10, (http //cardmarketing faulknergray com), 2 pp.

Speidel, Richard, "Impact of Electronic Contracting on Contract Formation Under Revised UCC Article 2, Sales", The American Law Institute—ABA Course of Study, Dec. 9, 1993, 4 pp.

"Cardbriefs: Stored-Value Card Designed for Casinos", The American Banker, Oct. 31, 1995, Section: Credit/Debit/ATMS, 1 pg.

"Tecmark Reward Terminal", (http //www tecmarkinc com/terminal htm), copyright, 1996 Tecmark Services, Inc., 1 pg.

"Draft – Uniform Commercial Code Revised Article 2. Sales—Parts 2,3, and 7", The American Law Institute, Jan. 4, 1996, 24 pp.

"MyPoints: Members Guide", (http www mypoints com/mp/dStatial show?isref=main nonmemberguide default), download date: Apr. 28, 2000, 5 pp.

Website: "Verizon Wireless at Radio Shack", (http//www radioshack com/Partners/Verizon/VerizonLanding asp?ln—ve), Copyright 2003, 3 pp.

Website: "The Loan Process", Mortgage Loan Specialists, (http //web archive org/web/19707152006608/http //www sdtech com/mls/ process html), download date: Sep. 30, 2003, 3 pp.

Website: "The Nasdaq Stock Market, Inc. ('Nasdaq') Consolidated Subscriber Agreement", (http //www pcquote com/geninfo/exchange/ex_nasdaq php), download date: Sep. 30, 2003, 4 pp.

Website: "NETIS—Internet's Largest Auction Site for Auction Information", (http web archive org/web/19980703174530/http //www2 auctionweb com/), 9 pp.

Website: "Phonemiser: Frequently Asked Questions", (http //web archive org/web/19970601100142/http //www phonemiser com/faq htm), download date: Sep. 30, 2003, 8 pp.

Website: "Welcome to Sotheby's", (http //web archive org/web/ 19970101034054/http www sotheby's com/), download date: Sep. 30, 2003, 2 pp.

Website: "Welcome to Trade-direct", (http //web archive org/web/ 19970212130834/http //www trade-direct com/), download date: Sep. 30, 2003, 2 pp.

Website: "Airhitch Your Way to Low Cost Travel!", (http //web archive org/web/19970416104620/http//www vaportrails com/Budget/BudFeatures/Airhitch/A... ), download date: Nov. 7, 2003, 2 pp.

Carroll, Richard, "TravelASSIST Magazine—Travel Deals—Hitch a Flight to Europe", (http //web archive org/web/19970118210259/ http //www travelassist com/mag/a69 html), download date: Nov. 7, 2003, 1 pg.

Rozen, Miriam, "What's New in Joint Promotions", The New York Times, Mar. 10, 1985, Section 3, Financial Desk, 1 pg.

Katcher, P. Royall, "Getting products to consumers; The Basics of Retailing, part 2", Automotive Marketing, May 1990, Section: vol. 19, No. 5, ISSN: 0193-3264, 1 pg.

McKinney, Jeff, "Merchant program could pay off for provident", The Cincinnati Enquirer, Mar. 24, 1996, Section: Financial, 2 pp.

Website: "Rate Hunter", (http //207.49.64.77/rhprodrh htm), download date: Jul. 14, 1996, 2 pp.

Website: "Cathay Pacific—Cyber Traveler Auction #3—Official Rules", (http //www cathaypacific com), download date: Jul. 30, 1996, 4 pp.

"UK's World Telecom Unveils New WorldSaver Tariffs", Newsbytes, Feb. 13, 1997, 1 pg.

Fickenscher, Lisa, "Merchant: American Express Seeks to Mine Its Data on Cardholder Spending Patters", The American Banker, Mar. 24, 1997, Credit/Debit/ATMS, 2 pp.

Kelsey, John et al., "Conditional Purchase Orders", Fourth ACM Conference on Computers, Apr. 1997, 8 pp.

"About IAO", (http //www iaoauction com/about htm), download date: Sep. 8, 1997, 10 pp.

"Welcome to ONSALE", ONSALE, Inc., (http www onsale com), download date: Sep. 8, 1997, 15 pp.

Hoeschen, Brad, "Brookfield Square hopes mall card strikes a chord", Business Journal-Milwaukee, Sep. 12, 1997, Section: vol. 14, No. 50, 2 pp.

Holton, Lisa Cable Efforts Help Insurers Tune Into New Markets:, Card Marketing, Jan. 1999, 2 pp.

Shook, David "Rebate Limits Can Be A pain for Consumers", The Buffalo News, Jan. 5, 1999, 2 pp.

Samuelson, Paul "Economics Ninth Edition", McGraw Hill Book Company, 1973, 10 pp.

Blattberg, Robert C and Levin, Alan, "Modeling The Effectiveness And Profitability Of Trade Promotions", Marketing Science, 1987, 23 pp.

Jensen, Elizabeth, "Yaking It Up" The Wall Street Journal Europe, Apr. 28, 1998, 5 pp.

Point.com, webpage, copyright 1998-2000, 6 pp.

Booker, Ellis, "Checkout lines to offer more than just candy and waiting", Computer World, May 21, 1990, 1 pg.

Shaw, Robert, "How the Smart Card is Changing Retailing", vol. 24, 1991, 4 pp.

Travel Agent No Show Crackdown, vol. 287, No. 6, 1 pg.

Website: "Apollo Host Computer", (http //www Apollo com), undated, 4 pp.

Brochure: "Reaching Out in New Directions", Fist Data Corporation, Merchant Services, 19 pp.

Sprint Opens First Store In Mechanicsburg, Central Penn Business Journal, Nov. 3, 1993, 3 pp.

Foster, Ed, "Can mixing 'cookies' with online marketing be a recipe for heartburn?", InfoWold, Jul. 22, 1996, 2 pp.

Patch, Kimberly PC Week, Sled, InterNIC debut Internet Services, May 16, 1994, 1 pg.

Office Action for U.S. Appl. No. 09/282,747 mailed Sep. 7, 2007, 23 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Feb. 27, 2007, 24 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Mar. 21, 2006, 21 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Dec. 7, 2004, 12 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Apr. 13, 2004, 14 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Nov. 19, 2002, 18 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Mar. 1, 2002, 20 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed May 21, 2001, 35 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Oct. 13, 2000, 34 pp.

Office Action for U.S. Appl. No. 09/322,351 mailed Aug. 20, 2007, 25 pp.

Office Action for U.S. Appl. No. 09/322,351 mailed Nov. 30, 2006, 26 pp.

Office Action for U.S. Appl. No. 09/332,351 mailed Mar. 13, 2006, 20 pp.

Office Action for U.S. Appl. No. 09/332,351 mailed Nov. 19, 2004, 22 pp.

Office Action for U.S. Appl. No. 09/332,351 mailed Jan. 27, 2003, 28 pp.

Office Action for U.S. Appl. No. 09/332,351 mailed Sep. 25, 2001, 22 pp.

Office Action for U.S. Appl. No. 09/332,351 mailed Oct. 12, 2000, 34 pp.

Board of Appeals Decision for U.S. Appl. No. 09/540,034 decided Mar. 26, 2007, 16 pp.

Examiner's Answer for U.S. Appl. No. 09/540,034 mailed Jan. 23, 2006, 44 pp.

Office Action for U.S. Appl. No. 09/540,034 mailed Oct. 10, 2003, 21 pp.

Office Action for U.S. Appl. No. 09/540,034 mailed Jan. 14, 2003, 21 pp.

Office Action for U.S. Appl. No. 09/219,267 mailed Mar. 10, 2009, 15 pp.

Office Action for U.S. Appl. No. 09/219,267 mailed Jan. 5, 2010, 15 pp.

Office Action for U.S. Appl. No. 11/423,493 mailed Oct. 18, 2007, 21 pp.

Office Action for U.S. Appl. No. 11/423,493 mailed Jan. 26, 2007, 6 pp.

Office Action for U.S. Appl. No. 11/423,498 mailed Oct. 18, 2007, 9 pp.

Office Action for U.S. Appl. No. 11/423,498 mailed Jan. 26, 2007, 6 pp.

Office Action for U.S. Appl. No. 09/274,281 mailed Jun. 29, 2007, 5 pp.

Examiner's Answer for U.S. Appl. No. 09/274,281 mailed Oct. 31, 2006, 13 pp.

Office Action for U.S. Appl. No. 09/274,281 mailed Jul. 27, 2005, 9 pp.

Office Action for U.S. Appl. No. 09/274,281 mailed Apr. 10, 2003, 7 pp.

Office Action for U.S. Appl. No. 09/274,281 mailed Apr. 12, 2002, 9 pp.

Office Action for U.S. Appl. No. 09/579,215 mailed Jul. 12, 2007, 18 pp.

Office Action for U.S. Appl. No. 09/579,215 mailed Mar. 6, 2006, 19 pp.

Office Action for U.S. Appl. No. 09/579,215 mailed Dec. 17, 2004, 20 pp.

Office Action for U.S. Appl. No. 09/579,215 mailed Apr. 7, 2004, 32 pp.

Office Action for U.S. Appl. No. 09/579,215 mailed Jul. 29, 2003, 20 pp.

Marn, Michael, Rosiello, Robert L., Managing Price, gaining profit, Autumn 1992, 10 pp.

Howard, Lisa S., RM sees outsourcing challenge, National Underwriter Property & Casualty-Risk & Benefits Management, Nov. 24, 1997, 2 pp.

Shamrock Technology Co. Establishes No. American IIQ as monitor manufacturer continues market expansion, Business Wire, Mar. 25, 1997, 2 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Dec. 10, 1999, 17 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Mar. 4, 2009, 16 pp.

Office Action for U.S. Appl. No. 09/282,747 mailed Jun. 12, 2008, 14 pp.

Office Action for U.S. Appl. No. 09/322,351 mailed Aug. 4, 2009, 20 pp.

**US 7,827,056 B2**

Page 11

Office Action for U.S. Appl. No. 09/322,351 mailed Apr. 17, 2008, 19 pp.

Office Action for U.S. Appl. No. 09/219,267 mailed mailed Jun. 13, 2008, 12 pp.

Office Action for U.S. Appl. No. 09/219,267 mailed Sep. 7, 2007, 17 pp.

Office Action for U.S. Appl. No. 09/219,267 mailed Mar. 6, 2006, 19 pp.

Office Action for U.S. Appl. No. 09/219,267 mailed Dec. 14, 2004, 24 pp.

Office Action for U.S. Appl. No. 09/219,267 mailed Jan. 9, 2004, 27 pp.

Office Action for U.S. Appl. No. 09/219,267 mailed Apr. 22, 2003, 18 pp.

Office Action for U.S. Appl. No. 09/219,267 mailed May 17, 2001, 14 pp.

Notice of Allowance for U.S. Appl. No. 09/274,281 mailed Jun. 9, 2010, 5 pp.

Office Action for U.S. Appl. No. 09/274,281 mailed Feb. 20, 2009, 4 pp.

Office Action for U.S. Appl. No. 09/274,281 mailed May 5, 2008, 7 pp.

US 5,709,782, 01/1998, Larson et al. (withdrawn)

* cited by examiner

*Primary Examiner*—Eric W Stamber
*Assistant Examiner*—Tri V Nguyen

(74) *Attorney, Agent, or Firm*—Fincham Downs, LLC; Michael Downs

(57)            **ABSTRACT**

A merchant server of a first merchant receives an indication of items that a customer is to purchase via a web site. The indication may be, for example, a signal indicating that the customer is ready to "check out" his shopping cart of items on the web site. In response, the merchant server provides an offer for a subsidy from a second merchant. The offer is provided before the items are purchased, and thus the offer is not provided unless and until the customer has manifested an intent to make a purchase from the first merchant. A response is received from the customer. If the response indicates acceptance of the offer, then the subsidy is applied to the items purchased. For example, the total price paid for the items may be reduced, or the items may even be provided to the customer without charge. In exchange, the customer agrees to participate in a transaction with the second merchant. For example, the customer may be required to switch service providers (e.g. long distance telephone service) or initiate a new service agreement (e.g. sign up for a credit card account).

**48 Claims, 18 Drawing Sheets**

Copy provided by USPTO from the PIRS Image Database on 03/30/2011



FIG. 1

Copy provided by USPTO from the PIRS Image Database on 02/30/2011



FIG. 2

300

| | CUSTOMER IDENTIFIER 320 | NAME 322 | BILLING ADDRESS 324 | CREDIT CARD INFORMATION 326 | E-MAIL 328 |
|---|---|---|---|---|---|
| 302 | | | | | |
| 304 | C0001 | DAN MANN | 123 MAIN ST. | VISA 1111-1111-1111-1111 | DMANN@ISP.COM |
| 306 | C0002 | STEVE DAVIS | 3 RIVERPLACE ROAD | AMEX 4444-555 6666-3333 | SDAVIS@SCHOOL.EDU |
| 308 | C0003 | JEFF SMITH | 2 THRUSH LANE | DIS 2222-3333 4444-7777 | SMITH@WEBTV.COM |
| | C0004 | GEORGE ALAN | 15 LAUREL AVENUE | VISA 1111-4444-8888-3333 | ALAN@WORK.COM |

FIG. 3

Copy provided by USPTO from the PIRS Image Database on 02/30/2011

WD000015

```
                                          400
```

| ITEM IDENTIFIER 420 | ITEM DESCRIPTION 422 | ITEM PRICE 424 | AVAILABILITY 426 |
|---|---|---|---|
| P001 | WAR AND PEACE | $13.95 | IN STOCK |
| P002 | SUN TZU: THE ART OF WAR | $15.95 | AVAILABLE IN 2-3 DAYS |

402

404

# FIG. 4

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000016

U.S. Patent

Nov. 2, 2010

Sheet 5 of 18

US 7,827,056 B2

Copy provided by USPTO from the PIRS Image Database on 07/20/2011

500

| TRANSACTION IDENTIFIER 520 | TIME OF TRANSACTION 522 | ITEMS ORDERED 524 | CREDIT CARD INFORMATION 526 | AMOUNT CHARGED 528 | DELIVERY ADDRESS 530 | CUSTOMER IDENTIFIER 532 |
|---|---|---|---|---|---|---|
| T 000 001 | 1/4/2001 8:07 AM | P038, P049, P812 | VISA 1111-1111-1111-1111 EXP. 3/2002 | $49.87 | 123 MAIN ST. TOWN, USA | NONE |
| T 000 002 | 1/9/2001 9:00 PM | P123 | MASTERCARD 2222-2222-2222-2222 EXP. 9/2002 | $0.00 | 9876 PARK AVE. CITY, USA | C1234 |
| T 000 003 | 1/10/2001 3:02 AM | P456, P789, P789 | AMEX 9999-9999-9999-9999 EXP. 4/2005 | $0.00 | 24 SHADY LA. TOWN, USA | C5678 |

502

504

506

FIG. 5

WD000017

**U.S. Patent**          Nov. 2, 2010          Sheet 6 of 18          US 7,827,056 B2

600

| SUBSIDIZING PARTY IDENTIFIER 620 | SUBSIDIZING PARTY NAME 622 | ACCOUNT 624 | AMOUNT OWED TO MERCHANT 626 |
|---|---|---|---|
| S001 | CREDIT CARD COMPANY X | BANK ACCOUNT #2345678 | $855.00 |
| S002 | LONG DISTANCE TELEPHONE Y | MC 1111-2222-3333-4444 | $4,390.00 |
| S003 | SATELLITE TELEVISION Z | PREPAID BALANCE $10,500 | $0 |

602
604
606

# FIG. 6

Copy provided by USPTO from the PIRS Image Database on 07/20/2011

700

| OFFER RULE IDENTIFIER 720 | SUBSIDIZING PARTY IDENTIFIER 722 | SUBSIDY AMOUNT 724 | WHEN EFFECTIVE 726 | ADDITIONAL TRANSACTION REQUIRED 728 |
|---|---|---|---|---|
| R00001 | S11 | UP TO $50 | ALWAYS | SIGN UP FOR CREDIT CARD ACCOUNT |
| R0002 | S12 | UP TO $50 | TOTAL PRICE > $300 | SIGN UP FOR CREDIT CARD ACCOUNT |
| R0003 | S12 | $40 | CREDIT CARD = VISA AND TOTAL PRICE > $100 | SIGN UP FOR VISA PLUS ACCOUNT |
| R0004 | 213 | $80 | CUSTOMER IS FROM A NEW ENGLAND STATE | SIGN UP FOR CELLULAR TELEPHONE SERVICE |
| R0005 | S14 | $75 | CUSTOMER DOES NOT HAVE CABLE TELEVISION FROM SERVICE PROVIDER | SIGN UP FOR CABLE TELEVISION |

702
704
706
708
710

FIG. 7

WD000019

U.S. Patent

Nov. 2, 2010

Sheet 8 of 18

US 7,827,056 B2

~ 800

| OFFER IDENTIFIER 820 | TRANSACTION IDENTIFIER 822 | SUBSIDIZING PARTY 824 | OFFER RULE APPLIED 826 | SUBSIDY AMOUNT 828 | TOTAL PRICE 830 | TOTAL PRICE WITH SUBSIDY 832 | ACCEPTED YES/NO 834 |
|---|---|---|---|---|---|---|---|
| F001 | T123 | S111 | R1230 | $50 | $97.12 | $37.12 | YES |
| F002 | T456 | S222 | R4561 | $100 | $19.95 | $19.95 | YES |
| F003 | T789 | S345 | R7892 | $10 | $10.00 | $0 | YES |
| F004 | T109 | S678 | R0123 | $15 | $15.00 | $0 | YES |
| F005 | T555 | S901 | R3454 | $75 | $48.00 | $0 | YES |

802
804
806
808
810

FIG. 8

Copy provided by USPTO from the PIRS Image Database on 02/20/2011

— 900

| SUBSIDIZING PARTY IDENTIFIER: S888 | | | _902_ |
|---|---|---|---|
| TOTAL NUMBER OF OFFERS: 1,794 | | | _904_ |
| TOTAL NUMBER OF OFFERS ACCEPTED: 1,003 | | | _906_ |
| TOTAL AMOUNT OF SUBSIDIES: $52,800.00 | | | _908_ |
| OFFER RULE IDENTIFIER _920_ | NUMBER OF OFFERS _922_ | NUMBER OF OFFERS ACCEPTED _924_ | AMOUNT OF SUBSIDIES DUE _926_ |
| R1111 | 1004 | 500 | $2,500.00 |
| R2222 | 790 | 503 | $50,300.00 |

910

912

## FIG. 9

Copy provided by USPTO from the PIRS Image Database on 02/30/2011

WD000021

A0174



FIG. 10

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000022



FIG. 11

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

1200

APPLY FOR A VISA PLUS CREDIT CARD ACCOUNT
AND YOUR PURCHASE IS **ABSOLUTELY FREE!**

APPLICATION FOR CREDIT

NAME:

ADDRESS 1:

ADDRESS 2:

SOC. SEC. NUMBER:

ANNUAL INCOME:

1204

CLICK HERE TO
COMPLETE THE
APPLICATION

1202

1206

BACK TO MY
SHOPPING CART

FIG. 12

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000024

A0177



FIG. 13A

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000025



FROM FIG. 13A

A

DETERMINE SUBSIDY AMOUNT
1318

SUBTRACT SUBSIDY AMOUNT FROM
TOTAL PRICE OF THE ITEMS
1320

SELL THE ITEMS FOR THE
REDUCED TOTAL PRICE
1322

FIG. 13B

Copy provided by USPTO from the PIRS Image Database on 03/30/2011



FIG. 14A

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000027



FROM FIG. 14B

A

INITIATE A NEW SERVICE AGREEMENT
WITH THE SECOND MERCHANT
1420

REDUCE TOTAL PRICE OF THE
SHOPPING CART OF ITEMS BY
AMOUNT OF SUBSIDY
1422

SELL ITEMS FOR REDUCED
TOTAL PRICE
1424

FIG. 14B

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000028



FIG. 15

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000029



1600

RECEIVE AN INDICATION THAT THE CUSTOMER IS READY TO PURCHASE ITEMS HAVING A TOTAL PRICE    1602

PROVIDE OFFER FOR A SUBSIDY, THE SUBSIDY DEFINING A DISCOUNT AMOUNT APPLIED TO THE CUSTOMER'S PURCHASE AND A SPREAD AMOUNT RETAINED BY THE FIRST MERCHANT    1604

RECEIVE CUSTOMER ACCEPTANCE    1606

CHARGE CUSTOMER'S ACCOUNT: TOTAL AMOUNT - DISCOUNT AMOUNT    1608

CHARGE SECOND MERCHANT'S ACCOUNT: DISCOUNT AMOUNT + SPREAD AMOUNT    1610

## FIG. 16

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000030

US 7,827,056 B2

**1**

**METHOD AND APPARATUS FOR FACILITATING ELECTRONIC COMMERCE THROUGH PROVIDING CROSS-BENEFITS DURING A TRANSACTION**

CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S patent application Ser. No. 09/219,267 filed Dec. 23, 1998 entitled "METHOD AND APPARATUS FOR FACILITATING ELECTRONIC COMMERCE THROUGH PROVIDING CROSS-BENEFITS DURING A TRANSACTION".

U.S. patent application Ser. No. 09/219,267 is a continuation-in-part of Ser. No. 08/943,483 filed Oct. 3, 1997 and now abandoned entitled "SYSTEM AND METHOD FOR FACILITATING ACCEPTANCE OF CONDITIONAL PURCHASE OFFERS (CPOs)"; which is a continuation-in-part of U.S. patent application Ser. No. 08/923,683 filed Sep. 4, 1997 and issued as U.S. Pat. No. 6,553,346 on Apr. 22, 2003 entitled "CONDITIONAL PURCHASE OFFER (CPO) MANAGEMENT SYSTEM FOR PACKAGES"; which is a continuation-in-part of U.S. patent application Ser. No. 08/889,319 filed Jul. 8, 1997 and issued as U.S. Pat. No. 6,085,169 on Jul. 4, 2000 entitled "CONDITIONAL PURCHASE OFFER MANAGEMENT SYSTEM"; which is a continuation-in-part of U.S. patent application Ser. No. 08/707,660 filed Sep. 5, 1996 and issued as U.S. Pat. No. 5,794,207 on Aug. 11, 1998 entitled "METHOD AND APPARATUS FOR A CRYPTOGRAPHICALLY ASSISTED COMMERCIAL NETWORK SYSTEM DESIGNED TO FACILITATE BUYER-DRIVEN CONDITIONAL PURCHASE OFFERS".

U.S. patent application Ser. No. 09/219,267 is also a continuation-in-part of U.S. patent application Ser. No. 09/100,684 filed Jun. 19, 1998 and issued as U.S. Pat. No. 6,196,458B1 entitled "BILLING STATEMENT CUSTOMER ACQUISITION SYSTEM"; which is a continuation-in-part of U.S. patent application Ser. No. 08/982,149 filed Dec. 1, 1997 entitled "METHOD AND APPARATUS FOR PRINTING A BILLING STATEMENT TO PROVIDE SUPPLEMENTARY PRODUCT SALES" and issued as U.S. Pat. No. 6,196,458 on Mar. 6, 2001.

U.S. patent application Ser. No. 09/219,267 is also a continuation-in-part of U.S. patent application Ser. No. 08/994,426 filed Dec. 19, 1997 and issued as U.S. Pat. No. 6,694,300 on Feb. 17, 2004 entitled "METHOD AND APPARATUS FOR PROVIDING SUPPLEMENTARY PRODUCT SALES TO A CUSTOMER AT A CUSTOMER TERMINAL"; which is a continuation-in-part of U.S. patent application Ser. No. 08/920,116 filed Aug. 26, 1997 and issued as U.S. Pat. No. 6,119,099 on Sep. 12, 2000 entitled "METHOD AND SYSTEM FOR PROCESSING SUPPLEMENTARY PRODUCT SALES AT A POINT-OF-SALE TERMINAL"; which is a continuation-in-part of U.S. patent application Ser. No. 08/822,709 filed Mar. 21, 1997 and issued as U.S. Pat. No. 6,267,670 on Jul. 31, 2001 entitled "SYSTEM AND METHOD FOR PERFORMING LOTTERY TICKET TRANSACTIONS UTILIZING POINT-OF-SALE TERMINALS".

Each of the above-referenced applications is incorporated by reference herein in its entirety.

The present application is also related to the following U.S. Patent Applications:

U.S. patent application Ser. No. 11/423,493 filed Jun. 12, 2006 entitled "METHOD AND APPARATUS FOR FACILI-

**2**

TATING ELECTRONIC COMMERCE THROUGH PROVIDING CROSS-BENEFITS DURING A TRANSACTION"; and

U.S. patent application Ser. No. 11/423,498 filed Jun. 12, 2006 entitled "METHOD AND APPARATUS FOR FACILITATING ELECTRONIC COMMERCE THROUGH PROVIDING CROSS-BENEFITS DURING A TRANSACTION".

FIELD OF THE INVENTION

The present invention relates to methods and apparatus for facilitating electronic commerce.

BACKGROUND OF THE INVENTION

Electronic commerce is becoming more accepted as growing numbers of customers find shopping via the World Wide Web more appealing. However, electronic commerce suffers many problems that have plagued conventional commerce. For example, there is a great deal of competition among merchants to attract and retain customers that actually make purchases. Price competition is even stronger on the Internet, where customers can more readily "shop around" and determine the prices offered by various merchants.

Even when a customer has browsed a merchant's inventory, he may not make a purchase if an item's price is greater than the customer is willing to pay. One way to increase customer willingness to purchase, via the World Wide Web or otherwise, is to provide discounts on items purchased. Unfortunately, merchants must use discounts sparingly, since reducing purchase prices likewise reduces profits and the reduced profits may not be offset by increased sales.

It is known for a merchant to offer promotions to provide an incentive for customers to make purchases. For example, a merchant may offer a "buy one get one free" promotion whereby a purchase of an item yields the benefit of an additional item at no cost. Similarly, a merchant may provide a discount on a purchase in exchange for signing up for a credit card account provided by the merchant.

It is known to provide a promotion among more than one merchant. For example, a first merchant may advertise that if a product is purchased, a second product may be purchased from or given away by a second merchant.

It is also known for a promotion to be provided at the point of sale. For example, a web site of a merchant may provide a "banner advertisement" that allows a customer to go to another site to make a second purchase.

It would be advantageous to facilitate further electronic commerce in a manner that maintained an acceptable level of profits for merchants yet increased a customer's willingness to make purchases.

SUMMARY OF THE INVENTION

It is an object of the present invention to facilitate electronic commerce.

In accordance with the present invention, a merchant server of a first merchant receives an indication of items that a customer is to purchase via a web site. The indication may be, for example, a signal indicating that the customer is ready to "check out" his shopping cart of items on the web site. In response, the merchant server provides an offer for a benefit from a second merchant, which may be referred to as a cross-benefit. The offer is provided before the items are purchased, and thus the offer is not provided unless and until the customer has manifested an intent to make a purchase from the

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000031

US 7,827,056 B2

3

first merchant. A response to the offer is received from the customer. If the response indicates acceptance of the offer, then the benefit is applied to the items purchased. For example, the total price paid for the items may be reduced, or the items may even be provided to the customer without charge.

In exchange, the customer agrees to participate in a transaction with the second merchant. For example, the customer may be required to switch service providers (e.g. long distance telephone service) or initiate a new service agreement (e.g. sign up for a credit card account). In one embodiment, the customer's agreement may be secured, such that a penalty is assessed against the customer if he does not participate in the transaction as he agreed to.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic illustration of an apparatus for facilitating electronic commerce.

FIG. 2 is a schematic illustration of a merchant server of the apparatus of FIG. 1.

FIG. 3 is a representation of a customer database of the merchant server of FIG. 2.

FIG. 4 is a representation of an item database of the merchant server of FIG. 2.

FIG. 5 is a representation of a transaction database of the merchant server of FIG. 2.

FIG. 6 is a representation of a subsidizer database of the merchant server of FIG. 2.

FIG. 7 is a representation of an offer rules database of the merchant server of FIG. 2.

FIG. 8 is a representation of an offers database of the merchant server of FIG. 2.

FIG. 9 is a representation of a record of an offer summary database of the merchant server of FIG. 2.

FIG. 10 is a flow chart illustrating an embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

FIG. 11 is an exemplary web page.

FIG. 12 is another exemplary web page.

FIGS. 13A and 13B are a flow chart illustrating another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

FIGS. 14A and 14B are a flow chart illustrating another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

FIG. 15 is a flow chart illustrating another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

FIG. 16 is a flow chart illustrating another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Applicants have recognized that the acquisition budgets of various service providers may be advantageously used to facilitate electronic commerce. A customer that is purchasing items from a first merchant may be paid by a second merchant, so that the customer pays a reduced price, or nothing at all, for his desired items. In exchange, the customer signs up or agrees to sign up for a service that is provided by the second merchant. Since many service providers are willing to pay significant amounts of money (e.g. often $50 to $200) to acquire a new customer, the ability to acquire a customer by essentially "intervening" in a sale between others can benefit

4

all parties involved. The customer is benefited by the reduced price of his items, the first merchant is benefited by the increased sales that such an arrangement would bring, and the second merchant is benefited by the acquisition of a new customer.

Furthermore, by presenting offers for such "cross-subsidies" only after a customer is ready to buy items, the merchant may reduce the chance that customers will merely "bargain shop", rather than make purchases.

In addition, a number of benefits may be offered besides reduced prices. For example, the first merchant may alternatively provide the customer with an upsell (e.g. a product upgrade for no additional cost).

Referring to FIG. 1, an apparatus 100 includes a merchant server 110 that is in communication with a customer terminal 120 and with subsidizing merchant servers 130, 140 and 150. The merchant server 110 may communicate with the customer terminal 120 and subsidizing merchant servers 130, 140 and 150 via an appropriate network such as the Internet. Each of the customer terminal 120 and with subsidizing merchant servers 130, 140 and 150 may comprise computers, such as those based on the Intel® Pentium® microprocessor, that are adapted to communicate via the Internet (e.g. via a modem). Any number of subsidizing merchant servers and customer terminals may be in communication with the merchant server 110.

The merchant server 110 may be a "web server" of a merchant. The merchant server 110 can generate a web page that may be accessed via the World Wide Web and allow purchases from the merchant to be made in a manner known in the art. A customer terminal may appropriately access the web page to communicate with the merchant server 110 in a manner that is also known to those skilled in the art.

Referring to FIG. 2, the merchant server 110 comprises a processor 200, such as the Intel® Pentium® microprocessor. The processor 200 is in communication with a data storage device 210, such as an appropriate combination of magnetic, optical and/or semiconductor memory. For example, the data storage device 210 may comprise one or more of a ROM, RAM and hard disk. The processor 200 and the data storage device 210 may each be (i) located entirely within a single computer or other computing device; (ii) connected to each other by a remote communication medium, such as a serial port cable, telephone line or radio frequency transceiver; or (iii) a combination thereof. In one embodiment, the merchant server 110 may comprise one or more computers that are connected to a remote server computer for maintaining databases.

The data storage device 210 stores a program 220 for controlling the processor 200. The processor 200 performs instructions of the program 220, and thereby operates in accordance with the present invention, and particularly in accordance with the methods described in detail herein. The program 220 furthermore includes program elements that may be necessary, such as an operating system and "device drivers" for allowing the processor 200 to interface with computer peripheral devices. Appropriate device drivers and other necessary program elements are known to those skilled in the art, and need not be described in detail herein.

The storage device 210 also stores (i) a customer database 230, (ii) a item database 240, (iii) a transaction database 250, (iv) a subsidizer database 260, (v) an offer rules database 270, (vi) an offers database 280 and (vii) an offer summary database 290. The databases 230, 240, 250, 260, 270, 280 and 290 are described in detail below and depicted with exemplary entries in the accompanying figures. As will be understood by those skilled in the art, the schematic illustrations and accom-

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000032

US 7,827,056 B2

5

panying descriptions of the databases presented herein are exemplary illustrations for stored representations of information. A number of other arrangements may be employed besides those suggested by the tables shown. Similarly, the illustrated entries of the databases represent exemplary information, and those skilled in the art will understand that the number and content of the entries can be different from those illustrated herein.

Referring to FIG. 3, a table 300 represents an embodiment of the customer database 230 (FIG. 2). The table 300 includes entries 302, 304, 306 and 308, each defining a customer that may purchase items via the merchant server 10 (FIG. 1). Those skilled in the art will understand that the table 300 may include any number of entries. The table 300 also defines fields for each of the entries 302, 304, 306 and 308. The fields specify (i) a customer identifier 320 that uniquely identifies the customer, (ii) a name 322 of the customer, (iii) a billing address 324 of the customer, (iv) credit card information 326 which may be used to render payment in purchasing the items, and (v) an electronic mail ("email") address 328 for communication with the customer.

Referring to FIG. 4, a table 400 represents an embodiment of the item database 240 (FIG. 2). The table 400 includes entries 402 and 404, each defining an item sold via the merchant server 10 (FIG. 1). Those skilled in the art will understand that the table 400 may include any number of entries. The table 400 also defines fields for each of the entries 402 and 404. The fields specify (i) a item identifier 420 that uniquely identifies the item, (ii) an item description 422, (iii) an item price 424 for which the item is typically sold, and (iv) an availability 426 of the item which may be based on an inventory level of the item.

Referring to FIG. 5, a table 500 represents an embodiment of the transaction database 250 (FIG. 2). The table 500 includes entries 502, 504 and 506, each defining a transaction with the merchant server 110 (FIG. 1). Typically, the transaction includes a purchase of items by a customer. Those skilled in the art will understand that the table 500 may include any number of entries. The table 500 also defines fields for each of the entries 502, 504 and 506. The fields specify (i) a transaction identifier 520 that uniquely identifies the transaction, (ii) a time 522 of the transaction, (iii) the items ordered 524, (iv) credit card information 526 that may define a credit card account that was charged to pay for the items purchased, (v) an amount charged 528 for the items, (vi) a delivery address 530 for the items, and (vii) a customer identifier 532 (if any) that identifies the customer that made the purchase.

Referring to FIG. 6, a table 600 represents an embodiment of the subsidizer database 260 (FIG. 2). The table 600 includes entries 602, 604 and 606, each defining a party (e.g. another merchant) that may subsidize purchases made via the merchant server 110 (FIG. 1). Those skilled in the art will understand that the table 600 may include any number of entries. The table 600 also defines fields for each of the entries 602, 604 and 606. The fields specify (i) a subsidizing party identifier 620 that uniquely identifies the subsidizing party, (ii) a name 622 of the subsidizing party, (iii) an account 624 used to pay for the subsidies, and (iv) an amount owed 626 by the subsidizing party to the merchant.

Referring to FIG. 7, a table 700 represents an embodiment of the offer rules database 270 (FIG. 2). The table 700 includes entries 702, 704, 706, 708 and 710, each defining an offer rule. When an offer rule is satisfied during a transaction, the merchant provides an offer for a specified benefit, such as a subsidy. Those skilled in the art will understand that the table 700 may include any number of entries. The table 700

6

also defines fields for each of the entries 702, 704, 706, 708 and 710. The fields specify (i) an offer rule identifier 720 that uniquely identifies the offer rule, (ii) a subsidizing party identifier 722 that uniquely identifies the subsidizing party, (iii) a subsidy amount 724, (iv) when the offer rule is effective (i.e. when the offer rule is satisfied), and (v) an additional transaction 728 that is required of the customer in exchange for the subsidy. As described below, several types of transactions, such as additional purchases or initiating service agreements, may be required of the customer.

Referring to FIG. 8, a table 800 represents an embodiment of the offers database 280 (FIG. 2). The table 800 includes entries 802, 804, 806, 808 and 810, each defining an offer for a subsidy. The offer was provided to a customer during a transaction of the customer with the merchant. Those skilled in the art will understand that the table 800 may include any number of entries. The table 800 also defines fields for each of the entries 802, 804, 806, 808 and 810. The fields specify (i) an offer identifier 820 that uniquely identifies the offer, (ii) a transaction identifier 822 that uniquely identifies the transaction during which the offer was provided, (iii) a subsidizing party identifier 824 that uniquely identifies the subsidizing party, (iv) an identifier of an offer rule 826 that was satisfied during the transaction, (v) a subsidy amount 828, (vi) a total price 830 that the customer would have to pay without the subsidy, (vii) a total price 832 that the customer would have to pay with the subsidy, and (viii) whether the offer was accepted 834. As described above with reference to FIG. 7, offer rules define specific subsidies. Thus, the identifier of an offer rule stored in field 826 may be used to determine a corresponding subsidy amount.

Referring to FIG. 9, a table 900 represents a record of an embodiment of the offer summary database 290 (FIG. 2). The offer summary database 290 typically includes a plurality of records, each defining a summary of offers for subsidies that have been provided on behalf of a subsidizing party. The table 900 includes a subsidizing party identifier 902 that uniquely identifies the subsidizing party, a total number of offers provided 904 on behalf of the subsidizing party, a total number of those offers that were accepted 906, and a total amount 908 of the subsidies due in connection with accepted offers.

The table 900 also includes entries 910 and 912, each defining offers provided due to satisfaction of an offer rule of the subsidizing party. Those skilled in the art will understand that the table 900 may include any number of entries. The table 900 also defines fields for each of the entries 910 and 912. The fields specify (i) an offer rule identifier 920 that uniquely identifies the offer rule, (ii) a number 922 of offers provided due to the offer rule, (iii) a number 924 of these offers that were accepted, (iv) an amount 926 of the subsidies due in connection with these accepted offers.

Referring to FIG. 10, a flow chart 1000 illustrates an embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant. In one embodiment, the illustrated method is performed by the merchant server 110 after the customer has accessed a web page generated and/or controlled by the merchant server 110.

The merchant server 110 receives an indication that the customer is to purchase items from the web site of the merchant (step 1002). For example, after a customer accesses the web site, the customer may select one or more items to purchase, and "click" a button that indicates that the customer desires to purchase the selected items. The act of clicking could generate a signal that the merchant server 110 interprets as an indication that the customer is to purchase the selected items. In another embodiment, the act of accessing the web site could generate a signal that the merchant server 110

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000033

US 7,827,056 B2

7

interprets as an indication that the customer is to purchase the selected items. Those skilled in the art will understand still other types of appropriate indications.

Before the customer purchases the items, the merchant server 110 provides the customer with an offer for a subsidy (step 1004). For example, the web page may display text describing the subsidy. In one embodiment, the web page may be dynamically modified to include a button that, when clicked, indicates acceptance of an offer for a subsidy. Alternatively, the offer may be transmitted to the customer via email or other means.

A response to the offer is received from the customer (step 1006). For example, the customer may click a button on the web page or click on a hyperlink on the web page. If it is determined that the offer is not accepted (step 1008), then the transaction is processed conventionally (step 1010). For example, the items are purchased for the conventional total price, and a credit card account of the customer is charged appropriately.

If it is determined that the offer is accepted (step 1008), then the subsidy is applied to the items (step 1012) and the items are sold to the customer with the benefit of the subsidy (step 1014).

Referring to FIG. 11, an exemplary web page 1100 illustrates a possible means for providing an offer for a benefit and receiving an acceptance of the offer. The web page 1100 illustrates an embodiment in which the merchant sells books via the World Wide Web.

A book that the customer is ready to purchase is indicated by text 1102, and a quantity of that book (one book in FIG. 11) is indicated by text 1104. A price of the books is indicated by text 1106, and similarly a total price (e.g. the sum of item prices and any other prices) due from the customer is indicated by text 1108.

A button 1110 is clicked by the customer if the customer desires to purchase the specified items and thereby consummate the purchase. Upon clicking the button 1110, the items may be immediately deemed as having been purchased by the customer. A button 1112 is clicked by the customer if the customer desires to accept an offer for a subsidy. Alternatively, actuating the button 1112 may indicate that the customer is interested in further information regarding an offer for a subsidy, and the customer may subsequently indicate whether he accepts the offer.

Referring to FIG. 12, a second exemplary web page 1200 allows the customer to provide customer information via a form having fields 1202 that receive entered text. The customer information is used in applying for a credit card account with a credit card issuer. In one embodiment, the web page 1200 may be displayed after the customer clicks the button 1110 of FIG. 11. Information that is entered via the web page 1200 may be transmitted to the merchant server 110 upon actuation of a button 1204. Actuation of the button 1204 may furthermore indicate acceptance of the offer for the subsidy. For example, actuation of the button 1204 may indicate a willingness to apply for a credit card account, or that the customer has applied for the credit card account. Conversely, actuation of the button 1206 may indicate rejection of the offer for the subsidy.

Referring to FIGS. 13A and 13B, a flow chart 1300 illustrates another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a merchant. The merchant server 110 receives an indication that the customer is ready to purchase items from the web site of a first merchant (step 1302). A customer may indicate his readiness to purchase by, for example, selecting items to purchase and actuating a specific button that consummates

8

the purchase of the items. Before the customer purchases the items, the merchant server 110 provides the customer with an offer for a subsidy from a second merchant (step 1304). Subsequently, a response from the customer is received (step 1306).

If it is determined that the offer is not accepted (step 1308), then the transaction is processed conventionally (step 1310). If however it is determined that the offer is accepted (step 1308), then customer information is received (step 1312). Such customer information may be used in providing or facilitating an additional transaction that is required of the customer in exchange for the subsidy. In one embodiment described in further detail below, in exchange for the subsidy the customer agrees to initiate a new service agreement, so that a service is provided by the second merchant. Accordingly, the customer information may comprise an indication of a service that is provided to the customer (e.g. whether the customer has cable television service), or a service provider that provides a service to the customer (e.g. which company provides cable television service to the customer). The additional transaction may occur after a significant amount of time has elapsed. Accordingly, in one embodiment there is a means for determining if the future action has occurred.

Furthermore, a penalty may be assessed against the customer if the customer does not perform the required additional transaction. For example, the subsidy to the customer may be canceled and the transaction may then be processed conventionally. Alternatively, a penalty fee may be charged to the customer.

Similarly, a penalty could be assessed if another imposed condition is violated. For example, a penalty could be assessed if the items are purchased and then returned. Accordingly, in such an embodiment a returnable purchase is made a non-returnable purchase in exchange for the subsidy or other benefit.

The customer information may be received from the customer. In one embodiment, the merchant server 10 can request that the customer provide customer information. For example, the merchant server 10 may transmit a form (e.g. via the web site) including questions to be answered. In response, the merchant server would receive answers to the questions, and these answers would constitute the customer information from the customer.

In another embodiment, the customer information may be received from a party other than the customer. For example, information regarding the customer may be received from a third-party database (e.g. a list of addresses to provide a location of the customer). Alternatively, customer information may be received from an ISP (Internet Service Provider), which can provide information such as an Internet address of the customer.

In still another embodiment, the customer information may be received via a "cookie" stored on the customer terminal 120 (FIG. 1). Those skilled in the art will understand that a great variety of data may be stored in such cookies, and information may be stored in the cookie in response to various events such as the web sites that are visited by the customer.

The merchant server 110 may verify whether the customer information is accurate (step 1314). For example, if the information is provided by the customer, it can be advantageous to assure that the customer information is not false. To provide a further incentive for the customer to provide accurate customer information, a penalty may be assessed against the customer if the customer information is not accurate. For example, if it is determined that the customer information is not accurate (step 1316), the subsidy to the customer may be canceled and the transaction is processed conventionally

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000034

US 7,827,056 B2

9

(step **1310**). Alternatively, a penalty fee may be charged to the customer if it is determined that the customer information is not accurate. In such an embodiment, it may be further advantageous to verify the customer information before the purchase is consummated. Thus, the threat that the subsidy will not be forthcoming can give the customer an incentive to provide accurate information.

If it is determined that the customer information is accurate (step **1316**), then the merchant server **110** determines the amount of the subsidy (step **1318**). The subsidy amount is typically stored in the offer rules database **270** (FIG. 2). The subsidy amount may be, for example, a predetermined amount or a predetermined percentage (e.g. a predetermined percentage of the total price). The subsidy amount may also be limited, such that the price charged cannot be lower than zero. For example, a subsidy amount may be "up to $100 off, but no more than the total price".

The subsidy amount is subtracted from the total price of the items (step **1320**) and the items are sold for the reduced total price (step **1322**). Alternatively, instead of the total price being reduced, a price of one or more items (e.g. items of a certain type or promotional items) may be reduced to provide an incentive to purchase these items. In summary, accepting the subsidy allows the items to be sold to the customer for a lesser price, and the items may even be provided to the customer without charge.

Referring to FIGS. **14A** and **14B**, a flow chart **1400** illustrates another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a first merchant. The merchant server **110** receives a signal indicating that the customer is ready to "check out" his "shopping cart" of items on the web site of the first merchant (step **1402**). As is understood by those skilled in the art, a shopping cart of items on a web site defines a set of items the customer desires to purchase. Checking out the shopping cart indicates a desire to proceed with purchasing the selected items.

Before the customer purchases the items, the merchant server **110** provides the customer with an offer for a reduction in the total price in exchange for signing up for a service with a second merchant (step **1404**). For example, the service may be telephone service, Internet service, banking services, credit card account services, insurance service, securities trading service, satellite television service, or cable television service. Accordingly, the second merchant would be a provider of such services, and the customer would be requested to participate in a transaction (e.g. initiate a service agreement with) with the second merchant.

Subsequently, a response from the customer is received (step **1406**). If it is determined that the offer is not accepted (step **1408**), then the transaction is processed conventionally (step **1410**). If however it is determined that the offer is accepted (step **1408**), then a current service provider of the customer (i.e. a party that provides a specified service to the customer) is determined (step **1412**). The customer may be asked to provide information of the current provider, or this information may be determined from other sources. For example, one or more databases may be accessed to determine the long distance telephone service provider of the customer. Alternatively, the second merchant may allow access to a database of its existing customers.

If it is determined that the customer has a service provider (step **1414**), and it is determined that the second merchant already provides the customer with the specified service (step **1416**), then the transaction is processed conventionally (step **1410**). If it is determined that the customer has a service provider (step **1414**), but it is determined that the second merchant does not provide the customer with the specified

10

service (step **1416**), then the customer must have a service agreement with another service provider. Accordingly, the existing service agreement is canceled (step **1418**).

If it is determined that the customer does not have a service provider of the specified service at all (step **1414**), (or if the merchant server **110** will cancel or has canceled the existing service agreement) then a new service agreement is initiated with the second merchant (step **1420**). Thus, the second merchant has acquired a new customer, either by signing up the customer for a new service or by switching providers of the specified service that is provided to the customer. In exchange, the total price of the shopping cart of items is reduced by the amount of the subsidy (step **1422**), and the items are sold for this reduced total price (step **1424**).

Referring to FIG. **15**, a flow chart **1500** illustrates another embodiment of a method for providing an offer for a benefit to a customer that is to purchase items from a first merchant. The merchant server **110** receives an indication that the customer is ready to purchase items from the web site of a first merchant (step **1502**). The merchant server **110** may also receive customer information (step **1504**), as described above. The customer information may comprise, for example, a location of the customer or a current service provider of the customer.

A set of subsidies for which the customer may be eligible is determined (step **1506**). In one embodiment, the set of subsidies is determined based on customer information. For example, upon reference to the customer information, one or more offer rules may be satisfied. The corresponding subsidies would then be included in the set of subsidies. In another embodiment, the offer rules may be satisfied without reference to customer information. For example, an offer rule may be satisfied if the total price of the items (or the price of any of the item) is greater than a predetermined threshold. In yet another embodiment, one or more subsidizing merchants may be contacted, customer information may be transmitted to the subsidizing merchants, and in response the subsidizing merchants may transmit to the merchant server **110** a description of a subsidy to offer.

Offers for each of the subsidies may be provided to the customer (step **1508**) for the customer to select one (or more). For example, each offer may be listed on a web page, and the customer must click a hyperlink corresponding to his desired offer. The customer selection is received (step **1510**) and the corresponding subsidy is applied to the customer's purchase (step **1512**). Alternatively, the customer may be similarly prompted to select a merchant from a plurality of merchants, and the customer would subsequently be provided with an offer for a subsidy from the selected merchant.

Referring to FIG. **16**, a flow chart **1600** illustrates another embodiment of a method for providing an offer for a benefit. In particular, the illustrated flow chart **1600** shows the exchange of payment among the parties. The merchant server **110** receives an indication that the customer is ready to purchase items having a total price (step **1602**). In response, the merchant server **110** provides an offer for a subsidy (step **1604**). The subsidy defines a discount amount that is applied to the customer's purchase. The subsidy also defines a spread amount that is retained by the first merchant.

Once the customer acceptance is received (step **1606**), the customer's account (e.g. a credit card account) is charged by the total amount less the discount amount (step **1608**). Similarly, an account of the second merchant is charged by the sum of the discount amount and the spread amount. The second merchant may be charged substantially immediately (e.g.

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000035

US 7,827,056 B2

11

immediately after the customer accepts). In another embodiment, the customer may be charged at predefined intervals (e.g. once per month).

Although the present invention has been described with respect to a preferred embodiment thereof, those skilled in the art will note that various substitutions may be made to those embodiments described herein without departing from the spirit and scope of the present invention.

What is claimed is:

1. A method, comprising:

receiving an indication of at least one item in a shopping cart that a customer is ready to purchase from a first merchant via a web site;

allowing a second merchant to intervene in the purchase of the at least one item by the customer from the first merchant by providing, in response to the received indication, an offer for a benefit from the second merchant, the step of providing the offer being performed before the at least one item is purchased,

in which providing the offer comprises transmitting to the customer a web page including

an indication of the at least one item in the shopping cart,

an indication of an associated total price for the at least one item,

a first selectable web page element associated with a first option for the customer to pay the associated total price for the at least one item, and

a second selectable web page element associated with a second option for the customer to receive an offer for a reduction of the associated total price,

in which the offer comprises an offer from the second merchant to have the at least one item provided to the customer for an amount less than the associated total price in exchange for the customer agreeing to sign up for a service with the second merchant and in which the service is not one of the at least one item to be purchased from the first merchant, and

in which the offer is not provided unless and until the indication of the at least one item that the customer is to purchase from the first merchant is received;

receiving from the customer via the web page a signal indicating selection by the customer of the second selectable web page element; and

applying the benefit to the at least one item in response to the received signal, in which applying the benefit comprises selling the at least one item to the customer for a second price, the second price being less than the first price.

2. The method of claim 1, further comprising:

receiving information about the customer.

3. The method of claim 2, in which the information about the customer does not include the indication of the at least one item that the customer is to purchase.

4. The method of claim 2, in which the customer information comprises:

a service that is provided to the customer.

5. The method of claim 2, in which the customer information comprises:

a service provider that provides a service to the customer.

6. The method of claim 2, in which the step of providing an offer for a benefit from a second merchant comprises:

selecting the second merchant from a plurality of merchants based on the customer information received from the customer; and

providing an offer for a benefit from the selected merchant.

12

7. The method of claim 2, in which the step of providing an offer for a benefit from a second merchant comprises:

selecting the benefit based on the customer information received from the customer.

8. The method of claim 2, in which the step of receiving customer information comprises:

requesting that the customer provide customer information; and

receiving, in response to the step of requesting, customer information from the customer.

9. The method of claim 8, in which the step of requesting that the customer provide customer information comprises:

transmitting to the customer at least one question to be answered.

10. The method of claim 9, in which the step of receiving customer information from the customer comprises:

receiving at least one answer to the at least one question.

11. The method of claim 2, further comprising:

verifying whether the customer information is accurate.

12. The method of claim 11, further comprising:

assessing a penalty against the customer if the customer information is not accurate.

13. The method of claim 12, in which the step of assessing the penalty comprises:

canceling the benefit if the customer information is not accurate.

14. The method of claim 12, in which the step of assessing the penalty comprises:

charging a penalty fee to the customer if the customer information is not accurate.

15. The method of claim 11, in which the step of verifying is performed before the purchase is consummated.

16. The method of claim 2, in which the step of providing the offer is performed after the customer information is received.

17. The method of claim 16, in which the step of providing the offer is performed based on the customer information.

18. The method of claim 1, further comprising:

receiving customer information from a party other than the customer.

19. The method of claim 2, in which the step of receiving customer information comprises:

receiving information regarding at least one of:

a location of the customer, and

an Internet address of the customer.

20. The method of claim 1, in which the second price is a predetermined amount less than the first price.

21. The method of claim 20, in which the second price is a predetermined amount less than the first price if the first price is greater than the predetermined amount.

22. The method of claim 1, in which the second price is a predetermined percentage less than the first price.

23. The method of claim 1, in which the step of applying the benefit comprises:

providing the at least one item to the customer without charge.

24. The method of claim 1, further comprising:

requesting that the customer participate in a transaction with the second merchant.

25. The method of claim 24, in which the step of requesting that the customer participate in a transaction with the second merchant comprises:

requesting that the customer initiate a service agreement with the second merchant.

26. The method of claim 1, further comprising:

receiving an indication of agreement to participate in a transaction with the second merchant.

Copy provided by USPTO from the PIRS Image Database on 03/30/2011



US 7,827,056 B2

13

**27.** The method of claim **1**, further comprising:
facilitating a transaction with the second merchant.

**28.** The method of claim **27**, in which the step of facilitating the transaction with the second merchant comprises:
determining a service provider that provides a service to the customer.

**29.** The method of claim **28**, in which the step of facilitating the transaction with the second merchant comprises:
canceling a service agreement with the service provider.

**30.** The method of claim **28**, in which the step of facilitating the transaction with the second merchant comprises:
initiating a new service agreement so that the service is provided by the second merchant.

**31.** The method of claim **28**, in which the step of determining a service provider that provides a service to the customer comprises:
determining whether the service is provided by the second merchant.

**32.** The method of claim **27**, in which the step of facilitating the transaction with the second merchant comprises:
switching providers of a service that is provided to the customer.

**33.** The method of claim **32**, in which the service is selected from the group consisting essentially of:
telephone service,
Internet service,
banking services,
credit card account services,
insurance service,
securities trading service,
satellite television service, and
cable television service.

**34.** The method of claim **27**, in which the step of facilitating the transaction with the second merchant comprises:
initiating a new service agreement so that a service is provided to the customer.

**35.** The method of claim **34**, in which the service is selected from the group consisting essentially of:
telephone service,
Internet service,
banking services,
credit card account services,
insurance service,
securities trading service,
satellite television service, and
cable television service.

**36.** The method of claim **1**, in which the step of providing an offer is performed only if a price of the at least one item is greater than a predetermined threshold.

**37.** The method of claim **1**, in which the step of providing an offer is performed only if a predetermined rule is satisfied.

**38.** The method of claim **1**, in which the step of providing an offer for a benefit from a second merchant comprises:
providing a plurality of offers for benefits from at least one merchant.

**39.** The method of claim **38**, further comprising:
receiving from the customer a selection of an offer from the provided plurality of offers.

**40.** The method of claim **1**, in which the step of providing an offer for a benefit from a second merchant comprises:
selecting a merchant from a plurality of merchants; and
providing an offer for a benefit from the selected merchant.

**41.** The method of claim **1**, in which the benefit is based on the at least one item.

**42.** The method of claim **41**, in which the benefit is based on a price of the at least one item.

14

**43.** The method of claim **1**, in which the step of providing an offer for a benefit from a second merchant comprises:
selecting a benefit from a plurality of benefits based on the at least one item.

**44.** The method of claim **1**, further comprising:
receiving an amount of payment from the second merchant.

**45.** The method of claim **44**, in which the benefit is based on the amount of payment.

**46.** The method of claim **1**, in which the second price is zero.

**47.** A computer readable medium storing instructions configured to direct a computing device to perform a method comprising:
receiving an indication of at least one item in a shopping cart that a customer is ready to purchase from a first merchant via a web site;
allowing a second merchant to intervene in the purchase of the at least one item by the customer from the first merchant by providing, in response to the received indication, an offer for a benefit from the second merchant, the step of providing the offer being performed before the at least one item is purchased,
in which providing the offer comprises transmitting to the customer a web page including
an indication of the at least one item in the shopping cart,
an indication of an associated total price for the at least one item,
a first selectable web page element associated with a first option for the customer to pay the associated total price for the at least one item, and
a second selectable web page element associated with a second option for the customer to receive an offer for a reduction of the associated total price,
in which the offer comprises an offer from the second merchant to have the at least one item provided to the customer for an amount less than the associated total price in exchange for the customer agreeing to sign up for a service with the second merchant, and in which the service is not one of the at least one item to be purchased from the first merchant, and
in which the offer is not provided unless and until the indication of the at least one item that the customer is to purchase from the first merchant is received;
receiving from the customer via the web page a signal indicating selection by the customer of the second selectable web page element; and
applying the benefit to the at least one item in response to the received signal, in which applying the benefit comprises selling the at least one item to the customer for a second price, the second price being less than the first price.

**48.** An apparatus comprising:
a processor; and
a computer readable medium in communication with the processor, the computer readable medium storing instructions configured to direct the processor to perform a method comprising:
receiving an indication of at least one item in a shopping cart that a customer is ready to purchase from a first merchant via a web site;
allowing a second merchant to intervene in the purchase of the at least one item by the customer from the first merchant by providing, in response to the received indication, an offer for a benefit from the second merchant,

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000037

US 7,827,056 B2

15

the step of providing the offer being performed before the at least one item is purchased,

in which providing the offer comprises transmitting to the customer a web page including

an indication of the at least one item in the shopping cart,

an indication of an associated total price for the at least one item,

a first selectable web page element associated with a first option for the customer to pay the associated total price for the at least one item, and

a second selectable web page element associated with a second option for the customer to receive an offer for a reduction of the associated total price,

in which the offer comprises an offer from the second merchant to have the at least one item provided to the customer for an amount less than the associated total

16

price in exchange for the customer agreeing to sign up for a service with the second merchant and in which the service is not one of the at least one item to be purchased from the first merchant, and

in which the offer is not provided unless and until the indication of the at least one item that the customer is to purchase from the first merchant is received;

receiving from the customer a signal indicating selection by the customer of the second selectable web page element; and

applying the benefit to the at least one item in response to the received signal, in which applying the benefit comprises selling the at least one item to the customer for a second price, the second price being less than the first price.

\* \* \* \* \*

Copy provided by USPTO from the PIRS Image Database on 03/30/2011

WD000038

A0191

US008112359B2

(12) **United States Patent** (10) Patent No.: **US 8,112,359 B2**

Walker et al. (45) Date of Patent: **Feb. 7, 2012**

(54) **PRE-SALE DATA BROADCAST SYSTEM AND METHOD**

(75) Inventors: **Jay S. Walker**, Ridgefield, CT (US); **Daniel E. Tedesco**, Huntington, CT (US); **Magdalena M. Fincham**, Ridgefield, CT (US)

(73) Assignee: **Walker Digital, LLC**, Stamford, CT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/974,742**

(22) Filed: **Dec. 21, 2010**

(65) **Prior Publication Data**

US 2011/0093345 A1 Apr. 21, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/549,435, filed on Oct. 13, 2006, now Pat. No. 7,856,379, which is a continuation of application No. 09/221,099, filed on Dec. 28, 1998, now Pat. No. 7,236,942, and a continuation-in-part of application No. 09/166,405, filed on Oct. 5, 1998, now Pat. No. 6,405,174, which is a continuation-in-part of application No. 08/994,426, filed on Dec. 19, 1997, now Pat. No. 6,694,300.

(51) **Int. Cl.**
*G06F 21/00* (2006.01)

(52) **U.S. Cl.** ................ **705/51**; 705/64; 705/67; 705/75; 705/1

(58) **Field of Classification Search** .................... 705/51, 705/64, 67, 75, 1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,573,747 | A | 4/1971 | Adams et al. |
| 3,691,527 | A | 9/1972 | Yamamoto |
| 3,705,384 | A | 12/1972 | Wahlberg |
| 3,747,733 | A | 7/1973 | Knickerbocker |
| 3,937,929 | A | 2/1976 | Knauer |
| 4,108,361 | A | 8/1978 | Krause |
| 4,237,537 | A | 12/1980 | Pitches et al. |
| 4,245,730 | A | 1/1981 | Bachmann et al. |
| 4,258,837 | A | 3/1981 | Manos et al. |
| 4,282,575 | A | 8/1981 | Hoskinson et al. |
| 4,316,532 | A | 2/1982 | Levasseur |
| 4,323,770 | A | 4/1982 | Dieulot et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2070736 A1 6/1992

(Continued)

OTHER PUBLICATIONS

Office Action for U.S. Appl. No. 12/111,637 mailed Feb. 21, 2011, 21 pp.

(Continued)

*Primary Examiner* — Pierre E Elisca
(74) *Attorney, Agent, or Firm* — Fincham Downs LLC; Michael D. Downs

(57) **ABSTRACT**

In one embodiment, a method for promoting the sale of a substitute product at the point of sale (POS). Upon the presentation of an original product for purchase by a consumer at a POS terminal, various manufacturers may decide to offer a substitute product to the consumer, prior to completing the purchase of the original product. If the customer accepts the offer, the point of sale terminal completes the sale of the substitute product.

**15 Claims, 13 Drawing Sheets**



## US 8,112,359 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,341,951 A | 7/1982 | Benton | |
| 4,359,147 A | 11/1982 | Levasseur | |
| 4,376,479 A | 3/1983 | Sugimoto et al. | |
| 4,412,292 A | 10/1983 | Sedam et al. | |
| 4,420,751 A | 12/1983 | Paganini et al. | |
| 4,478,353 A | 10/1984 | Levasseur | |
| 4,494,197 A | 1/1985 | Troy et al. | |
| 4,498,570 A | 2/1985 | King et al. | |
| 4,551,935 A | 11/1985 | Bachmann et al. | |
| 4,554,446 A | 11/1985 | Murphy et al. | |
| 4,567,609 A | 1/1986 | Metcalf | |
| 4,574,947 A | 3/1986 | Hutchings | |
| 4,598,378 A | 7/1986 | Giacomo | |
| 4,603,390 A | 7/1986 | Mehdipour et al. | |
| 4,639,875 A | 1/1987 | Abraham et al. | |
| 4,654,800 A | 3/1987 | Hayashi et al. | |
| 4,669,730 A | 6/1987 | Small | |
| 4,677,553 A | 6/1987 | Roberts et al. | |
| 4,679,150 A | 7/1987 | Hayashi et al. | |
| 4,689,742 A | 8/1987 | Troy et al. | |
| 4,703,423 A | 10/1987 | Bado et al. | |
| 4,723,212 A | 2/1988 | Mindrum et al. | |
| 4,734,858 A | 3/1988 | Schlafly | |
| 4,736,096 A | 4/1988 | Ushikubo | |
| 4,737,910 A | 4/1988 | Kimbrow | |
| 4,743,022 A | 5/1988 | Wood | |
| 4,760,247 A | 7/1988 | Keane et al. | |
| 4,766,548 A | 8/1988 | Cedrone et al. | |
| 4,799,156 A | 1/1989 | Shavit et al. | |
| 4,815,741 A | 3/1989 | Small | |
| 4,817,166 A | 3/1989 | Gonzalez et al. | |
| 4,817,990 A | 4/1989 | Krost | |
| 4,825,045 A | 4/1989 | Humble | |
| 4,833,607 A | 5/1989 | Dethloff et al. | |
| 4,834,231 A | 5/1989 | Awane et al. | |
| 4,839,507 A | 6/1989 | May | |
| 4,854,590 A | 8/1989 | Jolliff et al. | |
| 4,857,840 A | 8/1989 | Lanchais | |
| 4,859,838 A | 8/1989 | Okiharu | |
| 4,876,592 A | 10/1989 | Von Kohorn | |
| 4,878,248 A | 10/1989 | Shyu et al. | |
| 4,882,473 A | 11/1989 | Bergeron et al. | |
| 4,882,675 A | 11/1989 | Nichtberger et al. | |
| 4,899,906 A | 2/1990 | Bella | |
| 4,902,880 A | 2/1990 | Garczynski et al. | |
| 4,906,828 A | 3/1990 | Halpern | |
| 4,908,761 A | 3/1990 | Tai | |
| 4,910,672 A | 3/1990 | Off et al. | |
| 4,922,435 A | 5/1990 | Cahlander et al. | |
| 4,922,522 A | 5/1990 | Scanlon | |
| 4,937,853 A | 6/1990 | Brule et al. | |
| 4,947,028 A | 8/1990 | Gorog | |
| 4,948,174 A | 8/1990 | Thomson et al. | |
| 4,963,723 A | 10/1990 | Masada | |
| 4,973,952 A | 11/1990 | Malec et al. | |
| 4,982,337 A | 1/1991 | Burr et al. | |
| 4,982,346 A | 1/1991 | Girourard et al. | |
| 4,992,940 A | 2/1991 | Dworkin | |
| 4,993,714 A | 2/1991 | Golightly | |
| 4,999,763 A | 3/1991 | Ousborne | |
| 5,010,485 A | 4/1991 | Bigari | |
| 5,025,372 A | 6/1991 | Burton et al. | |
| 5,029,099 A | 7/1991 | Levasseur | |
| 5,034,739 A | 7/1991 | Gruhl | |
| 5,039,848 A | 8/1991 | Stoken | |
| 5,056,019 A | 10/1991 | Schultz et al. | |
| 5,058,044 A | 10/1991 | Stewart et al. | |
| 5,064,999 A | 11/1991 | Okamoto et al. | |
| 5,081,685 A | 1/1992 | Jones, III et al. | |
| 5,091,713 A | 2/1992 | Horne et al. | |
| 5,117,354 A | 5/1992 | Long et al. | |
| 5,117,407 A | 5/1992 | Vogel | |
| 5,119,295 A | 6/1992 | Kapur | |
| 5,121,945 A | 6/1992 | Thomson et al. | |
| 5,128,862 A | 7/1992 | Mueller | |
| 5,132,914 A | 7/1992 | Cahlander et al. | |
| 5,136,658 A | 8/1992 | Mori | |
| 5,172,328 A | 12/1992 | Cahlander et al. | |
| 5,173,851 A | 12/1992 | Off et al. | |
| 5,176,224 A | 1/1993 | Spector | |
| 5,177,342 A | 1/1993 | Adams | |
| 5,185,695 A | 2/1993 | Pruchnicki | |
| 5,189,607 A | 2/1993 | Shirasaki et al. | |
| 5,191,410 A | 3/1993 | McCalley et al. | |
| 5,191,525 A | 3/1993 | LeBrun et al. | |
| 5,192,854 A | 3/1993 | Counts | |
| 5,193,648 A | 3/1993 | Yuter | |
| 5,201,010 A | 4/1993 | Deaton et al. | |
| 5,202,826 A | 4/1993 | McCarthy | |
| 5,204,675 A | 4/1993 | Sekine | |
| 5,216,595 A | 6/1993 | Protheroe | |
| 5,223,698 A | 6/1993 | Kapur | |
| 5,231,569 A | 7/1993 | Myatt et al. | |
| 5,239,165 A | 8/1993 | Novak | |
| 5,243,515 A | 9/1993 | Lee | |
| 5,245,533 A | 9/1993 | Marshall | |
| 5,253,165 A | 10/1993 | Leiseca et al. | |
| 5,256,863 A | 10/1993 | Ferguson et al. | |
| 5,257,179 A | 10/1993 | DeMar | |
| 5,262,941 A | 11/1993 | Saladin et al. | |
| 5,267,452 A | 12/1993 | Zinsmeyer et al. | |
| 5,274,547 A | 12/1993 | Zoffel et al. | |
| 5,283,731 A | 2/1994 | Lalonde et al. | |
| 5,287,268 A | 2/1994 | McCarthy | |
| 5,297,026 A | 3/1994 | Hoffman | |
| 5,297,031 A | 3/1994 | Gutterman et al. | |
| 5,302,811 A | 4/1994 | Fukatsu | |
| 5,305,195 A | 4/1994 | Murphy | |
| 5,309,355 A | 5/1994 | Lockwood | |
| 5,315,093 A | 5/1994 | Stewart | |
| 5,315,664 A | 5/1994 | Kumagai | |
| 5,319,542 A | 6/1994 | King, Jr. et al. | |
| 5,325,291 A | 6/1994 | Garrett et al. | |
| 5,326,959 A | 7/1994 | Perazza | |
| 5,344,144 A | 9/1994 | Canon | |
| 5,353,218 A | 10/1994 | De Lapa et al. | |
| 5,353,219 A | 10/1994 | Mueller et al. | |
| 5,367,450 A | 11/1994 | Pintsov | |
| 5,367,452 A | 11/1994 | Gallery et al. | |
| 5,371,796 A | 12/1994 | Avarne | |
| 5,380,991 A | 1/1995 | Valencia et al. | |
| 5,381,155 A | 1/1995 | Gerber | |
| 5,383,111 A | 1/1995 | Homma et al. | |
| 5,398,932 A | 3/1995 | Eberhardt et al. | |
| RE34,915 E | 4/1995 | Nichtberger et al. | |
| 5,408,417 A | 4/1995 | Wilder | |
| 5,420,606 A | 5/1995 | Begum et al. | |
| 5,422,473 A | 6/1995 | Kamata | |
| 5,425,108 A | 6/1995 | Hwang et al. | |
| 5,434,394 A | 7/1995 | Roach et al. | |
| 5,450,938 A | 9/1995 | Rademacher | |
| 5,452,344 A | 9/1995 | Larson | |
| 5,458,284 A | 10/1995 | Haan et al. | |
| 5,459,306 A | 10/1995 | Stein et al. | |
| 5,481,094 A | 1/1996 | Suda | |
| 5,482,139 A | 1/1996 | Rivalto | |
| 5,495,412 A | 2/1996 | Thiessen | |
| 5,504,475 A | 4/1996 | Houdou et al. | |
| 5,504,675 A | 4/1996 | Cragun et al. | |
| 5,510,979 A | 4/1996 | Moderi et al. | |
| 5,511,646 A | 4/1996 | Maldanis et al. | |
| 5,513,102 A | 4/1996 | Auriemma | |
| 5,513,117 A | 4/1996 | Small | |
| 5,521,364 A | 5/1996 | Kimura et al. | |
| 5,526,257 A | 6/1996 | Lerner | |
| 5,536,045 A | 7/1996 | Adams | |
| 5,537,314 A | 7/1996 | Kanter | |
| 5,539,189 A | 7/1996 | Wilson | |
| 5,544,040 A | 8/1996 | Gerbaulet | |
| 5,544,784 A | 8/1996 | Malaspina | |
| 5,546,316 A | 8/1996 | Buckley et al. | |
| 5,550,746 A | 8/1996 | Jacobs | |
| 5,557,721 A | 9/1996 | Fite et al. | |
| 5,564,546 A | 10/1996 | Molbak et al. | |
| 5,568,406 A | 10/1996 | Gerber | |
| 5,572,653 A | 11/1996 | DeTemple et al. | |
| 5,581,064 A | 12/1996 | Riley et al. | |

**US 8,112,359 B2**

Page 3

| | | | |
|---|---|---|---|
| 5,591,972 | A | 1/1997 | Noble et al. |
| 5,592,375 | A | 1/1997 | Salmon et al. |
| 5,592,376 | A | 1/1997 | Hodroff |
| 5,592,378 | A | 1/1997 | Cameron et al. |
| 5,596,501 | A | 1/1997 | Comer et al. |
| 5,602,377 | A | 2/1997 | Beller et al. |
| 5,604,901 | A | 2/1997 | Kelley et al. |
| 5,608,643 | A | 3/1997 | Wichter et al. |
| 5,611,051 | A | 3/1997 | Pirelli |
| 5,611,052 | A | 3/1997 | Dykstra et al. |
| 5,612,527 | A | 3/1997 | Ovadia |
| 5,612,868 | A | 3/1997 | Off et al. |
| 5,613,620 | A | 3/1997 | Center et al. |
| 5,615,269 | A | 3/1997 | Micali |
| 5,620,079 | A | 4/1997 | Molbak |
| 5,621,201 | A | 4/1997 | Langhans et al. |
| 5,621,640 | A | 4/1997 | Burke |
| 5,621,812 | A | 4/1997 | Deaton et al. |
| 5,630,357 | A | 5/1997 | Akiyama |
| 5,631,724 | A | 5/1997 | Sawada et al. |
| 5,632,010 | A | 5/1997 | Briechle et al. |
| 5,637,859 | A | 6/1997 | Menoud |
| 5,638,302 | A | 6/1997 | Gerber |
| 5,642,484 | A | 6/1997 | Harrison, III et al. |
| 5,642,485 | A | 6/1997 | Deaton et al. |
| 5,644,723 | A | 7/1997 | Deaton et al. |
| 5,649,114 | A | 7/1997 | Deaton et al. |
| 5,651,075 | A | 7/1997 | Frazier et al. |
| 5,652,421 | A | 7/1997 | Veeneman |
| 5,655,007 | A | 8/1997 | McAllister |
| 5,664,115 | A | 9/1997 | Fraser |
| 5,665,953 | A | 9/1997 | Mazzamuto et al. |
| 5,666,493 | A | 9/1997 | Wojcik et al. |
| 5,675,662 | A | 10/1997 | Deaton et al. |
| 5,685,435 | A | 11/1997 | Picioccio et al. |
| 5,687,087 | A | 11/1997 | Taggart |
| 5,687,322 | A | 11/1997 | Deaton et al. |
| 5,689,100 | A | 11/1997 | Carrithers et al. |
| 5,692,132 | A | 11/1997 | Hogan |
| 5,701,252 | A | 12/1997 | Facchin et al. |
| 5,708,782 | A | 1/1998 | Larson et al. |
| 5,710,557 | A | 1/1998 | Schuette |
| 5,710,886 | A | 1/1998 | Christensen et al. |
| 5,710,887 | A | 1/1998 | Chelliah et al. |
| 5,713,795 | A | 2/1998 | Kohorn |
| 5,717,866 | A | 2/1998 | Naftzger |
| 5,719,396 | A | 2/1998 | Jack et al. |
| 5,724,886 | A | 3/1998 | Ewald et al. |
| 5,726,450 | A | 3/1998 | Peterson |
| 5,727,163 | A | 3/1998 | Bezos |
| 5,727,164 | A | 3/1998 | Kaye et al. |
| 5,732,398 | A | 3/1998 | Tagawa |
| 5,732,950 | A | 3/1998 | Moody |
| 5,734,150 | A | 3/1998 | Brown et al. |
| 5,734,838 | A | 3/1998 | Robinson et al. |
| 5,737,710 | A | 4/1998 | Anthonyson |
| 5,739,512 | A | 4/1998 | Tognazzini |
| 5,754,653 | A | 5/1998 | Canfield |
| 5,758,328 | A | 5/1998 | Giovannoli |
| 5,761,648 | A | 6/1998 | Golden et al. |
| 5,761,650 | A | 6/1998 | Munsil et al. |
| 5,768,142 | A | 6/1998 | Jacobs |
| 5,769,269 | A | 6/1998 | Peters |
| 5,774,868 | A | 6/1998 | Cragun et al. |
| 5,774,870 | A | 6/1998 | Storey |
| 5,774,874 | A | 6/1998 | Veeneman et al. |
| 5,780,133 | A | 7/1998 | Engstrom |
| 5,791,991 | A | 8/1998 | Small |
| 5,794,207 | A | 8/1998 | Walker et al. |
| 5,799,284 | A | 8/1998 | Bourquin |
| 5,802,015 | A | 9/1998 | Rothschild et al. |
| 5,806,044 | A | 9/1998 | Powell |
| 5,809,144 | A | 9/1998 | Sirbu et al. |
| 5,812,769 | A | 9/1998 | Graber et al. |
| 5,816,918 | A | 10/1998 | Kelly et al. |
| 5,822,216 | A | 10/1998 | Satchell, Jr. et al. |
| 5,822,736 | A | 10/1998 | Hartman et al. |
| 5,831,862 | A | 11/1998 | Hetrick et al. |
| 5,832,457 | A | 11/1998 | O'Brien et al. |
| 5,842,178 | A | 11/1998 | Giovannoli |
| 5,842,212 | A | 11/1998 | Ballurio et al. |
| 5,844,808 | A | 12/1998 | Konsmo et al. |
| 5,845,259 | A | * 12/1998 | West et al. .................. 705/14.38 |
| 5,845,265 | A | 12/1998 | Woolston |
| 5,848,399 | A | 12/1998 | Burke |
| 5,850,446 | A | 12/1998 | Berger et al. |
| 5,855,007 | A | 12/1998 | Jovicic et al. |
| 5,857,175 | A | 1/1999 | Day et al. |
| 5,864,604 | A | 1/1999 | Moen et al. |
| 5,864,822 | A | 1/1999 | Baker, III |
| 5,870,716 | A | 2/1999 | Sugiyama et al. |
| 5,870,717 | A | 2/1999 | Wiecha |
| 5,870,719 | A | 2/1999 | Maritzen et al. |
| 5,873,069 | A | 2/1999 | Reuhl et al. |
| 5,875,110 | A | 2/1999 | Jacobs |
| 5,878,139 | A | 3/1999 | Rosen |
| 5,878,401 | A | 3/1999 | Joseph |
| 5,883,810 | A | 3/1999 | Franklin et al. |
| 5,887,271 | A | 3/1999 | Powell |
| 5,890,136 | A | 3/1999 | Kipp |
| 5,890,718 | A | 4/1999 | Byon |
| 5,905,246 | A | 5/1999 | Fajkowski |
| 5,907,830 | A | 5/1999 | Engel et al. |
| 5,918,213 | A | 6/1999 | Bernard et al. |
| 5,923,016 | A | 7/1999 | Fredregill et al. |
| 5,924,078 | A | 7/1999 | Naftzger |
| 5,924,080 | A | 7/1999 | Johnson |
| 5,924,082 | A | 7/1999 | Silverman et al. |
| 5,930,145 | A | 7/1999 | Tuyama et al. |
| 5,930,771 | A | 7/1999 | Stapp |
| 5,937,391 | A | 8/1999 | Ikeda et al. |
| 5,938,717 | A | 8/1999 | Dunne et al. |
| 5,946,665 | A | 8/1999 | Suzuki et al. |
| 5,948,038 | A | 9/1999 | Daly et al. |
| 5,956,695 | A | 9/1999 | Carrithers et al. |
| 5,959,869 | A | 9/1999 | Miller et al. |
| 5,963,452 | A | 10/1999 | Etoh et al. |
| 5,963,939 | A | 10/1999 | McCann et al. |
| 5,970,469 | A | 10/1999 | Scroggie et al. |
| 5,974,399 | A | 10/1999 | Giuliani et al. |
| 5,988,346 | A | 11/1999 | Tedesco et al. |
| 5,991,740 | A | 11/1999 | Messer |
| 5,995,942 | A | 11/1999 | Smith et al. |
| 5,997,928 | A | 12/1999 | Kaish et al. |
| 5,999,914 | A | 12/1999 | Blinn et al. |
| 6,006,207 | A | 12/1999 | Mumick et al. |
| 6,012,834 | A | 1/2000 | Dueck et al. |
| 6,014,634 | A | 1/2000 | Scroggie et al. |
| 6,016,504 | A | 1/2000 | Arnold et al. |
| 6,017,157 | A | 1/2000 | Garfinkle et al. |
| 6,021,394 | A | 2/2000 | Takahashi |
| 6,026,370 | A | 2/2000 | Jeermyn |
| 6,026,375 | A | 2/2000 | Hall et al. |
| 6,029,139 | A | 2/2000 | Cunningham et al. |
| 6,029,141 | A | 2/2000 | Bezos et al. |
| 6,038,551 | A | 3/2000 | Barlow et al. |
| 6,048,267 | A | 4/2000 | Wichinsky |
| 6,049,777 | A | 4/2000 | Sheena et al. |
| 6,050,568 | A | 4/2000 | Hachquet |
| 6,052,667 | A | 4/2000 | Walker et al. |
| 6,055,513 | A | 4/2000 | Katz |
| 6,058,373 | A | 5/2000 | Blinn et al. |
| 6,058,375 | A | 5/2000 | Park |
| 6,061,660 | A | 5/2000 | Eggleston et al. |
| 6,064,987 | A | 5/2000 | Walker et al. |
| 6,070,147 | A | 5/2000 | Harms et al. |
| 6,073,840 | A | 6/2000 | Marion |
| 6,076,070 | A | 6/2000 | Stack |
| 6,078,866 | A | 6/2000 | Buck et al. |
| 6,085,168 | A | 7/2000 | Mori et al. |
| 6,088,682 | A | 7/2000 | Burke |
| 6,101,485 | A | 8/2000 | Fortenberry et al. |
| 6,112,191 | A | 8/2000 | Burke |
| 6,115,641 | A | 9/2000 | Brown et al. |
| 6,115,649 | A | 9/2000 | Sakata |
| 6,119,099 | A | 9/2000 | Walker et al. |
| 6,131,085 | A | 10/2000 | Rossides |
| 6,134,534 | A | 10/2000 | Walker et al. |

**US 8,112,359 B2**

Page 4

| | | | |
|---|---|---|---|
| 6,138,105 | A | 10/2000 | Walker et al. |
| 6,167,382 | B1 | 12/2000 | Sparks et al. |
| 6,192,349 | B1 | 2/2001 | Husemann et al. |
| 6,193,154 | B1 | 2/2001 | Phillips et al. |
| 6,193,155 | B1 | 2/2001 | Walker et al. |
| 6,196,458 | B1 | 3/2001 | Walker et al. |
| 6,205,435 | B1 | 3/2001 | Biffar |
| 6,223,163 | B1 | 4/2001 | Van Luchene |
| 6,236,971 | B1 | 5/2001 | Stefik et al. |
| 6,247,047 | B1 | 6/2001 | Wolff |
| 6,249,772 | B1 | 6/2001 | Walker et al. |
| 6,260,024 | B1 | 7/2001 | Shkedy |
| 6,266,651 | B1 | 7/2001 | Woolston |
| 6,267,670 | B1 | 7/2001 | Walker et al. |
| 0,013,011 | A1 | 8/2001 | Day et al. |
| 0,014,868 | A1 | 8/2001 | Herz et al. |
| 6,292,786 | B1 | 9/2001 | Deaton et al. |
| 6,298,329 | B1 | 10/2001 | Walker et al. |
| 6,298,331 | B1 | 10/2001 | Walker et al. |
| 6,321,984 | B1 | 11/2001 | McCall et al. |
| 6,324,520 | B1 | 11/2001 | Walker et al. |
| 6,330,544 | B1 | 12/2001 | Walker et al. |
| 6,370,513 | B1 | 4/2002 | Kolawa et al. |
| 6,405,174 | B1 | 6/2002 | Walker et al. |
| 6,512,570 | B2 | 1/2003 | Garfinkle et al. |
| 6,584,448 | B1 | 6/2003 | Laor |
| 6,970,837 | B1 | 11/2005 | Walker et al. |
| 2002/0120496 | A1 | 8/2002 | Scroggie et al. |
| 2003/0033292 | A1 | 2/2003 | Meisel et al. |
| 2003/0088465 | A1 | 5/2003 | Monteverde |
| 2003/0139969 | A1 | 7/2003 | Scroggie et al. |
| 2004/0243478 | A1 | 12/2004 | Walker et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2217739 | 4/1996 |
| EP | 0 085 546 A2 | 8/1983 |
| EP | 0 109 189 | 3/1984 |
| EP | 0 512 509 A2 | 11/1992 |
| EP | 512413 | 11/1992 |
| EP | 607686 | 7/1994 |
| EP | 0 779 587 A2 | 9/1996 |
| EP | 0 779 587 A3 | 9/1996 |
| EP | 0 817 138 A1 | 1/1998 |
| EP | 0 856 812 A2 | 5/1998 |
| EP | 0 862 150 A2 | 9/1998 |
| GB | 2 109 305 A | 6/1983 |
| GB | 2 265 032 A | 9/1993 |
| JP | 58132886 A | 8/1983 |
| JP | 2001093 A | 1/1990 |
| JP | 2208798 A | 8/1990 |
| JP | 4235700 A | 8/1992 |
| JP | 5242363 A | 9/1993 |
| JP | 6035946 | 2/1994 |
| JP | 7065218 A | 3/1995 |
| JP | 7073375 | 3/1995 |
| JP | 7078274 | 3/1995 |
| JP | 07098779 A | 4/1995 |
| JP | 07249176 | 9/1995 |
| JP | 7272012 | 10/1995 |
| JP | 8030848 A | 2/1996 |
| JP | 08137951 | 5/1996 |
| JP | 8-147545 | 6/1996 |
| JP | 8221484 | 8/1996 |
| JP | 8221645 A | 8/1996 |
| JP | 8279007 | 10/1996 |
| JP | 08329323 A | 12/1996 |
| JP | 09016836 A | 1/1997 |
| JP | 9062908 A | 3/1997 |
| JP | 9097288 | 4/1997 |
| JP | 9190479 A | 7/1997 |
| JP | 10187820 | 7/1998 |
| JP | 10214284 | 8/1998 |
| JP | 10240830 | 9/1998 |
| JP | 10269049 | 10/1998 |
| JP | 11088560 | 3/1999 |
| KR | 9503826 B | 4/1995 |
| WO | WO 95/27242 | 10/1995 |
| WO | WO96/29668 | 9/1996 |
| WO | WO 96/32701 | 10/1996 |

| | | | |
|---|---|---|---|
| WO | WO96/36926 | | 11/1996 |
| WO | WO 97/08638 | * | 3/1997 |
| WO | WO 97/16797 | | 5/1997 |
| WO | WO 97/16897 | | 5/1997 |
| WO | WO 97/20279 | | 6/1997 |
| WO | WO 97/21200 | | 6/1997 |
| WO | WO 97/23838 | | 7/1997 |
| WO | WO97/24680 | | 7/1997 |
| WO | WO 97/24701 | | 7/1997 |
| WO | WO 97/25684 | | 7/1997 |
| WO | WO 97/28510 | | 8/1997 |
| WO | WO 97/35441 | | 9/1997 |
| WO | WO 97/44749 | | 11/1997 |
| WO | WO97/46961 | | 12/1997 |
| WO | WO 97/50064 | | 12/1997 |
| WO | WO 98/06050 | | 2/1998 |
| WO | WO 98/15907 | | 4/1998 |
| WO | WO 98/19260 | | 5/1998 |
| WO | WO 98/21713 | | 5/1998 |
| WO | WO 98/28699 | | 7/1998 |
| WO | WO 98/48388 | | 10/1998 |
| WO | WO 98/48563 | | 10/1998 |
| WO | WO 98/49658 | | 11/1998 |
| WO | WO 99/04326 | | 1/1999 |
| WO | WO 99/07121 | | 2/1999 |
| WO | WO 99/09508 | | 2/1999 |
| WO | WO 99/12117 A1 | | 3/1999 |
| WO | WO 99/38125 A1 | | 7/1999 |
| WO | PCT/US 99/21720 | | 3/2000 |
| WO | WO00/75855 | | 12/2000 |

OTHER PUBLICATIONS

Office Action for U.S. Appl. No. 12/111,637 mailed Jul. 21, 2010, 20 pp.

Office Action for U.S. Appl. No. 10/699,462 mailed May 11, 2011, 16 pp.

Office Action for U.S. Appl. No. 10/699,462 mailed Nov. 10, 2010, 12 pp.

Office Action for U.S. Appl. No. 10/699,462 mailed May 24, 2010, 12 pp.

Complaint, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Apr. 11, 2011), 19 pp.

Defendant Dell Inc's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jun. 5, 2011), 15 pp.

Defendant Overstock.Com, Inc's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jun. 9, 2011), 17 pp.

Defendant Nieman Marcus, Inc.'s Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jun. 09, 2011), 24 pp.

Defendant Macy's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jun. 13, 2011), 15 pp.

Defendant Wal-Mart's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jun. 20, 2011), 14 pp.

Defendant Bestbuy.Com, LLC's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jun. 21, 2011), 17 pp.

Defendant Barnes & Noble, Inc's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jun. 24, 2011), 16 pp.

Defendant GSI Commerce Solutions, Inc's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 1, 2011), 17 pp.

Defendant NBA Media Ventures LLC's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 1, 2011), 16 pp.

Defendant EBAY Inc's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 1, 2011), 18 pp.

Defendant Amazon.Com, Inc.'s Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 1, 2011), 13 pp.

Defendant Target Corporation's Answer, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 1, 2011), 13 pp.

Plaintiffs' Answer to Defendant Dell's Counterclaims, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 5, 2011), 8 pp.

Plaintiffs' Answer to Defendant Overstock.com, Inc.'s Counter-claim, *Walker Digital, LLC v. Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 5, 2011), 7 pp.

US 8,112,359 B2

Page 5

Plaintiffs' Answer to Defendant Neiman Marcus Inc's Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 5, 2011), 8 pp.

Plaintiffs' Notice of Voluntary Dismissal to Defendant Apple Inc., *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11- cv-00315 (Del. Jul 6, 2011), 4 pp.

Plaintiffs' Answer to Defendant Bloomingdale's, Inc. And Macy's. Com, Inc.'s Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 7, 2011), 8 pp.

Defendant Saks Answer, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 7, 2011), 21 pp.

Defendant Expedia Inc.'s Answer, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 11, 2011), 13 pp.

Defendant Microsoft Corporation's Answer, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 11, 2011), 13 pp.

Defendant GAP, Inc's Answer, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 11, 2011), 19 pp.

Defendant Nordstrom, Inc.'s Answer, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 11, 2011), 19 pp.

Plaintiffs' Answer to Defendant Barnes & Noble, Inc.'s Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 18, 2011), 6 pp.

Plaintiffs' Answer to Defendant Bestbuy.Com, LLC's Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 15, 2011), 6 pp.

Defendant Verizon Communications Inc.'s Answer, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 20, 2011), 13 pp.

Plaintiffs' Answer to Defendant Amazon.Com, Inc.'s Counterclaims, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 25, 2011), 6 pp.

Plaintiffs' Answer to Defendant Target Corporation's Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 25, 2011), 7 pp.

Plaintiffs' Answer to Defendant GSI Commerce Solutions, Inc.'s Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C. A. No. 1:11-cv-00315 (Del. Jul. 25, 2011), 6 pp.

Plaintiffs' Answer to Defendant NBA Media Ventures LLC's Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 25, 2011), 7 pp.

Plaintiffs' Answer to Defendant EBAY Inc.'s Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Jul. 25, 2011), 6 pp.

Plaintiffs' Answer to Defendant Saks Incorporated's Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11- cv-00315 (Del. Aug. 1, 2011), 9 pp.

Plaintiffs' Answer to Defendant Nordstrom, Inc.'s Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Aug. 4, 2011), 6 pp.

Plaintiffs' Answer to Defendant Microsoft Corporation's Counterclaims, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Aug. 04, 2011), 4 pp.

Plaintiffs' Answer to Defendant GAP, Inc.'s Counterclaim, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Aug. 4, 2011), 5 pp.

Plaintiffs' Answer to Defendant Expedia, Inc.'s Counterclaims, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Aug. 4, 2011), 6 pp.

Plaintiffs' Answer to Defendant Verizon Communications Inc., Counterclaims, *Walker Digital, LLC* v. *Amazon et al.*, C.A. No. 1:11-cv-00315 (Del. Aug. 15, 2011), 5 pp.

Quinn, Jane Byrant, "New Cars for Less", Newsweek; Oct. 23, 1978; Section: The Columnists; p. 80, 2 pp.

"My Auto Broker—Online Auto Broker", (http://www.adverlink.com/myautobroker), download date: May 28, 1997, 4 pp.

"About CyberSlice", (http://www.cyberslice.com/cgi-bin/WebObjects/CyberSlice:2@httpserv01/), download date: May 6, 1997, 2 pp.

"PriceWatch", (http://icon.co.za/-robo/prod01.htm), Jan. 14, 1997, 5 pp.

PCT International Search Report for Application No. PCT/US97/13588, dated Dec. 4, 1997, 2pp.

Anthony Joseph, "Baby the engine, and other saving tips", The Christian Science Monitor, Nov. 4, 1986, p. B10, 3 pp.

"Coupons & more", welcome to coolsavings.com—Copyright 1996-1999. (http://208,134.230.42/cgi-win/temppps.exe/first.htm), 3 pp.

"A personal shopping organizer for the web savvy consumer. My KillerApp offers a personalized shopping experience to meet the unique needs of every individual user". (http://www.killerapp.com/html/main/pr0004.html), Oct. 2, 1998, 2 pp.

"SaveSmart—How SaveSmart Works for Consumers"; (http://savesmart.com/consumer/consumer-howitworks.html), Copyright 1998, 7 pp.

"Welcome to Planet U, providers of U-pons—Internet Coupons—Internet Coupons"; (http://www.webcertificate.com:443/webcert/faq-detail.asp), Copyright 1998, 8 pp.

Webcertificate, the perfect gift-giving solution . . . It's quick! It's Easy! It's Secure!; (http://www.webcertificate.com:443/webcert/faq-detial.asp), Copyright 1998, 14 pp.

Shop the Marketplace, 1-800-flowers.com; (http://www.1800flowers.com/flowers/welcome.asp), Copyright 1998, 4 pp.

"The Leader in Internet Shopping Systems for Supermarkets and Drug Stores", groceries online. copyright 1996 Groceries Online, Inc. (http://www.groceries-online.com/), download date: Nov. 6, 1996, 4 pp.

"Brother Industries is pushing ahead with its new Pc software . . . ", IDC Japan Report, Aug. 30, 1991, Section: vol. 17, p. 53, 1 pg.

Maras, Elliot, "1995: downsizing adds costs; new strategies sought", Automatic Merchandiser, Aug. 1996, 13 pp.

Naik, Gautam, "In Digital Dorm, Click on Return for Soda", The Wall Street Journal, Jan. 23, 1997, Section: Online, p. B1, 3 pp.

Shea, Barbara, "Read Fine Print When Comparing Car Rentals", Feb. 9, 1997, St. Louis Post-Dispatch, Section: Travel & Leisure, p. 04T, 2 pp.

Website: "CSH Drink Machine(s)", (http //www csh rit edu/proj/drink html), download date: Jan. 29, 1998, 2 pp.

Desjardins, Doug, "Hollywood's Investment in Online Video Retailer Gets Mixed Reviews", Video Store, Aug. 9, 1998, Section: p. 1, ISSN: 0195-1750, 3 pp.

Website: "FAQ: CSH Coke Machine Information", (http //www cs uu nl/wais/html/na-dir/csh-coke-machine-info html), May 5, 1994, 6 pp.

Stigler, George J., "The Theory of Price", The Macmillan Company, Copyright 1952, pp. 82-94, 214-221, 14 pp.

Bowman, Jr., Ward S., "Tying Arrangements and the Leverage Problem", The Yale Law Journal, Nov. 1957, vol. 67, No. 1, pp. 19-36 (10 pp.).

Stigler, George J., "The Theory of Price", The Macmillan Company, Third Edition, Copyright 1966, 8 pp.

Narasimhan, Chakravarthi, "A Price Discrimination Theory of Coupons", Marketing Science, Spring 1984, vol. 3, No. 2, 20 pp.

Judith Evans, "Who was that masked Cybershopper?; MasterCard-Visa Agreement on Credit Card security may make ON-LINE commerce fly", The Washington Post, View Related Topics; Feb. 2, 1996, Final Edition; Section: Financial; p. F01, 2 pp.

"First Virtual Holdings Releases Beta Software for Secure Transactions on Microsoft Merchant Server", PR Newswire, Mar. 31, 1997; Section: Financial News, 2 pp.

"Six vendors sign on for early electronic commerce venture", Phillips Business Information, Inc. Voice Technology News, Dec. 13, 1994; No. 25, vol. 6; ISSN: 1045-1498, 4 pp.

"The easy, pain-free way to buy or lease your next car", What is autoseek; (http://www.autoseek.com/#what) download date: May 28, 1997, 4 pp.

Nora Lockwood Tooher, "Macy's new gift card gets trial run in Warwick", The Providence Journal-Bulletin; Oct. 1, 1998; Section: Business; p. 1E, 2 pp.

Denise Caruso, "Digital Commerce; The boom in on-line shopping adds a twist to the old quandary of how to tax interstate purchases", The New York Times, View Related Topics, Dec. 28, 1998; Late Edition — Final; Section: C; p. 3; col. 5; Business/Financial Desk, 3 pp.

Godwin, Nadine, "New software was key lure in $17 million agency buyout", TravelWeekly, Nov. 26, 1984, Section: vol. 43, p. 45, ISSN: 0041-2082, 4 pp.

"Woodside Management Systems Inc. today announced . . . ", PR Newswire, Apr. 1, 1986, 2 pp.

Tellis, Gerard J., "Beyond the Many Faces of Price: An Integration of Pricing Strategies", Journal of Marketing, Oct. 1986, vol. 50, pp. 146-160, 15 pp.

Godwin, Nadine, "Agency, funded by 3M, set to market software; Travelmation touts trip planner to corporations; designed to eliminate client-agent telephone calls; Business Travel Update", Travel Weekly, Oct. 13, 1986, Section: vol. 45, p. 45, ISSN: 0041-2082, 4 pp.

Godwin, Nadine, "Agency dares to launch its own air res system; Travelmation system provides greater versatility, Automation Report", Travel Weekly, Oct. 23, 1986, 5 pp.

"Thomas Cook Travel U.S.A. has announced . . . ", PR Newswire, Jan. 12, 1987, 2 pp.

Bawa, Kapil et al., "The Coupon-Prone Consumer: some Findings Based on Purchase Behavior Across Product Classes", Journal of Marketing, Oct. 1987, vol. 51, pp. 99-110, 12 pp.

Nomani, Sr., A., "Air Crashes Stir Signs of Anxiety in Travelers", Wall Street Journal, Aug. 1, 1989, Section 2, p. 1, col. 1, 2 pp.

Carlsen, Clifford, "From Airline Tickets to Human Organs, the Electronic Markets are Booming", San Francisco Business Times, Aug. 14, 1989, Section: vol. 3, No. 50, Section 1, p. 17, 2 pp.

Kuttner, Robert, "Computers May Turn the World into One Big commodities Pit.", Business Week, Sep. 11, 1989, Section: Economic Viewpoint, No. 3123, p. 17, 3 pp.

Golden, Fran, "AAL's Riga doubts Marketel's appeal to retailers", Travel Weekly, Nov. 13, 1989, Section: vol. 48, No. 91, p. 4, ISSN: 0041-2082, 2 pp.

Del Rosso, Laura, "Firm proposes ticket-bidding system; Marketel explores electronic auction of travel; Marketel International", Travel Weekly, Nov. 13, 1989, Section: No. 91, vol. 48, p. 1, ISSN: 0041-2082, 3 pp.

"Letters to BusinessExtra", The San Francisco Chronicle, Dec. 26, 1989, Section: Business, C7, 3 pp.

Wallace, David, "Company Planning to Let Flyers bid on Airfares", Philadelphia Business Journal, Mar. 26, 1990, Section: vol. 9, No. 3, Section 1, p. 15, 3 pp.

Greenberg, Peter S., "The Savvy Traveler: Lower Air Fares for Consumers Not in the Cards . . . " Los Angeles Times, Jul. 8, 1990, Section: Travel, Part L., p. 2, col. 1, Travel Peak, 2 pp.

Carey, Christopher, "Firm Offers Auction for Airline Tickets", St. Louis Post-Dispatch, Aug. 7, 1991, Section: Business, p. 1B, 2 pp.

Pelline, Jeff, "Travelers Bidding on Airline Tickets SF firm offers chance for cut-rate fares", The San Francisco Chronicle, Aug. 19, 1991, Section: News, p. A4, 4 pp.

Upton, Kim, "News and Briefs: French Say Monoliths Off-Limits to Visitors", Los Angeles Times, Aug. 25, 1991, Section: Travel, Part L, p. 4, col. 1, Travel Desk, 2pp.

"Buy Low, Fly High", USA Today, Nov. 14, 1991, Section: Bonus, p. 15, 2 pp.

Feldman, Joan M., "To rein in those CRSs; computer reservation systems" Air Transport World, Dec. 1991, Section: vol. 28, No. 12, p. 89, ISSN: 0002-2543, 5 pp.

"Traveler's notes; Bookit Report", Consumers Reports Travel Letter, Dec. 1991, Section: vol. 7, No. 12, p. 143, 1 pg.

"CRTL's Blue Ribbon Deals for 1992", Consumer Reports Travel Letter, Jan. 1992, Section: vol. 8, No. 1, pp. 3-5, 2 pp.

"Newsletters", The Atlanta Journal and Constitution, Mar. 1, 1992, Section: Travel: Section K, p. 13, 1 pg.

Del Rosso, Laura, "Ticket-bidding firm closes its doors, Marketel International", Travel Weekly, Mar. 12, 1992, Section: vol. 51, No. 21, p. 1, ISSN: 0041-2082, 2 pp.

Hainer, Cathy et al., "Where vacationing kids get good care", USA Today, Apr. 1, 1992, Section: Life, p. 4D, 2 pp.

Weatherford, Lawrence R. And Bodily, Samuel E., "A Taxonomy and Research Overview of Perishable-Asset Revenue Management: Yield Management, Overbooking, and Pricing", Operations Research, Sep.-Oct. 1992, vol. 40, No. 5, pp. 831-844, 14 pp.

Spencer, Milton H. And Amos, Jr., Orley M., "Contemporary Economics, Eight Edition", Worth Publishers, Copyright 1993, 5 pp.

Rajendran, K.N. And Tellis, Gerard J., "Contextual and Temporal Components of Reference Price", Journal of Marketing, Jan. 1994, 13 pp.

Feldman, Joan M., "Reclaiming control; new software to close gap between projected and actual revenues", Aug. 1995, Section: vol. 32, No. 8, p. 35, ISSN: 0002-2543, 5 pp.

United Sates v. Eastman Kodak Co., United States Court of Appeals for the Second Circuit, decided Aug. 4, 1995, 16 pp.

Bronnenberg, Bart J., "Limited Choice Sets, Local Price Response, and Implied Measures of Price Competition", Journal of Marketing Research, Spring 1996, Section: vol. XXXIII, 20 pp.

Prentice, Michael, "Searching for the lowest fare: Getting the lowest fare takes work, but it's worth the effort", The Ottawa Citizen, Oct. 9, 1996, Section: Citylife; Consuming Passion, p. C3, 3 pp.

"Auctioning unsold airline tickets", Insight (USA), download date: Oct. 29, 1996, 1 pg.

"Web Ventures presents Bookit!", (http www webventures com/bookit), Copyright 1996, 1 pg.

"Salomon Brother's Maldutis Says Internet is Aviation's 'Third Revolution,' Will Earn Billions", World Airline News, Mar. 21, 1997, Section: vol. 7, No. 12, 2 pp.

Feldman, Joan M., "Pricing and cybersales; Internet airline ticket sales and reservations", Feb. 1998, Section: No. 2, vol. 35, p. 64, ISSN: 0002-2543, 4 pp.

Adyanthaya, Surain, "Revenue Management: the Black Art." Interavia Business & Technology, Sep. 1998, Section: No. 623, vol. 53, p. 43, ISSN: 0983-1592, 4 pp.

"Airfare Bargains on the Net: About E-mail Lists", (http //travel epicurious com/travel/c_planning/02_airfares/email/intro html), Copyright 1998, 17 pp.

"Airtech — FlightPass Faq", (http //www airtech com/at_flightpass/at_faqflightpass htm), download date: Oct. 5, 1998, 4 pp.

Woolley, Scott, "I got it cheaper than you", Forbes, Nov. 2, 1998, Section: Management, Strategies, Trends, p. 82, 4 pp.

Varian, Hal R., "First Monday: Differential Pricing and Efficiency", (http www firstmondaydk/issues/issue2/different/), Copyright 1996, 18 pp.

Kephart, Jeff, "Price Dynamics of Vertically; Introduction", (http //www research ibm com/infoecon...), Aug. 15, 1998, 3 pp.

"Bookit Airfare Bidding System (Fax for Your Plane Ticket?)", Consumer Reports Travel Letter, Sep. 1991, Section: vol. 7, No. 9, p. 97, 106, 3 pp.

Nelson, Janet, "Practical Traveler; Airlines Relaxing Policy on No-Refund Tickets", The New York Times, Sep. 22, 1991, Section 5, p. 3, col. 1, Travel Desk, 4 pp.

"Traveler's Notes; Easier Airfare Bidding.", Consumer Reports Travel Letter, Oct. 1991, Section: vol. 7, No. 10, p. 119, 1 pg.

Website: VendMaster, "Windows for Vending Pro with Inventory", (http //www vendmaster com/pro_inv_main html), download date: Jul. 16, 1998, 2 pp.

Website: Optimum Energy Group — Products, "VendingMi$er", (http //www optimumenergy com/products/miser html), download date: Aug. 12, 1998, 2 pp.

Burke, Raymond R., "Virtual Shopping: Breakthrough in Marketing Research", Harvard Business Review, Mar.-Apr. 1996, pp. 120-131, 9 pp.

Website: VendMaster,"Products; Windows for Vending", (http //www vendmaster com/products_main html), download date: Jul. 16, 1998, 2 pp.

PCT International Search Report for Application No. PCT/N095/00060, dated Oct. 10, 1995, 3 pp.

Rehayem, Gilbert, "Opinion: X-Press Betting", La Fleur's Lottery World, Feb 7, 1997, 1 pg.

"Cape Town", Reuters Ltd, Nov. 8, 1979, PM Cycle, 1 pg.

"Save the mark", Financial Times (London), Feb. 1, 1983, Section I, Men & Matters at p. 12, 1 pg.

"POS spectrum: a lottery looks to POS for growth", UMI, Inc., POS News, Jan. 1989, vol. 5, No. 7, p. 8, ISSN: 0896-6230, Coden: Bhorad, 1 pg.

"Let's Play the Cash Register Receipts Lottery", The New York Times, Dec. 25, 1990, Section 1, p. 30, col. 4, Editorial Desk, 1 pg.

Schrage, Michael, "An Experiment in Economic Theory; Labs Testing Real Markets", The Record, Nov. 26, 1989, Section: Business at p. B01, 1 pp.

Nakayama, Atsushi, "Coca-Cola machines to be 'smarter'; the Teleterminal control system is aimed at keeping customers, and machines, satisfied", The Japan Economic Journal, Feb. 23, 1991, Section: Industry: Chemicals, 2 pp.

Del Rosso, Laura, "Marketel says it plans to launch air fare 'auction' in June; Marketel International Inc.", Travel Weekly, Apr. 29, 1991, Section: vol. 50, No. 34, p. 1, ISSN: 0041-2082, 3 pp.

"Philips offers customers financing through Citicorp; Philips Medical Systems North America, Citicorp North America Inc." Health Industry Today, Jun. 1991, Section: vol. 54, No. 6, p. 4, ISSN: 0745-4678, 1 pp.

"Coupons get serious; supermarkets use barcodes to prevent misredemptions", Chain Store Age Executive with Shopping Center Age, Oct. 1992, Section: vol. 68, No. 10, p. 68, ISSN: 01931199, 2 pp.

"Winn-Dixie/The Salvation Army Report Contributions for War Against Hunger", PR Newswire, Jun. 10, 1993, Section: Financial News, 1 pg.

Jones, Jeanne, "Data Readers Streamline Management; Scanner Technology Aids Retailers As Well As Plants, Wholesalers", The Houston Post, Jun. 26, 1994, Section: Business at Pg. D1, 4 pp.

Fiorini, Phillip, "'No Place for Penny?' /Smallest coin doesn't make cents to some", USA Today, Jul. 29, 1994, Section: News at p. 1A, 3 pp.

Smith, Alison, "Survey of UK Consumer Credit and Asset Finance", Financial Times, Nov. 3, 1994, 3 pp.

Andreoli, Tom et al., "Cash Machines Offer a Whole Lotto Money for Withdrawl; An Unfortunate Juxtaposition; Block That Metaphor!; Something Street Talk; Fishy in Springfiled; State Street Sears?; Champion As Underdog; A 'Whole Language' Graduate", Crain's Chicago Business, Jun. 19, 1995, 2 pp.

"Spain: BBV launches new card", Cards International, Jun. 22, 1995, 1 pg.

Greene, Jan, "Farm bills please assns; National Grocers Association", Supermarket News, vol. 35, Dec. 23, 1985, 1 pg.

Knippenberg, Jim, "Will local radio empires strike back?", The Cincinnati Enquirer, Jul. 23, 1995, Section: Tempo at p. F01, 1 pg.

Brochure, "Cyber Bid", Net Fun Ltd., Copyright 1996, 9 pp.

Maras, Elliot, "Software opens doors to scientific machine menuing", Automatic Merchandiser, Feb. 1996, p. 36, ISSN: 0002-7545, 5 pp.

Hadley, Kimberly, "Pastors praying anti-arson effort will bum bias", The Nashville Banner, Jul. 26, 1996, Section: News at p. A13, 1 pg.

Gapper, John, "NatWest reports rise in bad debt", Financial Times, Jul. 31, 1996, Section: News: UK, 1 pg.

Gilbert, Allan Z., "A call to action for wireless data communication", Automatic Merchandiser, Aug. 1996, Financial Management section, 3 pp.

"Lynx Technology: Lynx to provide business leasing program through Schroder Leasing", M2 Presswire, Aug. 9, 1996, 2 pp.

Brochure, "For the Crew & the Customer: The Best Drive-Thru & Grill Service", Olivetti North America, Winter 1998, 2 pp.

"VendMaster: Windows and Vending Software, Reports", (http //www vendmaster com/reports__main html), download date: Feb. 6, 1998, 12 pp.

Taylor, Paul, "Towards a dream market", Financial Times (London), Sep. 4, 1996, Section: Survey—FT IT, 2 pp.

Singletary, Michelle, "Electronic World, Unchecked Problem? U.S. Move to Paperless Payments Raises Worries About Those Who Don't Use Banks", The Washington Post, Mar. 4, 1997, Section: Financial, 4 pp.

Hirschfeld, David, "Increasing Profits Through Automation", Independent Vendors Association Quarterly, Apr./May/Jun. 1997, 10 pp.

"Avco Financial Services", National Home Furnishing Association, (http //www homefurnish comHFA/avco htm), download date: May 23, 1997, 2 pp.

Website, "Catalina Marketing Corporation", (http //catalinamktg com/prodcdir htm), Copyright 1997, 17 pp.

Riordan, Teresa, "Patents; A novel approach to making a better spermicide harks back to some old-fashioned methods", The New York Times, Jun. 9, 1997, Section D, p. 2, col. 1, Business/Financial Desk, 3 pp.

Nairn, Geoff, "The key to your identity: Falling costs will allow fingerprint verification to be widely used, reports Geoff Nairn", Financial Times (London), Jul. 15, 1997, Section: Technology; at p. 12, 3 pp.

"The United Computer Exchange, How It All Works", (http //www uce com/howitworks html), Copyright 1995-1997, 6 pp.

"Classified 2000: the Internet Classifieds", Classifieds2000, Inc., (http //www classifieds2000 com/cgi-cli/Display exe?C2K+aboutus), Copyright 1996-1997, 3 pp.

"General trading information and terms provided by tradingfloor. com", (http //www tradingfloor com/info htm), Oct. 22, 1996, 11 pp.

"NASDAQ", Information Sheet, (http //home axford com/corfin/corfll htm), download date: Aug. 15, 1997, 3 pp.

Gilbert, Allan Z., "Operators can gain with creative merchandising", Automatic Merchandiser, Oct. 1992, p. 80, ISSN: 1061-1797, 3 pp.

"Public Internet Kiosks, Inc. Receives First Order for Its 'Internet Station' — The Vending Machine of the Future", PR Newswire, Sep. 16, 1996, 2 pp.

French, Simone A. et al., "A Pricing Strategy to Promote Low-Fat Snack Choices through Vending Machines", American Journal of Public Health, May 1997, vol. 87, No. 5, 3 pp.

Kohda, Youji, Endo, Susumu, "Ubiquitous Advertising on the WWW: Merging Advertisement on the Browser", Computer Networks and SDN Systems 28, May 1, 1996 at pp. 1493-1499, 8 pp.

"Coupon acceptor; Coinco", Beverage Industry, Jul. 1998, No. 7, vol. 89, p. 38, 2 pp.

"Coinco offers BA-30 dollar bill acceptor", Automatic Merchandiser, Aug. 1998, p. 43, 2 pp.

Rich Karlgaard, "Keep your eyes on the prize", Forbes, Sep. 21, 1998, p. 43, 3 pp.

"Coupon acceptor", Beverage Industry, Dec. 1998, No. 12, vol. 89, p. 34, 1 pg.

Tim Davis, "Vending suppliers scurry to meet Coke-mandated vendor communication", Automatic Merchandiser, Aug. 1996, 2 pp.

Conlon et al. "Press 1 for profit." Sales and Marketing Management. Sep. 1998, 6 pp.

PCT International Search Report for Application No. PCT/US98/21216, dated May 4, 1999, 4 pp.

PCT International Search Report for Application No. PCT/US00/13349, dated Nov. 9, 2000, 4 pp.

PCT International Preliminary Examination Report for Application No. PCT/US00/13349, dated Aug. 30, 2001, 7 pp.

Office Action for U.S. Appl. No. 09/348,566, Examiner James Zurita, mailed Oct. 1, 2003, 3 pp.

Cook, Louise, "ConsumerWatch: Clip, Snip, Save", The Associated Press, Mar. 12, 1984, Business News Section, 2 pp.

"Global, Second-Generation, and Frequent-Buyer Set New Trends", Marketing News, Jun. 7, 1985, vol. 19, No. 12, 1 pg.

Lacher, Lisa, "Coupon Gimmick Registers Profits", Business Dateline, Business Record, Dec. 7, 1987, vol. 83, No. 47, Section 1 at p. 1, 2 pp.

Stevens, Lawrence, "Hypermarket Challenge", Computerworld, Dec. 19, 1988, Section: Software & Services, 2 pp.

McIntyre, Faye, "Small businesses may prefer alternatives to advertising.", South Dakota Business Review, Jun. 1989, 4 pp.

"Safeway Introduces Store-Generated Coupons", PR Newswire, May 1, 1990, 1 pg.

Ramirez, Anthony, "The Pizza Version of Dialing '911'", The New York Times, Sep. 9, 1991, Late Edition—Final, Section D, p. 1, col. 3, Financial Desk, 4 pp.

Blattenberg, Robert C., "Interactive marketing: exploiting the age of addressability", Sloan Management Review, Sep. 22, 1991, Section: vol. 33, No. 1, 15 pp.

O'Kane, Gerry, "Parking your car by computer", South China Morning Post, Mar. 23, 1993, Section: Supplement 3 pp.

McDowell, Bill, "Frequency marketing builds repeat business; Management", Information Access Company, a Thomson Corporation Company, Reed Publishing USA, Building Supply Home Centers, Aug. 1993, 5 pp.

Arend, Mark, "Debit frenzy? Not quite, but getting there", ABA Banking Journal, Apr. 1994, vol. 86, 4 pp.

Rubel, Chad, "Young firm armed with technology fights an old giant; ETM to Ticketmaster: Let's rock", American Marketing Association, Marketing News TM, Jun. 19, 1995, 3 pp.

"Tecmark Reward Terminal", Tecmark Services, Inc., Copyright 1996, (http://www.tecmarkinc.com/terminal.htm), 1 pg.

McKinney, Jeff, "Merchant program could pay off for Provident", The Cincinnati Enquirer, Mar. 24, 1996, 2 pp.

"Staples The Office Superstore to Participate in Visa 'Rewards for Your Home' Promotion; Savings will be offered to thousands of Visa Staples customers.", Business Wire, Mar. 25, 1996, 2 pp.

Retailers in small N. D. town join forces (Discount Points Corp launches Discount Points, a multi-retailer consumer discount program), Tire Business, Apr. 29, 1996, 3 pp.

Wagner, Jim, "Cameras Tell Mall What Door You Use, How Often You Go", Albuquerque Tribune, Aug. 9, 1996, 2 pp.

Fickenscher, Lisa, "Amex to Start Free Rewards Program with Discounts on Merchandise", The American Banker, Oct. 18, 1996, Section: Credit/Debit/ATMS at p. 10, 2 pp.

Fitzgerald, Kate, "Amex Program Moves Loyalty to Next Level: Custom Extras Finds A Medium Customers Can't Ignore: Billing Statements", Crain Communications Inc., Advertising Age, Nov. 4, 1996, 2 pp.

"Click this box for extra pepperoni; CyberSlice routes online orders", The Dallas Morning News, Dec. 2, 1996, Section: Business at p. 6D, 2 pp.

Bonnici, Joseph et al., "Consumer issues in coupon usage: An exploratory analysis", Journal of Applied Business Research, Winter 1996/1997, vol. 13, No. 1, 12 pp.

"Frequent shopper programs are taking off", Grocery Marketing, Jan. 1997, vol. 63, No. 1, 2 pp.

Fickenscher, Lisa, "Merchant: American Express Seeks to Mine Its Data on Cardholder Spending Patterns", The American Banker, Mar. 24, 1997, 2 pp.

"Dispensing the future", Lafferty Publications Limited, Electronic Payments International, May 1997, 5 pp.

"Grocery shopping goes on line in many markets; Technology spurs remote ordering concept", The Dallas Morning News, May 12, 1997, 2 pp.

"Industry Briefs", Phillips Business Information, Inc., Card News, Jun. 9, 1997, vol. 12, No. 11, 2 pp.

Popyk, Bob, "Turn customers into torchbearers", Information Access Company, a Thomson Corporation Company, National Trade Publications, Boating Industry, Sep. 1997, No. 9, vol. 60, 3 pp.

Hoeschen, Brad, "Brookfield Square hopes mall card strikes a chord", The Business Journal of Milwaukee Inc., Business Dateline, Business Journal-Milwaukee, Sep. 12, 1997, vol. 14, No. 50, 2 pp.

"Acxiom Case-in-Point Case Study — Bloomingdale's Inc.", "Pushing Technology's Edge Upscale department store applies database for profit", (http://www.acxiom.com/cip-cs-b.htm), download date: Sep. 23, 1997, 3 pp.

"NCR 7452 Workstation—Beyond Traditional POS", (http://www.ncr.com/product/retail/products/catalog/7452_shtml), download date: Sep. 23, 1997, 3 pp.

"From Our Family to Yours . . . 5 Weeks of Coupon Values for a Valuable Customer", Shoprite, Wakefern Food Corporation, Copyright 1998, 1 pg.

Heller, Al, "Chain Pharmacy: Forecast '98: New Technology Advances Pharmacy Productivity", Lebhar-Friedman Inc., Drug Store News, Jan. 12, 1998, 4 pp.

"Advanced Mechanics Internet Specials", (http://www.metroplexweb.com/advcpn2.htm), download date: Mar. 12, 1998, 2 pp.

Website: "New Partners, more exciting rewards: The Membership Rewards program for 1998.", (http://www.americanexpress.com/rewards/news/docs/1998new_mr.shtml), download date: Mar. 12, 1998, 38 pp.

Website: "U.P.C. Coupon Code Guidelines Manual", (http://www.uc-council.org/d31-3.htm), download date: Mar. 12, 1998, 10 pp.

Rubinstein, Ed, "Internet Continues to Fortify Takeout Sector for Operators", Lebhar-Friedman Inc., Nation's Restaurant News, Mar. 23, 1998, 5 pp.

Information Packet: "My Points® — Universal Rewards Currency", MotivationNet, Inc. Apr. 1998, 29 pp.

Hemsley, Steve, "Research and destroy; Point-of-purchase research provides brand managers . . .", Centaur Communications Ltd., Marketing Week, Apr. 16, 1998, 3 pp.

"WellsPark Group Lauches 'V.I.P. Rewards'; the Most Comprehensive Relationship Marketing Program Ever Created by a Mall Developer", Business Wire, Inc., May 19, 1998, 2 pp.

"Catching Red Light Runners", Business Communications Company, Advanced Transportation Technology News, Jun. 1998, 2 pp.

Amato-McCoy, Deena, "Co-Branded Acme Credit Card Rewards Loyal Users", Information Access Company, A Thomson Corporation Company, Capital Cities Media Inc., Supermarket News, Jun. 15, 1998, 2 pp.

"Acme Markets, U.S. Bancorp Debut visa Rewards Card", Phillips Business Information, Inc., Card News, Jun. 22, 1998, 1 pg.

Rubinstein, Ed, "Technology: Prepaid program lets Galleria guests dine 'A la Card'", Nations's Restaurant News, (http://www.nrn.com), Jun. 29, 1998, 1 pg.

"DataCard Partners With CSI To Offer Card-Based Loyalty Solution To Merchants", Business Wire, Inc., Jul. 9, 1998, 1 pg.

Albright, Mark, "Grocery savings via Web coupons", Times Publishing Company, St. Petersburg Times, Jul. 22, 1998, Section: Business at p. 1E, 2 pg.

Campos, Frellie, "Discount shopping program extended to residents.", Pacific Business News, Sep. 21, 1998, 3 pp.

"Garage management needs", "Unit Tracking with the General Manager Professional", (http www.dacobusy.com/garage/idxgarg.htm), download date: Mar. 16, 1999, 2 pp.

"Route Sales Automation — Track customers, orders, sales, and inventory! Route accounting,..", "Point of sale system carried in the palm of your hand", (http://www.dacobusy.com/), download date: Mar. 16, 1999, 1 pg.

"Alphatech, Inc., Looking to the Future", (http://www.alphatech.com/), download date: Mar. 25, 1999, 1 pg.

"Alphatech: Technologies and Projects", (http://www.alphatech.com/secondary/techpro/compvis.html), download date: Mar. 25, 1999, 3 pp.

"IMPS: Vehicle License Plate Recognition System", "IMPS™ Integrated Multi-Pass System State of the Art Vehicle License Plate Recognition System", (http www.singapore.com/optasia/imps), download date: Mar. 25, 1999, 3 pp.

"MSTAR main", "Moving and Stationary Target Acquisition and Recognition (MSTAR)", (http://www.alphatech.com/secondary/techpro/projects/mstar/MSTAR_TopLevel.html), download date: Mar. 25, 1999, 2 pp.

"Welcome to Q Lube", (http://www.qlube.com/), download date: Mar. 25, 1999, 1 pg.

Silverman, Gene "Planning and using infomercial campaigns effectively", Direct Marketing, Sep. 1995, 3 pp.

Bigger Plans, (Provident bank, issuer of MeritValue customer loyalty card, plans to offer program in 25 cities in six months), CardFax, Oct. 7, 1996, 1 pg.

Quittner, Jeremy, "Ohio's Provident Brings Its Discount Card to Fla.", American Banker, Feb. 11, 1997, 2 pp.

Symons, Allene "Lucky, Say-on debut Rewards Card", Drug Store News, Feb. 17, 1997, 2 pp.

MasterCard Purchasing Card, www.mastercard.com business purchasing card6 download date Feb. 28, 1997, 13 pp.

McKeveny, Alexander, "Giving Them A Good Reason", Bank Marketing, Mar. 1997, 5 pp.

Marketing Q&A #3, Frankie Hollywood's Public Relations Newsletter, Apr. 1-15, 1997, 2 pp.

Myhre, James W., Examiner's Affidavit dated Feb. 22, 2001, 1 pg.

Notice of Allowability for U.S. Appl. No. 09/166,405 mailed Jun. 29, 2001, 5 pp.

Office Action for U.S. Appl. No. 09/166,405 mailed Mar. 8, 2001, 14 pp.

Office Action for U.S. Appl. No. 09/166,405 mailed Sep. 13, 2000, 15 pp.

Notice of Allowance for U.S. Appl. No. 10/118,620 mailed Dec. 16, 2005, 17 pp.

## US 8,112,359 B2

Office Action for U.S. Appl. No. 10/118,620 mailed Apr. 4, 2005, 18 pp.

Office Action for U.S. Appl. No. 10/118,620 mailed Oct. 28, 2004, 15 pp.

Office Action for U.S. Appl. No. 10/118,620 mailed Apr. 13, 2004, 15 pp.

Notice of Allowance for U.S. Appl. No. 11/399,143 mailed Dec. 27, 2007, 7 pp.

Notice of Allowance for U.S. Appl. No. 11/399,143 mailed Jun. 27, 2007, 7 pp.

Office Action for U.S. Appl. No. 11/399,143 mailed Apr. 6, 2006, 10 pp.

Notification of Transmittal of International Preliminary Examination Report for PCT/US/99/22060, Jan. 31, 2001, 11 pp.

Written Opinion for PCT/US99/22060 mailed Sep. 7, 2000, 9 pp.

International Search Report for PCT/US99/22060 mailed Feb. 16, 2000, 3 pp.

Notice of Allowance for U.S. Appl. No. 09/221,099 mailed Feb. 22, 2007, 7 pp.

Notice of Allowance for U.S. Appl. No. 09/221,099 mailed Sep. 6, 2006, 7 pp.

Office Action for U.S. Appl. No. 09/221,099 mailed Jun. 24, 2005, 4 pp.

Office Action for U.S. Appl. No. 09/221,099 mailed Jun. 1, 2004, 7 pp.

Office Action for U.S. Appl. No. 09/221,099 mailed Jan. 22, 2003, 7 pp.

Office Action for U.S. Appl. No. 09/221,099 mailed Mar. 8, 2002, 7 pp.

Office Action for U.S. Appl. No. 09/221,099 mailed Aug. 8, 2001, 7 pp.

Office Action for U.S. Appl. No. 09/221,099 mailed Dec. 18, 2000, 6 pp.

Office Action for U.S. Appl. No. 08/994,426 mailed May 31, 2000, 13 pp.

Office Action for U.S. Appl. No. 08/994,426 mailed Sep. 1, 1999, 18 pp.

Notice of Allowability for U.S. Appl. No. 08/994,426 mailed Jun. 20, 2003, 8 pp.

Notice of Allowability for U.S. Appl. No. 08/994,426 mailed Jun. 20, 2003, 5 pp.

Notice of Allowability for U.S. Appl. No. 08/994,426 mailed May. 7, 2002, 4 pp.

Notice of Allowability for U.S. Appl. No. 08/994,426 mailed Mar. 22, 2002, 4 pp.

Notice of Allowability for U.S. Appl. No. 08/994,426 mailed Nov. 28, 2001, 6 pp.

Office Action for U.S. Appl. No. 98/994,426 mailed Feb. 8, 2001, 14 pp.

Office Action for U.S. Appl. No. 10/699,462 mailed Sep. 29, 2009, 6 pp.

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5A



FROM FIG. 5A

A

ADD UNDISCOUNTED SUBSTITUTE
PRODUCT PRICE AND IDENTIFIER
TO PENDING SALE DATA     540

APPLY MANUFACTURER DISCOUNT
TO SUBSTITUTE PRODUCT PRICE
542

CALCULATE TOTAL
545

COMMUNICATE TRANSACTION
SUMMARY DATA TO POS SERVER
550

FIG. 5B



FIG. 6A



FROM FIG. 6A

A

DOES CUSTOMER
ACCEPT OFFER?
640

NO

B

TO FIG. 6A

YES

RECORD TRANSACTION DETAILS
IN TRANSACTION DATABASE
645

TRANSMIT TRANSACTION
DETAILS TO APPROPRIATE
MANUFACTURER SERVER(S)    650

FIG. 6B



FIG. 7



800
RECEIVE TRANSACTION DATA FROM POS TERMINAL 805
IDENTIFY APPROPRIATE MANUFACTURER SERVERS TO RECEIVE TRANSACTION DATA 810
TRANSMIT TRANSACTION DATA TO IDENTIFIED MANUFACTURERS 815
MORE THAN ONE MANUFACTURER OFFER RECEIVED? 820
NO
ONE MANUFACTURER OFFER RECEIVED? 845
NO
PROCESS TRANSACTION CONVENTIONALLY 850
YES
YES
DETERMINE WHICH MANUFACTURER OFFER YIELDS THE HIGHEST RETAILER PROFIT 830
TRANSMIT OFFER TO POS TERMINAL 840
DOES CUSTOMER ACCEPT OFFER? 860
NO
PROCESS TRANSACTION CONVENTIONALLY 865
YES
A
TO FIG. 8B

FIG. 8A

Case: 13-1520 CASE PARTICIPANTS ONLY Document: 52 Filed: 02/27/2014 Page: 187 Filed: 02/27/2014



FROM FIG. 8A

A

RECORD TRANSACTION DETAILS
IN TRANSACTION DATABASE
<u>870</u>

TRANSMIT TRANSACTION DETAILS
TO THE APPROPRIATE
MANUFACTURER SERVER    <u>880</u>

FIG. 8B



FIG. 9



FIG. 10

A0213

1

## PRE-SALE DATA BROADCAST SYSTEM AND METHOD

### CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 11/549,435 filed Oct. 13, 2006 and issued as U.S. Pat. No. 7,856,379 on Dec. 21, 2010, entitled "PRE-SALE BROADCAST SYSTEM AND METHOD"; which is a continuation of U.S. patent application Ser. No. 09/221,099, filed Dec. 28, 1999 and issued as U.S. Pat. No. 7,236,942 on Jun. 26, 2007.

U.S. patent application Ser. No. 09/221,099 is a continuation-in-part of U.S. patent application Ser. No. 08/994,426, entitled "METHOD AND APPARATUS FOR PROVIDING SUPPLEMENTARY PRODUCT SALES TO A CUSTOMER AT A CUSTOMER TERMINAL", filed Dec. 19, 1997, and issued as U.S. Pat. No. 6,694,300 on Feb. 17, 2004; and U.S. patent application Ser. No. 09/221,099 is also a continuation-in-part of U.S. patent application Ser. No. 09/166,405, entitled "METHOD AND APPARATUS FOR DEFINING ROUTING OF CUSTOMERS BETWEEN MERCHANTS," filed Oct. 5, 1998 and issued as U.S. Pat. No. 6,405,174 on Jun. 11, 2002. Each of the above-referenced applications is incorporated by reference herein in its entirety.

### FIELD OF THE INVENTION

The present invention relates generally to point-of-sale (POS) systems, and more specifically to POS marketing systems.

### BACKGROUND OF THE INVENTION

Cash registers have historically been used by retailers to manage transactions. Specifically, cash registers perform efficient and accurate tallying and reporting duties. As retailers have begun to increasingly rely on sales data, POS systems have gradually started to replace conventional cash registers. Today, POS systems utilize data for both accounting and marketing purposes.

For example, retailers have used data obtained from a POS system to manage frequent shopper programs. In such programs, customers often carry cards with a machine-readable indicia, such as magnetic stripes or bar codes. The cards identify the customer to the POS system which tracks purchase behavior. The transaction data which can be obtained through the POS system may include one or more of the following: (i) the items an individual purchased, (ii) the frequency at which an individual shops, (iii) an individual's average purchase total, and/or (iv) an individual's coupon redemption behavior. In addition, transaction data can be aggregated to account for regional and demographic behavior such as reactions to sales and promotions. While customers are rewarded for their loyalty, a database of such information is formed.

Product manufacturers have also utilized data collected through POS systems for marketing purposes. Manufacturers use the data to track product performance and the impact of manufacturer promotions, such as coupons and rebates. Manufacturers can benefit from the ability provided by the POS to instantly and directly market to individual customers. For example, many manufacturers profit through many POS couponing services offered by systems such as those disclosed in various U.S. patents, including U.S. Pat. Nos. 4,723,212; 4,910,672; 5,173,851; and 5,612,868.

2

The benefits realized by manufacturers through the use of POS data and current POS marketing techniques are grossly exaggerated, however. Sales data drastically diminishes in value by the time manufacturers have a chance to analyze the data and make decisions on their analysis. Post-sale sales data, at best, can be used to influence a customer's subsequent purchases. For one-time or infrequent purchases, data indicating that a customer purchased a competing brand is relatively useless to a manufacturer in that the customer has already purchased the competitor's product. Furthermore, although prior systems may give customers targeted coupons instantly after a purchase at the POS, this is too late to encourage current consumer behavior because the customer must bring the coupon back to the store at a subsequent visit.

In addition, because coupons and rebates require a further active step in addition to the initial purchase, the effectiveness of such programs is minimal. This deficiency can be attributed to a manufacturer's extremely passive role in such promotions. Coupons are printed, distributed, and left to customers to redeem. Customers, however, often forget to bring such coupons to the store, and often misplace such coupons. Even so-called "coupon-less" frequent shopper card systems require shoppers to carry cards, which are burdensome to carry and are also lost or frequently forgotten. Because coupons suffer low redemption rates, coupons are inevitably a poor vehicle for manufacturers to effectively provide customer value. In addition, rebate offers are often ignored because of the inconvenience to the buyer in redeeming the offer. Ultimately, customers often find rebates valueless because the amount of money to be redeemed can be rather insubstantial compared to the effort and postage required for redemption.

Manufacturers have also historically been limited in their ability to compete with other manufacturers at retail locations. At best, manufacturers can effectively compete by packaging products more attractively and by obtaining better positioned retailer shelf space. Because manufacturers are not actively involved in retail transactions and sales efforts, they miss opportunities to market directly to ready, willing and able buyers at a time when buyers are making purchasing decisions.

### SUMMARY OF THE INVENTION

It is an object of the present invention to provide a method and apparatus for more effectively marketing products to consumers.

In accordance with the present invention, manufacturers can market products directly to consumers at the time of purchase. Prior to completing the sale of an original product at a POS terminal, one or more manufacturers can offer comparable substitute products to a customer. As such, customers need not actively seek and/or redeem promotional benefits after a purchase, thereby enhancing manufacturer marketing efforts.

In one embodiment of the present invention, the method for promoting the sale of substitute products includes receiving transaction data regarding an original product presented for purchase by a consumer at a point of sale terminal; determining a substitute product to be offered to the consumer during a transaction session; and offering the substitute product to the consumer before the transaction session terminates. The method of determining the substitute product to be offered to the customer may be based on factors such as product profit margin, product inventory information, product expiration date, retail product price information, product floor price information, product sales information, sale and promotional

US 8,112,359 B2

**3**

pricing information, product demand, product forecasts, product class, product pricing, and product features. This method may be carried-out by the manufacturers' servers, retailer's server and/or various POS terminals, as well as other devices.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram illustrating an overview of a system in accordance with the present invention.

FIG. **2** is a block diagram illustrating an exemplary POS terminal in accordance with the present invention.

FIG. **3** is a block diagram illustrating an exemplary POS server in accordance with the present invention.

FIG. **4** is a block diagram illustrating an exemplary manufacturer server in accordance with the present invention.

FIGS. **5**A and **5**B together comprise a flowchart illustrating a process performed by the POS terminal in accordance with one embodiment of the present invention.

FIG. **6**A & **6**B together comprise a flowchart illustrating a process performed by a POS server in accordance with one embodiment of the present invention.

FIG. **7** is a flowchart illustrating a process performed by a manufacturer's server in accordance with one embodiment of the present invention.

FIGS. **8**A and **8**B together comprise a flowchart illustrating a process performed by a POS server in accordance with another embodiment of the present invention.

FIG. **9** is a flowchart illustrating a process performed by a POS server in accordance with another embodiment of the present invention.

FIG. **10** is a flowchart illustrating a process performed by a manufacturer's server in accordance with various embodiments of the present invention.

DETAILED DESCRIPTION OF SEVERAL EMBODIMENTS OF THE PRESENT INVENTION

The present invention provides a POS system configured to actively solicit manufacturer marketing promotions during a sales transaction. As used throughout the application, the term "manufacturer" refers to any product supplier, regardless of whether or not the supplier actually manufactures the end product that is sold through retail channels. By directly marketing to customers at the time of purchase, but prior to consummation of the purchase, manufacturers market directly to customers, thereby enhancing their marketing efforts. Further, since such customers have already indicated their readiness to purchase the product, the manufacturers are assured that their marketing efforts have an increased chance of success. As such, the present invention provides manufacturers a greater opportunity to compete with other manufacturers at retail locations. The present invention also provides a greater opportunity for retailers to accelerate the sale of overstocked, distressed and/or slow-selling merchandise. As such, customers need not actively realize promotional benefits after a purchase, through any form of coupon or rebate redemption.

In various embodiments of the present invention, a central POS server is connected via a communication port to at least one POS terminal and at least one remote manufacturer server. After the initiation of a transaction at a POS terminal, but before consummation of the transaction, the POS server contacts one or more manufacturer servers. The POS server notifies the manufacturer server(s) of a transaction in progress and provides the manufacturer server(s) with transaction data

**4**

such as product identifiers, customer identifiers, inventory data, or the like. After receiving the transaction data, a manufacturer server may evaluate the data to determine if the customer's product selection best serves the manufacturer's financial interest. If not, the manufacturer server would return a signal to the POS server conveying a promotional offer to encourage the buyer to favorably switch products. For example, the manufacturer may determine that it would be more profitable for the customer to purchase the manufacturer's product rather than a competitor's product. In the alternative, the manufacturer may determine that it would be more profitable if the customer were to purchase a different one of its own products rather than the one the customer has selected. If the customer accepts the offer, the POS terminal voids the sale of the original product from the pending transaction subtotal, adds the substitute product's price to the subtotal, adjusts the price of the substitute product to reflect the manufacturer's discount and completes the sale of the substitute product.

With reference to the Figures, various embodiments and exemplary POS terminals, POS servers and manufacturer servers, and their methods of operation, will now be described. The leading number of each reference number used throughout the drawings indicates the first figure in which the reference number is introduced.

With reference to FIG. **1**, the overall system **100** of one embodiment of the present invention is shown. In this embodiment, the system **100** includes N number of POS terminals **110**, a POS server **120**, a network **130** and N number of manufacturer servers **140**, each of which will be described in greater detail below.

POS terminals **110** are connected via communication ports to the POS server **120**. Although three POS terminals are shown in FIG. **1**, it is to be understood that the system **100** may have as few as one POS terminal or as many as N number of POS terminals. Each of the POS terminals **110** includes a card authorization terminal ("CAT"), such as those manufactured by Verifone, Inc., or a similar device for generating data relating to a purchase, such as purchase price, items purchased and other purchase parameters. The POS terminals **110** transmit this generated data to the POS server **120**, thereby providing information to the POS server **120** relating to the purchase. The POS server **120** communicates via a network **130**, such as the internet, LAN, WAN, or a telephone network, to communicate with one or more manufacturer servers **140**. It is to be understood however that the POS server **120** may communicate with the POS terminals **110** and manufacturer servers **140** through other media, such as through wireless communication devices.

With reference to FIG. **2**, an exemplary POS terminal **110** is shown. The POS terminal **110** includes a CPU **210**, which may contain one or more conventional microprocessors, and is connected to a RAM **220**, ROM **230**, clock **240**, one or more output device(s) **250**, one or more input device(s) **260**, and a communications port **270** for communicating with the POS server **120**. Output devices **250** may include devices such as LCD displays, LED displays, CRT terminals, and printers, among other devices. The input devices **260** may include a keyboard, cardreaders, and touch screen devices, among others.

With reference to FIG. **3**, a schematic block diagram of an exemplary POS server **120** is shown. The POS server **120** includes a CPU **310**, which may contain one or more conventional microprocessors, and a data storage device **320**, which may contain an appropriate combination of magnetic, optical and semiconductor memory devices. The CPU **310** communicates with POS terminals **110** and network **130** via a com-

US 8,112,359 B2

**5**

munication port **330**. The CPU **310** and the storage device **320** may be (i) located entirely within a single computer or other computing device; (ii) connected to each other by a remote communication link such as a serial port cable, telephone line or radio frequency transceiver; or (iii) a combination thereof.

The POS server **120** also includes a RAM **340**, a ROM **350** and a clock **360** which are disposed in communication with the CPU **310**. The storage device **320** stores (i) a program **365** for controlling the CPU **310**; (ii) an inventory database **370**; (iii) a transaction database **380** and (iv) a manufacturer database **390**. The program **365** drives the CPU **310** to operate in accordance with the present invention and with the methods described in detail herein. The program **365** further includes additional program elements that may be necessary, such as "device drivers," for allowing the CPU **310** to interface with other devices.

The inventory database **370** stores information regarding products that the retailer currently has in stock. For example, the inventory database **370** may contain information such as UPC codes, corresponding prices and corresponding available quantities. The inventory database **370** may also be accessed during a conventional transaction to check for prices and update inventory status. In one embodiment of the present invention, the inventory database **370** may be indirectly queried by a manufacturer server to see if a retailer has a sufficient inventory of a particular product for possible selection as an offered substitute product.

In general, it is to be understood that the inventory database **370** may contain a wide array of information for use by the POS server **120** and/or manufacturer servers **140**, such as product profit margin information, product inventory information, product expiration date information, retail product price information, product floor price information, product sales information, sale and promotional pricing information, product demand information, product forecast information, product class information, product pricing information, and information regarding product features. Product profit margin information reflects the differences between prices paid by the retailer, and the prices at which products are to be sold by the retailer. Product inventory information reflects the identity and quantity of each of the products in inventory. This information may indicate inventory at a particular location, within a particular geographic region and/or across all stores of a retailer. Product expiration date information may include expiration dates of perishable items, and/or pre-defined dates which determine when a product is outdated (i.e., when it becomes "last year's" model). Retail product price information includes current prices of products, whether or not in inventory. Product floor price information includes prices of products currently on display at a retailer. Product sales information may include the number and type of products sold over a period of time. Product demand information may also be included to reflect recent product sales rates over a period of time, as well as the number of "rain-checks" issued for particular products. Sale and promotional pricing information may include past, present and likely future sale prices and promotions. Product forecast information may include projections of likely consumer demand for particular products, particularly during specific shopping seasons. Product class information may include general classifications such as "consumer appliance" or "TV," or more specific classification such as "flat screen TV." Specific product feature information may also be included.

The transaction database **380** stores information regarding transactions for later reconciliation with the manufacturer for any promotional discounts, coupons and the like. Such information may include the time of a particular transaction, a

**6**

frequent shopper ID, product identifiers for substitute products sold, the quantity of substitute products sold, the prices of substitute products sold, manufacturer discounts applied to substitute products (and therefore owed by the manufacturer to the retailer) and UPC data, among other information.

The manufacturer database **390** stores information that is used by the POS server **120** to manage pre-sale data broadcasts to manufacturers. The manufacturer database **390** may contain rules and instructions regarding which manufacturer(s) to contact, as well as when and how to contact the manufacturer(s). For example, the manufacturer database **390** may contain rules to contact only registered manufacturers who have subscribed with a service to receive such information. In such an embodiment, interested manufacturers pay a registration and/or subscription fee to receive information regarding customer purchases, thereby giving the registered manufacturer(s) the opportunity to offer substitute products. In addition, the manufacturer database **390** may contain rules regarding when the manufacturer is to be contacted. For example, a manufacturer may be contacted when a competing product is scanned at a retailer's POS terminal, or when a product having a certain "product class" denoted by the UPC code is scanned. The manufacturer database **390** may also contain rules on how to contact the manufacturer including internet and e-mail addresses, telephone numbers to initiate electronic communication via communication port **330**, and the like.

With reference to FIG. **4**, a schematic block diagram of an exemplary manufacturer server **140** is shown. The manufacturer server **140** includes a CPU **410**, which may contain one or more conventional microprocessors, and a data storage device **420**, which may include any suitable combination of magnetic, optical and semiconductor memory devices. The CPU **410** communicates with network **130** via a communication port **430**. The manufacturer server **140** further includes RAM **440**, ROM **450** and a clock **460** which are disposed in communication with CPU **410**. Storage device **420** stores (i) a program **465** for controlling the CPU **410**; (ii) a product database **470**; and (iii) a transaction database **480**. The CPU **410** and the storage device **420** may be (i) located entirely within a single computer or other computing device; (ii) connected to each other by a remote communication link such as a serial port cable, telephone line or radio frequency transceiver; or (iii) a combination thereof.

The program **465** drives the CPU **410** to operate in accordance with the present invention and with the methods described in detail herein. The program **465** further includes additional program elements that may be necessary such as device drivers for allowing the processor to interface with other devices.

The product database **470** stores information that is used by the manufacturer server **140** to make decisions on comparable but more profitable substitute products to offer to a customer. The product database **470** may store information such as UPC codes, prices, description of features, price floors, profit margins, and other information. The product database **470** may also include information similar to that found in inventory database **370** of a POS server **120**, such as product demand information and product pricing information.

The transaction database **480** stores data relating to all transactions that are made with a retailer POS server **120**. As such, information contained within the transaction database **480** may be used for purposes of settlement, reconciliation, reporting, and auditing, among other purposes.

With reference to FIGS. **5A** and **5B**, a flowchart **500** describing the method performed by the POS terminal **110** in various embodiments of the present invention is shown. The

US 8,112,359 B2

**7**

illustrated method is performed after a customer has presented a product for purchase at a retailer's POS terminal **110**.

Transaction data which represents a customer's product selection is first received by the POS terminal **110** (step **505**). This data may be entered manually by an employee of the retailer, or may be derived from the UPC code of the product selected by the customer. In one embodiment of the invention, original product data is then entered as pending sale data in the POS terminal **110**. In an alternate embodiment of the invention, original product data is only entered as pending sale data in the POS terminal **110** if the customer declines a manufacturer's substitute product offer.

The POS terminal **110** transmits the transaction data to the POS server **120** (step **510**) and awaits receipt of any manufacturer's offer(s). If no such offer is received from the POS server **120**, the sale of the original product is processed and completed conventionally (step **520**). If, however, one or more manufacturer offers are received from the POS server **120** (step **515**), the one or more manufacturer offers are outputted and communicated to the customer (step **525**). Each manufacturer offer includes a substitute product identifier and its corresponding price which are communicated to the customer. The manufacturer offer(s) may be communicated to the customer in any of a variety of ways, including verbal communication by the retailer's sales attendant to the customer, outputting the information to a printer and displaying the information to the customer, or displaying the offer(s) to the POS terminal **110** for viewing by the customer. It is to be understood, however, that other means of communicating the manufacturer offers to the customer may also be used.

If the customer does not accept the offer (step **530**), the sale of the original product is conventionally completed (step **520**). Upon acceptance of the offer (step **530**), the POS terminal **110** removes original product information from pending sale data (step **535**), adds the undiscounted substitute product price to the pending sale data (step **540**), and applies the manufacturer discount (step **542**) to arrive at the price at which the substitute product was offered to the customer. It is to be understood that various alternate techniques may also be used. For example, the POS terminal **110** may receive signal from the POS server **120** to replace the original product data with substitute product data in the pending sale data.

A purchase total is ultimately calculated (step **545**), the sales transaction is completed and transaction summary data is communicated to the POS server **120** (step **550**). This information is used by the POS server **120** to update the inventory database **370** and the transaction database **380**.

With reference to FIG. **6**, a flowchart **600** describing the method performed by the POS server **120** in accordance with one embodiment of the present invention is shown. The POS server **120** receives transaction data from a POS terminal **110** regarding an original product presented for purchase by a customer (step **605**). Based on instructions provided in program **365**, and information contained in the inventory database **370**, the transaction database **380** and the manufacturer database **390**, a determination is made by the POS server **120** as to whether any manufacturers are registered to receive transaction data (step **610**) corresponding to the original product. If no registered manufacturers correspond to the transaction data, the transaction is processed conventionally (step **615**) and the sale of the original product is completed at the POS terminal **110**. In one embodiment, a signal is transmitted to the POS terminal **110** to indicate that no substitute product offer is available. In another embodiment, no signal is sent to the POS terminal **110**, and the sale of the original product is completed at the POS terminal **110** after a desig-

**8**

nated amount of time has passed and no information has been received from the POS server **120**.

It is to be understood that there may be many situations in which no substitute products are offered. For example, if there are no alternative substitute products available in the inventory database **370** corresponding to the inventory of a particular retailer, the POS server **120** may conclude that no substitute product is available. In another example, there may be no registered manufacturers which could offer substitute products for the original product.

If there are registered manufacturers which correspond to the transaction data (step **610**), the transaction data is transmitted to one or more manufacturer servers **140** (step **620**) and the POS server **120** awaits receipt of a response signal from the one or more manufacturer servers **140** (step **625**). If the POS server **120** receives a response signal indicating that one or more manufacturers transmitted an offer for a substitute product (step **630**), the one or more substitute product offers (including the substitute product identifier(s) and price(s)) are transmitted to the POS terminal (step **635**). If no response is received from the manufacturer server(s) or if responses are received from the manufacturer server(s) indicating that no substitute product offers are to be made (step **630**), the sale of the original product is processed conventionally and the sale of the original product is completed (step **615**). If the customer does not accept the offer for the substitute product (step **640**), the sale of the original product is also processed conventionally (step **615**).

If the customer does accept the offer (step **640**), an acceptance signal is received from the POS terminal **110** and the transaction details are recorded in the transaction database **380** (step **645**). The POS server **120** also transmits the transaction details to the appropriate manufacturer server(s) **140** (step **650**). This information is ultimately used to assure that the manufacturer of the substitute product compensates the retailer for the amount of the discount. In one embodiment of the present invention, if several manufacturers have provided substitute product offers, only the one manufacturer whose substitute product offer was accepted by the customer receives an indication of the customer's acceptance. In another embodiment of the present invention, all of the manufacturers who have submitted substitute product offers receive information regarding the completion of the substitute product sale.

With reference to FIG. **7**, a flowchart **700** describing the method performed by a manufacturer server **140** in accordance with one embodiment of the present invention is shown. The manufacturer server **140** receives transaction data from the POS server **120** regarding an original product presented for purchase by a customer (step **705**). The manufacturer server **140** may also receive information regarding the inventory of a retailer from the inventory database **370** of the POS server **120**. The manufacturer server **140** determines whether the retailer has inventory of one or more profitable and comparable substitute products (step **710**). If not, the manufacturer server may transmit a decline message to the POS server **120** (step **715**). If the retailer does have sufficient inventory of more profitable and comparable substitute products, the manufacturer server **140** transmits an offer to sell one or more substitute product(s) to the POS server **120** (step **720**). This offer includes a substitute product identifier and a substitute product price to be conveyed to the customer. If the customer accepts the offer (step **725**), transaction details are ultimately received from the POS server **120** (step **735**) and the transaction details are recorded in the transaction database **480** (step **740**). If the customer does not accept the offer, the manufacturer server **140** may update the transaction database

US 8,112,359 B2

9

**480** to record that no transaction was completed for a specific substitute product offer, or the manufacturer server may simply take no action in response to the customer's decline of the substitute product offer (step **730**).

In determining if the retailer has inventory of more profitable but comparable product, various alternate procedures may be used. In one embodiment, the manufacturer server **140** queries the inventory database **370** and the manufacturer product database **470** to determine if a more profitable but comparable product is available. In another embodiment, the manufacturer server **140** may query the POS server **120** to see if the retailer has an available inventory of a substitute product or may be based upon an assumption that the retailer is likely to have inventory of such a substitute product. In another embodiment, the profitability determination may be made automatically by the manufacturer server **140** or may be made manually by an operator of the manufacturer server **140**. Such an evaluation may be based on various factors including those found in inventory database **370** such as: expiration dates, retail and floor prices, upcoming sales and promotions, demand rates, and forecasts, among others. It is to be understood that there are numerous ways to accomplish this determination, each of these ways falling within the scope of the instant invention.

With reference to FIGS. **8**A and **8**B, a flowchart **800** describing the method performed by a POS server **120** in accordance with another embodiment of the present invention is shown. In this embodiment, multiple manufacturers are contacted by the POS server **120**, which screens any offers to determine which offer yields the highest retailer profit. The POS server **120** transmits only this highest profit yielding offer to the POS terminal **110**.

The POS server **120** receives transaction data from a POS terminal **110** regarding an original product presented for purchase by a customer (step **805**). Based on instructions provided in program **365**, and information contained in the inventory database **370**, the transaction database **380** and the manufacturer database **390**, the POS server **120** identifies appropriate manufacturer servers to receive the transaction data (step **810**). In so doing, the POS server **120** may query the manufacturer database **390** for information. Appropriate manufacturers may be those sharing a similar Standard Industry Classification (SIC) code as the original product presented for purchase by a customer, or may be those manufacturers that are preregistered with the POS server **120**. As such, manufacturers can subscribe for the service or can be sent offers regardless of their affirmative participation in the program. Transaction data is then transmitted to the identified manufacturer(s) (step **815**). If more than one manufacturer offer is received (step **820**), the POS server **120** determines which manufacturer offer yields the highest retailer profit (step **830**) and transmits the chosen offer to the POS terminal **110** (step **840**). If only one manufacturer offer was received (step **845**), the POS server **120** transmits the offer to the POS terminal **110** (step **840**). If no manufacturer offer is received (step **845**), a signal is transmitted to the POS terminal **110** to process the sale of the original product presented by the customer in a conventional manner (step **850**).

If the customer does not accept the offer (step **860**), the sale of the original product is completed conventionally at the POS terminal **110** (step **865**). If the customer does accept the offer (step **860**), a signal is received from the POS terminal **110** indicating acceptance of the offer and the POS server **120** records the transaction details, including price, product identifier, retailer identification, and the like, in the transaction database **390** (step **870**). The POS server **120** then transmits

10

the transaction details to the appropriate manufacturer server which provided the accepted substitute product offer (step **880**).

In determining which manufacturer offer yields the highest retailer profit (step **830**), various techniques may be used. The evaluation may include queries of the inventory database **370**, the transaction database **380** and the manufacturer database **390**. As such, the evaluation may be based on factors such as expiration dates, retail and floor prices, upcoming sales and promotions, demand rates, and forecasts, among others. It is to be understood that these and other factors may be used in the determination of which manufacturer offer would yield the highest profit for the retailer.

With reference to FIG. **9**, a flow chart **900** describing the method performed by the POS server **120** in accordance with another embodiment of the present invention is shown. In this embodiment, multiple manufacturers are contacted by the POS server **120** and, if multiple offers are received, all of the multiple offers are communicated to the customer. In response, the customer may select one or more substitute product offers.

The POS server **120** receives transaction data from a POS terminal **110** regarding an original product presented for purchase by a customer (step **905**). Based on instructions provided in program **365**, and information contained in the inventory database **370**, the transaction database **390** and the manufacturer database **390**, the POS server **120** identifies appropriate manufacturer servers to receive transaction data (step **910**), in much the same manner as in the aforementioned embodiment of FIG. **8** (see step **810**). The POS server **120** then transmits any manufacturer offers to the POS terminal **110** (step **940**).

If the customer does not accept any offer (step **960**), the sale of the original product is completed conventionally at the POS terminal **110** (step **965**). If the customer does accept one or more offers (step **960**), a signal is received from the POS terminal **110** confirming acceptance of one or more of the offers and the POS server **120** records the transaction details in the transaction database **390** (step **970**). The POS server **120** then transmits the transaction details to the appropriate manufacturer server(s) which provided the accepted substitute product offer(s) (step **980**).

With reference to FIG. **10**, a flow chart **1000** describing the method performed by a manufacturer server **140** in accordance with the embodiments of FIGS. **8** and **9** is shown. The manufacturer server **140** receives transaction data from the POS server **120** regarding an original product presented for purchase by a customer (step **1005**). The manufacturer server **140** also receives information regarding the inventory of a retailer from inventory database **370** of the POS server **120**. The manufacturer server **140** identifies comparable products in the inventory database **370** (step **1010**) and determines whether any substitute product offer is to be made to the customer. If so, the substitute product offer is transmitted to the POS server **120** (step **1015**). If the customer does not accept the offer (step **1020**), the manufacturer server **140** may record various details regarding the rejection of the substitute product offer, or otherwise end the process (step **1025**). If the customer does accept the offer (step **1020**), the manufacturer server **140** receives the transaction details (step **1030**) and records these details in transaction database **480** (step **1035**).

### Additional Alternate Embodiments

It is also to be understood that various additional alternative embodiments are also envisioned in the present invention. In one such alternate embodiment, the substitute product offer

US 8,112,359 B2

11                                                          12

may be supplemented by a supplemental or complementary product offer, rebate, or the like. Such supplemental product offering techniques are disclosed in commonly-assigned and co-pending patent application Ser. No. 08/994,426, which is hereby incorporated by reference.

In another embodiment of the present invention, the POS server **120** does not transmit transaction data directly to the manufacturers server **140**. Rather, a "middle man" system is used in which the POS terminal **110** transmits data to a central service (which may be operated for example by a credit card processor or issuer) which then communicates with manufacturers on behalf of the POS server **120**.

In another embodiment of the present invention, a secure database can be employed by the POS server **120** to receive and store manufacturer offer rules from manufacturer servers **140**. In such an embodiment, manufacturers need not be queried in real-time during the transaction. As such, the POS server **120** would contain all of the necessary rules and decision-making ability to determine whether substitute product offers are to be made, and to communicate the substitute product offers to the POS terminal **110**. The use of such an alternate embodiment would potentially reduce the time necessary to determine whether substitute product offers are to be made. A technique for ceasing supplementary product offers provided by POS terminals when transaction volume surpasses predetermined levels can be seen in commonly-owned, co-pending U.S. patent application Ser. No. 09/045,386 entitled "Method and Apparatus for Controlling the Performance of a Supplementary Process at a Point of Sale Terminal," filed Mar. 20, 1998, incorporated by reference herein. The present invention recognizes that customers are often unwilling to wait on long slow-moving lines. As such, this embodiment may significantly reduce the time needed to present substitute product offers to customers.

In another embodiment of the present invention which also addresses this concern regarding time delays in offering substitute products to customers, a computer program is used to temporarily stop the use of the substitute product offering techniques of the present invention if the transaction volume (number of transactions per minute) surpasses a predefined threshold. As such, during busy shopping periods, retailers could suspend substitute product offerings to accelerate sales of original products. In addition, in each of the embodiments of the present invention, the system may be configured to automatically and conventionally complete the sale of the original product, if no substitute product offers are received from the POS server **120** within a predetermined time.

In another embodiment of the present invention, the POS server **120** may be programmed to determine whether substitute product offers are to be made based on inventory and information regarding only the retailer. In this embodiment, no information is need from the manufacturer servers **140**. As such, the retailer may directly market substitute products to the customer based on the retailer's own rules. This embodiment may be particularly effective in advancing the sale of overstocked or distressed items in a particular retailer.

In another embodiment to the present invention, secure databases of information regarding manufacturer offer rules and/or retailer offer rules are provided directly to the POS terminals **110**. In this embodiment, the POS terminals **110** may directly determine whether substitute product offers are to be made to customers. The use of such an embodiment would eliminate the need to query various manufacturers, as well as the need to query the POS server **120**. Such information may transmitted to the POS terminals **110** in a number of ways. For example, this information may be encrypted and transmitted over the Internet, communicated over a telephone network or transmitted over a LAN or WAN.

In yet another embodiment to the present invention, the retailer may gather subsidy information from potential subsidizers who are willing to subsidize a portion of the substitute product offer in exchange for some action by the customer. For example, a customer may seek to purchase a product, model X, at the point of sale. This transaction information is communicated to the POS server **120**, along with a customer profile, including information such as frequent shopper information, to a bank. In response, the bank may present the customer with an offer that will add SY to upgrade the customer's purchase to model Z, if the customer agrees to apply for and/or accept a new credit card offer from the bank. The customer may further be required to purchase the camera with the approved new credit card.

Although the present invention has been described with respect to various embodiments thereof, it is to be understood that various substitutions may be made in those embodiments described herein, without the departing from the spirit and scope of the present invention.

What is claimed is:

**1**. A method comprising:
 registering one or more manufacturers in a manufacturer database;
 upon receiving transaction data regarding an original product presented for purchase by a consumer at a point of sale terminal, determining, by a server in communication with a plurality of point of sale terminals, based on information about the one or more manufacturers within the manufacturer database, if the manufacturer has an associated offer relating to a substitute product; and
 presenting, by the server via the point of sale terminal, the associated offer relating to the substitute product to the consumer.

**2**. The method of claim **1** in which the transaction data includes at least one of: product price, product identifier and product UPC code.

**3**. The method of claim **1**, further comprising receiving, from the point of sale terminal, an identifier identifying the substitute product.

**4**. The method of claim **1** in which said original and substitute products have different manufacturers.

**5**. The method of claim **1** in which one manufacturer manufactures both the original product and the substitute product.

**6**. The method of claim **1** in which presenting comprises transmitting the associated offer to the consumer via at least one of: a printer, a display terminal and a speaker of the point of sale terminal

**7**. The method of claim **1** further comprising receiving inventory information of at least one potential substitute of the original product.

**8**. The method of claim **1** further comprising: receiving additional information for determination of the substitute product, the additional information comprising at least one of:
 product profit margin information,
 product inventory information,
 product expiration date information,
 retail product price information,
 product floor price information,
 product sales information,
 sale and promotional pricing information,
 product demand information,
 product forecast information,
 product class information,
 product pricing information, and
 information regarding product features.

US 8,112,359 B2

**13**

**9**. The method of claim **1** further comprising charging a fee to the one or more manufacturers for registering.

**10**. The method of claim **1** further comprising charging a subscription fee to the one or more manufacturers after registering.

**11**. The method of claim **1** further comprising contacting the one or more manufacturers.

**12**. The method of claim **11** further comprising establishing rules relating to the contacting.

**14**

**13**. The method of claim **11** wherein contacting the one or more manufacturers comprises wirelessly contacting the one or more manufacturers.

**14**. The method of claim **1** further comprising receiving the associated offer from the manufacturer.

**15**. The method of claim **1** further comprising establishing the manufacturer database.

* * * * *

# CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that, in accordance with Federal Circuit Rule 25 and the Court's Administrative Order Regarding Electronic Case Filing, a copy of the foregoing NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT was served on February 27, 2014, by electronic mail, with consent of all parties, and two bound copies were served via Federal Express upon the following principal counsel for Defendants-Appellees:

Ahmed Davis
Fish & Richardson, P.C.
1425 K Street, N.W.
11th Floor
Washington, DC 20005-3500
Email: ajd@fr.com

*Counsel for Appellee Expedia, Inc.*

Jeffrey S. Love
Klarquist Sparkman, LLP
One World Trade Center
Suite 1600
121 S.W. Salmon Street
Portland, OR 97204
Email: jeffrey.love@klarquist.com

*Counsel for Amazon.com, Inc. and Zappos.com, Inc.*

John Campbell
McKool Smith, P.C.
300 W. 6th Street
Suite 1700
Austin, TX 78701
Email: jcampbell@mckoolsmith.com

*Counsel for American Airlines, Inc.*

Philip A. Rovner, Attorney
Potter Anderson & Corroon, LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19899
Email: provner@potteranderson.com

*Counsel for Barnes & Nobel, Inc.*

/s/ Anthony G. Simon
Anthony G. Simon
*Attorney for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 12,422 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.


Dated:  February 27, 2014   /s/ Anthony G. Simon
            Anthony G. Simon
            *Attorney for Plaintiff-Appellant*